## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETSS

William Sussman, Lior Alon, and The Louis )
D Brandeis Center Coalition to Combat )
Anti-Semitism                          )
                                       )
                          Plaintiffs,  )        **JURY TRIAL DEMANDED**
                                       )
                                       )
            v.                         )        Civil Action Case No.
                                       )
                                       )
Massachusetts Institute of Technology and )
Michel DeGraff                         )
                                       )
                         Defendants.   )

## COMPLAINT

Plaintiffs Lior Alon and William Sussman (the "Individual Plaintiffs"), and The Louis D Brandeis Center Coalition to Combat Anti-Semitism (the "Coalition") (collectively, "Plaintiffs") for their complaint against Defendants Massachusetts Institute of Technology ("MIT") and Michel DeGraff allege as follows:

## INTRODUCTION

1.     On December 5, 2023, while the world was watching, the president of MIT stood before Congress and said, now infamously, that calls for the elimination of the Jewish people can be anti-Semitic *depending on the context*."  The presidents of the University of Pennsylvania and Harvard University gave similar answers, and as a result, lost their jobs.  The president of MIT remains at the helm of MIT and under her leadership, the anti-Semitism which was already rampant on campus when Congress called her to testify, has soared.

2.      Although anti-Semitism had been alive on the MIT campus for years, Jew hatred spiked sharply following the brutal terrorist attacks in Israel by Hamas on October 7, 2023.  After October 7, the campus became a hotbed of anti-Semitic hate and lawlessness, where student groups celebrated the murderous rampage of October 7, demonstrators shouted for violence against Jews worldwide, students occupied buildings and interrupted classes with hateful anti-Semitic chants, an individual urinated on the Hillel building, students erected an encampment in the center of campus where Israelis and Jews could not enter, students cheered for the terror group Hamas, protestors chanted "intifada," students distributed "terror maps" promoting violence at campus locations deemed Jewish, and professors and students alike, shunned, maligned and bullied Jews and Israelis with impunity.

3.      Jews and Israelis at MIT who lived through the First and Second Intifadas in Israel grew up in an atmosphere of terror, lost people close to them in terror attacks and were injured by rocket fire during that period; they lost family during the Holocaust; and they lost loved ones on October 7 who were brutally murdered and taken hostage by Hamas.  After October 7, these same Jews and Israelis found themselves living in a climate of terror on the MIT campus.

4.      Although the MIT administration issued various lukewarm statements when anti-Semitic conduct threatened campus safety and took steps to end the anti-Israel encampment after two weeks of disruption and policy violations, anti-Semitic incidents continued to escalate after the encampment were removed.  Yet the administration failed to act reasonably in response in light of the new, known

circumstances and the hostile climate for Jews and Israelis further intensified.

5.    In the spring of 2024, a tenured professor publicly harassed and vilified an Israeli postdoctoral associate by posting images of him on social media with his name and Israeli military service.  As a result, the postdoctoral associate was aggressively confronted by people he did not know in various locations including his child's daycare and the grocery store.  He sent an email to the president of MIT detailing the onslaught, describing the hostile anti-Semitic climate at MIT, expressing fears for the safety of himself and his family and requesting support.  The President never responded.  No action was taken.

6.    In the fall of 2024, this very same professor, emboldened by MIT's failure to address his harassment of Jews, intensified his assault on Jewish identity and Jewish students.  He began teaching an anti-Israel seminar titled "Language and Linguistics. . . From the River to the Sea in Palestine. . ." and posted online about a Jewish "mind infection."  When a Jewish student objected to the hateful rhetoric, the professor harassed him publicly, declaring him to be a real-life example of the "mind infection" in a relentless series of online posts and mass emails sent to the entire Linguistics and Philosophy Department and other distribution lists.  The president of MIT was copied on these communications, where she could witness the anti-Semitic bullying of a student by a professor in real time, and again, stayed silent.

7.    When the student filed a complaint with MIT's Institute Discrimination and Harassment Response Office, it compounded the harm by refusing to investigate his claim of anti-Jewish discrimination, instead justifying the conduct with more anti-

Semitic language about "settler-colonial Zionist propaganda." And still, the professor continued to target the student publicly. In the absence of any action by the MIT administration to address the persecution and protect the student, he felt forced to leave MIT and his PhD program, abandoning a dream and a promising career in computer science.

8.      These incidents are emblematic of a larger problem on the MIT campus where anti-Semitism has been permitted to take root and fester in the absence of leadership and accountability.  The post-October 7 surge of Jew hatred on campus in which students promoted terror against Jews in every corner of campus life with no interference from administrators, ultimately ballooned into a culture that emboldened tenured professors to use their positions of power to persecute Jews without consequence--simultaneously devastating Jews and Israelis and impeding the advancement of science.

9.      As a result of the hostile anti-Semitic environment on campus, Plaintiffs have been deprived of educational and professional opportunities and the ability to participate in campus life to the same extent as their non-Jewish peers.  Jews and Israelis on campus were prevented from fully engaging in their studies, their research, and the full spectrum of campus life.  They have been forced out of their programs, out of campus spaces, off campus, and even out of the university entirely.

10.     Jews and Israelis on campus, including the Individual Plaintiffs and Coalition members, experienced severe and pervasive harassment and discrimination based on national origin and shared ancestry, as well as retaliation

for complaining about their improper treatment, and MIT administrators knowingly failed to take action to eliminate the hostile climate and discrimination against them or to stop the retaliation, in violation of Title VI of the Civil Rights Act of 1964. The Individual Plaintiffs were also subjected to outrageous and wrongful conduct that has resulted in severe emotional distress and extreme anxiety and anguish. The Individual Plaintiffs were also defamed by a MIT professor.

## JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction over Counts I, II, and III of this action under 28 U.S.C. §§ 1331 and 1343 because these claims arise under federal law.

12.    The Court has supplemental jurisdiction over Counts IV through VIII because they are "so related to [the] claims in [this] action within" the Court's "original jurisdiction that [they] form part of the same case or controversy." 28 U.S.C. § 1367.

13.    The Court has personal jurisdiction over MIT because it is located and conducts business in the District of Massachusetts.

14.    The Court has personal jurisdiction over Michel DeGraff because he resides and works in the District of Massachusetts.

15.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant MIT is located in the District of Massachusetts, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District.

## PARTIES

16.    Plaintiff Lior Alon is a citizen of Israel and was a Jewish Israeli postdoctoral associate at MIT.  He is currently an instructor at MIT.  He is a member of the Coalition.

17.    Plaintiff William Sussman is a United States citizen and a Jewish former PhD student at MIT.  He is a member of the Coalition.

18.    Plaintiff The Louis D Brandeis Center Coalition to Combat Anti-Semitism is a national membership organization whose mission is to advance the civil and human rights of the Jewish people and promote justice for all through lawful means, including litigation. The Coalition's members consist of individuals, including Jewish and Israeli undergraduate, graduate, and professional students, who have personally been aggrieved by, or have by association been impacted by, anti-Semitism and discrimination.   The Coalition's members include members of the MIT community, including faculty, alumni and students, who have experienced anti-Semitism on the MIT campus.

19.    Defendant MIT is a private research institution located in Cambridge, Massachusetts.  At all times relevant to the allegations outlined in this Complaint, MIT was and continues to be a recipient of federal funds, including student loans,[1] as well as grants from federal agencies, including the National Institute of Health and

---

[1] Federal loans, referred to as "grants and loans of federal funds" by the U.S. Department of Justice, are an example of federal assistance. *See* Civ. Rights Div., U.S. Dep't of Just., *DOJ Title VI Legal Manual*, https://www.justice.gov/crt/book/file/1364106/dl?inline, Section V at 5 (last visited July 26, 2024).

the Department of Defense.  In fiscal year 2023, MIT reportedly received over $1.6 billion in federal funds.

20.    Defendant Michel DeGraff is a tenured associate professor at MIT.

## FACTUAL ALLEGATIONS

**A.    The Meaning of Anti-Semitism**

21.    The Jewish people have deep indigenous roots in the land of Israel. Despite periods of forced exile, a continuous Jewish presence has endured there for millennia. This historical bond, along with the Jewish people's right to self-determination in their ancestral homeland, is the foundation of Jewish identity. Zionism reflects this enduring connection between the Jewish people and the land and recognizes the right of Jewish self-determination in the land of Israel.

22.    The International Holocaust Remembrance Alliance ("IHRA") defines anti-Semitism as "a certain perception of Jews, which may be expressed as hatred toward Jews.  Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[2]  The IHRA working definition acknowledges that Zionism cannot be separated from the identity of most Jews, and therefore incorporates examples such as:

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of Israel a behavior not expected or demanded of any other democratic nation.

---

[2] *Working definition of antisemitism*, Int'l Holocaust Remembrance All., https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.

- Holding Jews collectively responsible for actions of the State of Israel.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

The IHRA working definition of anti-Semitism recognizes the fact that Jews share more than a common faith; they are a people with a shared history and heritage deeply rooted in the land of Israel.

23.    The United States, along with 42 other countries, has adopted the IHRA working definition.[3]  Similarly, 33 states have adopted the IHRA working definition of anti-Semitism, through either executive orders, resolutions, or laws.[4]

24.    A number of colleges and universities have expressly incorporated in policy guidelines the IHRA working definition of anti-Semitism, including Harvard University, Yale University, Duke University, New York University, University of Pennsylvania, George Mason University, University of Pittsburgh, North Carolina State, Ohio State University, Occidental College, public universities in Florida, Kansas, Nevada, Oklahoma, and Tennessee, as well as nearly every university in the United Kingdom.

25.    Zionism does not preclude criticism of the political or military policies of the State of Israel, or advocacy for Palestinian self-determination and statehood.

---

[3] *Defining Antisemitism*, U.S. Dep't of State, https://www.state.gov/defining-antisemitism/.
[4] *States Adopt IHRA Anti-Semitism Definition, Jewish Virtual Library* (2024). https://www.jewishvirtuallibrary.org/states-adopt-ihra-definition-of-anti-semitism.

Criticism of Israel is not inherently anti-Semitic. However, expressions of hatred against "Zionists" are.[5]

26.    According to the Anti-Defamation League, the vast majority of Jews around the world identify as Zionists or feel a connection or kinship with Israel, regardless of their opinions on the policies of the Israeli government.[6] A 2020 Pew study found that more than 80% of Jews in the United States view Israel as integral to their Jewish identity.[7] A 2024 survey conducted by the American Jewish Committee likewise found that for 81% of Jews in the United States, caring about Israel is important to what being Jewish means to them.[8]

27.    "Zionist" is frequently used as a codeword, proxy term, or dog-whistle for "Jew." But the dominant understanding among Jews for thousands of years is that a central tenet of the Jewish faith, the love of Zion (Jerusalem), stems from the recognition that the Jews are a people whose ancestral history is rooted in the land of Israel. Accordingly, conduct that targets "Zionists" targets Jews and discrimination against Zionists therefore constitutes discrimination against the vast majority of Jews.

---

[5] U.S. House of Representatives Staff Report on Anti-Semitism, p.16, (Dec. 18, 2024), https://www.speaker.gov/wp-content/uploads/2024/12/House-Antisemitism-Report.pdf
[6] *See* https://www.adl.org/resources/glossary-terms/zionism.
[7] https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/.
[8] American Jewish Committee, The State of Antisemitism in America 2024, https://www.ajc.org/AntisemitismReport2024/AmericanJews

**B.    Anti-Semitism Is a Widespread Problem on the MIT Campus**

28.    Coalition members, including Alon and Sussman, as well as other Jewish and Israeli members of the MIT community, have experienced consistent, widespread and steadily intensifying anti-Semitism and anti-Israeli harassment and discrimination on campus.

29.    Even before the October 7 attacks, Jewish and Israeli students at the MIT campus have been subjected to anti-Semitism, which was widely documented and acknowledged within the University community.

- On Holocaust Remembrance Day on April 18th, 2023, vandals defaced a display commemorating the Holocaust with anti-Israel graffiti in MIT's main lobby.

- On April 30, 2023, a Nazi swastika was found on a board belonging to a Jewish faculty member, whose name on the door is identifiably Jewish.

30.    After the brutal massacre of Jews and Israelis on October 7, 2023, a torrent of anti-Semitic hate was unleashed.  The conduct described below was experienced by and known to members of the Coalition and caused great emotional distress and feelings of fear and anxiety.

- On and immediately after October 7, members of the MIT community celebrated and glorified the brutal massacre of Jews.

- The MIT Coalition Against Apartheid ("CAA") posted on social media celebrating and justifying the massacre of innocent civilians, claiming "[v]ictory is ours," "this resistance is 100% predictable and justified," and "the resistance rises."

- While stunned and grief-stricken Jewish and Israeli students were learning the fate of loved ones in Israel, the CAA sent an email to all of MIT's undergraduate students, blaming Israel and justifying the massacre: "[W]e hold the Israeli regime responsible for all unfolding violence."

31.    Students chalked anti-Semitic slogans on various campus locations, hosted "die-ins," took over campus spaces and disrupted classes with anti-Semitic speeches, chants and walkouts.

32.    At frequent rallies on campus, students regularly chanted violent slogans such as "One Solution: Intifada Revolution," "Globalize the Intifada" and "From the river to the sea, Palestine will be free," known calls for the violent elimination of Jews from the State of Israel.  The word "intifada" refers to two periods in Israel's history characterized by deadly terrorist attacks against Israeli civilians in buses, on streets, in restaurants and in bars.  Jews and Israelis who heard this call for the annihilation of their people were shocked, terrified and shaken to their core.

33.    In classrooms throughout campus, protestors interrupted class with speeches, screams and chants.  In an algebra class, the professor gave the floor to a disruptor who stood in front of the class declaring "[a]s we witness the ongoing genocide in Gaza. . . I am joining hundreds of students. . . walking out of class. . . because we stand for the liberation of Palestine against active genocide perpetrated by MIT, Israel and the United States!  Free, free Palestine!"  Other students began screaming "Free, free Palestine" so loudly that no learning could take place.

34.    At the same hour, in other classrooms on campus, students gave the same speech, started chants and were joined by many voices shouting "free, free Palestine" while students stood up and walked out of class, leaving Jewish and Israeli students shaken and distraught.  In some classes, lecturers ended class early to

support the walkout, depriving Jewish and Israeli students who did not wish to participate, of class instruction.

35.     On the anniversary of Kristallnacht (the date in 1938 when Nazi leadership orchestrated a violent wave of anti-Jewish pogroms as a precursor to the Holocaust), an anti-Israel protest took place inside MIT's main lobby and thoroughfare, Lobby 7 and the Infinite Corridor.  The protestors screaming inside the building were loud and threatening.  Students were blocked from accessing classes and were forced to find alternate routes which were lined with hateful anti-Israel protest signs.  Chants could be heard justifying the October 7 atrocities including "resistance is justified when people are occupied."  On the day commemorating the beginning of the Holocaust, Jews on campus could not walk through the main campus thoroughfares.

36.     In December of 2023, an individual urinated on the Hillel building. According to MIT Hillel's mission, it serves "as the center for Jewish life at MIT" and "offers a vibrant program of religious, educational, social, and Israel activities that enable the exploration of Jewish culture, tradition, and scholarship."

37.     On April 21, 2024, anti-Israel students at MIT erected an encampment in the center of campus on Kresge Lawn, which remained for two weeks.  During this time Jewish and Israeli students were blocked from entering this area of campus.

38.     At a protest on May 1, 2024, near the MIT Hillel building, a crowd of students cheered as a man spoke in support of jihadi terror and praised US-designated terror groups Hamas, PFLP and the Muslim Brotherhood.

39.    On May 5, 2024, protesters chanted for the forced expulsion and murder of Jews (translated from Arabic):

> We wish to say it loud and clear, we don't want to see Zionists here. From water to water, Palestine – Arab.  From water to water, Israel–Destroyed. From water to water, Palestine – Arab.  We will sacrifice our blood and souls for you Palestine.  Free Palestine, Israel get out.  Free Palestine, Zionists get out.  The iron gate of Al-Aqsa - open for the martyr.  From water to water, death to Zionism.

40.    Protestors at the encampment also desecrated Israeli flags with red "bloody" handprints.



41.    In September of 2024, an online group of MIT graduate students, "MIT Grads for Palestine," with over 2800 followers, promoted on social media the Popular Front for the Liberation of Palestine, a US-designated foreign terrorist organization.



42.     On March 14, 2025, the MIT International Students Association posted a video on its Instagram page welcoming the new class of international students.  The video featured students from approximately fifty countries greeting the newly admitted students in their native language while holding their national flags.  There were no Israeli students or Israeli flags in the video.

43.     Upon information and belief, Israeli students were not invited to participate in the video, resulting in the absence of any Israeli representation.  Current Israeli students at MIT would have willingly taken part in this video to welcome incoming Israeli students.  Israeli students continue to be excluded from the video, which remains online.

44.    On April 18, 2025, students handed out "terror maps" of the MIT campus.  These maps marked which buildings had connections to the Jewish and Israeli communities and promoted violence against them with the phrases "From the river to the sea, Palestine will be free" and "Resistance is justified when people are colonized."

45.    These maps inciting violence against Jews and Israelis at precise campus locations were distributed widely to students on campus and via mass emails.

46.    These "terror maps" follow an earlier incident at an orientation event in August of 2024 when students handed out flyers containing a link to the Mapping Project to incoming students.  The Mapping Project targets Jewish organizations and other locations "that support the colonization of Palestine" by revealing their locations on a map and encouraging violence against them.  The stated goal of the Mapping Project is "to reveal the local entities and networks that enact devastation, so we can dismantle them. Every entity has an address, every network can be disrupted."  Although President Kornbluth subsequently issued a statement about the Mapping Project in which she stated that "I believe the Mapping Project promotes antisemitism" her statement failed to have any impact on the increasingly hostile and violent campus climate.  Less than one year later, the "terror maps" appeared on campus.  Upon information and belief, no action has been taken in response to these "terror maps."

47.    On May 26, 2025, a group calling themselves "ethical scientists at MIT" defaced MIT property, removing a painting of one of MIT's founders in protest of the "zionist entity."  In a chilling video posted on social media, an MIT scientist draped in a keffiyeh, with his face covered and voice disguised, boasted of the vandalism, accused two MIT professors by name of being "complicit in genocide" and spoke of a "Free Palestine from every river, to every sea" an allusion widely understood to be a call to wipe Jews off the face of the earth.  He further threatened violence against Israelis, Jews and those that support them at MIT, warning "we will not forget MIT's complicity in genocide.  If MIT does not end this, we will."

48.    On May 29, 2025, at the MIT Commencement Ceremony, the class president stood on stage and delivered a speech that MIT admitted was an unapproved "protest from the stage," demonizing Israel and accusing Israel of genocide.  Jewish and Israeli families walked out of the event, despite traveling far distances to celebrate the occasion.  President Kornbluth entered the stage immediately afterwards and did not address the hateful rhetoric. President Kornbluth did not affirm that the views of the class president were not the views of MIT or that MIT supports all of its Jewish and Israeli students.  Instead, she began speaking about the fashionable red jackets of the members of the class of 1975.  In that moment, Jews and Israelis received the message that MIT will not protect them from anti-Jewish and anti-Israeli harassment and discrimination.  After President Kornbluth finished speaking, people in the crowd began screaming, "Free Free Palestine," a phrase now associated with the murder of Jews.  Indeed, just one week

16

earlier, that same cry, "Free Free Palestine" was the shout of the murderer who killed two innocent people outside of a Jewish event in Washington, DC.  And only a few days later, on June 1, 2025, the perpetrator of the Molotov cocktail attack at a peaceful demonstration in Boulder, Colorado, also shouted "Free Palestine." Although MIT later banned the student president from the following day's graduation ceremony, this was "too little, too late" because President Kornbluth failed to speak up at a critical moment to protect Jewish and Israeli students in the Commencement Ceremony audience.

49.     On June 9, 2025, flyers were posted on campus with the message "YOU CAN'T DEPORT THE INTIFADA."



50.     The very next day, additional flyers were posted on campus locations promoting a classic anti-Semitic blood libel, displaying a Jewish star, dripping with blood.  Later that day, President Kornbluth issued a statement about the desecration of a religious symbol without addressing the larger issues and threats facing Jews and Israelis at MIT. As the identity-based targeting of Jews, for whom a connection

to Israel is an integral part of their ethnic and ancestral identity, ballooned on campus, President Kornbluth continued to display a blatant disregard for this targeting of Jews. She remained silent about the intifada stickers posted on campus just the day before, threatening Jews and Israelis with violence, and failed to acknowledge the ongoing threats of violence Jews and Israelis face at MIT. In choosing to call out and investigate religious imagery only and to treat Judaism as a religion only, instead of acknowledging that Jews are a people with a shared ancestry and ethnicity rooted in the land of Israel, she continued to deny the reality of Jews and Israelis who have been under attack on campus since October of 2023.

51. In this statement, President Kornbluth further stated:

> No matter what cause you champion, targeting, threatening, intimidating and spreading false statements about members of the MIT community is unacceptable and potentially unlawful – and it has to stop. *If we find that members of our community engaged in these activities, we will hold them responsible.* (Emphasis added)

As described in detail herein, this representation is false. She was notified by Plaintiffs of egregious instances of anti-Semitic targeting, threatening, intimidation and the spreading of false statements about Jewish and Israeli MIT community members, but she failed to act.

52. In this communication, President Kornbluth also revealed that she knew that "several faculty, staff and students have been targeted." President Kornbluth's performative gesture underscores that she has knowledge of campus anti-Semitism but is taking no meaningful action to stop it. MIT's practice of uttering words without action has allowed anti-Semitism to dominate campus life for Jews and Israelis as described herein.

53.    All of the anti-Semitic incidents described herein (¶¶29 to 52) were widely publicized on the MIT campus and were known to Jewish and Israeli members of the MIT community, including Coalition members.  The incidents were also known to the MIT administration, and the incidents – and MIT's tepid or non-existent responses to the incidents – created a hostile environment and a sense that Jewish and Israeli members of the community were not welcome on campus.

54.    These anti-Semitic incidents have caused Jewish and Israeli members of the MIT community, including Coalition members, to live in fear for their personal safety, have hindered their ability to complete their academic studies, marred their ability to participate in MIT campus life, and caused them to experience extreme anxiety.  Some have felt ostracized, isolated from their classmates, and unwelcome in participating in campus activities.  Some have felt like they need to hide their Jewish identity and have even ceased attending Jewish-sponsored events on campus.  Some have skipped classes, skipped events and activities, and chosen to spend more time at home.  Based on the fear they have experienced, some have even avoided entire sections of campus.

55.    The negative impact on Jewish and Israeli members of the MIT community, including Coalition members, has been exacerbated by MIT's disregard of the anti-Semitic incidents and environment.  MIT failed to protect Dr. Alon (*see infra* 20-29)*.  MIT failed to protect Mr. Sussman (*see infra* 29-44).  MIT failed to respond to the "terror maps."  MIT failed to respond to the defacing of MIT property.  More broadly, MIT has failed to take meaningful action to prevent more anti-Semitic

incidents from occurring, failed to hold accountable the vast majority of anti-Semitic wrongdoers, and failed to eliminate the anti-Semitic hostile environment.

**C.    A Tenured Professor Targeted, Harassed and Discriminated Against Jews and Israelis on Campus and MIT Failed to Take Action**

      **1.    Dr. Lior Alon**

56.    Against the backdrop described above in which Jews and Israelis on campus are, day in and day out, subjected to aggressive anti-Jewish and anti-Israeli rhetoric, imagery, conduct, threats and hatred, the following events took place.

      **(a)    Alon's Academic Background**

57.    Dr. Lior Alon, who is Israeli and Jewish, was a postdoctoral associate in the Mathematics Department at MIT, one of the top mathematics departments in the world from fall 2022 through August 2024.

58.    Alon is currently an Instructor in the Mathematics Department at MIT, which receives federal funding.

59.    In 2020, Alon received a Ph.D. from the Technion—Israel Institute of Technology, earning the Foundation for Excellence in Mathematics award for his dissertation. He subsequently held a postdoctoral position at the Institute for Advanced Study (IAS) in Princeton—a world-renowned research institute, historically home to Einstein, Gödel, and other intellectual icons—where he worked under the mentorship of Peter Sarnak, one of the most influential mathematicians of this time. Alon then joined MIT as a postdoctoral associate within the Simons Collaboration on Localization of Waves, hosted by David Jerison, a prominent analyst and a member of the American Academy of Arts and Sciences.

60.     Alon's research lies at the interface of spectral geometry, mathematical physics, and Fourier analysis, with notable contributions to quantum graphs, nodal statistics, and Fourier quasicrystals. His work has appeared in top-tier journals such as Inventiones Mathematicae—one of the most selective and prestigious mathematics journals globally—and Communications in Mathematical Physics, a leading journal at the intersection of mathematics and theoretical physics. He has authored over ten peer-reviewed publications and two active preprints.

61.     In addition to his research, Alon has taught undergraduate seminars at MIT, mentored students in MIT's SPUR+ and UROP programs, and organized a major international workshop.

62.     In April of 2025, Alon was one of nine postdocs and research scientists at MIT to receive the School of Science's 2025 Infinite Expansion Award, which "highlights extraordinary members of the MIT community."

63.     Prior to joining MIT, Alon considered offers from several world-renowned universities but chose MIT because he considered it a premiere institution in his chosen field, where he envisioned a bright future for himself.

**(b)     Alon's Experience with Anti-Semitism at MIT**

64.     Alon's grandparents are Holocaust survivors, and much of his extended family was murdered during the Holocaust, including some who were killed at Auschwitz.

65.     Alon grew up in Israel during both the First and Second Intifadas, which were periods of violent uprisings involving terror attacks against Israeli and Jewish

civilian targets. Alon grew up in an atmosphere of terror.

66.    On October 7, 2023, Alon tragically lost a childhood friend who was murdered by Hamas terrorists while protecting his family. The fiancée of another childhood friend was also brutally murdered at the Nova festival on October 7.

67.    Just days after the massacre, stunned and grief-stricken, Alon witnessed demonstrators on campus calling for violence against Jews inside of an MIT building, chanting "from the river to the sea, Palestine will be free" in the corridor right below his office. Growing up in Israel where he heard that phrase in Arabic calling for the land of Israel to be Arab from water to water, Alon recognizes that phrase as calling for the annihilation of Jews.

68.    On October 19, 2023, Alon heard protestors chanting loudly for "intifada" which was shocking and terrifying to him. That day, he emailed President Kornbluth to alert her to calls on campus for terror acts. He told President Kornbluth that "[t]here was a clear and concrete call for terror acts today at MIT, in a demonstration in front of the student house. A large group of people were calling out loud and repeatedly 'one solution, intifada'." He told her that "I also send my kids to the MIT daycare, and I am truly afraid." Alon explained that as an Israeli, he experienced two Intifadas in his life, the first in 1987-1993 and the second in 2000-2005. To ensure that she understood what intifada meant, he explained that "intifada" refers to a violent uprising involving terrorist attacks against Israeli and Jewish civilians and provided a link which contained a long list of such suicide attacks. Alon stated "I am expressing here not only my concerns but the concerns of

many Israelis and Jewish people on campus. We are truly afraid for our lives and for the lives of our children, right here on campus."

69.    Alon forwarded the email to the head of his department who affirmed that "[t]his is quite scary indeed" and stated, "I hope [President Kornbluth] will take actions to keep our campus safe."

70.    President Kornbluth responded to Alon with two sentences "I appreciate your outreach and share your concern.  This matter has our full attention." Despite her full knowledge of the situation and her expressed "concern," she did not specifically speak out against calls for intifada on her campus.  On October 21, 2023, President Kornbluth issued a video referencing "ugly words and actions," stating that "[w]e cannot let MIT become a place where we treat each other this way," but she did not directly address calls for intifada on campus, and the calls for violence against Jews and Israelis continued.

71.    When the encampment was erected in April 2024 in the center of campus, the MIT administration did nothing to prevent Israelis and Jews from being excluded from this large and central area of campus, and in fact, actively participated in excluding Israelis and Jews from this central campus location.

72.    The encampment was located between Alon's child's daycare center and the math department, on a route that Alon walks daily.  On April 23, 2024, on the way from the daycare center to the math department, Alon attempted to walk through Kresge Lawn, but he was blocked and told that he could not enter this area of campus.  An MIT administrator and police officer asked him to leave.

73.    Upon information and belief, the administrator and others attempting to keep Alon out of this campus space knew that he was Jewish and Israeli.

74.    This administrator told Alon that he must leave because the individuals in the encampment "reserved the space for a program that they are hosting." This representation was blatantly false. In fact, MIT Hillel had reserved the space and was prevented from using it.

75.    The encampment was unauthorized and violated MIT's rules prohibiting exercises of free expression being "used for purposes of harassment, discrimination . . . threats or violence, [or] targeting of groups or individuals."

76.    Alon was excluded from a part of campus by the MIT administration because he is Israeli and Jewish.

77.    On May 6, 2024, Alon saw an Israeli flag that had been defaced with bloody handprints.

78.    Later that same day, he walked into the encampment but was blocked from exiting. When he tried to leave, a group of people blocked the exit and would not let him out, trapping him inside because he is Israeli and Jewish. He was only able to leave after calling for police assistance.

79.    Also that day, all the Israelis present gathered together to honor their murdered and kidnapped loved ones, singing *Hatikva*, the Israeli national anthem. Tenured professor, Michel DeGraff, wearing a ribbon designating him as a faculty member tasked with deescalating tension, aggressively filmed the Israelis singing. Alon translated the words for Professor DeGraff: *"We haven't lost our hope, our 2000-*

*year-old hope, to be a free people in our homeland, the land of Zion and Jerusalem,"* but Professor DeGraff shoved his phone in Alon's face, filming him.

80.     Soon after, Professor DeGraff posted videos on social media with Alon's face, name and personal information, including details of his Israeli military service, tagging Al Jazeera and others–putting Alon at serious risk.  Professor DeGraff edited the videos, creating a false narrative vilifying Alon.

81.     As a result of Professor DeGraff's social media posts, Alon was aggressively confronted by people he did not know at various locations, including at the grocery store and his child's daycare.  At the grocery store, a woman that he had never seen before approached him and began screaming at him as a result of these posts.

82.      Because of these posts, Alon experienced unwarranted hostility, significant distress, harm to his reputation and fear for his safety.

83.     DeGraff also maligned Alon in an essay he published in the *Le Monde diplomatique,* a prominent, international periodical that is available in twenty-four languages and has a circulation of approximately 2.4 million copies worldwide.  In a propaganda piece published online on May 24, 2024, Professor DeGraff continued his smear campaign against Alon, falsely accusing Alon of stating that "SAGE's students' pleas to halt the genocide of Palestinians are 'pro-Hamas' and advocate the killing of Jews."  Alon made no such statement.  In support of DeGraff's claim, he linked to a news clip of Alon from October 25, 2023.  This clip was made before SAGE ("Student's Against Genocide Encampment") even existed.  Instead, in this news clip, Alon spoke

about how calls for intifada at MIT (i.e., calls for violence on the MIT campus) just weeks after the October 7 massacre made him and his family feel unsafe. Further, DeGraff juxtaposed that news clip with a video shot over six months later when Jews were blocked from entering the campus area where the encampment was located. After being blocked on multiple occasions from entering, Alon entered the area. When his Israeli friend was blocked from entering because he is Israeli, Alon called out that he felt unsafe and needed an Israeli person to help him, in an attempt to gain entry for his Israeli friend. At that point, the individuals guarding the encampment allowed his Israeli friend to enter. Further fabricating a damaging narrative, DeGraff stated that Alon "mock[ed] his own 'fear,'" which again was patently false and caused Alon great embarrassment and distress.

84.    DeGraff also falsely stated in the article that Alon "participate[d] in well-rehearsed propaganda that erases the anti-Zionist Jewish students and misrepresents them, along with their non-Jewish comrades, as violent and antisemitic." That is false. There were no rehearsals, no propaganda and Alon made no such statements. The defamatory article remains online today.

85.    On June 17, 2024, Alon emailed President Kornbluth a detailed recounting of these events. He stated that "I have been subjected to anti-Semitic harassment and defamation by a professor, including online doxing which has made me and my family fear for our safety." He shared his history living through two Intifadas and losing people close to him in the October 7 terrorist attack. He reported to President Kornbluth:

- Calls on campus for intifada (i.e. violence against Jews);

- Being denied access to a part of campus due to his Jewish and Israeli identity;

- The desecration of an Israeli flag with bloody handprints;

- Being trapped in an area of campus by students that restricted his movement based on his Jewish and Israeli identity;

- Online harassment of him by Professor DeGraff which resulted in aggressive confrontations in the real world by people who viewed the defamatory and anti-Semitic posts;

- His fears for his safety and the safety of his family.

86.    Alon requested in his email to President Kornbluth that the MIT administration immediately request that Professor DeGraff take down the posts of him and if he does not do so, to take disciplinary action against him.

87.    President Kornbluth never responded.

88.    President Kornbluth and MIT took no action.

89.    The social media posts were not taken down.

90.    Upon information and belief, MIT failed to discipline Professor DeGraff.

91.    A year later, the videos of Alon remain online, the article defaming Alon remains online, and he continues to suffer through an anti-Semitic hostile environment on a daily basis.

### (c)    The Impact of Anti-Semitic and Anti-Israeli Harassment and the Hostile Campus Climate on Alon

92.    The anti-Semitic climate on the MIT campus has had a profound impact on Alon—emotionally, socially, academically and professionally. On campus, he has regularly seen anti-Israeli posters, people holding anti-Israel signs, and frequent

demonstrations where protestors call for violence against Jews and Israelis—including inside his academic building, directly beneath his office.  He has experienced depression and anxiety.

93.    Prior to October 7, a significant portion of Alon's exchange of scientific ideas with members of the MIT community took place in casual conversations—in hallways, common rooms, and shared spaces. After October 7, these spaces became places where he no longer felt welcome. Other postdocs and PhD students he previously talked to regularly became involved with anti-Israel activities, and they no longer engaged in conversation. Professor DeGraff publicly shamed him on social media, and despite asking the president of MIT for help, nothing was done.  The administration sent a clear message that no one cared about him as an Israeli on campus.

94.    Although Alon continued to perform his duties as a postdoc, the hostile anti-Semitic climate made it extremely difficult to focus, collaborate, and benefit from the position in the ways he had envisioned. The hostile climate has undermined both his sense of belonging and his ability to engage fully in scientific work.

95.    The cumulative effect of the environment has taken a toll on Alon's mental and emotional health. He has experienced depression, began seeing a therapist, and eventually had to seek additional medical support.

96.    The anti-Semitic public exposure Alon was subjected to has also impacted his search for a position as a tenured professor.  Despite his extraordinary academic, research and professional credentials, he was denied positions, again and

again, that a candidate with his credentials would otherwise have been offered. Alon applied to more than 50 tenure track positions in mathematics across the United States and did not receive a single offer. Upon information and belief, most, if not all, other postdocs in the mathematics department at MIT who applied for positions in academia received offers.

97.    Due to safety concerns, Alon also moved his child out of the MIT daycare, which was in walking distance to his office, to a public childcare facility, which he could no longer walk to from his office.

98.    Not only did President Kornbluth's silence and MIT's inaction cause harm to Alon, but MIT's failure to act also emboldened Professor DeGraff, and his harassment of Jews escalated as a result.

**2.    William Sussman**

99.    In the fall of 2024, William Sussman was subjected to anti-Semitic harassment by Professor DeGraff that was so extreme and intolerable that it forced him to leave MIT and abandon the course of study he had been pursuing with dedication since 2017.

100.    In 2021, Sussman received a Bachelor of Science in Electrical Engineering and Computer Science with Distinction from Yale University. In 2019, he was named the northeastern US recipient of the Larry K. Wilson Regional Student Activities Award by the Institute of Electrical and Electronics Engineers ("IEEE"), the world's largest technical professional organization for the advancement of technology. The award recognizes an IEEE student member whose accomplishments

are considered extraordinary.  In 2020, the Yale School of Engineering & Applied Science ("SEAS") awarded Sussman the Belle and Carl Morse Prize, which recognizes the most outstanding junior in SEAS. In 2021, Sussman was awarded the Franz Tuteur Memorial Prize, which recognizes the most outstanding senior project in Electrical Engineering at Yale.

101.    In fall of 2021, Sussman began his PhD program in computer science at MIT, where he was a Jacobs Presidential Fellow in the Networks and Mobile Systems group at the MIT Computer Science and Artificial Intelligence Laboratory.  Sussman was enthusiastic about the opportunities before him at MIT.

102.    On July 7, 2023, Sussman was featured in an MIT news article highlighting his academic career, research interests and aspirations for the future as a computer scientist.  The article states:

> Although he has just two years of graduate school under his belt, Sussman is considering a career in academia. Yet he is also intrigued by government service and plans to complete the MIT Graduate Certificate Program in Science, Technology and Policy. This summer he is conducting research at the National Institute of Standards and Technology. By the time he graduates, he says, "I hope to have an understanding of systems that scale, nationally and globally."

103.    Sussman was also the president of MIT Graduate Hillel, known as Grad Hillel, an association of Jewish students from all parts of the MIT community. Grad Hillel is part of MIT Hillel which is at the center of Jewish life at MIT and celebrates and supports the development of individual Jewish identities on the MIT campus.

104.    As a Jew on campus, Sussman was aware of anti-Semitism on campus even before October 7, 2023, such as an event at which Mohammed El-Kurd asked

audience members to create a database of former Israeli soldiers who are the founders of companies, targeting members of the MIT community, and the vandalism of a display commemorating the Holocaust in April 2023.

105.    After October 7, 2023, as president of Grad Hillel, Sussman had to cope not only with his own experiences of campus anti-Semitism but was constantly supporting other Jewish and Israeli students who were experiencing anti-Semitism on campus, including witnessing chants for violence against Jews, building takeovers, classroom interruptions and aggressive confrontations. Sussman received frequent messages from other students about the events on campus, causing him to feel anxiety, concern and fear about anti-Semitism at MIT.

106.    Student protestors were arrested both inside and outside of Sussman's office building, the Ray and Maria Stata Center.

107.    When demonstrators erected an encampment in the middle of campus in April 2024, MIT Hillel was forced to move and postpone its long-planned annual celebration of Israel's Independence Day, which distracted Sussman from his master's thesis. The hostile anti-Semitic campus climate impacted his computer science research. It was hard to focus on his work in such a climate and he felt derailed.

### (a)    DeGraff Targets Sussman Publicly

108.    In the fall of 2024, Professor DeGraff offered an anti-Israel seminar titled "Language and linguistics for decolonization and liberation and for peace and community building from the river to the sea in Palestine and Israel to the

mountaintops in Haiti and beyond."  "From the river to the sea" is a well-known phrase calling for the violent removal of Jews from the land of Israel.

109.    In this seminar, a guest lecturer spoke to the class about an alleged settler-colonial Zionist (i.e. Jewish) "mind infection." Soon after, Professor DeGraff posted on Instagram about the Zionist "mind infection" and claimed that well-known "Jewish student life organizations" such as Hillel and Chabad fund this "mind infection." Zionist is often a codeword for Jew, and here, where Professor DeGraff directly linked "Jewish student life organizations" to the "Zionist mind infection," it is clear that "Zionist" and "Jew" are interchangeable.

110.    On November 9, 2024, Sussman posted on the social media platform X (formerly Twitter) that "an @MIT professor posted extremely dangerous rhetoric about [Jewish student life organizations].  These groups represent the majority of Jews on campus, and he accuses them of funding a 'mind infection.'"

111.    Later that day, Professor DeGraff posted a message targeting Sussman by name on his X platform of over 10,000 followers, and another message the next morning at 8:31am.

112.    On November 10, 2024 at 1:47pm, Sussman emailed Professor DeGraff copying high-level administrators and professors at MIT including Melissa Nobles (Chancellor), Karl W. Reid (Vice President for Equity and Inclusion at the time), and Suzy Nelson (Vice Chancellor for Student Life) stating: "Professor DeGraff:  Please leave me alone.  Will Sussman."

113.    That same day, at 3:29pm, 3:50pm and 4:24pm, Professor DeGraff posted three more messages on X targeting Sussman.

114.    At 4:16pm, Sussman emailed Chancellor Nobles and Vice Chancellor, Nelson, stating "[a]s you know, earlier today I asked Professor DeGraff to leave me alone. Since then, he has directed his audience of 10,000+ strangers at me. . . . Please ask him to stop."

115.    At 5:09pm, Professor DeGraff replied to Sussman's email, copying additional administrators including President Sally Kornbluth, Chancellor Nobles, Vice Chancellor Nelson, Vice President Reid, Dean of Student Life Randall, Director of IDHR & Institute Title IX and VI Coordinator Rankin, Chief of MIT Police John DiFava, Vice Provost for Faculty Paula Hammond, Vice President for Human Resources Ramona Allen and Senior Associate Dean, Student Engagement & Campus Activities Erin Farrell telling Sussman to "cease and desist," even though Sussman had not contacted Professor DeGraff since asking to be left alone.

116.    At 6:03pm, Professor DeGraff forwarded Sussman's email and his response to the entire Linguistics and Philosophy Department (including students and professors), everyone in his anti-Israel seminar (including students, staff, and non-affiliates), Vice President for Human Resources Ramona Allen, Vice Provost Paula Hammond and others, claiming to use Sussman to illustrate "live" the Jewish "mind infection."

117.    At 7:14pm, a staff member in the MIT Sloan School of Management "replied all" to the entire thread, providing "background" on Sussman and

characterizing him as aligning with a racist cause.

118. At 7:41pm, Professor DeGraff responded back to the entire thread, "[t]hank you, Scott!" and expressed an intent to explore this "real-life case study" of Sussman at the next class.

119. At 1:03am on November 11, 2024, an Israeli professor responded, stating "I'm writing to express my concern regarding how your interaction with Will has been handled," and that "[t]here seems to be a significant power imbalance at play here." He further stated to Professor DeGraff that "[y]ou are a distinguished tenured professor while Will is still a student, likely under considerable stress. He reached out to you privately with a simple request to end your exchange, yet his email has now been distributed broadly and is set to become a case study for the entire department." Many members of MIT's administration received this email, including: President Kornbluth, Chancellor Nobles, Vice Chancellor Nelson, Vice President Reid, Dean Randall, Director Rankin, Chief DiFava, Vice Provost Hammond, Vice President Allen and Senior Associate Dean Farrell, plus the entire Linguistics and Philosophy Department and everyone in Professor DeGraff's seminar.

120. At 2:45am, one of Professor DeGraff's guest speakers in his seminar, Nurit Peled "replied all" that this Israeli professor "is the best proof for the infection of the Israeli Jewish best minds" and "[t]his great scientist' [sic] vanity is the best product of Israeli racist education or rather Mind Infection."

121. Again, the 2:45am email was received by President Kornbluth, Chancellor Nobles, Vice Chancellor Nelson, Vice President Reid, Dean Randall,

Director Rankin, Chief DiFava, Vice Provost Hammond, Vice President Allen and Senior Associate Dean Farrell plus the entire Linguistics and Philosophy Department and everyone in Professor DeGraff's seminar.

122.    But not a single administrator copied on the exchange intervened to stop the harassment or condemn the targeting of both a Jewish student and an Israeli professor in such a vicious and public way.

123.    At 8:44 am, Vice Chancellor, Nelson replied to Sussman's email from the day before requesting that she take action to stop the harassment.  She said she is "sorry to see this exchange" and that they "have many support resources at MIT" and that she "will share this exchange with Human Resources for consideration of next steps" and that "you may also wish to avoid further engagement with him on social media in response."  But she did nothing to stop the ongoing harassment.

124.    At 9:10am, Professor DeGraff posted on X, again targeting Sussman for the sixth time, once more, publicly referring to him as "an excellent case study."

125.    At 9:45 am, Sussman emailed the MIT Police Department and IDHR to request a restraining order, stating "Professor Michel DeGraff is putting me (a Jewish student) in danger by directing an anti-[S]emitic mob toward me (see attached)."

126.    Less than one hour later at 10:53am, Professor DeGraff sent another mass email publicly targeting Sussman.  Again, not a single one of the many senior administrators copied on this email intervened to stop the ongoing harassment of Sussman, even as Sussman was emailing them separately, pleading for help.

127.    At 10:55 a.m., Professor DeGraff sent another mass email publicly targeting Sussman in front of the same group, accusing Sussman of having "powerful connections" in Congress and in the media, advancing a classic anti-Semitic trope.

128.    At 11:29pm, the Israeli professor again asked Professor DeGraff to honor Sussman's request to be left alone, stating to Professor DeGraff that

> Within the MIT community, you are a tenured professor, and Will is a student. The power imbalance here is significant, and it's important to acknowledge the potential impact that our actions as faculty can have on students.

> The student has simply asked to be left alone. It's entirely reasonable to ask that this be mutual, and ultimately, I believe we should respect his request— particularly within the classroom and MIT-affiliated spaces.

129.    While a long list of senior administrators witnessed the continuing anti-Semitic harassment of a student by a professor, the only person who spoke out in an attempt to protect Sussman was an Israeli professor who himself was targeted and harassed by Professor DeGraff based on his Israeli identity.

130.    At 11:58 pm, Professor DeGraff, targeted Sussman with another mass email. Once again, although the highest level of MIT administrators, including President Kornbluth, were included on the email where the harassment of Sussman was on display in real time, not one of them intervened.  Every single one of them was silent.  No one came to Sussman's defense or to the defense of the Israeli professor, and no one spoke up to stop the onslaught.

131.    Their silence emboldened perpetrators to continue harassing Jews on campus.

132.    Every  single  Jewish  and  Israeli  student  in  the  Linguistics  and

Philosophy Department was also copied on this email exchange, where they witnessed ongoing attacks on a Jewish student by this professor. They also witnessed the silence from the highest levels of MIT administrators who were copied on the exchange. The ongoing attacks while MIT administrators watched in silence sent the message to Jewish students that they are not safe on campus and MIT will not protect them. Others observed that they could harass Jewish students without consequence.

133.    Plaintiff Lior Alon, as well as many other Jews and Israelis on campus, were aware of the relentless attacks on Sussman and of MIT's failure to act.

134.    Sussman and his family feared for his safety. The next morning, on November 12, 2024, Sussman emailed the MIT Police Department again, copying Chancellor Nobles and Vice Chancellor Nelson stating that Professor DeGraff's rhetoric "is extremely dangerous. My mother is worried that he is going to get me killed. And it appears that his seminar about me will proceed as planned on Wednesday."

135.    On the morning of November 13, 2024, flyers were slipped under the doors in a graduate dormitory where Sussman used to live which advocated for violent "resistance" against Israel and Jews. The article contained a green band with white lettering styled after Hamas headbands, in which it was written "THIS ARTICLE AND THE AUTHOR WERE BANNED FROM MIT AFTER ZIONISTS TWEETED ABOUT IT." Upon information and belief, the reference to "Zionists" was to Sussman, who had posted about the article on X. Sussman reported this to the

MIT Police Department and administrators that morning.  Days later, on November 15, 2024, this same article was distributed on campus in Lobby 10.

136.   At Professor DeGraff's seminar, also on November 13, 2024, Professor DeGraff began the seminar by referring to Sussman as a student who he engaged with over email and Twitter.  "I won't mention his name but you probably know who he is. Let us not forget that as we engage in this academic exercise that there is a genocide going on," Professor DeGraff stated.

137.   At this seminar, Professor DeGraff also espoused common anti-Semitic tropes, promoted the erasure of Jewish history and identity, and engaged in anti-Semitic victim blaming:

- He represented that Israeli Jews weaponize the trauma of the Holocaust.

- He denied that a connection to Israel is an essential component of Judaism.

- He showed a slide that claims that 42% of Jews do not believe that Israel was divinely given to the Jews.

- He justified the attack on Israeli soccer fans in Amsterdam.

138.   Professor DeGraff continued to harass Sussman and to post anti-Semitic messages to his large following on social media, where he is followed by MIT students and faculty members.  On December 25, 2024, Professor DeGraff engaged in erasive anti-Semitism publicly, attempting to deny the connection between Zionism and Judaism and declaring such connection to be another correlate of "mind infection" in "Zionist education."  As explained above, for many Jews a recognition of the Jewish

people's ancestral connection to Israel (i.e. Zionism) is an integral component of Jewish identity.



139.    On December 29, 2024, Professor DeGraff posted a message to Israeli mothers to "help them" prevent the "mind infection" among Israeli children "who are still being turned into monsters."



140.   On January 3, 2025, Professor DeGraff again targeted Sussman with a post on X.

141.   Professor DeGraff continues to promote anti-Semitic hatred to his large social media following which includes MIT students and faculty members.  On May 21, 2025, he reposted a quote accusing Jews of being "monsters" and "killers."

### (b)    Sussman Reports Anti-Semitic Harassment and MIT Refuses to Acknowledge Anti-Semitism

142.   On November 10, 2024, Sussman filed a complaint with MIT's IDHR alleging, *inter alia,* harassment and retaliation based on a protected class, and stalking.

143.   On November 14, 2024, Meg Chuhran from IDHR emailed Sussman informing him that his complaint was being transferred to Human Resources ("HR"), rather than IDHR where complaints of discrimination and harassment are handled, because IDHR failed to find any anti-Semitic discrimination or harassment in Professor DeGraff's targeting of Sussman.  Chuhran also offered to discuss a "mutual no-contact arrangement" between Sussman and Professor DeGraff, implying that Sussman was also at fault.

144.   On November 15, 2024, a Zoom call was held with Jewish and Israeli students, postdocs and faculty, and MIT administrators, including Vice Chancellor, Nelson, Dean Randall, and Chief DiFava  to discuss the problems facing Jews and Israelis on campus. On the call, a postdoc stated, "I want to say that Will is an important person of our community for being so brave and exposing some of the hardships that our community is going through. The fact that he is personally

targeted and considering leaving is a huge loss for MIT and for all the Jewish students at MIT." The administration knew that Sussman was considering leaving due to anti-Semitism, and still the administration did nothing.

145.    On December 10, 2024, Sussman emailed IDHR to appeal its determination that Professor DeGraff's conduct did not constitute discrimination based on a protected class. Sussman stated that "Professor DeGraff is treating me differently because I am Jewish; in his words, I am 'a helpful real-life case study' of the Jewish 'mind infection.'"

146.    On January 13, 2025, Moriah Silver, Manager of Investigations from IDHR emailed Sussman that "IDHR's decision to refer an investigation to HR and not to pursue a discrimination investigation is not subject to appeal." Ms. Silver further stated to Sussman that Professor DeGraff's communications "do[] not suggest that Prof. DeGraff is treating you differently because you are Jewish."

147.    Incredibly, in her role as Manager of Investigations of MIT's IDHR Office, Ms. Silver, perpetuated common anti-Semitic tropes as a justification for why Professor DeGraff's conduct was not anti-Semitic, stating that Professor DeGraff's use of the term "mind infection" refers to "settler-colonial Zionist propaganda" that the professor believes is "funded by the Israeli government through several organizations." The term "settler-colonial Zionist" itself is a classic example of contemporary anti-Semitism.

148.    Ms. Silver further excused Professor DeGraff's behavior by referencing an email that stated that "the term 'mind infection' refers to 'Israeli racist education,'"

again propagating anti-Semitic tropes.  Ms. Silver concluded that "[i]n short, it appears that Prof. DeGraff's use of the 'mind infection' term relates to his views of the Israeli government, its education system, and how its 'propaganda' about the Israeli-Palestinian conflict has impacted the discourse and events on U.S. college campuses" and "we do not believe there is sufficient basis to conclude that Prof. DeGraff's decision to use your social media/email exchanges as a case study was based on your Jewish identity so as to warrant an investigation into protected class discrimination."

149.    "Holding Jews collectively responsible for actions of the state of Israel" and "claiming that the existence of the State of Israel is a racist endeavor" are classic examples of contemporary anti-Semitism under the IHRA definition.  The fact that the Manager of Investigations for MIT's IDHR Office does not recognize blatant anti-Semitism, exposes the level of institutional blindness and apathy at MIT when it comes to anti-Semitism.

150.    As a result of the hostile anti-Semitic climate, the relentless harassment, MIT's failure to recognize the harassment as anti-Semitic and its refusal to protect him, Sussman could no longer remain at MIT.  On January 16, 2025, Sussman left MIT.

151.    On January 27, 2025, the Director of Labor & Employee Relations in Human Resources notified Sussman by letter that HR was closing the investigation of Professor DeGraff because Sussman left MIT and was no longer available to meet.

152.   Section 9.8.5.6 of MIT's Policies and Procedures states "[i]f either the Complainant or the Respondent leaves MIT after a Complaint is filed, MIT generally continues the investigation to the extent possible."  Sussman had already provided all of the documentary evidence that they would need from him including all of Professor DeGraff's emails and posts targeting him. MIT"s closure of the investigation into Sussman's complaint further demonstrates its apathy towards anti-Semitism.

### (c)   Impact on Sussman

153.   Due to fears for his safety, Sussman began using additional measures to lock his on-campus apartment door beyond the MIT building swipe access locks, and he began taking different routes to his office to avoid anti-Israel demonstrations.

154.   As a result of the hostile anti-Semitic climate, Sussman found it increasingly difficult to concentrate, focus on his work, and perform his academic tasks.

155.   For the first time in his life, he sought help from Student Mental Health & Counseling.

156.   When MIT's senior leadership and anti-discrimination administrators failed to protect him from Professor DeGraff's continuing public assault, he could no longer remain on campus and engage in his studies.

157.   With a few years left in his PhD program, Sussman felt forced to abandon his dream and his promising future as a computer scientist.

158.    Three years earlier, Sussman had recounted in an MIT Grad Blog post the exhilaration of being accepted into the PhD program at MIT.  Seeing the subject line of the acceptance email, "Exciting News from the PhD Program in EECS at MIT! YES!!" he thought "[t]his can't be real." The email stated, "Our decision regarding your application to our doctoral graduate degree program is a resounding and unequivocal YES!"  The email continued:

> Among the thousands of applications submitted from all over the world, we believe, and we are confident, that you have much to offer to our community with regard to our research endeavors, our academic pursuits, and our collaborative engagements to achieve our collective goals to impact the world and to also achieve our individual career aspirations.

His father cried and Sussman thought "[t]his is the beginning of the rest of my life."

159.    Sussman had been considering a career in academia after earning his PhD.  Because of the severe and pervasive anti-Semitism at MIT, this is no longer his reality.

## D.    MIT Administrators Had Actual Notice of Anti-Semitic and Anti-Israeli Conduct on Campus

160.    President Kornbluth was informed about the incidents described herein, again and again.  Yet she stayed silent and ignored the repeated pleas for help from Jews and Israelis on campus.  Alon wrote to her on October 19, 2023 and June 17, 2024, and she was copied on the series of emails in which Professor DeGraff was harassing Sussman on November 10 and 11, 2024.  Yet she took no action to end the harassment, eliminate the hostile environment and prevent it from recurring.

161.    President Kornbluth also met in person with members of the MIT Jewish and Israeli community, who described the extreme anti-Semitism they were

experiencing. At the meetings, she expressed sympathy and uttered niceties but took no discernable action.

162.    As detailed herein, other high-level administrators were also aware of the anti-Semitic incidents, and they, too, took no discernable action to end the harassment of Jews and Israelis, eliminate the hostile environment and prevent it from recurring.

163.    The IDHR received numerous reports of anti-Semitism but failed to take any meaningful action to end the harassment of Jews and Israelis, eliminate the hostile environment or prevent it from recurring. The IDHR even failed to recognize some of the most egregious incidents of anti-Semitic conduct as discrimination against Jews.  Even worse, IDHR also perpetuated the harm by espousing anti-Semitic rhetoric.

164.    The administration failed to act reasonably in response in light of the new, known circumstances and the hostile climate for Jews and Israelis further intensified.

165.    In the absence of moral leadership and meaningful action, the MIT campus was turned into a breeding ground of anti-Semitic and anti-Israeli hate and hostility that emboldened students and professors to harass and discriminate against Jews and Israelis without restraint.

**E.    Plaintiffs Have Suffered from Anti-Semitic and Anti-Israeli Harassment and Discrimination and Been Deprived of Benefits to which They Are Entitled**

166.    Anti-Semitic harassment and discrimination have taken a significant emotional, physical, social, reputational, academic and professional toll on Plaintiffs as described in detail in paragraphs 54-55, 92-98 and 153-59.

**F.    Federal Law Protects Plaintiffs and Coalition Members from Anti-Semitism**

167.    Title VI of the Civil Rights Act of 1964 prohibits all forms of harassment tied to a person's ancestry or ethnic characteristics, including anti-Semitism.

168.    On September 28, 2023, the Biden Administration noted in a Fact Sheet that "eight federal agencies clarified . . . that Title VI of the Civil Rights Act of 1964 prohibits certain forms of antisemitic, Islamophobic, and related forms of discrimination in federally funded programs and activities." It also reiterated that "Title VI of the 1964 Civil Rights Act applies to all programs and activities supported by federal financial assistance. Thus, these protections are wide-ranging and provide important tools to prevent and curb discrimination."[9]

169.    Title VI of the Civil Rights Act applies to any "program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

_____

[9] Fact Sheet: Biden-Harris Administration Takes Landmark Step to Counter Antisemitism, White House (Sept. 28, 2023), https://www.whitehouse.gov/briefing-room/statementsreleases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counterantisemitism/.

170.    Defendant MIT receives federal financial assistance from the United States Department of Education, Department of Health and Human Services, and Department of Defense and is therefore subject to suit under Title VI.

171.    Discrimination against Jews and Israelis is prohibited under Title VI, as reflected in the written policies of the Department of Education's Office for Civil Rights ("OCR").

172.    Individual Plaintiffs and Coalition Members are all Jewish, Israeli, and/or of Israeli descent, and therefore, are members of a protected class within the scope of Title VI's protections.

## G.    MIT's Own Policies Protect Individual Plaintiffs and Coalition Members from Anti-Semitism and Anti-Israeli Discrimination

173.    MIT has numerous policies in place to protect its students from anti-Semitism, including policies relating to discrimination, harassment, and retaliation. Defendants' actions violate all of these policies.

174.    *Nondiscrimination*.  MIT has a published "Nondiscrimination" policy that "applies to faculty, staff, students and all other members of the MIT community." (https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/93-nondiscrimination).    MIT    prohibits    discrimination    against individuals on the basis of numerous characteristics including race, religion, and "national or ethnic origin."  The policy applies in the administration of MIT's other policies, including specifically its "educational policies" and "employment policies."

175.    By its express terms, MIT's Nondiscrimination policy clearly prohibits discrimination by MIT faculty against members of the MIT community for being Jewish and/or Israeli.  .

176.    ***Harassment***.  MIT has a published "Harassment" policy.  MIT defines "harassment" "as unwelcome conduct of a verbal, nonverbal or physical nature that is sufficiently severe or pervasive to create a work or academic environment that a reasonable person would consider intimidating, hostile or abusive and that adversely affects an individual's educational, work, or living environment." (https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/95-harassment)

177.    In determining whether unwelcome conduct is harassing, MIT "examine(s) the totality of the circumstances surrounding the conduct, including its frequency, nature and severity, the relationship between the parties and the context in which the conduct occurred."  (*Id.*)  MIT's enumerated examples of types of harassing conduct include "deliberate and repeated humiliation" and "deliberate interference with the life or work of another person."  (*Id.*)

178.    By its express terms, MIT's harassment policy clearly prohibits an MIT professor from repeatedly targeting a student or employee for humiliation, especially based on the student or employee's membership in a protected class.

179.    ***Stalking***.  MIT also identifies stalking, including cyber stalking, as a type of prohibited harassment.  MIT defines stalking "as engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for

their safety or the safety of others, or to suffer substantial emotional distress." (https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/95-harassment). MIT acknowledges that stalking can take many forms, and enumerated examples include "continuing to contact a person after receiving requests not to" and "non-consensual communication, telephone calls, voice messages, emails, texts, letters, notes, gifts, or any other communications that are repeated and undesired." MIT similarly prohibits cyberbullying, which it defines as "willful, repeated harm inflicted using computers, cell phones, and other electronic devices." (https://resources.mit.edu/doxingresources/)

180.    By its express terms, MIT's stalking and cyberbullying policies clearly prohibit an MIT professor from repeatedly targeting a student or employee online for humiliation through the use of online posts and mass emails, especially based on the student or employee's membership in a protected class.

181.    ***Doxing***.  MIT also identifies doxing as a type of prohibited harassment. (https://resources.mit.edu/doxingresources/). MIT defines doxing as "a form of intimidation involving the publication of someone's personal information (e.g., private email, personal phone number, home address, family address) on various platforms in an attempt to frighten the individual and encourage additional harassment by others."

182.    By its express terms, MIT's doxing policy clearly prohibits an MIT professor from repeatedly publishing a student's face, name and personal information, including Israeli military service, in social media posts, especially when

done in a misleading manner for the purpose of encouraging others to harass the student.

183. ***Non-Retaliation***.  MIT has a specific policy prohibiting retaliation against those who in good faith make complaints about the possible violation of any MIT policy.            (https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/97-non-retaliation).  The policy "applies to those who report an incident, file a complaint, or otherwise raise a concern about a policy violation or other wrongdoing."  MIT defines retaliation as "any adverse action, harassment, threats, or other conduct that would discourage a reasonable person from making a report or participating in a complaint review process."

184. MIT reaffirmed at the outset of the 2024-25 school year that all of these rules apply to all members of the MIT community, including faculty:

> Above all, our rules reaffirm that harassment, discrimination, retaliation, unreasonable invasion of personal privacy (including doxing), defamation, threats, violence, disorderly conduct, targeting of groups or individuals, or infringing the intellectual property rights of others are prohibited at MIT, including during demonstrations. **These rules apply to faculty, staff, postdocs, and students universally, regardless of viewpoint.** (https://orgchart.mit.edu/letters/guidelines-we-start-new-year) (emphasis in original).

## COUNT I

**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***

**(Direct Discrimination)**
**(By All Plaintiffs Against MIT)**

185. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 184 as if fully set forth herein.

186.    MIT receives financial assistance from the United States Department of Education, United States Department of Health and Human Services, and the United States Department of Defense.  Plaintiff Alon's position is paid for through federal funding.  MIT is therefore subject to suit under Title VI of the Civil Rights Act of 1964 for both discrimination relating to students and discrimination relating to Alon's employment.

187.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

188.    That Title VI protects Jews from discrimination has long been the declared policy of the U.S. Department of Education's Office for Civil Rights. *See e.g.*, U.S. Dep't of Educ., OCR Dear Colleague Letter: Addressing Discrimination Against Jewish Students (May 25, 2023),

https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/antisemitism-dcl.pdf.

189.    On November 7, 2023, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they have a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is

based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language.  U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/sharedancestry.html.

190.    Discrimination against Jews and/or Israelis—including based on actual or perceived shared ancestry, race, ethnic characteristics, or national origin—is thus prohibited under Title VI.  Title VI protects members of a protected class from both direct, intentional acts of discrimination and from a hostile environment.

191.    Direct, intentional acts of discrimination in violation of Title VI include discriminatory actions that are motivated by animus toward a protected class, including deliberate indifference to teacher or peer harassment of a member of a protected class.

192.    Members of the Coalition, including Plaintiffs  Alon and Sussman, are Jewish, Israeli, and/or of Israeli descent and therefore are members of a protected class within the scope of Title VI's protections.

193.    As a direct result of being a member of a protected class, members of the Coalition, including Plaintiffs  Alon and Sussman, were subjected to discrimination by MIT based on their Jewish ethnicity and ancestry and/or actual or perceived Israeli national origin.

194.    Alon's protected status was a focal point of Professor DeGraff.  Professor DeGraff brazenly singled Alon out for harassment specifically because he is Jewish. The harassment went well beyond anything that could be justified as part of legitimate academic discussion or debate.  He posted videos on social media with Alon's face, name and personal information, including his Israeli military service. Professor DeGraff edited the videos, creating a false narrative and vilifying Alon.

195.    Professor DeGraff then escalated his discrimination and harassment of Jewish students with Sussman.  In response to a post by Sussman expressing concern about Professor DeGraff accusing Jewish groups on campus of funding a "mind infection," Professor DeGraff repeatedly targeted him online, by email to the entire Linguistics and Philosophy Department, and in class.  DeGraff ignored direct pleas by Sussman to stop.  Professor DeGraff ignored direct pleas by another professor to stop.  The harassment again went well beyond anything that could be justified as part of legitimate academic discussion or debate.  He engaged in a sustained, unapologetic campaign of anti-Semitic harassment of Sussman simply for raising a concern about an MIT professor's promotion of claims about a Jewish "mind infection."

196.    Alon and Sussman both informed senior MIT officials of the harassment and discrimination they were experiencing and pleaded for help.  Sussman emailed high level administrators and professors at MIT including the Chancellor, the Vice President for Equity and Inclusion at the time, and the Vice Chancellor for Student Life.  Sussman also filed a formal complaint with the IDHR Office.

197.    MIT demonstrated its animus to Jewish and Israeli students, including Alon, Sussman and other members of the Coalition, by deliberately refusing to take any action.  MIT did not stop the harassment.  MIT did not discipline the perpetrator. Rather than just demonstrate "deliberate indifference," MIT's actions provide overwhelming direct evidence of discrimination.   Meg Chuhran from IDHR affirmatively informed Sussman that her office would not investigate his claims because Professor DeGraff's anti-Semitic targeting of Sussman was not the type of harassment and discrimination it cared about.  Sussman attempted to appeal this decision and explained that "Professor DeGraff is treating me differently because I am Jewish; in his words, I am 'a helpful real-life case study' of the Jewish 'mind infection.'"  In response, IDHR's Manager of Investigations unambiguously confirmed that MIT does not regard Professor DeGraff's anti-Semitic targeting of Sussman as discrimination.[10]

198.    President Kornbluth and other senior administrators, who were included both on the harassing emails and on Sussman's emails pleading for the harassment to stop, also had actual knowledge of Professor DeGraff's harassment of Sussman and deliberately chose to do nothing.  They continued to do nothing even when they learned that Sussman was considering leaving MIT due to the harassment.

---

[10] To erase any doubt about its animus, MIT's IDHR Manager engaged in multiple anti-Semitic tropes in her explanation of why she did not see anything wrong with DeGraff's actions.  *Supra* 41.

199. Alon's appeal to the President of the University asking that the administration immediately request that Professor DeGraff remove the posts vilifying Alon and cease harassing him or face disciplinary action was also fruitless.

200. By deliberately refusing to take action to stop anti-Semitic harassment (much less take action against the perpetrators), as a result of their actions described herein, MIT engaged in intentional discrimination. This is deliberate indifference *per se* – MIT affirmatively stated that it did not regard the anti-Semitic targeting of a Jewish student as falling within its discrimination office's purview. Further, this was done with full knowledge of the university president. This cannot be characterized as anything other than a conscious, affirmative decision by MIT not to do what the law requires.

201. MIT violated Title VI by subjecting members of the Coalition, including Plaintiffs Alon and Sussman, to a series of intentional hostile acts and adverse actions while they were in pursuit of their education or, Alon's cases, their employment). These acts were designed to deprive members of the Coalition, including Plaintiffs Alon and Sussman, of the benefits of their education or employment and derail their academic pursuit and/or career because of their national origin, ethnicity, and ancestry.

202. MIT's actions had their intended effects. As a direct and proximate result of MIT's actions and inactions, Plaintiffs Alon and Sussman were deprived of access to educational and work opportunities and benefits, including the ability to study and work in an environment free from discrimination and intimidation, the

ability to fully and freely participate in all classes and campus activates without fear of discrimination and intimidation, and the loss of significant class time, lab time, and group learning.

203.   As a result of MIT's discrimination, Alon was subjected to continued harassment by Professor DeGraff and aggressively confronted by people he did not know at various locations, including the grocery store.  He experienced unwarranted hostility, significant distress, fear for his and his family's safety, and harm to his reputation and career.  Upon information and belief, the public exposure Alon has received as a result of campus anti-Semitism has impacted his search for a position as a tenured professor.   Despite his extraordinary academic, research and professional credentials, he was denied positions, again and again, that a candidate with his credentials would otherwise have been offered.  Alon applied to more than 50 tenure track positions in mathematics across the United States and did not receive a single offer.  Upon information and belief, most, if not all, other postdocs in the mathematics department at MIT who applied for positions in academia received offers.

204.   As a result of MIT's discrimination, Sussman was subjected to continued harassment by Professor DeGraff and targeted by other students.  The harassment was so severe and pervasive that Sussman ultimately was forced to leave MIT.  He left MIT with only a few years left in his PhD program.  His aspiring career in computer science has been derailed.

## COUNT II

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.**

**(Hostile Educational Environment)**
**(By All Plaintiffs Against MIT)**

205.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 204 as if fully set forth herein.

206.    The May 25, 2023 OCR Letter unequivocally states, "Schools must take immediate and appropriate action to respond to harassment that creates a hostile environment."

207.    OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.*

208.    Members of the Coalition, including Plaintiffs Alon and Sussman, are Jewish, Israeli, and/or of Israeli descent, and therefore, are members of a protected class within the scope of Title VI's protections.

209.    As a direct result of their being members of a protected class, members of the Coalition, including Plaintiffs Alon and Sussman, were subjected to severe, pervasive and objectively offensive harassment while at MIT based on their Jewish and Israeli ancestry and religion.

210.    Professor DeGraff espoused common anti-Semitic tropes, promoted the erasure of Jewish history and identity, and engaged in anti-Semitic victim blaming. Professor DeGraff's objectively offensive conduct included:

- representing that Israeli Jews weaponize the trauma of the Holocaust.

- justifying the attack on Israeli soccer fans in Amsterdam.

- publicizing the idea of a Jewish "mind infection."

- posting a message to Israeli mothers to "help them" prevent the "mind infection" among Israeli children "who are still being turned into monsters."

211.    But Professor DeGraff did not limit his conduct to anti-Jewish and anti-Israeli propaganda.  He targeted individual Jewish students and postdoctoral associates, including Alon and Sussman, for severe and pervasive private and public harassment based on their being Jewish and/or Israeli.

212.    Defendant MIT had actual knowledge of the harassment and discrimination against members of the Coalition, including Plaintiffs Alon and Sussman.  The wrongful behavior of Professor DeGraff, as well as other anti-Semitic incidents on campus, were reported to senior administrators who had the power to stop them.  But MIT neither stopped the harassment, nor engaged in any discipline of the perpetrators for their actions described herein.  MIT's response to the reports of harassment and discrimination were either inadequate or, more often, nonexistent.

213.    MIT and its administrators have thus demonstrated deliberate indifference to the anti-Semitic abuse, harassment, and intimidation of members of the Coalition, including Plaintiffs Alon and Sussman, in violation of Title VI.

214.   As a result of MIT's deliberate indifference, members of the Coalition, including Plaintiffs Alon and Sussman, have been denied the benefits of educational and other programs at MIT.

215.   As a direct and proximate result of Defendants' actions and inactions, members of the Coalition, including Plaintiffs Alon and Sussman, were deprived of access to educational and work opportunities and benefits, including the ability to study and work in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activities without fear of discrimination and intimidation, and the loss of significant class time, group learning, and career opportunities.

## COUNT III

### Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

### (Retaliation)
### (By Plaintiffs Sussman and Coalition Against MIT)

216.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 215 as if fully set forth herein.

217.   The Department of Education has promulgated a regulation that provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part." 34 C.F.R. § 100.7(e).

218.    That regulation applies once a "student … or other individual complains formally or informally to a school about a potential civil rights violation" and aims to ensure that "individuals [are] commended when they raise concerns about compliance with the Federal civil rights laws, not punished for doing so."11

219.    Members of the Coalition, including Sussman, are Jewish, Israeli, and/or of Israeli descent and, therefore, are members of a protected class within the scope of Title VI's protections.

220.    Members of the Coalition, including Sussman, engaged in protected activity by reporting instances of discrimination and harassment to MIT officials and employees.

221.    Plaintiff Sussman first reported his concerns about Professor DeGraff's rantings about a Jewish "mind infection" directly to DeGraff.  After he was targeted for harassment, retaliation and stalking by Professor DeGraff, Sussman then complained to a long series of administrators, including IDHR, another professor, and President Kornbluth.

222.    After engaging in protected activity, Sussman was subjected to escalated retaliation by his harasser.  After Sussman's complaints to the administration, Professor DeGraff increased his personal and public attacks on Sussman.

---

11 Letter from Seth M. Galanter, Acting Assistant Sec'y for Civil Rts., U.S. Dep't of Educ. to Colleague at 1 (Apr. 24, 2013), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf.

223.    Despite actual knowledge that Professor DeGraff was retaliating against Sussman, MIT refused to take any discernable action to stop Professor DeGraff.  MIT's deliberate indifference to the retaliation led directly to Sussman being constructively forced to leave the university.  This constitutes a material adverse action in violation of Title VI.

224.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff Sussman was deprived of access to educational and work opportunities and benefits, including the ability to study and work in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activates without fear of discrimination and intimidation, and the loss of significant class time, lab time, and group learning.[12]

## COUNT IV

### Intentional Infliction of Emotional Distress
### (By Plaintiffs Alon and Sussman Against All Defendants)

225.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 224 as if fully set forth herein.

226.    Professor DeGraff's conduct intentionally harassing, discriminating against, and retaliating against Plaintiffs Alon and  Sussman was extreme and

---

[12] Plaintiff Alon intends to file administrative charges with the Equal Employment Opportunity Commission (EEOC) and Massachusetts Commission Against Discrimination (MCAD) asserting (i) a hostile environment claim under Title VII of the Civil Rights Act of 1964 against MIT, and (ii) a hostile environment claim under Massachusetts General Law Chapter 151B, § 1 et seq. against MIT and DeGraff.  Upon the exhaustion of his administrative remedies, Alon intends to amend the complaint in this action to include those claims.

outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

227.    MIT's conduct intentionally discriminating against Plaintiffs Alon and Sussman, deliberately ignoring the harassment they were enduring, and deliberately ignoring the retaliation they were experiencing, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.  This goes well beyond merely ignoring peer-on-peer harassment (as bad as that may be); a university professor engaged in discrimination, harassment, and retaliation against Plaintiffs for being Jewish and/or Israeli with full knowledge and impunity of the university president and other administrators who had supervisory duties to prevent discrimination, harassment and retaliation.

228.    Defendants intentionally engaged in conduct that was designed to cause or was reckless and/or negligent in its disregard in the likelihood of causing Plaintiffs Alon and Sussman severe emotional distress.  Defendants' actions were malicious and done with the intent to harm.

229.    As a direct and proximate cause of Defendants' actions, Plaintiffs Alon and Sussman have suffered severe emotional distress.

## COUNT V

### Reckless Infliction of Emotional Distress
### (By Plaintiffs Alon and Sussman Against All Defendants)

230.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 229 as if fully set forth herein.

231.   Defendants knew or should have known that emotional distress was likely to result from the conduct alleged herein.

232.   Professor DeGraff's conduct in harassing, discriminating against, and retaliating against Plaintiffs Alon and Sussman was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

233.   MIT's conduct in discriminating against Plaintiffs Alon and Sussman, deliberately ignoring the harassment they were enduring, and deliberately ignoring the retaliation they were experiencing, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. This goes well beyond merely ignoring peer-on-peer harassment (as bad as that may be); university professors engaged in discrimination, harassment, and retaliation against Plaintiffs for being Jewish and/or Israeli with full knowledge and impunity of the university president and other administrators who had supervisory duties to prevent discrimination, harassment and retaliation.

234.   Defendants engaged in conduct that was designed to cause or was reckless in its disregard in the likelihood of causing Plaintiffs Alon and Sussman severe emotional distress.

235.   As a direct and proximate cause of Defendants' actions, Plaintiffs Alon and Sussman have suffered severe emotional distress of a nature that no reasonable man could be expected to endure.

## COUNT VI

### Negligent Infliction of Emotional Distress
### (By Plaintiff Alon Against All Defendants)

236.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 235 as if fully set forth herein.

237.    By virtue of MIT's relationship to Plaintiff Alon as an employee, its published policies on discrimination, nondiscrimination, harassment, stalking, and doxing, its public statements that anti-Semitism is totally unacceptable in the MIT community and would not be tolerated, and its private interactions with Alon, MIT owed or assumed a duty of care to Alon.

238.    MIT negligently breached its duty of care in refusing to follow its own policies and refusing to reasonably respond to Alon's complaints of discrimination, harassment, stalking, and doxing.

239.    As a direct and proximate cause of Defendants' actions, Plaintiff Alon has suffered severe emotional distress.  Physical manifestations of Alon's emotional distress include insomnia, fatigue and several panic attacks.

240.    Any reasonable person would have suffered severe emotional distress under the circumstances alleged herein.

## COUNT VII

### Defamation
### (By Plaintiff Sussman Against DeGraff)

241.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 240 as if fully set forth herein.

242.    Professor DeGraff repeatedly published defamatory statements about Sussman to third parties, including online, by email to the entire Philosophy and Linguistics Department, and verbally in his class.  In his defamatory statements, Professor DeGraff repeatedly accused Sussman of being a helpful real-life case study of the Jewish "mind infection."  In his 10:55pm email on November 11, 2024, DeGraff also stated that Sussman has "powerful connections to Congress" and "influential friends in Congress like Rep. Elise Stefanik."  Those statements are false and also perpetuate the common anti-Semitic trope that Jews are conniving schemers who control levers of power.  https://antisemitism.adl.org/power/

243.    Professor DeGraff's statements were not expressions of opinion that are protected by the First Amendment.

244.    Professor DeGraff's statements about Sussman were false, published with actual malice, and designed to hold Sussman up to contempt, hatred, scorn or ridicule.  Professor DeGraff's statements were made solely for the purpose of causing Sussman harm and impairing his standing at MIT and in the larger academic community.

245.    Given Professor DeGraff's prominence as a tenured professor at MIT, his false statements had their intended effect.  Sussman's reputation in the MIT community and academic community have been severely and irreparably tarnished and he has experienced economic harm.  Despite Sussman's sterling credentials, awards, and status as a Jacobs Presidential Fellow in computer science, he left MIT without completing his PhD due to DeGraff's statements.

## COUNT VIII

### Defamation
### (By Plaintiff Alon Against DeGraff)

246.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 245 as if fully set forth herein.

247.    Professor DeGraff published defamatory statements about Alon to third parties in the publication Le Monde diplomatique.  The article was published on May 24, 2024 and is still available online today.  DeGraff specifically named Alon in the essay and falsely accused him of stating that "SAGE's students' pleas to halt the genocide of Palestinians are 'pro-Hamas' and advocate the killing of Jews." (https://mondediplo.com/outside-in/mit-gaza) In fact, Alon's only public statements had been focused on the calls for "intifada" at MIT (i.e., calls for violence on the MIT campus).  DeGraff also falsely stated that Alon "participate[d] in well-rehearsed propaganda that erases the anti-Zionist Jewish students and misrepresents them, along with their non-Jewish comrades, as violent and antisemitic."  That was also made up.  Alon made no such statements.

248.    Professor DeGraff's statements were not expressions of opinion that are protected by the First Amendment.

249.    Professor DeGraff's statements about Alon were false, published with actual malice, and designed to hold Alon up to contempt, hatred, scorn or ridicule. Professor DeGraff's statements were made solely for the purpose of causing Alon harm and impairing his standing at MIT and in the larger academic community.

250.    Given Professor DeGraff's prominence as a tenured professor at MIT, his false statements had their intended effect.  Alon's reputation in the MIT community and academic community have been severely and irreparably tarnished and he has experienced economic harm.  Despite Alon's sterling credentials, he has been denied over 50 tenure-track positions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court order the following relief:

1.   Entry of judgment against Defendants on all Counts;

2.   Injunctive relief to eliminate the hostile climate for Jews and Israelis at MIT, to prevent it from recurring and to ensure that MIT will enforce its non-discrimination and harassment policies against prohibited conduct rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI.

3.   A declaratory judgment that the failure by MIT to enforce its policies to protect Jewish and Israeli members of the MIT community has violated Title VI of the 1964 Civil Rights Act;

4.   For Plaintiff Lior Alon, injunctive relief requiring MIT to enforce its policies against harassment and doxing, thereby requiring Professor DeGraff to remove all videos and images of Alon from all social media platforms;

5.   For Plaintiff Lior Alon, an award of compensatory and consequential damages, including, without limitation, for his loss of wages, out-of-pocket costs for

therapy, counseling and/or medical, psychological and psychiatric care required as a result of MIT's conduct, costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of MIT's conduct, and lost career earnings in an amount to be determined at trial;

6.  For Plaintiff Lior Alon, emotional damages for intentional infliction of emotional distress, as Alon suffered and continues to suffer from severe and lasting emotional damages: psychological trauma and injury, embarrassment, humiliation, and mental anguish and injury;

7.  For Plaintiff Lior Alon, punitive damages in an amount to be determined at trial against MIT and Michel DeGraff;

8.  For Plaintiff William Sussman, an award of compensatory and consequential damages, including, without limitation, for his loss of educational opportunities, loss of wages, lost career earnings in an amount to be determined at trial, and out of pocket costs for security and/or security training;

9.  For Plaintiff William Sussman, emotional damages for intentional infliction of emotional distress, as Sussman suffered and continues to suffer from severe and lasting emotional damages: psychological trauma and injury, embarrassment, humiliation, and mental anguish and injury;

10. For Plaintiff William Sussman, punitive damages in an amount to be determined at trial against MIT and Michel DeGraff;

11. Plaintiffs' reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

12. Pre-judgment interest and post-judgment interest at the maximum allowable rate permitted by law;

13. Any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Dated:  June 25, 2025               Respectfully submitted,

**THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW**


By:____*/s/ Philip Y. Brown*_____

**THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW**
Richard A. Rosen*
Paul M. Eckles*
1330 Ave of the Americas, 23rd floor
New York, NY 10019
Telephone:  (202) 559-9296
rrosen@brandeiscenter.com
peckles@brandeiscenter.com

Robin N. Pick*
1717 Pennsylvania Avenue NW, Suite 1025
Washington, DC 20006
Telephone:  (202) 559-9296
rpick@brandeiscenter.com

**BROWN COUNSEL, LLC**
Philip Y. Brown (BBO #552366)
Amelia R. Gray (BBO #675632)
One Marina Park Drive, 1410
Boston, MA 02210
Telephone:  (617) 683-1500
pbrown@browncounsel.com
agray@browncounsel.com

*Attorneys for Plaintiffs
William Sussman, Lior Alon & The Louis
D Brandeis Center Coalition to Combat
Anti-Semitism*

**White & Case LLP**
Jonathan D. Polkes*
1221 Avenue of the Americas
New York, New York 10020-1095
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
jonathan.polkes@whitecase.com

Rachel Rodman*
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone: (202) 626-3600
Facsimile:  (202) 639-9355
rachel.rodman@whitecase.com

*Attorneys for Plaintiff*
*The Louis D Brandeis Center Coalition to*
*Combat Anti-Semitism*

*\*Pro hac vice application forthcoming*