## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| William Sussman, Lior Alon, John Doe and The Louis D Brandeis Center Coalition to Combat Anti-Semitism )<br><br>Plaintiffs, )<br><br>v. ).<br><br>Massachusetts Institute of Technology and Michel DeGraff )<br><br>Defendants. ) | **JURY TRIAL DEMANDED**<br><br>Civil Action Case No.<br>1:25-cv-11826-RGS |

### FIRST AMENDED COMPLAINT

Plaintiffs William Sussman, Lior Alon, and John Doe (the "Individual Plaintiffs"), and The Louis D Brandeis Center Coalition to Combat Anti-Semitism (the "Coalition") (collectively, "Plaintiffs") for their complaint against Defendants Massachusetts Institute of Technology ("MIT") and Michel DeGraff allege as follows:

### INTRODUCTION

1.     On December 5, 2023, while the world was watching, the president of MIT stood before Congress and said, now infamously, that calls for the elimination of the Jewish people can be anti-Semitic *depending on the context.*"  The presidents of the University of Pennsylvania and Harvard University gave similar answers, and as a result, lost their jobs.  The president of MIT remains at the helm of MIT and under her leadership, the anti-Semitism which was already rampant on campus when Congress called her to testify, has soared.

2.     Although anti-Semitism had been alive on the MIT campus for years, Jew hatred spiked sharply following the brutal terrorist attacks in Israel by Hamas on October 7, 2023.  After October 7, the campus became a hotbed of anti-Semitic hate and lawlessness, where student groups celebrated the murderous rampage of October 7, demonstrators shouted for violence against Jews worldwide, students occupied buildings and interrupted classes with hateful anti-Semitic chants, an individual urinated on the Hillel building, students erected an encampment in the center of campus with MIT assistance and MIT police blocked Israelis and Jews from entering the encampment, students cheered for the terror group Hamas, protestors chanted "intifada," students distributed "terror maps" promoting violence at campus locations deemed Jewish, and professors and students alike, shunned, maligned and bullied Jews and Israelis with impunity.

3.     Jews and Israelis at MIT who lived through the First and Second Intifadas in Israel grew up in an atmosphere of terror, lost people close to them in terror attacks and were injured by rocket fire during that period; they lost family during the Holocaust; and they lost loved ones on October 7 who were brutally murdered and taken hostage by Hamas.  After October 7, these same Jews and Israelis found themselves living in a climate of terror on the MIT campus.

4.     Although the MIT administration issued various lukewarm statements when anti-Semitic conduct threatened campus safety and took steps to end the anti-Israel encampment after two weeks of disruption and policy violations, anti-Semitic incidents continued to escalate after the encampment was removed.  Yet the

administration failed to act reasonably in response in light of the new, known circumstances and the hostile climate for Jews and Israelis further intensified.

5.      In the spring of 2024, a tenured professor publicly harassed and vilified an Israeli postdoctoral associate by posting images of him on social media with his name and Israeli military service.  As a result, the postdoctoral associate was aggressively confronted by people he did not know in various locations including his child's daycare and the grocery store.  He sent an email to the president of MIT detailing the onslaught, describing the hostile anti-Semitic climate at MIT, expressing fears for the safety of himself and his family and requesting support.  The president never responded.  No action was taken.

6.      In the fall of 2024, this very same professor, emboldened by MIT's failure to address his harassment of Jews, intensified his assault on Jewish identity and Jewish students.  He began teaching an anti-Israel seminar titled "Language and Linguistics. . . From the River to the Sea in Palestine. . ." and posted online, seeking to draw a link between "Jewish student life organizations," such as Hillel and Chabad, and a purported "Zionist 'mind infection.'"  When a Jewish student objected to the hateful rhetoric, the professor harassed him publicly, declaring him to be a real-life example of the "mind infection" in a relentless series of online posts and mass emails sent to the entire Linguistics and Philosophy Department and other distribution lists.  The president of MIT was copied on these communications, where she could witness the anti-Semitic bullying of a student by a professor in real time, and again, stayed silent.

7.      When the student filed a complaint with MIT's Institute Discrimination and Harassment Response Office, it compounded the harm by refusing to investigate his claim of anti-Jewish discrimination, instead justifying the conduct with more anti-Semitic language about "settler-colonial Zionist propaganda." And still, the professor continued to target the student publicly. In the absence of any action by the MIT administration to address the persecution and protect the student, he felt forced to leave MIT and his PhD program, abandoning a dream and a promising career in computer science.

8.      This climate which fostered abuse of Jews and Israelis also affected a laboratory where another Israeli postdoctoral associate was conducting research.  In May of 2024, he emailed the president of MIT after being cornered in an MIT parking lot by a group of masked individuals calling for death to Israel and death to Zionists. He told her that he no longer feels safe at MIT.  Again, the president of MIT did not respond.  And again, inaction allowed the campus hostilities against Jews to spiral out of control.

9.      In the fall of 2024, students in the same postdoctoral associate's research group began tormenting and shunning him based on his Jewish and Israeli identity. Students treated him like a pariah, spewing anti-Semitic slurs and refusing to acknowledge his presence.  Students spoke of creating a covert plan to destroy his relationship with his Jewish partner to prevent more Jewish babies. His professor repeatedly vilified him in front of students for being Israeli and Jewish. Eventually, students began refusing to work with him because they did not want to work with a

Jew. The professor acknowledged that students did not want to work with "his kind," but instead of eliminating the anti-Semitism from the lab, he eliminated the Jew. The professor told the postdoctoral associate to stop coming to the lab, assigned him menial tasks to perform in isolation and ultimately terminated his contract. Following a familiar pattern, the matter was reported to the campus administration, including the president of MIT, and no action was taken. The professor retaliated against the postdoctoral associate after he reported the abuse, maligning him to colleagues with a Nazi slur and taking other retaliatory measures.

10.     These incidents are emblematic of a larger problem on the MIT campus where anti-Semitism has been permitted to take root and persist in the absence of leadership and accountability. The post-October 7 surge of Jew hatred on campus in which students promoted terror against Jews in every corner of campus life with no intervention from administrators, ultimately ballooned into a culture that emboldened tenured professors to use their positions of power to persecute Jews without consequence—simultaneously devastating Jews and Israelis and impeding the advancement of science.

11.     As a result of the hostile anti-Semitic environment on campus, Plaintiffs have been deprived of educational and professional opportunities and the ability to participate in campus life to the same extent as their non-Jewish peers. Jews and Israelis on campus were prevented from fully engaging in their studies, their research, and the full spectrum of campus life. They have been forced out of their programs, out of campus spaces, off campus, and even out of the university entirely.

Some left because the climate was intolerable for Jews and Israelis, losing positions, degrees, courses of study and career paths.  An Israeli Jew was forced out of a prestigious postdoctoral appointment.

12.    Jews and Israelis on campus, including the Individual Plaintiffs and Coalition members, experienced severe and pervasive harassment and discrimination based on national origin, shared ancestry and religion, as well as retaliation for complaining about their improper treatment, and MIT administrators knowingly failed to take action to eliminate the hostile climate and discrimination against them or to stop the retaliation, in violation of Title VI and Title VII of the Civil Rights Act of 1964 and Chapter 151B of the Massachusetts General Law. The Individual Plaintiffs were also subjected to outrageous and wrongful conduct that has resulted in severe emotional distress and extreme anxiety and anguish.  Dr. Alon was defamed by an MIT professor. Further, Plaintiff Doe's contract with MIT was wrongfully terminated by MIT.

## JURISDICTION AND VENUE

13.    The Court has subject matter jurisdiction over Counts I through VI of this action under 28 U.S.C. §§ 1331 and 1343 because these claims arise under federal law.

14.    The Court has supplemental jurisdiction over Counts VII through XV because they are "so related to [the] claims in [this] action within" the Court's "original jurisdiction that [they] form part of the same case or controversy." 28 U.S.C. § 1367.

15.    The Court has personal jurisdiction over MIT because it is located and conducts business in the District of Massachusetts.

16.    The Court has personal jurisdiction over Michel DeGraff because he resides and works in the District of Massachusetts.

17.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant MIT is located in the District of Massachusetts, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District.

## PARTIES

18.    Plaintiff Lior Alon is a Jewish citizen of Israel and was a postdoctoral associate at MIT.  He is currently an instructor at MIT.  He is a member of the Coalition.

19.    Plaintiff William Sussman is a United States citizen and a Jewish former PhD student at MIT.  He is a member of the Coalition.

20.    Plaintiff John Doe is a Jewish citizen of Israel.  He was previously a postdoctoral research associate in a science department at MIT and is currently an instructor in another department at MIT.  He is a member of the Coalition.  Plaintiff John Doe is not identified by name in this Complaint because of a reasonable fear that he would face retaliation and harassment and that his physical safety would be endangered.

21.    Plaintiff The Louis D Brandeis Center Coalition to Combat Anti-Semitism is a national membership organization whose mission is to advance the civil

and human rights of the Jewish people and promote justice for all through lawful means, including litigation. The Coalition's members consist of individuals, including Jewish and Israeli undergraduate, graduate, and professional students, who have personally been aggrieved by, or have by association been impacted by, anti-Semitism and discrimination.  The Coalition's members include members of the MIT community, including faculty, alumni and students, who have experienced anti-Semitism on the MIT campus.

22.    Defendant MIT is a private research institution located in Cambridge, Massachusetts.  At all times relevant to the allegations outlined in this Complaint, MIT was and continues to be a recipient of federal funds, including student loans,[1] as well as grants from federal agencies, including the National Institutes of Health and the Department of Defense.  In fiscal year 2023, MIT reportedly received over $1.6 billion in federal funds.

23.    Defendant Michel DeGraff is a tenured associate professor at MIT.

## FACTUAL ALLEGATIONS

### A.    The Meaning of Anti-Semitism

24.    The Jewish people have deep indigenous roots in the land of Israel. Despite periods of forced exile, a continuous Jewish presence has endured there for millennia. This historical bond, along with the Jewish people's right to self-determination in their ancestral homeland, is the foundation of Jewish identity.

---

[1] Federal loans, referred to as "grants and loans of federal funds" by the U.S. Department of Justice, are an example of federal assistance. *See* Civ. Rights Div., *DOJ Title VI Legal Manual*, U.S. DEP'T OF JUST., https://www.justice.gov/crt/media/1384931/dl?inline, Section V at 5 (last visited July 26, 2024).

Zionism reflects this enduring connection between the Jewish people and the land and recognizes the right of Jewish self-determination in the land of Israel.

25.    The International Holocaust Remembrance Alliance ("IHRA") defines anti-Semitism as "a certain perception of Jews, which may be expressed as hatred toward Jews.  Rhetorical and physical manifestations of anti-Semitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."[2]   The IHRA working definition incorporates examples such as:

- Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor.

- Applying double standards by requiring of Israel a behavior not expected or demanded of any other democratic nation.

- Drawing comparisons of contemporary Israeli policy to that of the Nazis.

- Holding Jews collectively responsible for actions of the State of Israel.

- Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations.

The IHRA working definition of anti-Semitism recognizes the fact that Jews share more than a common faith; they are a people with a shared history and heritage deeply rooted in the land of Israel.

---

[2] The Int'l Holocaust Remembrance All., *Working definition of antisemitism*, Int'l Holocaust Remembrance All., (last visited Sept. 16, 2025, at 10:25 ET), https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism.

26.     The United States, along with 42 other countries, has adopted the IHRA working definition.[3]  Similarly, 33 states have adopted the IHRA working definition of anti-Semitism, through either executive orders, resolutions, or laws.[4]

27.     A number of colleges and universities have expressly incorporated in policy guidelines the IHRA working definition of anti-Semitism, including Harvard University, Yale University, Duke University, New York University, University of Pennsylvania, George Mason University, University of Pittsburgh, North Carolina State University, Ohio State University, Occidental College, public universities in Florida, Kansas, Nevada, Oklahoma, and Tennessee, as well as nearly every university in the United Kingdom.

28.     Zionism does not preclude criticism of the political or military policies of the State of Israel, or advocacy for Palestinian self-determination and statehood. Criticism of Israel is not inherently anti-Semitic.  However, expressions of hatred against "Zionists" are anti-Semitic, as are denials of the right of Jewish people to self-determination (e.g., by claiming that the existence of a State of Israel is a racist endeavor).[5]

29.     According to the Anti-Defamation League, the vast majority of Jews around the world identify as Zionists or feel a connection or kinship with Israel,

---

[3] The U.S. Dep't of State, *Defining Antisemitism*, OFF. OF THE SPECIAL ENVOY TO MONITOR AND COMBAT ANTISEMITISM, https://www.state.gov/defining-antisemitism/.
[4] Jewish Virtual Library*, States Adopt IHRA Anti-Semitism Definition* (2024), https://www.jewishvirtuallibrary.org/states-adopt-ihra-definition-of-anti-semitism (last visited Sept. 16, 2025).
[5] U.S. HOUSE OF REPRESENTATIVES, *Staff Report on Anti-Semitism*, p.16, (Dec. 18, 2024), https://www.speaker.gov/wp-content/uploads/2024/12/House-Antisemitism-Report.pdf.

regardless of their opinions on the policies of the Israeli government.[6]  A 2020 Pew study found that more than 80% of Jews in the United States view Israel as integral to their Jewish identity.[7]  A 2024 survey conducted by the American Jewish Committee likewise found that for 81% of Jews in the United States, caring about Israel is important to what being Jewish means to them.[8]

30.     "Zionist" is frequently used as a codeword, proxy term, or dog-whistle for "Jew."  The dominant understanding among Jews for thousands of years is that a central tenet of the Jewish faith, the love of Zion (Jerusalem), stems from the recognition that the Jews are a people whose ancestral history is rooted in the land of Israel.    Accordingly, conduct that targets "Zionists" targets Jews, and discrimination against Zionists therefore constitutes discrimination against the vast majority of Jews.

## B.    Anti-Semitism Is a Widespread Problem on the MIT Campus

31.     Coalition members, including Alon, Sussman, Doe, and Coalition Member #1, as well as other Jewish and Israeli members of the MIT community, have experienced consistent, widespread and steadily intensifying anti-Semitic and anti-Israeli harassment and discrimination on campus.

32.     Even before the October 7 attacks, Jewish and Israeli students on the

---

[6] *See Zionism,* ADL (Sept. 1, 2016), https://www.adl.org/resources/glossary-terms/zionism.

[7] Pew Research Center, *7. U.S. Jews' connections with and attitudes toward Isr.*, DISCRIMINATION & PREJUDICE (May 11, 2021), https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/.

[8] *The State of Antisemitism in America 2024: AJC's Survey of American Jews*, AMERICAN JEWISH COMMITTEE, https://www.ajc.org/AntisemitismReport2024/AmericanJews (last visited Sept. 16, 2025).

MIT campus have been subjected to anti-Semitism, which was widely documented and acknowledged within the university community. For example:

- On Holocaust Remembrance Day on April 18th, 2023, vandals defaced a display commemorating the Holocaust with anti-Israel graffiti in MIT's main lobby.

- On April 30, 2023, a Nazi swastika was found on a board belonging to a Jewish faculty member, whose name on the door is identifiably Jewish.

33.    After the brutal massacre of Jews and Israelis on October 7, 2023, a torrent of anti-Semitic hate was unleashed. The conduct described below was experienced by and known to members of the Coalition and caused great emotional distress and feelings of fear and anxiety.

- On and immediately after October 7, members of the MIT community celebrated and glorified the brutal massacre of Jews.

- The MIT Coalition Against Apartheid ("CAA") posted on social media celebrating and justifying the massacre of innocent civilians, claiming "[v]ictory is ours," "this resistance is 100% predictable and justified," and "the resistance rises."

- While stunned and grief-stricken Jewish and Israeli students were learning the fate of loved ones in Israel, the CAA sent an email to all of MIT's undergraduate students, blaming Israel and justifying the massacre: "[W]e hold the Israeli regime responsible for all unfolding violence."

34.    Students chalked anti-Semitic slogans on various campus locations, hosted "die-ins," took over campus spaces and disrupted classes with anti-Semitic speeches, chants and walkouts.

35.    At frequent rallies on campus, students regularly chant violent slogans such as "One Solution: Intifada Revolution," "Globalize the Intifada" and "From the river to the sea, Palestine will be free," known calls for the violent elimination of Jews

from the State of Israel and around the globe. The word "intifada" refers to two periods in Israel's history characterized by deadly terrorist attacks against Israeli civilians in buses, on streets, in restaurants and in bars. Jews and Israelis at MIT who heard these calls for the annihilation of their people were shocked, terrified and shaken to their core.

36.    In classrooms throughout campus, protestors have interrupted classes with speeches, screams and chants. In an algebra class, the professor gave the floor to a disruptor who stood in front of the class declaring "[a]s we witness the ongoing genocide in Gaza. . . I am joining hundreds of students. . . walking out of class. . . because we stand for the liberation of Palestine against active genocide perpetrated by MIT, Israel and the United States! Free, free Palestine!" Other students began screaming "Free, free Palestine" so loudly that no learning could take place.

37.    At the same hour, in other classrooms on campus, students gave the same speech, started chants and were joined by many voices shouting "free, free Palestine" while students stood up and walked out of class, leaving Jewish and Israeli students shaken and distraught. In some classes, lecturers ended class early to support the walkout, depriving Jewish and Israeli students who did not wish to participate, of class instruction.

38.    On the anniversary of Kristallnacht (the date in 1938 when Nazi leadership orchestrated a violent wave of anti-Jewish pogroms as a precursor to the Holocaust), an anti-Israel protest took place inside MIT's main lobby and thoroughfare, Lobby 7 and the Infinite Corridor. The protestors screaming inside the

building were loud and threatening.  Students were blocked from accessing classes and were told by MIT to find alternate routes which were lined with hateful anti-Israel protest signs.  Chants could be heard justifying the October 7 atrocities including "resistance is justified when people are occupied."  On the day commemorating the beginning of the Holocaust, Jews on campus could not walk through the main campus thoroughfares.

39.    In December of 2023, an individual urinated on the window of the MIT Hillel Center, a room where Jewish students gather and pray daily.  According to MIT Hillel's mission, it serves "as the center for Jewish life at MIT" and "offers a vibrant program of religious, educational, social, and Israel activities that enable the exploration of Jewish culture, tradition, and scholarship."

40.    On April 21, 2024, anti-Israel students at MIT erected an encampment in the center of campus on Kresge Lawn, which remained for two weeks.  During this time Jewish and Israeli students were blocked from entering this area of campus. MIT Hillel was prevented from using the area during a time it had reserved the space for an event.

41.    At a protest on May 1, 2024, on campus near the MIT Hillel building, a crowd of students cheered as a man spoke in support of jihadi terror and praised US-designated terror groups Hamas, the Popular Front for the Liberation of Palestine (PFLP) and the Muslim Brotherhood.

42.    On May 5, 2024, protesters chanted for the forced expulsion and murder of Jews (translated from Arabic):

We wish to say it loud and clear, we don't want to see Zionists here. From water to water, Palestine – Arab.  From water to water, Israel – Destroyed. From water to water, Palestine – Arab.  We will sacrifice our blood and souls for you Palestine.  Free Palestine, Israel get out.  Free Palestine, Zionists get out.  The iron gate of Al-Aqsa – open for the martyr.  From water to water, death to Zionism.

43.    Protestors at the encampment also desecrated Israeli flags with red "bloody" handprints.[9]



44.    In September of 2024, an online group of MIT graduate students, "MIT Graduates for Palestine," with over 2,800 followers, promoted on social media the PFLP, a US-designated foreign terrorist organization.

---

[9] For Israelis, the image of blood-covered hands invokes painful memories and can only be interpreted as a threat.  On October 12, 2000, two Israeli reservists accidentally entered Ramallah, were arrested by Palestinian police, and then killed by a mob that stormed the station. The raised, blood-covered hands of the murderers became the unmistakable visual shorthand for the lynching.



45.    On March 14, 2025, the MIT International Students Association posted a video on its Instagram page welcoming the new class of international students who had received admission letters that day.    The video features students from approximately fifty countries greeting the newly admitted students in their native language while holding their national flags.    There are no Israeli students or Israeli flags in the video.

46.    Upon information and belief, Israeli students were not invited to participate in the video, resulting in the absence of any Israeli representation. Current Israeli students at MIT would have willingly taken part in this video to welcome incoming Israeli students.    Israeli students continue to be excluded from the video, which remains online.

47.    On April 18, 2025, students handed out "terror maps" of the MIT campus.  These maps marked which buildings had connections to the Jewish and Israeli communities and promoted violence against them with the phrases "From the river to the sea, Palestine will be free" and "Resistance is justified when people are colonized."

48.    These maps inciting violence against Jews and Israelis at precise campus locations were distributed widely to students on campus and via mass emails.

49.    These "terror maps" follow an earlier incident at an orientation event in August of 2024 when students handed out flyers containing a link to the Mapping Project to incoming students.  The Mapping Project targets Jewish organizations and other locations, including at MIT, that allegedly "support the colonization of Palestine," by revealing their locations on a map and encouraging violence against them.  The stated goal of the Mapping Project is "to reveal the local entities and networks that enact devastation, so we can dismantle them. Every entity has an address, every network can be disrupted."   Although President Kornbluth subsequently issued a statement about the Mapping Project in which she stated that "I believe the Mapping Project promotes antisemitism," her statement failed to have any impact on the increasingly hostile and violent campus climate.  Less than one year later, the "terror maps" appeared on campus.  Upon information and belief, no action has been taken in response to these "terror maps."

50.     On May 26, 2025, a group calling themselves "ethical scientists at MIT" defaced MIT property, removing a painting of one of MIT's founders in protest of the "zionist entity."  In a chilling video posted on social media by Unity of Fields (the US branch of Palestine Action, which the UK recently proscribed as a terror organization), an MIT scientist draped in a keffiyeh, with his face covered and voice disguised, boasted of the vandalism, accused two MIT professors by name of being "complicit in genocide" and spoke of a "Free Palestine from every river, to every sea" an allusion widely understood to be a call to wipe Jews off the face of the earth.  He further threatened violence against Israelis, Jews and those that support them at MIT, warning "we will not forget MIT's complicity in genocide.  If MIT does not end this, we will."

51.     On May 29, 2025, at the MIT Commencement Ceremony, the undergraduate class president stood on stage and delivered a speech that MIT admitted was an unapproved "protest from the stage," demonizing Israel and accusing Israel of genocide.  Jewish and Israeli families walked out of the event, despite traveling far distances to celebrate the occasion.  President Kornbluth entered the stage immediately afterwards and did not address the hateful rhetoric. President Kornbluth did not affirm that the views of the class president were not the views of MIT or that MIT supports all of its Jewish and Israeli students.  Instead, she began speaking about the fashionable red jackets of the members of the class of 1975.  In that moment, Jews and Israelis received the message that MIT will not protect them from anti-Jewish and anti-Israeli harassment and discrimination.  After President

Kornbluth finished speaking, people in the crowd began screaming, "Free, free Palestine," a phrase now associated with the murder of Jews. Indeed, just one week earlier, that same cry, "Free, free Palestine" was the shout of the murderer who killed two innocent people outside of a Jewish event in Washington, DC. And only a few days later, on June 1, 2025, the perpetrator of the Molotov cocktail attack at a peaceful demonstration in Boulder, Colorado, also shouted "Free Palestine." Although MIT later banned the student president from the following day's graduation ceremony, this was "too little, too late" because President Kornbluth failed to speak up at a critical moment to protect Jewish and Israeli students in the Commencement Ceremony audience.

52.     On June 9, 2025, flyers were posted on campus with the message "YOU CAN'T DEPORT THE INTIFADA."



53.     The very next day, additional flyers were posted on campus locations promoting a classic anti-Semitic blood libel, displaying a Jewish star, dripping with blood. Later that day, President Kornbluth issued a statement about the desecration

of a religious symbol without addressing the larger issues and threats facing Jews and Israelis at MIT.

54.    In this statement, President Kornbluth further stated:

No matter what cause you champion, targeting, threatening, intimidating and spreading false statements about members of the MIT community is unacceptable and potentially unlawful – and it has to stop. *If we find that members of our community engaged in these activities, we will hold them responsible.* (Emphasis added)

As described in detail herein, this representation is false.  She was notified by Plaintiffs of egregious instances of anti-Semitic targeting, threatening, intimidation and the spreading of false statements about Jewish and Israeli MIT community members, but she failed to act.

55.    In this communication, President Kornbluth also revealed that she knew that "several faculty, staff and students have been targeted."  President Kornbluth's performative gesture underscores that she has knowledge of campus anti-Semitism but is taking no meaningful action to stop it.  MIT's practice of uttering words without action has allowed anti-Semitism to dominate campus life for Jews and Israelis as described herein.

56.    As the identity-based targeting of Jews, for whom a connection to Israel is an integral part of their ethnic and ancestral identity, ballooned on campus, President Kornbluth continued to display a blatant disregard for this targeting of Jews.  She remained silent about the intifada stickers posted on campus just the day before, threatening Jews and Israelis with violence, and failed to acknowledge the ongoing threats of violence Jews and Israelis face at MIT.

57.    On July 6, 2025, The Stata Center, which houses MIT's Computer Science and Artificial Intelligence Laboratory (CSAIL), was defaced with anti-Israel graffiti, including the spray painting of "Death to the IOF."[10] A radical group called the "Direct Action Movement for Palestinian Liberation" (DAMPL) claimed responsibility and posted that this was a "costly warning shot." DAMPL specifically named a top researcher at MIT for her work on technology allegedly used by the Israeli military.  The posting made clear that this was a threat:  "You are building weapons for an occupying army. We will meet you with forceful resistance, not polite requests. The resistance is alive, and knows exactly where you work."  Significantly, this does not appear to have been an idle threat—when a suspect was later arrested, officers found homemade explosives in his car.

58.    It took MIT two days to put out a response to the threat and graffiti. When it did respond, its focus was on (i) stating MIT's belief that the perpetrator was not affiliated with MIT and (ii) defending the targeted researcher, not by an unqualified condemnation of the threats, but rather by arguing that the targeted professor's research had been "mischaracterized" and that the research project had already ended—implicitly suggesting that the threat would somehow have been justified if the professor was engaged in research that somehow supported the Israel military.

59.    All of the anti-Semitic incidents described herein (¶¶31 to 58) were widely publicized on the MIT campus and were known to Jewish and Israeli members

---

[10] "IOF" is a slur used by anti-Israeli activists, which refers to the "Israeli Defense Forces" as the "Israeli Occupation Forces."

of the MIT community, including Coalition members.  The incidents were also known to the MIT administration, and the incidents – and MIT's tepid or non-existent responses to the incidents – created a hostile environment and a sense that Jewish and Israeli members of the community were not welcome on campus.

60.    These anti-Semitic incidents have caused Jewish and Israeli members of the MIT community, including Coalition members, to live in fear for their personal safety, have hindered their ability to complete their academic studies, marred their ability to participate in MIT campus life, and caused them to experience extreme anxiety.  Some have felt ostracized, isolated from their classmates, and unwelcome participating in campus activities.  Some have felt like they need to hide their Jewish identity and have even ceased attending Jewish-sponsored events on campus.  Some have skipped classes, skipped events and activities, and chosen to spend more time at home.  Based on the fear they have experienced, some have even avoided entire sections of campus.

61.    The negative impact on Jewish and Israeli members of the MIT community, including Coalition members, has been exacerbated by MIT's disregard of the anti-Semitic incidents and environment.  MIT failed to protect Dr. Alon (*see infra* ¶¶ 78-91, 96-150, 162-168).  MIT failed to protect Mr. Sussman (*see infra* ¶¶ 92-161, 169-175).  MIT failed to protect Dr. Doe (*see infra* ¶¶ 176-272).  MIT failed to respond to the "terror maps."  MIT failed to respond to the defacing of MIT property. More broadly, MIT has failed to take meaningful action to prevent more anti-Semitic

incidents from occurring, failed to hold accountable the vast majority of anti-Semitic wrongdoers, and failed to eliminate the anti-Semitic hostile environment.

## C. Dr. Lior Alon and William Sussman Have Been the Direct Victims of Anti-Semitism on MIT's Campus

### 1. Alon's and Sussman's Backgrounds

#### (a) Dr. Lior Alon

62.    Dr. Lior Alon's grandparents are Holocaust survivors, and much of his extended family was murdered during the Holocaust, including some who were killed at Auschwitz.

63.    Alon, who is Israeli and Jewish, grew up in Israel during both the First and Second Intifadas, which were periods of violent uprisings involving terror attacks against Israeli and Jewish civilian targets.  Alon grew up in an atmosphere of terror.

64.    In 2020, Alon received a PhD from the Technion—Israel Institute of Technology, earning the Foundation for Excellence in Mathematics award for his dissertation. He subsequently held a postdoctoral position at the Institute for Advanced Study (IAS) in Princeton, New Jersey—a world-renowned research institute, historically home to Einstein, Gödel, and other intellectual icons—where he worked under the mentorship of Peter Sarnak, one of the most influential mathematicians of this time.  Alon then joined MIT as a postdoctoral associate within the Simons Collaboration on Localization of Waves, hosted by David Jerison, a prominent analyst and a member of the American Academy of Arts and Sciences.

65.    Alon's research lies at the interface of spectral geometry, mathematical physics, and Fourier analysis, with notable contributions to quantum graphs, nodal

statistics, and Fourier quasicrystals. His work has appeared in top-tier journals such as *Inventiones Mathematicae*—one of the most selective and prestigious mathematics journals globally—and *Communications in Mathematical Physics*, a leading journal at the intersection of mathematics and theoretical physics. He has authored more than ten peer-reviewed publications and two active preprints.

66.    From fall 2022 through August 2024, he was a postdoctoral associate in the Mathematics Department at MIT, one of the top mathematics departments in the world.

67.    Alon is currently an instructor in the Mathematics Department at MIT, which receives federal funding.

68.    In addition to his research, Alon has taught undergraduate seminars at MIT, mentored students in MIT's SPUR+ and UROP programs, and organized a major international workshop.

69.    In April of 2025, Alon was one of nine postdocs and research scientists at MIT to receive the School of Science's 2025 Infinite Expansion Award, which "highlights extraordinary members of the MIT community."

70.    Prior to joining MIT, Alon considered offers from several world-renowned universities but chose MIT because he considered it a premier institution in his chosen field, where he envisioned a bright future for himself.

(b)    **William Sussman**

71.    In 2019, Sussman was named the northeastern US recipient of the Larry K. Wilson Regional Student Activities Award by the Institute of Electrical and

Electronics Engineers ("IEEE"), the world's largest technical professional organization for the advancement of technology. The award recognizes an IEEE student member whose accomplishments are considered extraordinary.

72.    In 2020, the Yale School of Engineering & Applied Science ("SEAS") awarded Sussman the Belle and Carl Morse Prize, which recognizes the most outstanding junior in SEAS.

73.    In 2021, Sussman was awarded the Franz Tuteur Memorial Prize, which recognizes the most outstanding senior project in Electrical Engineering at Yale.

74.    Sussman graduated from Yale in 2021. He received a Bachelor of Science in Electrical Engineering and Computer Science with Distinction and a Certificate in Data Science.

75.    In fall of 2021, Sussman began his PhD program in computer science at MIT, where he was a Jacobs Presidential Fellow in the Networks and Mobile Systems group at the MIT Computer Science and Artificial Intelligence Laboratory ("CSAIL"). Sussman was enthusiastic about the opportunities before him at MIT.

76.    On July 7, 2023, Sussman was featured in an MIT news article highlighting his academic career, research interests and aspirations for the future as a computer scientist. The article states:

> "Although he has just two years of graduate school under his belt, Sussman is considering a career in academia. Yet he is also intrigued by government service and plans to complete the MIT Graduate Certificate Program in Science, Technology and Policy. This summer he is conducting research at the National Institute of Standards and Technology. By the time he graduates, he says, "I hope to have an understanding of systems that scale, nationally and globally."

77.    Sussman was also the president of MIT Graduate Hillel, known as Grad Hillel, an association of Jewish students from all parts of the MIT community. Grad Hillel is part of MIT Hillel which is at the center of Jewish life at MIT and celebrates and supports the development of individual Jewish identities on the MIT campus.

### 2.    Alon's and Sussman's Experience with Anti-Semitism on MIT's Campus Prior to DeGraff's Harassment

#### (a)    Dr. Lior Alon

78.    On October 7, 2023, Alon tragically lost a childhood friend who was murdered by Hamas terrorists while protecting his family.  The fiancée of another childhood friend was also brutally murdered at the Nova music festival on October 7.

79.    Just days after the massacre, stunned and grief-stricken, Alon witnessed demonstrators on campus calling for violence against Jews inside of an MIT building, chanting "from the river to the sea, Palestine will be free" in the corridor right below his office. Growing up in Israel where he heard that phrase in Arabic calling for the land of Israel to be Arab from water to water, Alon recognizes that phrase as calling for the annihilation of Jews.

80.    On October 19, 2023, Alon heard protestors on campus, not far from where his children attend daycare, chanting loudly "one solution, intifada" which was shocking and terrifying to him.  That day, he emailed President Kornbluth to alert her to calls on campus for terror acts.  He told President Kornbluth that "[t]here was a clear and concrete call for terror acts today at MIT, in a demonstration in front of the student house. A large group of people were calling out loud and repeatedly 'one solution, intifada.'"  He told her that "I also send my kids to the MIT daycare, and I

am truly afraid." Alon explained that as an Israeli, he experienced two Intifadas in his life, the first in 1987-1993 and the second in 2000-2005. To ensure that she understood what intifada meant, he explained that "intifada" refers to a violent uprising involving terrorist attacks against Israeli and Jewish civilians and provided a link which contained a long list of such suicide attacks. Alon stated, "I am expressing here not only my concerns but the concerns of many Israelis and Jewish people on campus. We are truly afraid for our lives and for the lives of our children, right here on campus."

81.    Alon forwarded the email to the head of his department who affirmed that "[t]his is quite scary indeed" and stated, "I hope [President Kornbluth] will take actions to keep our campus safe."

82.    President Kornbluth responded to Alon with two sentences: "I appreciate your outreach and share your concern. This matter has our full attention." Despite her full knowledge of the situation and her expressed "concern," she did not specifically speak out against calls for intifada on her campus. On October 21, 2023, President Kornbluth issued a video referencing "ugly words and actions," stating that "[w]e cannot let MIT become a place where we treat each other this way," but she did not directly address calls for intifada on campus, and the calls for violence against Jews and Israelis continued.

83.    When the encampment was erected in April 2024 in the center of campus, the MIT administration provided the protesters fencing to construct the

encampment and directed MIT police to exclude Israelis and Jews from entering this central campus location.

84.     The encampment was located between Alon's child's daycare center and the math department, on a route that Alon walks daily.  On April 23, 2024, on the way from the daycare center to the math department, Alon attempted to walk through Kresge Lawn, but was approached by an MIT administrator and police officer who told him to leave.

85.     Upon information and belief, the administrator and others attempting to keep Alon out of this campus space knew that he was Jewish and Israeli.

86.     This administrator told Alon that he must leave because the individuals in the encampment "reserved the space for a program that they are hosting."  This representation was blatantly false.  In fact, MIT Hillel had reserved the space and was prevented from using it.

87.      The encampment was unauthorized and violated MIT's rules prohibiting exercises of free expression being "used for purposes of harassment, discrimination . . . threats or violence, [or] targeting of groups or individuals."

88.     Alon was excluded from a part of campus by the MIT administration because he is Israeli and Jewish.

89.     On May 6, 2024, Alon saw an Israeli flag that had been defaced with bloody handprints.

90.     Later that same day, he entered the encampment by climbing over a fence at the rear of the encampment but was then blocked from walking out.  When

he tried to leave, a group of people blocked the exit and would not let him out, trapping him inside because he is Israeli and Jewish. He was only able to leave after calling for police assistance.

91.   Also that day, all the Israelis present gathered together to honor their murdered and kidnapped loved ones, singing Hatikva, the Israeli national anthem. Alon noticed tenured professor Michel DeGraff, wearing a ribbon designating him as a faculty member tasked with deescalating tension, aggressively filming the Israelis singing. Alon approached Professor DeGraff and began translating the words into English for him: "We haven't lost our hope, our 2000-year-old hope, to be a free people in our homeland, the land of Zion and Jerusalem," but Professor DeGraff shoved his phone in Alon's face, filming him.

**(b)   William Sussman**

92.   As a Jew on campus, Sussman was aware of the anti-Semitism on campus even before October 7, 2023, such as an event with Mohammed El-Kurd at which El-Kurd asked audience members to create a database of former Israeli soldiers who are the founders of companies, targeting members of the MIT community. Sussman was also aware of the vandalism of a display commemorating the Holocaust in April 2023.

93.   After October 7, 2023, as president of Grad Hillel, Sussman had to cope not only with his own experiences of campus anti-Semitism but was constantly supporting other Jewish and Israeli students who were experiencing anti-Semitism on campus, including witnessing chants for violence against Jews, building takeovers,

classroom interruptions and aggressive confrontations.  Sussman received frequent messages from other community members about the events on campus, causing him to feel anxiety, concern and fear about anti-Semitism at MIT.

94.     Student protestors were arrested both inside and outside of Sussman's MIT office building, the Ray and Maria Stata Center.

95.     When demonstrators erected an encampment in the middle of campus in April 2024, MIT Hillel was forced to move and postpone its long-planned annual celebration of Israel's Independence Day, which distracted Sussman from his master's thesis.  The hostile anti-Semitic campus climate impacted his computer science research.  It was hard to focus on his work in such a hostile climate and he felt derailed.

### 3.  Professor DeGraff Harasses Coalition Members Including Alon and Sussman and Exacerbates the Hostile Environment

96.     In addition to all the events described above that have led all Jews and Israelis on campus, including members of the Coalition, to be subjected to a hostile environment, day in and day out, including aggressive anti-Jewish and anti-Israeli rhetoric, imagery, conduct, threats and hatred, Alon and Summan have personally been the direct targets of anti-Semitism at MIT by Professor DeGraff.

97.     Soon after the May 6, 2024 encampment where Professor DeGraff aggressively filmed Dr. Alon as he sang the Israeli national anthem with a group of peaceful counter protestors, Professor DeGraff began posting videos on social media with Alon's face, name and personal information, including details of his Israeli

military service, tagging Al Jazeera and others–putting Alon at serious risk. Professor DeGraff edited the videos, creating a false narrative vilifying Alon.

98.    As a result of Professor DeGraff's social media posts, Alon was aggressively confronted by people he did not know at various locations, including at the grocery store and his child's daycare.  At the grocery store, a woman that he had never seen before approached him and began screaming at him as a result of these posts.

99.    Because of these posts, Alon experienced unwarranted hostility, significant distress, harm to his reputation and fear for his safety.

100.    Professor DeGraff also maligned Alon in an essay he published in *Le Monde diplomatique*, a prominent, international periodical that is available in twenty-four languages and has a circulation of approximately 2.4 million copies worldwide.  In a propaganda piece published online on May 24, 2024, Professor DeGraff continued his smear campaign against Alon, falsely accusing Alon of stating that "SAGE's students' pleas to halt the genocide of Palestinians are 'pro-Hamas' and advocate the killing of Jews."  Alon made no such statement.  In support of DeGraff's claim, he linked to a news clip of Alon from October 25, 2023.  This clip was made before SAGE ("Students Against Genocide Encampment") even existed.  Instead, in this news clip, Alon spoke about how calls for intifada at MIT (i.e., calls for violence on the MIT campus) just weeks after the October 7 massacre made him and his family feel unsafe.

101.    Further, Professor DeGraff juxtaposed that news clip with a video shot over six months later when Jews and Israelis were blocked from entering the campus area where the encampment was located for baseless "safety" reasons.  After being blocked on multiple occasions from entering, Alon eventually succeeded in entering the area by climbing over a fence at the rear of the encampment.  When his Israeli friend was similarly blocked from entering because he is Israeli, Alon called out that he felt "unsafe" and needed his Israeli friend to help him.  (The individuals guarding the entrance had made clear that "unsafe" was the code word that needed to be verbalized in order for another Israeli to be granted permission to enter.)  At that point, the individuals guarding the encampment allowed his Israeli friend to enter.  Further fabricating a damaging narrative, in the article, Professor DeGraff omitted the context and stated that Alon had "mock[ed] his own 'fear,'" which again was patently false and caused Alon great embarrassment and distress.

102.    Professor DeGraff also falsely stated in the article that Alon "participate[d] in well-rehearsed propaganda that erases the anti-Zionist Jewish students and misrepresents them, along with their non-Jewish comrades, as violent and antisemitic."  That is false.  There were no rehearsals, no propaganda and Alon made no such statements.  The article—which Alon was shocked to learn about in June 2025—remains online today.

32

103.    In a June 13, 2024 piece published on TheTech.com,[11] DeGraff again linked to multiple of his own social media posts and videos of Alon, accusing Alon of "manufactur[ing] danger" and "falsely accus[ing]" protestors of creating unsafe conditions for the MIT community as "part of a larger campaign to suppress free speech at MIT."  DeGraff also linked to a post with a video of Alon, citing Alon as an example of people "directly threatening or mocking SAGE students," which Alon never did.  This article also remains online today.

104.    On June 17, 2024, Alon emailed President Kornbluth a detailed recounting of the events on campus and DeGraff's social media posts.[12]  He stated that "I have been subjected to anti-Semitic harassment and defamation by a professor, including online doxing which has made me and my family fear for our safety."  He shared his history living through two Intifadas and losing people close to him in the October 7 terrorist attack.  He reported to President Kornbluth:

- Calls on campus for intifada (i.e. violence against Jews);

- Being denied access to a part of campus due to his Jewish and Israeli identity;

- The desecration of an Israeli flag with bloody handprints;

- Being trapped in an area of campus by students that restricted his movement based on his Jewish and Israeli identity;

- Online harassment of him by Professor DeGraff which resulted in aggressive confrontations in the real world by people who viewed the defamatory and anti-Semitic posts;

---

[11] Michel DeGraff, *Is MIT's #MindHandHeart for a #BetterWorld compatible with its "vibrant" complicity in Isr.'s genocide of Pal. in Gaza?*, THE TECH (June 13, 2024), https://thetech.com/2024/06/13/degraff-linguistics-pro-pal.

[12] Alon did not mention the *Le Monde diplomatique* article because he was not aware of it at that time.

- His fears for his safety and the safety of his family.

105.   Alon requested in his email to President Kornbluth that the MIT administration immediately request that Professor DeGraff take down the posts of him and if he does not do so, to take disciplinary action against him.

106.   President Kornbluth never responded and MIT took no action.

107.   The social media posts were not taken down.

108.   Upon information and belief, MIT failed to discipline Professor DeGraff for this conduct.

109.   Not only did President Kornbluth's silence and MIT's inaction cause harm to Alon, but MIT's failure to act also emboldened Professor DeGraff, and his harassment of Jews and Israelis escalated as a result.

110.   In the leadup to the Fall 2024 semester, Professor DeGraff harassed another Israeli member of the MIT community, who is the head of Professor DeGraff's own department, after the department denied one of Professor DeGraff's course proposals. Though the department's curriculum committee had voted unanimously not to approve the course, Professor DeGraff targeted the Israeli professor individually in public writings and in mass emails—spamming uninvolved members of the MIT community—in which he emphasized the professor's Israeli national origin as a likely basis for the denial.

111.   MIT was aware of Professor DeGraff's targeting of the Israeli professor and notified Professor DeGraff that these actions, including specifically the targeting of the professor based on his national origin, constituted misconduct—but the

University took no action to stop Professor DeGraff from engaging in the same type of harassment against Dr. Alon and, just a few months later, William Sussman.

112.    In the fall of 2024, Professor DeGraff offered the unapproved anti-Israel course as a seminar titled "Language and linguistics for decolonization and liberation and for peace and community building from the river to the sea in Palestine and Israel to the mountaintops in Haiti and beyond."  "From the river to the sea" is a well-known phrase calling for the violent removal of Jews from the land of Israel.

113.    In this seminar, a guest lecturer spoke to the class about an alleged settler-colonial Zionist (i.e. Jewish) "mind infection." Soon after, Professor DeGraff posted on Instagram about the Zionist "mind infection" and claimed that well-known "Jewish student life organizations" such as Hillel and Chabad fund this "mind infection."  Zionist is often a codeword for Jew, and here, where Professor DeGraff directly linked "Jewish student life organizations" to the "Zionist 'mind infection,'" it is clear that "Zionist" and "Jew" are interchangeable.  DeGraff chose to post his attack the day after a well-publicized pogrom against Israeli and Jewish soccer fans in Amsterdam.

114.    On November 8, 2024, Dr. Alon sent an email to the MIT administration with the subject line, "Meeting Request:  Urgent Concerns on Safety and Security."

115.    On November 9, 2024, Sussman posted on the social media platform X (formerly known as Twitter) that "[a]n @MIT professor posted extremely dangerous rhetoric about MIT Hillel … and other Jewish student life organizations.  These

groups represent the majority of Jews on campus, and he accuses them of funding a 'mind infection.'" Sussman did not tag Professor DeGraff's account.

116.    Later that day, Professor DeGraff posted a message targeting Sussman by name on his X platform of over 10,000 followers, and another message the next morning at 8:31am, tagging Sussman's account in each post.

117.    On November 10, 2024 at 1:47pm, Sussman emailed Professor DeGraff copying high-level administrators and professors at MIT including Melissa Nobles (Chancellor), Karl W. Reid (Vice President for Equity and Inclusion at the time), and Suzy Nelson (Vice Chancellor for Student Life) stating: "Professor DeGraff:  Please leave me alone.  Will Sussman."

118.    That same day, at 3:29pm, 3:50pm and 4:24pm, Professor DeGraff posted three more messages on X targeting Sussman, tagging Sussman's account each time.

119.    At 4:16pm, Sussman emailed Chancellor Nobles and Vice Chancellor Nelson, stating "[a]s you know, earlier today I asked Professor DeGraff to leave me alone. Since then, he has directed his audience of 10,000+ strangers at me. . . . Please ask him to stop."

120.    At 5:09pm, Professor DeGraff replied to Sussman's email, copying additional administrators including President Sally Kornbluth, Chancellor Nobles, Vice Chancellor Nelson, Vice President Reid, Dean of Student Life David Randall, Director of IDHR & Institute Title IX and VI Coordinator Sarah Rankin, Chief of MIT Police John DiFava, Vice Provost for Faculty Paula Hammond, Vice President for

Human Resources Ramona Allen and Senior Associate Dean, Student Engagement & Campus Activities Erin Farrell telling Sussman to "cease and desist," even though Sussman had not contacted Professor DeGraff since asking to be left alone.

121.    At 6:03pm, Professor DeGraff forwarded Sussman's email and his response to the entire Linguistics and Philosophy Department (including students and professors), everyone in his anti-Israel seminar (including students, staff, and non-affiliates), Vice President Allen, Vice Provost Hammond and others, claiming to use Sussman to illustrate "live" the Jewish "mind infection."

122.    At 7:14pm, Scott Cooper, a staff member in the MIT Sloan School of Management, "replied all" to the entire thread, providing "background" on Sussman and characterizing him as aligning with a racist cause.

123.    At 7:41pm, Professor DeGraff responded back to the entire thread, "[t]hank you, Scott!" and expressed an intent to explore this "real-life case study" of Sussman at the next class.

124.    At 1:03am on November 11, 2024, an Israeli professor responded, stating "I'm writing to express my concern regarding how your interaction with Will has been handled," and that "[t]here seems to be a significant power imbalance at play here." He further stated to Professor DeGraff that "[y]ou are a distinguished, tenured professor, while Will is still a student, likely under considerable stress.  He reached out to you privately with a simple request to end your exchange, yet his email has now been distributed broadly and is set to become a case study for the entire department."  Many members of MIT's administration received this email, including:

President Kornbluth, Chancellor Nobles, Vice Chancellor Nelson, Vice President Reid, Dean Randall, Director Rankin, Chief DiFava, Vice Provost Hammond, Vice President Allen and Senior Associate Dean Farrell, plus the entire Linguistics and Philosophy Department and everyone in Professor DeGraff's seminar.

125.   At 2:45am, the guest speaker from Professor DeGraff's seminar who had taught about the Zionist "mind infection," Nurit Peled-Elhanan, "replied all" that this Israeli professor "is the best proof for the infection of the Israeli Jewish best minds" and "[t]his great scientist' [sic] vanity is the best product of Israeli racist education or rather Mind Infection."

126.   Again, the 2:45am email was sent to President Kornbluth, Chancellor Nobles, Vice Chancellor Nelson, Vice President Reid, Dean Randall, Director Rankin, Chief DiFava, Vice Provost Hammond, Vice President Allen and Senior Associate Dean Farrell, plus the entire Linguistics and Philosophy Department and everyone in Professor DeGraff's seminar.

127.   But not a single administrator copied on the exchange intervened to stop the harassment or condemn the targeting of both a Jewish student and an Israeli professor in such a vicious and public way.

128.   At 8:44 am, Vice Chancellor Nelson replied to Sussman's email from the day before requesting that she take action to stop the harassment.  She said she is "sorry to see this exchange," that they "have many support resources at MIT," and that she "will share this exchange with Human Resources for consideration of next steps."  She added that "you may also wish to avoid further engagement with

[Professor DeGraff] on social media in response," though Sussman has never engaged with him on social media.  But she did nothing to stop the ongoing harassment.

129.    At 9:10am, Professor DeGraff posted on X, again targeting Sussman for the sixth time, once more tagging his account and publicly referring to him as "an excellent case study."

130.    At 9:45 am, Sussman emailed the MIT Police Department and IDHR to request a restraining order, stating "Professor Michel DeGraff is putting me (a Jewish student) in danger by directing an anti-[S]emitic mob toward me (see attached)."

131.    Less than one hour later at 10:53am, Professor DeGraff sent another mass email publicly targeting Sussman.  Again, not a single one of the many senior administrators copied on this email intervened to stop the ongoing harassment of Sussman, even as Sussman was emailing them separately, pleading for help.

132.    At 10:55 a.m., Professor DeGraff sent another mass email publicly targeting Sussman in front of the same group, accusing Sussman of having "powerful connections" in Congress and in the media, including "influential friends in Congress like Rep. Elise Stefanik."  These statements were false and advanced a classic anti-Semitic trope, that Jews are conniving schemers who control levers of power.

133.    At 11:29pm, the Israeli professor again asked Professor DeGraff to honor Sussman's request to be left alone, stating to Professor DeGraff that

> Within the MIT community, you are a tenured professor, and Will is a student. The power imbalance here is significant, and it's important to acknowledge the potential impact that our actions as faculty can have on students.
>
> The student has simply asked to be left alone. It's entirely reasonable to ask that this be mutual, and ultimately, I believe we should respect his request—

particularly within the classroom and MIT-affiliated spaces.

134.    While a long list of senior administrators witnessed the continuing anti-Semitic harassment of a student by a professor, the only person who spoke out in an attempt to protect Sussman was an Israeli professor.

135.    At 11:58 pm, Professor DeGraff targeted Sussman with another mass email. Once again, although the highest level of MIT administrators, including President Kornbluth, were included on the email where the harassment of Sussman was on display in real time, not one of them intervened.  Every single one of them was silent.  No one came to Sussman's defense or to the defense of the Israeli professor, and no one spoke up to stop the onslaught.  Their silence emboldened perpetrators to continue harassing Jews on campus.

136.    Every single Jewish and Israeli student in the Linguistics and Philosophy Department was also copied on this email exchange, where they witnessed ongoing attacks on a Jewish student by this professor.  They also witnessed the silence from the highest levels of MIT administrators who were copied on the exchange.  The ongoing attacks while MIT administrators watched in silence sent the message to Jewish students that they are not safe on campus and MIT will not protect them.  Others observed that they could harass Jewish students without consequence.

137.    Members of the Coalition, including Plaintiffs Lior Alon and John Doe, as well as many other Jews and Israelis on campus, were aware of and distressed by the relentless attacks on Sussman and of MIT's failure to act.

138.    Sussman and his family feared for his safety.  The next morning, on November 12, 2024, Sussman emailed the MIT Police Department again, copying Chancellor Nobles and Vice Chancellor Nelson stating that Professor DeGraff's rhetoric "is extremely dangerous.  My mother is worried that he is going to get me killed.  And it appears that his seminar about me will proceed as planned on Wednesday."  He sent a similar email directly notifying President Kornbluth, copying Dean Randall, and asking for their help.

139.    On the morning of November 13, 2024, flyers were slipped under the doors in a graduate dormitory where Sussman used to live which advocated for violent "resistance" against Israel and Jews.  The article contained a green band with white lettering styled after Hamas headbands, in which it was written "THIS ARTICLE AND THE AUTHOR WERE BANNED FROM MIT AFTER ZIONISTS TWEETED ABOUT IT."  Upon information and belief, the reference to "Zionists" was to Sussman and another Jewish student, who had posted about the article on X. Sussman reported this to the MIT Police Department and administrators that morning.  Days later, on November 15, 2024, this same article was distributed on campus in Lobby 10.

140.    At Professor DeGraff's seminar, also on November 13, 2024, Professor DeGraff began the seminar by referring to Sussman as a student who he engaged with over email and on X, stating: "I won't mention his name but you probably know who he is. Let us not forget that as we engage in this academic exercise that there is a genocide going on."

141. At this seminar, Professor DeGraff also espoused common anti-Semitic tropes, promoted the erasure of Jewish history and identity, and engaged in anti-Semitic victim blaming:

- He represented that Israeli Jews weaponize the trauma of the Holocaust.

- He denied that a connection to Israel is an essential component of Judaism.

- He showed a slide that claims that 42% of Jews do not believe that Israel was divinely given to the Jews.

- He justified the attack on Israeli soccer fans in Amsterdam.

142. On November 13, 2024, Dr. Alon—who was aware of these events on campus, including Professor DeGraff's "mind infection" teachings and harassment of Sussman—sent another email to Vice Chancellor Nelson, other MIT administrators and the MIT Police Department, copying Sussman and other concerned Jewish and Israeli MIT community members to again request a meeting regarding "the escalating situation" on campus. A Zoom call took place on November 15, 2024, during which Sussman, Alon and others raised their concerns, including that protestors' calls on campus had begun to escalate to even more specific and direct threats of violence, such as "We're going to shred you" and "We will burn the ground beneath your feet." But MIT did not commit to any concrete actions.

143. Professor DeGraff continued to harass Sussman and to post anti-Semitic messages to his large following on social media, where he is followed by MIT students and faculty members. On December 25, 2024, Professor DeGraff engaged in erasive anti-Semitism publicly, attempting to deny the connection between

Zionism and Judaism and declaring such connection to be another correlate of "mind infection" in "Zionist education."  As explained above, for many Jews a recognition of the Jewish people's ancestral connection to Israel (i.e. Zionism) is an integral component of Jewish identity.



144.   On December 29, 2024, Professor DeGraff posted a message to Israeli mothers to "help them" prevent the "mind infection" among Israeli children "who are still being turned into monsters."



145.    On January 3, 2025, Professor DeGraff again targeted Sussman with a post on X linking to a YouTube video in which DeGraff refers directly (albeit without naming Sussman) to Sussman's November 9, 2024 post on X as an example of "the Zionist war with words."

146.    Professor DeGraff continues to promote anti-Semitic hatred to his large social media following which includes MIT students and faculty members.  On May 21, 2025, he reposted a quote accusing Jews of being "monsters" and "killers."  On June 27, 2025, two days after Plaintiffs filed this action, he posted again about Israeli "mind infection," in posts which are now pinned prominently at the top of his X and Instagram pages.

147.    On or about August 19, 2025, DeGraff reposted attacks on CSAIL on X. Significantly, this was after CSAIL had been targeted by graffiti stating "Death to the IOF."  *Supra* ¶ 57.  DeGraff reposted that CSAIL "doesn't have 'academic freedom'

to do drone research sponsored by the Israeli military.  SACC student leader in 1969: 'One doesn't have the right to build gas chambers to kill people.'  No research for genocidaires."

148.    On or about August 19, 2025, DeGraff also again targeted Dr. Alon (albeit without mentioning him by name), reposting a tweet that reads:  "In the face of a mass murder and starvation campaign, MIT privileges Israeli post-docs on the basis of nationality.  Instead of ending research ties to the IOF, they inaugurate a program [Kalaniyot] whose architects want to destroy BDS and protect a genocidal state from any consequences."  Alon is part of the Kalaniyot program.

149.    On or about September 5, 2025, DeGraff posted on Facebook that MIT OpenCourseWare—a repository of MIT course content available online to the public—plans to publish the recording of his fall 2024 seminar, during which DeGraff taught about the "mind infection," referenced Sussman, and advanced anti-Semitic tropes.  DeGraff boasted in the post that this will allow the course to "reach millions of students."

150.    Upon information and belief, Professor DeGraff has also continued to disparage both Dr. Alon and Sussman in private chat channels.

### 4.    Sussman Reports DeGraff's Harassment and MIT Refuses to Acknowledge Anti-Semitism

151.    On November 10, 2024, Sussman filed a complaint with MIT's IDHR alleging, inter alia, harassment and retaliation based on a protected class, and stalking.

152.    On November 14, 2024, Meg Chuhran from IDHR emailed Sussman informing him that his complaint was being transferred to Human Resources ("HR"), rather than IDHR where complaints of discrimination and harassment are handled, because IDHR failed to find any anti-Semitic discrimination or harassment in Professor DeGraff's targeting of Sussman. Chuhran also offered to discuss a "mutual no-contact arrangement" between Sussman and Professor DeGraff, implying that Sussman was also at fault.

153.    On November 15, 2024, a Zoom call was held with Jewish and Israeli students, postdocs and faculty, including Dr. Alon and Sussman, and MIT administrators, including Vice Chancellor Nelson, Dean Randall, and Chief DiFava, to discuss the problems facing Jews and Israelis on campus. On the call, Sussman stated that he was considering leaving MIT due to anti-Semitism, and a postdoc wrote in the Zoom chat, "I want to say that Will is an important person of our community for being so brave and exposing some of the hardships that our community is going through. The fact that he is personally targeted and considering leaving is a huge loss for MIT and for all the Jewish students at MIT." The administration knew that Sussman was considering leaving MIT due to anti-Semitism, and still the administration did nothing.

154.    On December 10, 2024, Sussman emailed IDHR to appeal its determination that Professor DeGraff's conduct did not constitute discrimination based on a protected class. Sussman stated that "Professor DeGraff is treating me

differently because I am Jewish; in his words, I am 'a helpful real-life case study' of the Jewish 'mind infection.'"

155.   On January 13, 2025, Moriah Silver, Manager of Investigations from IDHR emailed Sussman that "IDHR's decision to refer an investigation to HR and not to pursue a discrimination investigation is not subject to appeal." Ms. Silver further stated to Sussman that Professor DeGraff's communications "do[] not suggest that Prof. DeGraff is treating you differently because you are Jewish."

156.   Incredibly, in her role as Manager of Investigations of MIT's IDHR Office, Ms. Silver perpetuated common anti-Semitic tropes as a justification for why Professor DeGraff's conduct was not anti-Semitic, stating that Professor DeGraff's use of the term "mind infection" refers to "settler-colonial Zionist propaganda" that the professor believes is "funded by the Israeli government through several organizations." The term "settler-colonial Zionist" itself is a classic example of contemporary anti-Semitism.

157.   Ms. Silver further excused Professor DeGraff's behavior by referencing an email that stated that "the term 'mind infection' refers to 'Israeli racist education,'" again propagating anti-Semitic tropes. Ms. Silver concluded that "[i]n short, it appears that Prof. DeGraff's use of the 'mind infection' term relates to his views of the Israeli government, its education system, and how its 'propaganda' about the Israeli-Palestinian conflict has impacted the discourse and events on U.S. college campuses" and "we do not believe there is sufficient basis to conclude that Prof. DeGraff's decision to use your social media/email exchanges as a case study was based

on your Jewish identity so as to warrant an investigation into protected class discrimination." But Sussman is Jewish, not Israeli; he was not educated in Israel.

158. "Holding Jews collectively responsible for actions of the state of Israel" and "claiming that the existence of the State of Israel is a racist endeavor" are classic examples of contemporary anti-Semitism under the IHRA definition. The fact that the Manager of Investigations for MIT's IDHR Office does not recognize blatant anti-Semitism, exposes the level of institutional blindness and apathy at MIT when it comes to anti-Semitism.

159. As a result of the hostile anti-Semitic climate, the relentless harassment, MIT's failure to recognize the harassment as anti-Semitic and its refusal to protect him, Sussman could no longer remain at MIT. On January 16, 2025, Sussman left MIT.

160. On January 27, 2025, the Director of Labor & Employee Relations in Human Resources notified Sussman by letter that HR was closing the investigation of Professor DeGraff because Sussman left MIT and was no longer available to meet.

161. Section 9.8.5.6 of MIT's Policies and Procedures states "[i]f either the Complainant or the Respondent leaves MIT after a Complaint is filed, MIT generally continues the investigation to the extent possible." Sussman had already provided all of the documentary evidence that they would need from him including all of Professor DeGraff's emails and posts targeting him. MIT's closure of the investigation into Sussman's complaint further demonstrates its apathy towards anti-Semitism.

48

5.    **Impact on Alon and Sussman**

(a)    **Dr. Lior Alon**

162.    The anti-Semitic climate on the MIT campus has had a profound impact on Alon—emotionally, socially, academically and professionally. He continues to suffer through an anti-Semitic hostile environment on a daily basis.  On campus, he frequently sees anti-Israel posters, people holding anti-Israel signs, and frequent demonstrations where protestors call for violence against Jews and Israelis— including inside his academic building, directly beneath his office.   He has experienced depression and anxiety.

163.    Prior to October 7, a significant portion of Alon's exchange of scientific ideas with members of the MIT community took place in casual conversations—in hallways, common rooms, and shared spaces. After October 7, these spaces became places where he no longer felt welcome. Other postdocs and PhD students he previously talked to regularly became involved with anti-Israel activities, and they no longer engaged in conversation. Professor DeGraff publicly shamed him on social media, and despite Alon asking the president of MIT for help, nothing was done.  The administration sent a clear message that no one cared about him as an Israeli on campus.

164.    Although Alon continued to perform his duties as a postdoc, the hostile anti-Semitic climate made it extremely difficult to focus, collaborate, and benefit from the position in the ways he had envisioned. The hostile climate has undermined both his sense of belonging and his ability to engage fully in scientific work.

165. The cumulative effect of the environment has taken a toll on Alon's mental and emotional health. He has experienced depression, began seeing a therapist, and eventually had to seek additional medical support.

166. The anti-Semitic public exposure Alon was subjected to has also impacted his search for a position as a tenured professor. DeGraff's videos of Alon and the article defaming him remain online.

167. Despite his extraordinary academic, research and professional credentials, he was denied positions, again and again, that a candidate with his credentials would otherwise have been offered. Alon applied to more than 50 tenure-track positions in mathematics across the United States and did not receive a single offer. Upon information and belief, most, if not all, other postdocs in the Mathematics Department at MIT who applied for positions in academia received offers.

168. Due to safety concerns, Alon also moved his child out of the MIT daycare, which was in walking distance to his office, to a public childcare facility, which he could no longer walk to from his office.

**(b)    William Sussman**

169. Due to fears for his safety, Sussman began using additional measures to lock his on-campus apartment door beyond the MIT building swipe access locks, and he began taking different routes to his office to avoid anti-Israel demonstrations.

170. As a result of the hostile anti-Semitic climate, Sussman found it increasingly difficult to concentrate, focus on his work, and perform his academic tasks.

171.    For the first time in his life, he sought help from Student Mental Health & Counseling.

172.    When MIT's senior leadership and anti-discrimination administrators failed to protect him from Professor DeGraff's continuing public assault, he could no longer remain on campus and engage in his studies.

173.    With a few years left in his PhD program, Sussman felt forced to abandon his dream and his promising future as an academic computer scientist.

174.    Three years earlier, Sussman had recounted in an MIT Grad Blog post the exhilaration of being accepted into the PhD program at MIT.  Seeing the subject line of the acceptance email, "Exciting News from the PhD Program in EECS at MIT! YES!!" he thought "[t]his can't be real." The email stated, "Our decision regarding your application to our doctoral graduate degree program is a resounding and unequivocal YES!"  The email continued:

> Among the thousands of applications submitted from all over the world, we believe, and we are confident, that you have much to offer to our community with regard to our research endeavors, our academic pursuits, and our collaborative engagements to achieve our collective goals to impact the world and to also achieve our individual career aspirations.

His father cried and Sussman thought "[t]his is the beginning of the rest of my life."

175.    Sussman had been considering a career in academia after earning his PhD.  Because of the severe and pervasive anti-Semitism at MIT, this is no longer his reality.

### D.    MIT Professor Harasses, Discriminates Against, and Retaliates Against John Doe

#### 1.    Doe's Background

176.    John Doe is a Jewish Israeli grandson of Holocaust survivors. Growing up in Israel, he lived through the horrors of the second intifada.  Among the civilians murdered in terrorist attacks was one of his teachers.  When he was in third grade, he also learned, sitting in class, that a childhood friend had been killed in a terrorist attack.

177.    In 2007, Doe was injured in a rocket strike while walking home from school.

178.    In 2008, Doe was injured in another rocket strike in the parking lot of his school.

179.    The following year, Doe's school was closed for several weeks due to ongoing rocket fire.  He was forced to leave the city temporarily and several of his classmates' homes were hit by rockets.  He endured significant emotional and psychological trauma during this time.

180.    On October 7, 2023, Doe's childhood friend was kidnapped by Hamas and later murdered in captivity.  On that day, a professor that Doe viewed as a role model, was brutally murdered, along with his wife by Hamas terrorists.  Doe was deeply affected by the atrocities of that day.

181.    Just days after October 7, hearing calls for intifada on the MIT campus brought to life his worst nightmares.

## 2. Doe is Recruited as a Postdoctoral Associate in Richard Roe's Lab

182.    Doe received a PhD in a scientific field from a prestigious university in Israel.  He has received numerous awards and scholarships for excellence in research and teaching, published eighteen scientific papers with more than ten in progress, and has been invited to present almost forty talks at conferences and seminars around the world.  He was even appointed to the role of "Lecturer" at two prestigious universities while still a graduate student. This is the highest teaching position available to graduate students and is typically awarded to only one individual across the entire Faculty of Exact Sciences.

183.    Prior to joining MIT, Doe considered offers from several world-renowned universities but chose MIT because he considered it a premier institution in his chosen field, where he envisioned a bright future for himself.

184.    Richard Roe is a prominent Professor in the same scientific field as Dr. Doe at MIT.[13]

185.    Doe became a postdoctoral associate at MIT under Professor Roe in the fall of 2023.

186.    A grant from the United States Department of Defense ("DoD") funded Doe's research, which was the primary function of his appointment as a postdoctoral associate.

---

[13] Plaintiffs use "Richard Roe" as a pseudonym for the professor to minimize the likelihood of John Doe being identified and retaliated against.

187.    Doe first met MIT Professor Roe at a conference in Europe in 2019.  In 2021, they began a dialogue about Doe joining a prominent scientific laboratory run by Professor Roe as a postdoctoral associate in Roe's field of study.

188.    In January 2022, Doe traveled to Boston to meet Professor Roe in person and spent two days in his laboratories with him and his graduate students.  After the visit, Doe began having weekly meetings over Zoom with Professor Roe and his graduate students, which continued for eighteen months.

189.    On April 22, 2022, Professor Roe issued a letter of invitation and recommendation for Doe, stating "I think very highly of [Doe] as a scientist and experimental researcher. He deeply understands [his field] and conveys his insight very clearly. I found that discussions with him advance very quickly and lead to a new or better understanding of the underlying concepts."  He further stated that "[Doe's] track record is excellent" and "given [Doe's] track record and skills, there would be big benefits if he could join my research group at MIT: he will advance his career . . . while making major contributions in [his field of study]. His fellowship application has my strongest support possible."

190.    In Doe's official offer letter for the postdoctoral associate position, Professor Roe offered Doe a salary above the standard rate due to his "unusually broad experience and accomplishments in different areas."

191.    The program dates for the postdoctoral appointment were from September 1, 2023 to August 31, 2026.

192.    Doe accepted the postdoctoral associate position at MIT specifically for the opportunity to work with Professor Roe and learn the fundamentals of Professor Roe's specific field of study.  He began work as a postdoctoral associate in September 2023.

### 3.    Doe Earns High Praise for His Work During his First Year at MIT.

193.    At the start of his postdoctoral appointment, Doe worked closely with Professor Roe and the graduate students in the lab.  Professor Roe frequently praised Doe's skills and his ability to learn quickly and advance the lab's experiments.  Doe also received positive feedback from a former postdoctoral associate of Professor Roe who visited the lab on various occasions.

194.    In June 2024, Professor Roe provided Doe formal feedback on his performance and praised Doe's mentorship of the graduate students.  Professor Roe also said he would like Doe to mentor future graduate students in a new lab that Doe was helping to establish.

195.    In July 2024, Professor Roe took a sabbatical and left Doe in charge of key functions, including in preparation for the new lab that was under development. Professor Roe frequently recognized and praised Doe's efforts in establishing the new lab and running operations in Professor Roe's absence.

196.    In August 2024, Doe had his formal one-year performance review meeting with Professor Roe.  The review was highly positive and included a discussion of potential tenure-track applications for September 2025 or 2026, as well as the possibility of transitioning to a Research Scientist role in his group.

197.    The written performance review, dated August 1, 2024, stated that "Doe had a productive year and was able to introduce many improvements to the lab."

### 4.    In His Second Year, Doe is Targeted for being Jewish and Israeli and The Laboratory Becomes a Hotbed of Anti-Semitic and Anti-Israeli Vitriol.

198.    In the fall of 2024, a new set of graduate students began working in the lab.  Two of these new students began targeting and harassing Doe based on his Jewish and Israeli identity.

199.    Upon learning that Doe was Jewish, one of the new students (Student A) exclaimed "oh, you're Jewish?!" and began bombarding Doe with personal questions about his Jewish identity, ties to Israel, military service, and whether his partner was Jewish.  She inquired whether Doe planned to renounce his Israeli citizenship.

200.    Student A spoke frequently about who was Jewish and Israeli at MIT. When a Jewish student greeted Doe with "Shalom," Student A exclaimed "Oh!  I didn't know he was Jewish!"  On other occasions, Student A inquired about Jewish faculty members at MIT and expressed disappointment upon learning that they were Jewish.  Student A often made comments about Jewish-Israeli students, postdocs and faculty members, questioning their military service and classifying them as "good" or "bad" based on their IDF roles.

201.    Student A collected data on Jews and Israelis on campus.  She approached Jews and inquired about personal information, including names of partners, children and details of military service.  She would often ask Doe questions

about Jews on campus.  Upon information and belief, Student A maintained a list with personal information about Israelis and Jews on campus.

202.    The climate in the lab grew increasingly hostile.  Another student in the lab stated, "Zionists control the world," a classic anti-Semitic trope.  Doe was interrogated about his political views on Israeli politics and whether he supported the arrest of the Israeli prime minister.  Other comments directed at Doe by students in the lab included:

- "What is the actual distance from the river to the sea?"

- "Are you planning to return to Israel?  I've heard that Israel even treats its own people badly."

- "Oh . . . so you're Jewish, but you're from Ukraine and speak Russian—everybody must hate you."

203.    Student A criticized Doe's attendance at an Israeli community lunch, remarking "oh, you're going to that event with the Jewish Israeli thing again?"  Doe learned that Student A had shared details about his Jewish identity, Israeli citizenship, and attendance at the Israeli community lunch with the other students in the group.  This led Doe to avoid Jewish and Israeli community events.

204.    During a car ride to a group dinner with the students in the lab, the conversation turned to Doe's applications for tenure-track positions.  When he mentioned Brandeis University as a possible option, one of the students shouted from the back of the car "But they are Jewish!"

205.    Student A inquired about Doe's partner "Is she Jewish or not Jewish?  Her nose looks Jewish so she is probably Jewish."

206.    Students spoke of creating a covert plan to destroy his relationship with his partner to prevent more Jewish babies.

207.    Student A spoke about Doe's purported cruelty during his Israeli military service even though Doe never actually served in the Israeli military.

208.    Students denied the existence of the State of Israel, Doe's home country, making comments such as "Is your partner also from Palestine?"  A student introduced Doe to a new student, saying "This is [John], a postdoc from Palestine."

209.    One student stated to Doe, "You know, we have many people but not everyone will stay in the group, you'll see."

210.    That same week Student B, who Doe had been assigned to mentor, began ignoring him and was unresponsive to Doe's efforts to schedule a meeting. Student A also began to ignore Doe.  This behavior persisted throughout the Fall 2024 semester.

211.    In one-on-one meetings with Professor Roe, Doe raised his concerns about the anti-Semitic harassment in the lab.  Each time, Professor Roe interrupted Doe and quickly changed topics.

212.    At group dinners, negative remarks about Judaism and Zionism were commonplace and made in the presence of Professor Roe, but Professor Roe did not intervene or stop them.

213.    In fact, Professor Roe, too, made comments that contributed to the hostile anti-Semitic climate.  During a group dinner, Professor Roe singled out Doe in front of the entire group as an example of someone who cannot see the suffering of

Palestinians.  Professor Roe later repeated the negative comment about Doe at a conference in front of the entire research group. Doe had never spoken of Palestinians or the situation in the Middle East with Professor Roe or anyone else in the lab. Professor Roe made that comment, vilifying Doe simply because he is Jewish.  The IHRA definition's contemporary examples of anti-Semitism include "[h]olding Jews collectively responsible for actions of the state of Israel."

214.    The frequent anti-Jewish and anti-Israel harassment in the lab by students and by Professor Roe targeting Doe based on his identity as a Jew and an Israeli, created a severe and pervasive hostile environment in the lab.

**5.    Doe Also Experiences the Hostile Anti-Semitic and Anti-Israeli Environment Outside the Laboratory.**

215.    Outside the laboratory, on the larger MIT campus, Doe was also subjected to a hostile environment.  On a daily basis, he was bombarded with anti-Semitic and anti-Israeli messages on campus–in classrooms, hallways, building entrances, parking garages, on the grounds.

216.    Stepping outside of his lab to take a break after hours of intense work, he often saw students draped in keffiyehs, crowding the main lobby, waving Palestinian flags and shouting, "Free Palestine!" and "Bring the intifada to MIT!"  To Doe, the word intifada—which calls for the death of Jews and Israelis—is not just history. To him, intifada is the explosion in Tel Aviv that took his friend and his teacher. Intifada is the horror he lived through growing up in Israel, the grief that he still lives with.  Years later, in the United States on the campus of one of the most prestigious research institutes in the world, he began hearing these words again.

When this happened, his chest tightened. His hands trembled. For a moment, he was immobilized.

217.    Walking to the lab in the morning, he often encountered students chanting "intifada revolution" which he heard as a call for his own death and the death of his family.  Once in the lab, the anti-Semitic hostility was inescapable.

218.    After a fourteen-hour day in the lab where he was treated as a pariah, he often saw posters and flyers denying the existence of his home country, promoting violence against Jews and Israelis and celebrating the October 7 massacre of Jews by Hamas, all around campus.

219.    Another morning before a long day in the lab, he saw student activity in the main dome advocating for a boycott of Israel, his home country. He had never seen protests to boycott any other country.

220.    In December 2023, when entering a classroom for a talk related to science, he saw scribbled on the chalkboard, "Free Palestine. End Genocide. MIT Cut the Ties," and in big letters, "No Justice No Peace," a threat of violence against Israelis.  He could not concentrate on science after seeing that blackboard.



221.    On May 6, 2024, Doe was walking to his car in an MIT parking lot when he saw a mob of screaming protestors carrying Palestinian flags and wearing Hamas headbands, shouting "Death to Israel" and "Death to Zionists."  He tried to walk through them to get to his car, but they blocked his way and pushed him against a wall, shouting "who are you" and "what are you doing here?"  He replied, "I just work here and want to go home." He escaped to the underground tunnels and stayed in a tunnel and waited.  He eventually got to his car through an emergency exit that led to a different path to the parking lot.

222.    That night, Doe wrote to President Kornbluth reporting what was happening in that parking lot and expressing that he no longer feels safe on campus. He said, "I never thought I'd write to you under these circumstances" and described the experience as "extremely unsettling and threatening."  The subject line of the email was "I don't feel safe anymore at MIT."

223.   President Kornbluth never responded.

224.   After this incident, out of fear for his safety, Doe began using MIT's underground tunnels regularly to walk between his lab and his car, and to traverse the campus.

225.   Doe was also aware of Professor DeGraff's aggressive targeting and harassment of William Sussman, and that Professor DeGraff publicly accused Sussman of having a Jewish mind infection.  Doe was aware that the MIT's senior administration witnessed the harassment as it unfolded and took no action to protect Sussman.  Doe was also aware that the anti-Semitic harassment was so severe that Sussman left MIT without completing his PhD program.

**6.     Roe Begins Pushing Doe out of the Lab Because He is Jewish.**

226.   The harassment of Doe in the lab based on his Jewish identity continued.

227.   On November 12, 2024, Professor Roe informed Doe that some of the students could not tolerate his presence in the lab.

228.   On November 26, 2024, during a Zoom meeting, Professor Roe announced that he would be terminating Doe's contract.

229.   At the next group meeting in the lab, Professor Roe announced in front of Doe and the rest of the group, "I am looking for a replacement for [Doe]."

230.   In the meantime, Doe continued to work long hours in the lab.

### 7.    Doe Reports Discrimination and Harassment and MIT Takes No Action.

231.    In early December 2024, Doe reported the anti-Semitic and anti-Israeli harassment and discrimination he was experiencing to the administration in his department.

232.    Doe and an Israeli MIT Professor (Israeli Professor A), who had been supporting Doe emotionally during this period, reached out to the head of the department via email on December 4, 2024 to schedule a meeting to talk about the hostile anti-Semitic climate in the lab.  On December 5, 2024, the department head emailed Doe that the department's HR officer and the associate head of the department would both meet with Doe to discuss his situation.

233.    On December 6, 2024, Doe and Israeli Professor A met with the HR officer and the associate head of the department in person.  Doe detailed the anti-Semitic harassment that he had been experiencing in the lab and Professor Roe's efforts to push Doe out of the lab for being Jewish.  Doe repeated several times that the harassment was happening because he was Jewish, not just Israeli.  Doe also mentioned that Student A was collecting data on Jewish and Israeli students.  The HR officer and associate head of the department indicated that they would file a complaint with IDHR, but three months later, Doe discovered that had not been done.  Despite knowledge of the hostile environment in the lab, MIT took no action and the hostile environment intensified.

8.    **Doe Is Dismissed from the Lab for the Express Reason that He is Jewish and Israeli.**

234.    At the outset of the Spring 2025 semester, Doe continued to work long hours, building a new lab and setting up essential infrastructure, while working closely with Student C, a graduate student who was supportive of Doe's presence in the lab.  Doe was also working on a project with Student C that required precision and extensive knowledge.

235.    By this point, Student A and Student B stopped interacting with Doe entirely.  When he entered the room, they would exchange glances and refuse to acknowledge his presence—or would abruptly storm out of the lab.

236.    On January 24, 2025, Doe and Israeli Professor A met with the associate head of the department again to discuss the hostile anti-Semitic climate in the lab. Again, no action was taken and the situation escalated further.

237.    On February 7, 2025, Doe and the associate head of the department met in her office to discuss the anti-Semitic harassment and discrimination in the lab.  A few days later, Doe met with her again about the situation.

238.    On February 11, 2025, a meeting was held over Zoom with Doe, the associate head of the department and another Israeli MIT Professor (Israeli Professor B) who joined to support Doe, to further discuss the anti-Semitic harassment and discrimination in the lab.

239.    Doe had two more phone calls with the associate head of the department in late February to discuss the anti-Semitism in the lab.

240.    In late February 2025, Professor Roe called Doe into the lab for a one-on-one meeting and stated that Student A and Student B could not stand the presence of "his kind" in the lab. Doe asked, "Is this because I am Jewish?"  Professor Roe fell silent and nodded his head in the affirmative.

241.    Professor Roe then instructed Doe to remove himself entirely from the construction of the new lab, cease work on all assignments and projects involving the graduate students, and find work he could do alone without any interaction with the group.

242.    Instead of ending the anti-Semitic harassment and eliminating the hostile environment in the lab, Professor Roe's solution was to eliminate the Jew.

243.    Professor Roe suggested that Doe could remain a part of the team until the summer, but he would need to find work he could do alone without any interaction with the rest of the group, such as managing the group's website, cleaning out an old lab, or assembling a museum display.  These menial tasks were completely unrelated to Doe's expertise and the scientific work he had dedicated himself to for the past three years, and so far beneath the skill level of someone with his background and expertise that it was degrading and humiliating.

244.    At a meeting, just days later, President Kornbluth was informed about the serious anti-Semitism in Professor Roe's lab.

245.    Upon information and belief, the Chair of the MIT Corporation, Mark Gorenberg, was also informed about a Jewish postdoc being pushed out of the lab due to anti-Semitism.

### 9.    Roe Objects to a Research Conference in Israel.

246.    In early March 2025, Doe went to Israel to attend a conference where he was invited to speak on his research.    Initially, Professor Roe approved Doe's participation in the conference, but when he found out that the conference was in Israel, he instructed Doe not to present any research from his lab and to present Doe's own research only.    As a result, Doe had to change the title and the contents of the presentation for his session.

247.    Doe had previously attended several conferences in the U.S. and Europe in which he presented both his own research and research from Professor Roe's lab and on behalf of Professor Roe.    The conference in Israel was the only conference in which Doe was prohibited from presenting research from Professor Roe's lab.

### 10.    Doe Reports Anti-Semitic and Anti-Israeli Discrimination Again and Roe Retaliates.

248.    On March 8, 2025, Doe emailed the associate head of his department and the department's HR officer to request coverage for the essential duties that he was no longer permitted to perform in the lab.    In this email, Doe reiterated that he could not perform these duties because Professor Roe told him to stay away from the lab because some of the students cannot tolerate being around a Jewish/Israeli person.

249.    On March 8, 2025, Doe also notified President Kornbluth that Professor Roe told him to stay away from the lab because some of the students cannot tolerate being around a Jewish/Israeli person.

250.    Again, President Kornbluth did not respond.

251.    On March 14, 2025, at 3:00 pm, Doe and Israeli Professor B met again with the associate head of the department and the department's HR officer.  The associate head of the department admitted that there were indeed major issues in Professor Roe's group, including the mistreatment of students, an improper treatment of Doe as a postdoc and a serious anti-Semitism problem.  She acknowledged that both the students and the professor had contributed to the anti-Semitism in the lab.  Since Doe received an offer for a position in another department for July 2025, the associate head offered him an early transition to the new department, to be funded temporarily by his current Department, and that he could start on Monday, March 17.

252.    At this meeting, for the first time, the HR officer offered Doe a menu of resources, including the option to file a formal complaint with IDHR, even though she and the associate head of the department had represented at the December 6 meeting that they were going to file a complaint with IDHR on his behalf.  Surprised, Doe said he thought they already had filed a complaint with IDHR in December as discussed. They explained that they had tried to handle everything informally until now and that no formal complaints had been submitted and IDHR had not been contacted. They said that he would need to file a formal complaint with IDHR and that they could not.  Israeli Professor B stated that this is not true, that they could file an administrative complaint on his behalf.  Then they admitted that they could in fact do so.

253.    The associate head of the department indicated that she would speak with Professor Roe after the meeting.

254.    A short time later the same day, at 5:14 pm, Professor Roe sent an email to Doe and a long list of people, maligning John Doe:

> Dear all,
>
> Due to escalating circumstances, I have decided that [John] will stop working in our group with immediate effect.  I have taken him off the group email lists.
>
> Best
> [Richard]

The subject line of the email was "[John]" and the recipients included the entire team in the lab, professors, a research scientist, and a graduate student at another university.

255.    Postdoctoral associates and graduate students typically remain on the group email lists in Professor Roe's group after they leave the group in order to stay connected for further research and collaboration.  Removing Doe from all group email lists was punitive and a departure from common practice.

256.    At 2:35 am on March 15, 2025, Professor Roe emailed Doe "Since you are no longer working with our group, I want to inform you that you are not allowed to enter offices and labs in [our research center].  Please return your physical keys, your MIT laptop and all other items which belong to the group."  Upon information and belief, Professor Roe does not ask other postdoctoral associates and graduate students to return their computers and does not prohibit their entry into the center's offices and labs, as some former group members visit often. As a result of being forced to

hand over his laptop, Doe lost access to all data and files stored on that laptop, including files related to ongoing projects for Roe's research and Doe's own research, effectively stalling Doe's research output by several months.

257.   Immediately, Professor Roe began spreading malicious falsehoods about Doe to colleagues.  That evening, on March 15, Professor Roe emailed a colleague at a university in Germany stating (translated from German) "I have prematurely terminated [Doe's] work with my group. I know that he did exceptional work as a Ph.D student, but my students did not want to and could not work with him further as he was often incompetent and not a good mentor."

258.   The next day, Professor Roe emailed the same colleague, stating (translated from German) "Since we know each other well and have spoken about [John] numerous times, I just wanted to inform you. You can of course continue working together with [John] without finding out what really happened. You're probably right that there are two Johns, but John at MIT unfortunately failed."  In academia, such conduct is considered to be career assassination.

259.   Although Doe is no longer a part of Professor Roe's lab, the harassment, discrimination and retaliation has continued.

260.   In March 2025, Doe found an anti-Israel flyer on his car in an MIT parking lot in which there were no flyers on any other cars.  The students in his former lab know which car is Doe's and where he parks.

261.   Professor Roe removed Doe from all of his websites where former members of the group are listed, erasing any trace of Doe despite his substantial

contributions to the lab, effectively erasing his affiliation and contributions. It is standard practice for former postdoctoral associates and graduate students to remain on the website as former group members.

262. Beginning in March 2025, Doe was also subjected to a series of cyberattacks in which someone tried to hack into multiple of his email accounts and succeeded with respect to one of those accounts. On March 15, Doe received a notification that the recovery email on one of his personal accounts had been changed to what appears to be Student A's email address. The IP address of the hacker is also traceable to where Student A resides. The password on the hacked account was also changed, preventing Doe, to this day, from being able to access the account to reset his login credentials. The hacker proceeded to delete numerous important research files belonging to Doe from his document drive. The cyber-attacks remain ongoing—on September 6, 2025, Doe received another notification of an unauthorized attempt to access his LinkedIn account.

263. Professor Roe continues to smear and defame Doe with vile rhetoric. Upon information and belief, at a lunch with other professors and scholars, he spoke to a colleague about Doe using anti-Semitic slurs and in terms he did not use to describe other co-workers or students.

264. Professor Roe spoke to another professor in the department about an "Israeli postdoc" who was not working well with the students in his lab and said that he had to terminate the postdoc's contract early, unnecessarily highlighting the fact that Doe is Israeli.

265.   Upon information and belief, Professor Roe has sent other negative emails with false information to colleagues in the field, including to a university where Doe was interviewing for a tenured professorship, retracting the letter of recommendation he had submitted and stating that he was not happy with Doe and had to terminate him.  Upon information and belief, Professor Roe's denigration of Doe led the university to hire a less qualified candidate for the role.  Again, in academia, such conduct is considered to be career assassination.

266.   Upon information and belief, Professor Roe has made defamatory, retaliatory comments to individuals at numerous institutions at which Doe applied for a position, including Boston University, University of New Hampshire, UMass Amherst, and UMass Boston.

267.   Months passed without MIT taking any action on Doe's complaints. Finally, on June 27, 2025 – just two days after the initial complaint in this action was filed – MIT's HR department reached out to Doe about potentially investigating his allegations and copied someone from MIT's IDHR office.  The delayed response and inclusion of IDHR, over eight months after Doe had first complained about discrimination and months after he had been terminated from Roe's lab, was a transparent attempt to manufacture a response for litigation purposes.

## 11.   Impact of Anti-Semitic and Anti-Israeli Harassment and Discrimination on Doe

268.   The harassment and discrimination in the lab had a profound impact on Doe's physical and emotional well-being.  His mental health deteriorated, and he experienced devastation, depression, anxiety, mental fatigue, a sense of alienation

and deep humiliation. He became hopeless, withdrawn and isolated. He stopped engaging in recreational activities or going out in the world, except to work long hours in the lab. He endured months of sleepless nights and developed acne and a stress-related eating disorder. He lost his appetite and had days where he ate and drank almost nothing.

269. On campus, Doe felt forced to downplay his Jewish and Israeli identity and avoid speaking about his background, heritage or culture when on campus. He did not speak about the Middle East or the war in Gaza. He tried to avoid conversations that had anything to do with Israel or Judaism. He even began avoiding most Israeli community events.

270. Because of the hostile anti-Semitic and anti-Israeli environment, Doe was afraid to speak in his native language of Hebrew on campus. He spoke in English even when speaking with other Israelis on campus. When he spoke on the phone with his partner, he would speak in English, even though she is also Israeli and they speak in Hebrew at home. He spent most of his waking hours on campus in the lab, working long 12-to-14 hour days, but could not call his mother in Israel because she does not speak English and it was not safe for him to speak Hebrew on campus. He was also afraid for people to see his phone when he received text messages in Hebrew.

271. Doe came to the United States on a three-year contract specifically to research a particular area of science under Professor Roe. But as a result of MIT's discrimination, Doe has been forced out of the program. He can no longer perform the cutting-edge work that he came to the United States to perform.

272.    As a top academic in the field, Professor Roe's spread of malicious rumors about Doe has caused significant damage to Doe's reputation and career, impacting future prospects for collaboration, research and employment.

**E.    Coalition Member #1**

273.    Coalition Member #1 is a current Jewish graduate student at MIT.

274.    In May 2025, Coalition Member #1 walked on the MIT campus with another person (Person A).  Later, someone else (Person B) approached Person A to warn them that they had been seen with "an Israeli." Person B knew Coalition Member #1 was an Israeli from a curated list of Israelis maintained by graduate students on the MIT campus who have created and shared a list identifying people on campus perceived to be Israelis.

275.    Upon information and belief, this is the same list maintained and/or contributed to by Student A in Doe's lab.

276.    On May 5, 2025, Coalition Member #1 reported this incident to MIT's IDHR and expressed his concern for his physical safety.

277.    MIT's IDHR office responded with a reference to online resources dealing with doxing and online harassment, which were completely non-responsive to the nature of the threat and Coalition Member #1's concerns.

278.    Coalition Member #1 reiterated his concerns and posed the following questions:  "Can you kindly answer the following question: What steps are being done by MIT administration, police, or others with regards to this situation right now or in the immediate future? Surely you don't expect me to burden this issue?"

279.    Israeli professors at MIT also emailed IDHR to support Coalition Member #1 and inquire what MIT would do in response to the threat.

280.    After not receiving a response, Coalition Member #1 wrote again on May 7, 2025, to explain what steps *he* was taking and inquire again what steps MIT would take:

> Since I believe I was exposed by public interactions (like speaking in Hebrew on the phone or with others or being seen at events), I have shared these precautionary suggestions from MIT (to not be identifiable as Israeli in public at MIT) with others in the community who voiced similar concerns to me as the feedback I have received from you. I hope these actions will help prevent any further lack of safety or harassment/discrimination, but I also know concrete action must be taken to get rid of this list and its spread amongst MIT affiliates.

281.    In response, MIT's IDHR office said it was "very concerned about the existence of such a list, and we'd like to help," but espoused that it could not do anything without more information.  But Doe had already provided IDHR, months earlier, with the name of Student A and another student that Doe believed to be involved in the making and keeping of the same list.

282.    Despite multiple further requests that MIT open an investigation or take some sort of action, MIT did nothing.

## F.    MIT Administrators Had Actual Notice of Anti-Semitic and Anti-Israeli Conduct on Campus

283.    President Kornbluth was informed about the incidents described herein, again and again.  Yet she stayed silent and ignored the repeated pleas for help from Jews and Israelis on campus.  Alon wrote to her on October 19, 2023 and June 17, 2024, and she was copied on the series of emails in which Professor DeGraff was

harassing Sussman on November 10 and 11, 2024, after which Sussman directly emailed her on November 12, 2024; and she was notified about the anti-Semitism in Doe's lab at an in-person meeting in late February 2025 and in an email on March 8, 2025. Yet she took no action to end the harassment, eliminate the hostile environment and prevent it from recurring.

284. President Kornbluth also met in person with members of the MIT Jewish and Israeli community, who described the extreme anti-Semitism they were experiencing. At the meetings, she expressed sympathy and uttered niceties but took no discernable action.

285. As detailed herein, other high-level administrators were also aware of the anti-Semitic incidents, and they, too, took no discernable action to end the harassment of Jews and Israelis, eliminate the hostile environment and prevent it from recurring.

286. The IDHR received numerous reports of anti-Semitism but failed to take any meaningful action to end the harassment of Jews and Israelis, eliminate the hostile environment or prevent it from recurring. The IDHR even failed to recognize some of the most egregious incidents of anti-Semitic conduct as discrimination against Jews. Even worse, IDHR also perpetuated the harm by espousing anti-Semitic rhetoric.

287. The administration failed to act reasonably in response in light of the new, known circumstances and the hostile climate for Jews and Israelis further intensified.

288.    In the absence of moral leadership and meaningful action, the MIT campus was turned into a breeding ground of anti-Semitic and anti-Israeli hate and hostility that emboldened students and professors to harass and discriminate against Jews and Israelis without restraint.

## G.    Plaintiffs Have Suffered from Anti-Semitic and Anti-Israeli Harassment and Discrimination and Been Deprived of Benefits to which They Are Entitled

289.    Anti-Semitic harassment and discrimination have taken a significant emotional, physical, social, reputational, academic and professional toll on Plaintiffs as described in detail in paragraphs 162-175 and 268-272.

## H.    Federal Law Protects Plaintiffs and Coalition Members from Anti-Semitism

290.    Title VI of the Civil Rights Act of 1964 prohibits all forms of harassment tied to a person's ancestry or ethnic characteristics, including anti-Semitism.

291.    On September 28, 2023, the Biden administration noted in a Fact Sheet that "eight federal agencies clarified . . . that Title VI of the Civil Rights Act of 1964 prohibits certain forms of antisemitic, Islamophobic, and related forms of discrimination in federally funded programs and activities." It also reiterated that "Title VI of the 1964 Civil Rights Act applies to all programs and activities supported by federal financial assistance. Thus, these protections are wide-ranging and provide important tools to prevent and curb discrimination."[14]

---

[14] *Fact Sheet: Biden-Harris Admin. Takes Landmark Step to Counter Antisemitism*, THE WHITE HOUSE (Sept. 28, 2023), [https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2023/09/28/fact-sheet-biden-harris-administration-takes-landmark-step-to-counter-antisemitism/].

292. Title VI of the Civil Rights Act applies to any "program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

293. Defendant MIT receives federal financial assistance from the United States Department of Education, Department of Health and Human Services, and Department of Defense and is therefore subject to suit under Title VI.

294. Discrimination against Jews and Israelis is prohibited under Title VI, as reflected in the written policies of the Department of Education's Office for Civil Rights ("OCR").

295. Individual Plaintiffs and Coalition Members are all Jewish, Israeli, and/or of Israeli descent, and therefore, are members of a protected class within the scope of Title VI's protections.

296. Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, and national origin and applies to employers with 15 or more employees. 42 U.S.C. § 2000e.

297. Dr. Alon and Dr. Doe are both Jewish and Israeli and are both MIT employees, and therefore, are members of a protected class within the scope of Title VII's protections.

298. Massachusetts General Law Chapter 151B, §4 ("MGL"), prohibits unlawful employment practices, including discrimination based on race, religion and national origin.

299. MGL has been interpreted to provide a private right of action for a hostile work environment and incorporates the same elements as Title VII. MGL also

provides for liability against individual employees who engage in harassment and retaliation.

I.    **Plaintiffs Alon, Doe and the Coalition Have Exhausted Administrative Remedies by Filing Charges of Discrimination with the EEOC and MCAD**

300.    On July 18, 2025, Alon filed Charges of Discrimination with the Equal Opportunity Employment Commission ("EEOC") within the 300-day filing deadline for his Title VII claims.  On July 31, 2025, he received a Notice of Right to Sue Letter from the EEOC.

301.    On July 28, 2025, Alon filed Charges of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") within the 300-day filing deadline.  Upon receipt of a Right to Sue Letter from MCAD, Alon will file a notice with the Court.

302.    On August 29, 2025, Doe filed Charges of Discrimination with the EEOC within the 300-day filing deadline.  On September 2, 2025, he received a Notice of Right to Sue Letter from the EEOC.

303.    On September 3, 2025, Doe filed Charges of Discrimination with the MCAD within the 300-day filing deadline.  Upon receipt of a Right to Sue Letter from MCAD, Doe will file a notice with the Court.

304.    On September 5, 2025, the Coalition filed Charges of Discrimination with the EEOC within the 300-day filing deadline for its Title VII claims.  Upon receipt of a Right to Sue Letter from the EEOC, the Coalition will file a notice with the Court.

305.   On September 8, 2025, the Coalition filed Charges of Discrimination with the MCAD within the 300-day filing deadline.  Upon receipt of a Right to Sue Letter from MCAD, the Coalition will file a notice with the Court.

**J.   MIT's Own Policies Protect Individual Plaintiffs and Coalition Members from Anti-Semitism and Anti-Israeli Discrimination**

306.   MIT has numerous policies in place to protect its students from anti-Semitism, including policies relating to discrimination, harassment, and retaliation. Defendants' actions violate all of these policies.

307.   **Nondiscrimination**.  MIT has a published "Nondiscrimination" policy that "applies to faculty, staff, students and all other members of the MIT community."[15]   MIT prohibits discrimination against individuals on the basis of numerous characteristics including race, religion, and "national or ethnic origin." The policy applies in the administration of MIT's other policies, including specifically its "educational policies" and "employment policies."

308.   By its express terms, MIT's Nondiscrimination policy clearly prohibits discrimination by MIT faculty against members of the MIT community for being Jewish and/or Israeli.  Excluding an employee from a lab and terminating his contract for being Jewish and/or Israeli is a *per se* violation of MIT's Nondiscrimination policy.

309.   **Harassment**.  MIT has a published "Harassment" policy.[16]  MIT defines "harassment" "as unwelcome conduct of a verbal, nonverbal or physical nature that

---

[15] https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/93-nondiscrimination.
[16] https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/95-harassment.

is sufficiently severe or pervasive to create a work or academic environment that a reasonable person would consider intimidating, hostile or abusive and that adversely affects an individual's educational, work, or living environment."

310.    In determining whether unwelcome conduct is harassing, MIT "examine(s) the totality of the circumstances surrounding the conduct, including its frequency, nature and severity, the relationship between the parties and the context in which the conduct occurred."  (*Id.*)   MIT's enumerated examples of types of harassing conduct include "deliberate and repeated humiliation" and "deliberate interference with the life or work of another person."  (*Id.*)

311.    By its express terms, MIT's harassment policy clearly prohibits an MIT professor from repeatedly targeting a student or employee for humiliation, especially based on the student or employee's membership in a protected class.

312.    **Stalking**.  MIT also identifies stalking, including cyber stalking, as a type of prohibited harassment.  MIT defines stalking "as engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others, or to suffer substantial emotional distress."[17]  MIT acknowledges that stalking can take many forms, and enumerated examples include "continuing to contact a person after receiving requests not to" and "non-consensual communication, telephone calls, voice messages, emails, texts, letters, notes, gifts, or any other communications that are repeated and undesired."  MIT similarly prohibits

---

[17] *9.5 Harassment*, MIT POLICIES, https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/95-harassment (last updated June 18, 2025).

cyberbullying, which it defines as "willful, repeated harm inflicted using computers, cell phones, and other electronic devices."[18]

313.    By its express terms, MIT's stalking and cyberbullying policies clearly prohibit an MIT professor from repeatedly targeting a student or employee online for humiliation through the use of online posts and mass emails, especially based on the student or employee's membership in a protected class, and especially after explicit requests by the student or employee for the professor to stop.

314.    **Doxing**.    MIT also identifies doxing as a type of prohibited harassment.[19]    MIT defines doxing as "a form of intimidation involving the publication of someone's personal information (e.g., private email, personal phone number, home address, family address) on various platforms in an attempt to frighten the individual and encourage additional harassment by others."

315.    By its express terms, MIT's doxing policy clearly prohibits an MIT professor from repeatedly publishing a student's face, name and personal information, including Israeli military service, in social media posts, especially when done in a misleading manner for the purpose of encouraging others to harass the student.

316.    **Non-Retaliation**.    MIT has a specific policy prohibiting retaliation against those who in good faith make complaints about the possible violation of any

---

[18] *Protecting Yourself After Online Targeting and Harassment*, MIT RESOURCES, https://resources.mit.edu/doxingresources/ (last visited Sept. 16, 2025).
[19] *Id.*

MIT policy.[20]  The policy "applies to those who report an incident, file a complaint, or otherwise raise a concern about a policy violation or other wrongdoing."  MIT defines retaliation as "any adverse action, harassment, threats, or other conduct that would discourage a reasonable person from making a report or participating in a complaint review process."

317.    By its express terms, MIT's Non-Retaliation policy clearly prohibits an MIT professor from removing an employee from a lab, terminating his contract, excluding him from work-related opportunities, and providing negative references in retaliation for the employee having made a complaint that he was being harassed for being Jewish and Israeli.

318.    MIT reaffirmed at the outset of the 2024-2025 school year that all of these rules apply to all members of the MIT community, including faculty:

> Above all, our rules reaffirm that harassment, discrimination, retaliation, unreasonable invasion of personal privacy (including doxing), defamation, threats, violence, disorderly conduct, targeting of groups or individuals, or infringing the intellectual property rights of others are prohibited at MIT, including during demonstrations. **These rules apply to faculty, staff, postdocs, and students universally, regardless of viewpoint.[21]**

---

[20] *9.7 Non-Retaliation*, MIT POLICIES, https://policies.mit.edu/policies-procedures/90-relations-and-responsibilities-within-mit-community/97-non-retaliation (last updated June 18, 2025).

[21] Suzy M. Nelson, *Guidelines as we start the new year*, MIT ORGANIZATION CHART (Aug. 29, 2024) https://orgchart.mit.edu/letters/guidelines-we-start-new-year (emphasis in original).

## COUNT I
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***

**(Direct Discrimination)**
**(By All Plaintiffs Against MIT)**

319.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

320.   MIT receives financial assistance from the federal government, including from United States Department of Education, United States Department of Health and Human Services, and the United States Department of Defense.  Both Plaintiff Alon's and Plaintiff Doe's positions are paid for through federal funding.  The MIT laboratory at which Plaintiff Doe worked was funded by a grant from the U.S. Department of Defense, which included a line item for the specific purpose of funding the Postdoctoral Associate position that was the subject of Doe's contract with MIT.  MIT is therefore subject to suit under Title VI and VII of the Civil Rights Act of 1964 for both discrimination relating to students, such as Sussman, and discrimination relating to Alon's and Doe's employment.

321.   Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

322.    That Title VI protects Jews from discrimination has long been the declared policy of the U.S. Department of Education's Office for Civil Rights.[22]

323.    On November 7, 2023, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they have a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language.[23]

324.    Discrimination against Jews and/or Israelis—including based on actual or perceived shared ancestry, race, ethnic characteristics, or national origin—is thus prohibited under Title VI.  Title VI protects members of a protected class from both direct, intentional acts of discrimination and from a hostile environment.

325.    Direct, intentional acts of discrimination in violation of Title VI include discriminatory actions that are motivated by animus toward a protected class,

---

[22] *See e.g.*, U.S. Dep't of Educ., OCR Dear Colleague Letter: Addressing Discrimination Against Jewish Students (May 25, 2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/antisemitism-dcl.pdf.
[23] U.S. Dep't of Educ., OCR Dear Colleague Letter: Shared Ancestry or Ethnic Characteristics (Nov. 7, 2023), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf.

including deliberate indifference to teacher or peer harassment of a member of a protected class.

326.    Members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, are Jewish, Israeli, and/or of Israeli descent and therefore are members of a protected class within the scope of Title VI's protections.

327.    As a direct result of being a member of a protected class, members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, were subjected to discrimination by MIT based on their Jewish ethnicity and ancestry and/or actual or perceived Israeli national origin.

328.    Alon's protected status was a focal point of Professor DeGraff.  Professor DeGraff brazenly singled Alon out for harassment specifically because he is Jewish and Israeli.  The harassment went well beyond anything that could be justified as part of legitimate academic discussion or debate.  He posted videos on social media with Alon's face, name and personal information, including his Israeli military service.  Professor DeGraff edited the videos, creating a false narrative and vilifying Alon.

329.    Professor DeGraff then escalated his discrimination and harassment of Jewish students with Sussman.  In response to a post by Sussman expressing concern about Professor DeGraff accusing Jewish groups on campus of funding a "mind infection," Professor DeGraff repeatedly targeted him online, by email to the entire Linguistics and Philosophy Department, and in class.  DeGraff ignored direct pleas by Sussman to stop.  Professor DeGraff ignored direct pleas by another professor to

stop. The harassment again went well beyond anything that could be justified as part of legitimate academic discussion or debate. He engaged in a sustained, unapologetic campaign of anti-Semitic harassment of Sussman simply for raising a concern about an MIT professor's promotion of claims about a Jewish "mind infection."

330. Doe was similarly targeted expressly for being Jewish and Israeli. He was targeted with pervasive, unsolicited conversation around his race, ethnicity and religion. He was ostracized. He was subjected to malicious rumors. He was subjected to stereotypes. And he was ultimately kicked out of the lab expressly for being Jewish.

331. Alon, Sussman, and Doe all informed senior MIT officials of the harassment and discrimination they were experiencing and pleaded for help. Sussman emailed high-level administrators at MIT including the President, the Chancellor, and the Vice Chancellor for Student Life. Sussman also filed a formal complaint with the IDHR Office. Doe sought help from the head of his department and its HR Manager and ultimately the Chancellor.

332. MIT demonstrated its animus to Jewish and Israeli students, including Alon, Sussman, and Doe, by deliberately refusing to take any action. MIT did not stop the harassment. MIT did not discipline the perpetrators. Rather than just demonstrate "deliberate indifference," MIT's actions provide overwhelming direct evidence of discrimination. Meg Chuhran from IDHR affirmatively informed Sussman that her office would not investigate his claims because Professor DeGraff's anti-Semitic targeting of Sussman was not the type of harassment and discrimination

it cared about. Sussman attempted to appeal this decision and explained that "Professor DeGraff is treating me differently because I am Jewish; in his words, I am 'a helpful real-life case study' of the Jewish 'mind infection.'" In response, IDHR's Manager of Investigations unambiguously confirmed that MIT does not regard Professor DeGraff's anti-Semitic targeting of Sussman as discrimination.[24]

333. President Kornbluth and other senior administrators, who were included both on the harassing emails and on Sussman's emails pleading for the harassment to stop, also had actual knowledge of Professor DeGraff's harassment of Sussman and deliberately chose to do nothing. They continued to do nothing even when they learned that Sussman was considering leaving MIT due to the harassment.

334. Doe's pleas for help also went nowhere. The head of his department and the department's HR Manager not only refused to take any action to stop the discrimination and harassment, but they also falsely led Doe to believe they had filed a complaint on his behalf with IDHR. In fact, they were simply stringing him along and attempting to placate him while hoping to keep the problem within the department.

335. Alon's appeal to the President of the University asking that the administration immediately request that Professor DeGraff remove the posts vilifying Alon and cease harassing him or face disciplinary action was also fruitless.

---

[24] To erase any doubt about its animus, MIT's IDHR Manager engaged in multiple anti-Semitic tropes in her explanation of why she did not see anything wrong with DeGraff's actions. *Supra* ¶¶ 155-158.

336.    By deliberately refusing to take action to stop anti-Semitic harassment (much less take action against the perpetrators), as a result of its actions described herein, MIT engaged in intentional discrimination.  This is deliberate indifference per se – MIT affirmatively stated that it did not regard the anti-Semitic targeting of a Jewish student as falling within its discrimination office's purview.  Further, this was done with full knowledge of the university president.  This cannot be characterized as anything other than a conscious, affirmative decision by MIT not to do what the law requires.

337.    MIT violated Title VI by subjecting members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, to a series of intentional hostile acts and adverse actions while they were in pursuit of their education or employment.  These acts were designed to deprive members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, of the benefits of their education or employment and derail their academic pursuit and/or career because of their national origin, ethnicity, and ancestry.

338.    MIT's actions had their intended effects.  As a direct and proximate result of MIT's actions and inactions, Plaintiffs Alon, Sussman and Doe were deprived of access to educational and work opportunities and benefits, including the ability to study and work in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activities without fear of discrimination and intimidation, and the loss of significant class time, lab time, and group learning.

339.    As a result of MIT's discrimination, Alon was subjected to continued harassment by Professor DeGraff and aggressively confronted by people he did not know at various locations, including the grocery store.  He experienced unwarranted hostility, significant distress, fear for his and his family's safety, and harm to his reputation and career.  Upon information and belief, the public exposure Alon has received as a result of campus anti-Semitism has impacted his search for a position as a tenured professor.  Despite his extraordinary academic, research and professional credentials, he was denied positions, again and again, that a candidate with his credentials would otherwise have been offered.  Alon applied to more than 50 tenure track positions in mathematics across the United States and did not receive a single offer.  Upon information and belief, most, if not all, other postdocs in the Mathematics Department at MIT who applied for positions in academia received offers.

340.    As a result of MIT's discrimination, Sussman was subjected to continued harassment by Professor DeGraff and targeted by other students and affiliates and non-affiliates of MIT.  The harassment was so severe and pervasive that Sussman ultimately was forced to leave MIT.  He left MIT with only a few years left in his PhD program.  His aspiring career in computer science has been derailed.

341.    As a result of MIT's discrimination, Doe was subjected to continued harassment by members of his lab, including Professor Roe, and ultimately was forced out of his lab expressly for being Jewish.  His contract was terminated early. He is no longer doing the research he was recruited to perform.  He has instead been

diverted to another department to perform work outside his specialty and desired career path.  Further, Professor Roe has actively thwarted Doe's attempts to obtain a tenured professorship at other institutions by spreading vile falsehoods about him.

## COUNT II

### Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

### (Hostile Educational Environment)
### (By All Plaintiffs Against MIT)

342.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

343.    The May 25, 2023 OCR Letter unequivocally states, "Schools must take immediate and appropriate action to respond to harassment that creates a hostile environment."

344.    OCR further explains that "the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id*.

345.    Members of the Coalition, including Plaintiffs Alon, Sussman, and Doe and Coalition Member #1, are Jewish, Israeli, and/or of Israeli descent, and therefore, are members of a protected class within the scope of Title VI's protections.

346.    As a direct result of their being members of a protected class, members of the Coalition, including Plaintiffs Alon, Sussman, and Doe and Coalition Member

#1, were subjected to severe, pervasive and objectively offensive harassment while at MIT based on their Jewish and Israeli ancestry and religion.

347. Professor DeGraff espoused common anti-Semitic tropes, promoted the erasure of Jewish history and identity, and engaged in anti-Semitic victim blaming. Professor DeGraff's objectively offensive conduct included:

- representing that Israeli Jews weaponize the trauma of the Holocaust.

- justifying the attack on Israeli soccer fans in Amsterdam.

- publicizing the idea of a Jewish "mind infection."

- posting a message to Israeli mothers to "help them" prevent the "mind infection" among Israeli children "who are still being turned into monsters."

348. But Professor DeGraff did not limit his conduct to anti-Jewish and anti-Israeli propaganda. He targeted individual Jewish students and postdoctoral associates, including Alon and Sussman, for severe and pervasive private and public harassment based on their being Jewish and/or Israeli.

349. Similarly, Doe was subject to severe, pervasive and outrageous harassment in his lab. While the harassment started with graduate students, Professor Roe ultimately joined in as well. The harassment became so omnipresent and so severe that Professor Roe decided the only solution was for Doe to leave the lab.

350. Defendant MIT had actual knowledge of the harassment and discrimination against members of the Coalition, including Plaintiffs Alon, Sussman, and Doe. The wrongful behavior of both Professor DeGraff and Professor Roe, as well

as other anti-Semitic incidents on campus, were reported to senior administrators who had the power to stop them. But MIT neither stopped the harassment, nor engaged in any discipline of the perpetrators for their actions described herein. MIT's response to the reports of harassment and discrimination were either inadequate or, more often, nonexistent.

351. MIT and its administrators have thus demonstrated deliberate indifference to the anti-Semitic abuse, harassment, and intimidation of members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, in violation of Title VI.

352. As a result of MIT's deliberate indifference, members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, have been denied the benefits of educational and other programs at MIT.

353. As a direct and proximate result of Defendants' actions and inactions, members of the Coalition, including Plaintiffs Alon, Sussman, and Doe, were deprived of access to educational and work opportunities and benefits, including the ability to study and work in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activities without fear of discrimination and intimidation, and the loss of significant class time, lab time, group learning, and career opportunities.

## COUNT III

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.***
**(Retaliation)**
**(By All Individual Plaintiffs Against MIT)**

354.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

355.   The Department of Education has promulgated a regulation that provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part." 34 C.F.R. § 100.7(e).

356.   That regulation applies once a "student … or other individual complains formally or informally to a school about a potential civil rights violation" and aims to ensure that "individuals [are] commended when they raise concerns about compliance with the Federal civil rights laws, not punished for doing so."[25]

357.   Members of the Coalition, including Plaintiffs Alon, Sussman and Doe, are Jewish, Israeli, and/or of Israeli descent and, therefore, are members of a protected class within the scope of Title VI's protections.

358.   Members of the Coalition, including Plaintiffs Alon, Sussman and Doe, engaged in protected activity by reporting instances of discrimination and harassment to MIT officials and employees.

---

[25] Letter from Seth M. Galanter, Acting Assistant Sec'y for Civil Rts., U.S. Dep't of Educ. to Colleague at 1 (Apr. 24, 2013), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201304.pdf.

359.    Plaintiff Alon wrote to President Kornbluth and informed her of the harassment and doxing he was experiencing by Professor DeGraff but received no response or remedy.

360.    Plaintiff Sussman first reported his concerns about Professor DeGraff's rantings about a Jewish "mind infection" directly to DeGraff.  After he was targeted for harassment, retaliation and stalking by Professor DeGraff, Sussman then complained to a long series of administrators, including IDHR and President Kornbluth.

361.    Plaintiff Doe first raised his concerns about peer harassment in his lab with Professor Roe but was met with indifference and harassment.  Doe then raised his concerns about harassment by both Professor Roe and his peers in the lab with the head of the department and the department's HR Manager.

362.    After engaging in protected activity, Alon, Sussman and Doe were subjected to escalated retaliation by their harassers.  After Alon's complaints to the administration, Professor DeGraff published a defamatory article about him.  After Sussman's complaints to the administration, Professor DeGraff increased his personal and public attacks on Sussman.   After Doe's complaints to the administration, Roe retaliated by ordering Doe to physically remove himself from the lab, removing him from distribution lists, erasing any mention of him from the group's website, and physically confiscating his computer, lab key, and access card.

363.   Despite actual knowledge that Professor DeGraff was retaliating against Alon and Sussman, MIT refused to take any discernable action to stop Professor DeGraff.

364.   MIT's deliberate indifference to the retaliation has damaged Alon's career and prevented him from obtaining a tenured professorship in the United States. This constitutes a material adverse action in violation of Title VI.

365.   MIT's deliberate indifference to the retaliation led directly to Sussman being constructively forced to leave the university. This constitutes a material adverse action in violation of Title VI.

366.   Despite actual knowledge that Professor Roe was retaliating against Doe, MIT refused to take any action to stop Professor Roe. MIT's deliberate indifference to the retaliation led directly to Doe ultimately being forced off of Professor Roe's team and into another department. Doe was also removed from email lists and webpages that former postdoctoral associates typically remain on after their position ends. These constitute material adverse actions in violation of Title VI.

367.   As a direct and proximate result of MIT's actions and inactions, Plaintiffs Alon, Sussman and Doe were deprived of access to educational and work opportunities and benefits, including the ability to study and work in an environment free from discrimination and intimidation, the ability to fully and freely participate in all classes and campus activities without fear of discrimination and intimidation, and the loss of significant class time, lab time, and group learning.

## COUNT IV
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e e*t seq.***

**(Direct Discrimination)**
**(By Plaintiff Doe Against MIT)**

368.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

369.    Doe was a postdoctoral associate in a science department at MIT when he began to experience discrimination and is now an instructor in another department at MIT, where he has continued to experience discrimination.  As a MIT employee whose salary is funded by the federal government, Doe is protected from discrimination by both Title VI and Title VII.

370.    Title VII of the Civil Rights Act of 1964 ("Title VII") makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

371.    Doe is Jewish and an Israeli citizen. His status as Jewish and Israeli brings him within Title VII's protections.

372.    The same conduct described above in paragraphs 320, 327, 330-332, 334, 336-338, and 341 of Count I that amounts to a violation of Title VI also constitutes employment discrimination in violation of Doe's rights under Title VII.

373.    Doe was terminated from Roe's lab because he is Jewish and Israeli. The termination of his contract constitutes an adverse employment action.

374.    Doe's termination because he is Jewish and Israeli also demonstrates causation.  Doe was expressly terminated because he is Jewish and Israeli.

375.    Doe has suffered injury and damages because of the discrimination.  He is no longer working in the same department.  He is no longer doing the research he was recruited to perform.  He has instead been diverted to another department to perform work outside his specialty and desired career path.  Further, Professor Roe has actively thwarted Doe's attempts to obtain a tenured professorship at other institutions by spreading vile falsehoods about him.

## <u>COUNT V</u>
## Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e e*t seq.*

### (Hostile Work Environment)
### (By Plaintiffs Alon, Doe, and the Coalition Against MIT)

376.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

377.    Alon was a postdoctoral associate at MIT when he began to experience discrimination and is now an instructor in the Mathematics Department at MIT, where he has continued to experience discrimination.  As a MIT employee whose salary is funded by the federal government, Alon is protected from discrimination by both Title VI and Title VII.

378.    Alon is Jewish and of Israeli national origin. His status as Jewish and Israeli brings him within Title VII's protections.  Like Doe, Alon has thus experienced discrimination prohibited by both Title VI and Title VII.

379.   The same conduct described above in paragraphs 346-348 and 350-353 of Count II that amounts to a hostile environment in violation of Title VI also constitutes a hostile work environment in violation of Plaintiff Alon's rights under Title VII.

380.   The same conduct described above in paragraphs 346 and 349-353 of Count II that amounts to a hostile environment in violation of Title VI also constitutes a hostile work environment in violation of Plaintiff Doe's rights under Title VII.

381.   Subjecting an employee to a hostile work environment is a form of discrimination prohibited by Title VII.

382.   Since the events of October 7, Alon and Doe have experienced a hostile environment across the MIT campus, including calls for "intifada."

383.   The harassment and hostile environment Alon and Doe have experienced (and are continuing to experience) has been unwelcome.

384.   In addition to the hostile environment across the MIT campus, Alon has been subjected to unwelcome harassment by DeGraff on the basis of being Jewish and Israeli.  DeGraff's conduct was not solicited or invited, and Alon viewed the conduct as both undesirable and offensive.

385.   In addition to the hostile environment across the MIT campus, Doe has also been subjected to unwelcome harassment by Roe on the basis of being Jewish and Israeli.  Roe's conduct was not solicited or invited, and Doe viewed the conduct as both undesirable and offensive.

386.    The harassment and hostile environment are both objectively and subjectively offensive, such that a reasonable person would find the environment hostile and abusive, and Alon and Doe do find the environment hostile and abusive.

387.    The harassment and hostile environment Alon and Doe have experienced (and are continuing to experience) is sufficiently severe and pervasive that it has altered the terms of their employment and subjected them to an abusive work environment.

388.    The harassment of Alon has been severe.  Alon's protected status has been a focal point of Professor DeGraff.  Professor DeGraff has brazenly singled Alon out for harassment specifically because he is Jewish.  The harassment goes well beyond anything that could be justified as part of legitimate academic discussion or debate.  In violation of MIT rules, DeGraff has posted videos on social media with Alon's face, name and personal information, including his Israeli military service. Professor DeGraff edited the videos, creating a false narrative and vilifying Alon. Professor DeGraff has also published defamatory statements about Alon to third parties in the publication *Le Monde diplomatique*.  (*See infra* ¶ 100).

389.    The harassment of Doe has been severe.  Doe's protected status was a focal point of both Roe and the graduate students in his lab.  They tormented and shunned him because he was Jewish and Israeli.  He was treated like a pariah and subjected to anti-Semitic slurs.  Students spoke of creating a covert plan to destroy his relationship with his Jewish partner to prevent more Jewish babies.  Roe

repeatedly vilified him for being Israeli and Jewish in front of students.  Eventually, students refused to work with him because they did not want to work with a Jew.

390.   The harassment and hostile environment have been (and continue to be) pervasive.  The campus has been (and continues to be) a hotbed of anti-Semitism. Anti-Semitic incidents, including violent threats, continue to occur on the MIT campus on a regular basis.

391.   Alon has been aggressively confronted by people he did not know at various locations, including the grocery store.  He has experienced unwarranted hostility, significant distress, and fear for his and his family's safety.  The videos and defamatory article published by DeGraff remain online today.

392.   Doe was subjected to omnipresent harassment in Roe's lab.

393.   MIT had actual knowledge of both the hostile environment and the harassment of Alon and Doe and refused to take any action.

394.   As a direct and proximate result of MIT's actions and inactions, Plaintiffs Alon and Doe have been deprived of access to work opportunities and benefits, including the ability to work in an environment free from harassment and intimidation, the ability to fully and freely participate in campus activities without fear of harassment and intimidation, and the loss of significant class time, lab time, and career opportunities.

## COUNT VI
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

### (Retaliation)
### (By Plaintiffs Alon and Doe Against MIT)

395.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

396.    The same conduct described above in paragraphs 357-359, 362-364, and 367 of Count III that amounts to retaliation in violation of Title VI also constitutes retaliation in violation of Plaintiff Alon's rights under Title VII.

397.    The same conduct described above in paragraphs 357-358, 361-362, and 366-367 of Count III that amounts to retaliation in violation of Title VI also constitutes retaliation in violation of Plaintiff Doe's rights under Title VII.

398.    Both Alon and Doe complained to MIT, including directly to President Kornbluth, about the hostile environment on campus and the harassment they were enduring.  Their complaints constitute protected activity under Title VII.

399.    Despite actual knowledge that Alon and Doe were being retaliated against, MIT refused to take any discernable action to stop the harassment.  Both Alon and Doe were subjected to increased and escalating harassment by their harassers due to their complaints.  Doe also had his contract terminated following his complaints.  These constitute material adverse actions in violation of Title VII.

400.    As a direct and proximate result of MIT's actions and inactions, Plaintiffs Alon and Doe were deprived of work opportunities and benefits, including the ability to work in an environment free from discrimination and intimidation, the

ability to fully and freely participate in all campus activities without fear of discrimination and intimidation, and the loss of significant class time, lab time, and career opportunities.  Doe also had his contract terminated and was deprived of his ability to continue the cutting-edge work that brought him to MIT.

## COUNT VII

### Violation of Massachusetts General Law Chapter 151B, § 1 et seq.

#### (Direct Discrimination)
#### (By Plaintiff Doe Against MIT)

401.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

402.    Massachusetts General Law Chapter 151B, §4 ("MGL") prohibits unlawful employment practices, including discrimination based on race, religion, national origin, and ancestry.

403.    The same conduct described above in Count I and Count IV (paragraphs 330-332, 334, 336-338, 341 and 373-375) that amounts to a violation of Title VI and Title VII also constitutes employment discrimination in violation of Plaintiff Doe's rights under MGL.  Not only did MIT fail to take appropriate corrective action, allowing the discriminatory conduct to continue, but these acts were designed to deprive Doe of the benefits of his employment and derail his career because of his race, religion, national origin, and/or ancestry.

404.    Doe was terminated from Professor Roe's lab because he is Jewish and Israeli.  The termination of his contract constitutes an adverse employment action.

405.   Doe's termination because he is Jewish and Israeli also demonstrates causation.  Doe was expressly terminated because he is Jewish and Israeli.

406.   Doe has suffered injury and damages because of the discrimination.  He is no longer working in the same department.  He is no longer doing the research he was recruited to perform.   Further, Professor Roe has actively thwarted Doe's attempts to obtain a tenured professorship at other institutions by spreading vile falsehoods about him.

## COUNT VIII

### Violation of Massachusetts General Law Chapter 151B, § 1 et seq.

### (Hostile Work Environment)
### (By Plaintiffs Alon, Doe, and the Coalition Against MIT and by Plaintiff Alon Against DeGraff)

407.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

408.   Subjecting an employee to a hostile work environment is a form of discrimination prohibited by MGL.

409.   The same conduct described above in Count II and Count V (paragraphs 346-348, 350-353, 382-384, 386-388, 390-391, and 393-394) that amounts to a hostile environment in violation of Title VI and Title VII also constitutes a hostile work environment in violation of Plaintiff Alon's rights under MGL.

410.   The same conduct described above in Count II and Count V (paragraphs 349-353; 382-383, 385-387, 389-390, and 392-394) that amounts to a hostile environment in violation of Title VI and Title VII also constitutes a hostile work environment in violation of Plaintiff Doe's rights under MGL.

411.    Both the employer and individual co-workers can be held liable under MGL for harassment that creates a hostile work environment.

412.    As discussed above, Alon and Doe were subjected to a hostile work environment based on being Jewish and Israeli.  The harassment was unwelcome, severe and pervasive; objectively and subjectively offensive; known to MIT, which failed to take prompt and effective remedial and preventative action reasonably calculated to end the harassment; caused Alon and Doe significant emotional, reputational and financial harm; and the harassing behavior and impact continue today.

## COUNT IX

**Violation of Massachusetts General Law Chapter 151B, § 1 et seq.**

**(Retaliation)**
**(By Plaintiffs Alon and Doe Against MIT and by Plaintiff Alon Against DeGraff)**

413.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

414.    MGL §4(4) provides that "[i]t shall be unlawful practice … [f]or any person [or] employer to discharge, expel or otherwise discriminate against any person because he has opposed the practices forbidden under this chapter."

415.    The same conduct described above in Count III and Count VI (paragraphs 357-359, 362-364, 367 and 398-400) that amounts to retaliation in violation of Title VI and Title VII also constitutes retaliation in violation of Plaintiff Alon's rights under MGL.

416.    The same conduct described above in Count III and Count VI (paragraphs 357-358, 361-362, 366-367 and 398-400) that amounts to retaliation in violation of Title VI and Title VII also constitutes retaliation in violation of Plaintiff Doe's rights under MGL.

417.    Both Alon and Doe were unlawfully retaliated against in violation of their rights under MGL.  Both complained to MIT, including directly to President Kornbluth, but received no response or remedy.  Both were subjected to increased and escalating harassment by their harassers.

418.    Despite actual knowledge that Alon and Doe were being retaliated against, MIT refused to take any discernable action to stop the harassment.  This constitutes a material adverse action in violation of MGL.

419.    MIT and DeGraff's retaliatory conduct were intentional, willful, and in reckless disregard of Plaintiffs Alon's and Doe's rights under Massachusetts law.  As a direct and proximate result of MIT's and DeGraff's retaliatory actions and inactions, Plaintiffs Alon and Doe were deprived of work opportunities and benefits, including the ability to work in an environment free from discrimination and intimidation, the ability to fully and freely participate in all campus activities without fear of discrimination and intimidation, and the loss of significant class time, lab time, and career opportunities.

## COUNT X

### Breach of Contract
### (By Plaintiff Doe Against MIT)

420.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

421.    Plaintiff Doe was recruited to MIT specifically to work on cutting edge experiments in a particular field of science.  He entered a valid, written contract with MIT for a position explicitly described as a Postdoctoral Associate within a specific science department at MIT.  The contract specifically defines his agreed-upon role as conducting research in a particular field of scientific study "[u]nder the direction of Professor [Richard Roe]."

422.    Doe's written contract with MIT set his annual salary as $70,000. Professor Roe informed Doe the salary was above MIT's standard rate, which "reflects your unusually broad experience and accomplishments in different areas."

423.    Doe's contractually defined duties and salary were essential to his willingness to obtain a visa, travel to the United States, and become a postdoctoral associate at MIT.

424.    At all relevant times, Doe was ready, willing and able to perform his duties under his contract with MIT.  Doe received exemplary reviews for his performance of his duties and his exile from the lab had nothing to do with his performance or the quality of his work.

425.    MIT breached and continues to breach its contract with Doe, by (i) having removed him from the lab and his contractually-defined duties at the request

of anti-Semites, and (ii) transferring him to another department where he will be performing a different type of work at a reduced salary.

426.    As a result of MIT's breaches, Doe has been damaged and continues to sustain substantial damages, in amounts to be determined at trial.

## COUNT XI

**Breach of Implied Covenant of Good Faith and Fair Dealing
(By Plaintiff Doe Against MIT)**

427.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

428.    MIT has breached the covenant of good faith and fair dealing implied in its contract with Doe.  In Doe's contract, MIT described itself as "a place where talent, resources, innovative ideas, and dedication meet to provide a uniquely stimulating and challenging environment with a commitment to making the world a better place. Postdoctoral Associates come to MIT to develop their scholarly competence while working under the supervision and mentorship of MIT faculty/investigators."  MIT has made a mockery of how it defines itself.  It has in all respects breached its "commitment to making the world a better place."

429.    MIT has acted in bad faith in breach of the implied covenant of good faith and fair dealing to deny Doe the benefits of his contract.  Postdoctoral associate positions are customarily three-year positions.  The contracts are written as one-year contracts with the option to renew for two additional years, which is the expectation of everyone involved in the absence of extraordinary circumstances.  Bowing to anti-Semitic hate that violates its own non-discrimination policy, MIT has allowed Doe to

be removed from his contractually-agreed upon department, allowed Doe to be removed from the experiments that are described in his contract, terminated his contract in the middle of his second year, failed to renew Doe's contract for the third year of his planned three-year stay, and failed to provide Doe an appropriate letter of recommendation to mitigate the damage to his career.

430.    As a result of MIT's breaches, Doe has been damaged, and continues to sustain substantial damages, in amounts to be determined at trial.

## COUNT XII

### Intentional Infliction of Emotional Distress
### (By Plaintiffs Alon, Sussman and Doe Against MIT and by Plaintiffs Alon and Sussman Against DeGraff)

431.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

432.    Professor DeGraff's conduct intentionally harassing, discriminating against, and retaliating against Plaintiffs Alon and Sussman was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

433.    MIT's conduct intentionally discriminating against Plaintiffs Alon, Sussman, and Doe, deliberately ignoring the harassment they were enduring, and deliberately ignoring the retaliation they were experiencing, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. This goes well beyond merely ignoring peer-on-peer harassment (as bad as that may be); a university professor engaged in discrimination, harassment, and retaliation against Plaintiffs for being Jewish and/or Israeli with

108

full knowledge and impunity of the university president and other administrators who had supervisory duties to prevent discrimination, harassment and retaliation.

434.    Defendants intentionally engaged in conduct that was designed to cause or was reckless and/or negligent in its disregard in the likelihood of causing Plaintiffs Alon, Sussman, and Doe severe emotional distress.    Defendants' actions were malicious and done with the intent to harm.

435.    As a direct and proximate cause of Defendants' actions, Plaintiffs Alon, Sussman, and Doe have suffered severe emotional distress.

## <u>COUNT XIII</u>

### Reckless Infliction of Emotional Distress
### (By Plaintiffs Alon, Sussman and Doe Against MIT and by Plaintiffs Alon and Sussman Against DeGraff)

436.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

437.    Defendants knew or should have known that emotional distress was likely to result from the conduct alleged herein.

438.    Professor DeGraff's conduct in harassing, discriminating against, and retaliating against Plaintiffs Alon and Sussman was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

439.    MIT's conduct in discriminating against Plaintiffs Alon, Sussman, and Doe, deliberately ignoring the harassment they were enduring, and deliberately ignoring the retaliation they were experiencing, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.    This goes well beyond merely ignoring peer-on-peer harassment (as bad as that may be);

university professors engaged in discrimination, harassment, and retaliation against Plaintiffs for being Jewish and/or Israeli with full knowledge and impunity of the university president and other administrators who had supervisory duties to prevent discrimination, harassment and retaliation.

440.   Defendants engaged in conduct that was designed to cause or was reckless in its disregard in the likelihood of causing Plaintiffs Alon, Sussman, and Doe severe emotional distress.

441.   As a direct and proximate cause of Defendants' actions, Plaintiffs Alon, Sussman, and Doe have suffered severe emotional distress of a nature that no reasonable person could be expected to endure.

## COUNT XIV

### Negligent Infliction of Emotional Distress
### (By Plaintiffs Alon and Doe Against MIT and by Plaintiff Alon Against DeGraff)

442.   Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

443.   By virtue of MIT's relationship to Plaintiffs Alon and Doe as employees, its published policies on discrimination, nondiscrimination, harassment, stalking, and doxing, its public statements that anti-Semitism is totally unacceptable in the MIT community and would not be tolerated, and its private interactions with Alon and Doe, MIT owed or assumed a duty of care to Alon and Doe.

444.   MIT negligently breached its duty of care in refusing to follow its own policies and refusing to reasonably respond to Alon's and Doe's complaints of discrimination, harassment, stalking, and doxing.

445.    As a direct and proximate cause of Defendants' actions, Plaintiffs Alon and Doe have suffered severe emotional distress.  Physical manifestations of Alon's emotional distress include insomnia, fatigue and several panic attacks.  Physical manifestations of Doe's emotional distress include insomnia and stress induced acne.

446.    Any reasonable person would have suffered severe emotional distress under the circumstances alleged herein.

## COUNT XV

### Defamation
### (By Plaintiff Alon Against DeGraff)

447.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 318 as if fully set forth herein.

448.    Professor DeGraff published defamatory statements about Alon to third parties in the publication *Le Monde diplomatique*.[26]  The article was published on May 24, 2024 and is still available online today.

449.    DeGraff specifically named Alon in the essay and falsely accused him of stating that "SAGE's students' pleas to halt the genocide of Palestinians are 'pro-Hamas' and advocate the killing of Jews," thereby falsely accusing Alon of characterizing an MIT protest group's statements purporting to oppose "genocide" as being "pro-Hamas" and encouraging violence.  DeGraff links to a video in which Alon supposedly makes these statements.  In fact, the video depicts Alon giving an interview to news media *prior* to the establishment of the Scientists Against Genocide

---

[26] Michel DeGraff, *MIT's Orwellian language masks its stance on Gaza protests*, LeMonde diplomatique (May 24, 2024), https://mondediplo.com/outside-in/mit-gaza.

Encampment (SAGE) in April 2024.  And Alon's only public statements, including in the video, had been focused on the calls for "intifada" at MIT (i.e., calls for violence on the MIT campus).

450.    DeGraff also falsely stated that Alon "participate[d] in well-rehearsed propaganda that erases the anti-Zionist Jewish students and misrepresents them, along with their non-Jewish comrades, as violent and antisemitic."  That was also made up.  Alon made no such statements.  In fact, in an interview to news media on May 2, 2024 in which he actually commented on the encampment at MIT, Alon expressly acknowledged that "not every Jewish person is a Zionist."

451.    Professor DeGraff's statements were not expressions of opinion that are protected by the First Amendment.

452.    Professor DeGraff's statements about Alon were false, published with actual malice, and designed to hold Alon up to contempt, hatred, scorn or ridicule. Professor DeGraff's statements were made solely for the purpose of causing Alon harm and impairing his standing at MIT and in the larger academic community.

453.    Given Professor DeGraff's prominence as a tenured professor at MIT, his false statements had their intended effect.  Alon's reputation in the MIT community and academic community have been severely and irreparably tarnished and he has experienced economic harm.  Despite Alon's sterling credentials, he has been denied over 50 tenure-track positions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court order the following

relief:

1. Entry of judgment against Defendants on all Counts;

2. Injunctive relief to eliminate the hostile climate for Jews and Israelis at MIT, to prevent it from recurring and to ensure that MIT will enforce its non-discrimination and harassment policies against prohibited conduct rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI and Title VII and Massachusetts state law.

3. A declaratory judgment that the failure by MIT to enforce its policies to protect Jewish and Israeli members of the MIT community has violated Title VI and Title VII of the 1964 Civil Rights Act and Massachusetts state law;

4. For Plaintiff Lior Alon, injunctive relief requiring Professor DeGraff to issue a public retraction of all defamatory statements and to remove all videos and images of Alon from all social media platforms, and injunctive relief requiring MIT to enforce its policies against harassment and doxing, thereby requiring Professor DeGraff to remove all video and images of Alon from all social media platforms;

5. For Plaintiff Lior Alon, an award of compensatory and consequential damages, including, without limitation, for his loss of wages, out-of-pocket costs for therapy, counseling and/or medical, psychological and psychiatric care required as a result of MIT's conduct, costs to be paid for further therapy, counseling and/or medical, psychological and psychiatric care required as a result of MIT's conduct, and lost career earnings in an amount to be determined at trial;

6. For Plaintiff Lior Alon, emotional damages for intentional infliction of

emotional distress, as Alon suffered and continues to suffer from severe and lasting emotional damages: psychological trauma and injury, embarrassment, humiliation, and mental anguish and injury;

7.  For Plaintiff Lior Alon, punitive damages in an amount to be determined at trial against MIT and Michel DeGraff;

8.  For Plaintiff William Sussman, an award of compensatory and consequential damages, including, without limitation, for his loss of educational opportunities, loss of wages, lost career earnings in an amount to be determined at trial, and out of pocket costs for security and/or security training;

9.  For Plaintiff William Sussman, emotional damages for intentional infliction of emotional distress, as Sussman suffered and continues to suffer from severe and lasting emotional damages: psychological trauma and injury, embarrassment, humiliation, and mental anguish and injury;

10. For Plaintiff William Sussman, punitive damages in an amount to be determined at trial against MIT and Michel DeGraff;

11. For Plaintiff John Doe, an award of compensatory and consequential damages, including, without limitation, for his loss of wages, and lost career earnings in an amount to be determined at trial;

12. For Plaintiff John Doe, emotional damages for intentional infliction of emotional distress, as Doe suffered and continues to suffer from severe and lasting emotional damages: psychological trauma and injury, embarrassment, humiliation, and mental anguish and injury;

13. For Plaintiff John Doe, punitive damages in an amount to be determined at trial against MIT;

14. Plaintiffs' reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988;

15. Pre-judgment interest and post-judgment interest at the maximum allowable rate permitted by law;

16. Any other relief this Court deems just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a jury trial on all issues so triable.

Dated:  September 17, 2025                Respectfully submitted,

                                         **THE LOUIS D. BRANDEIS CENTER**
                                         **FOR HUMAN RIGHTS UNDER LAW**


                                         By:____/s/ Philip Y. Brown____

                                         **THE LOUIS D. BRANDEIS CENTER**
                                         **FOR HUMAN RIGHTS UNDER LAW**
                                         Richard A. Rosen*
                                         Paul M. Eckles*
                                         Rebecca L. Harris*
                                         1330 Ave of the Americas, 23rd floor
                                         New York, NY 10019
                                         Telephone:  (202) 559-9296
                                         rrosen@brandeiscenter.com
                                         peckles@brandeiscenter.com
                                         rharris@brandeiscenter.com

                                         **BROWN COUNSEL, LLC**
                                         Philip Y. Brown (BBO #552366)
                                         Amelia R. Gray (BBO #675632)
                                         One Marina Park Drive, 1410
                                         Boston, MA 02210
                                         Telephone:  (617) 683-1500
                                         pbrown@browncounsel.com
                                         agray@browncounsel.com

                                         *Attorneys for Plaintiffs*
                                         *William Sussman, Lior Alon, John Doe &*
                                         *The Louis D Brandeis Center Coalition to*
                                         *Combat Anti-Semitism*


                                         **White & Case LLP**
                                         Jonathan D. Polkes*
                                         1221 Avenue of the Americas
                                         New York, New York 10020-1095
                                         Telephone:  (212) 819-8200
                                         Facsimile:  (212) 354-8113
                                         jonathan.polkes@whitecase.com


                                         Rachel Rodman*

701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone: (202) 626-3600
Facsimile:  (202) 639-9355
rachel.rodman@whitecase.com

*Attorneys for Plaintiff*
*The Louis D Brandeis Center Coalition to*
*Combat Anti-Semitism*

*\*Pro hac vice application forthcoming*