## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

William Sussman, et al.,

      Plaintiffs,

v.

Massachusetts Institute of Technology and
Michel DeGraff,

      Defendants.

Case No. 25-CV-11826-RGS

**Leave to File Excess Pages
Granted on September 29, 2025**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT MASSACHUSETTS INSTITUTE OF TECHNOLOGY'S
## PARTIAL MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. ii

INTRODUCTION............................................................................................................... 1

BACKGROUND................................................................................................................. 3

    A.     The Prior Litigation Against MIT Before This Court........................................... 3

    B.     The Present Complaint........................................................................................ 4

          1.     General Allegations About Alleged Antisemitism On Campus................ 4

          2.     Allegations About Professor DeGraff And MIT's Response.................... 7

          3.     Additional Allegations Relevant To The Coalition................................. 8

          4.     Claims For Relief.................................................................................. 9

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT...................................................................................................................... 9

I.     The AC Fails To Allege Title VI Direct Discrimination Against Alon Or
Sussman........................................................................................................................ 9

II.    The Bulk Of Plaintiffs' Title VI and Title VII Hostile-Environment Theories
Should Be Dismissed.................................................................................................... 11

    A.     Plaintiffs Have Not Alleged Deliberate Indifference Under Title VI By
MIT................................................................................................................... 12

    B.     Alon and Sussman Do Not Plausibly Allege Actionable Title VI
Harassment........................................................................................................ 16

    C.     Alon Does Not Allege Actionable Title VII Harassment................................... 21

III.   The AC Fails To State A Claim For Retaliation Against Alon Or Sussman Under
Either Title VI Or Title VII........................................................................................... 24

IV.   Alon's and Sussman's State-Law Claims Should Be Dismissed. .................................. 26

V.    The Coalition's Claims Should Be Dismissed For Lack Of Standing............................ 28

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

CASES

*Aaron v. City of Lowell*, 666 F. Supp. 3d 102 (D. Mass. 2023) .................................................. 27

*Alianza Americans v. DeSantis*, 727 F. Supp. 3d 9 (D. Mass. 2024)......................................... 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................................................ 9

*Boston Parent Coalition for Academic Excellence Corp. v. School Committee for City of Boston*, 89 F.4th 46 (1st Cir. 2023), *cert. denied*, 145 S. Ct. 15 (2024)................... 30

*Bray v. Worcester Polytechnic Institute*, 596 F. Supp. 3d 142 (D. Mass. 2022) ........................ 13

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)....................... 22, 23

*Canel v. Art Institute of Chicago*, No. 23-cv-17064, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025)............................................................................................................ 20, 21

*Chao v. Ballista*, 806 F. Supp. 2d 358 (D. Mass. 2011).......................................................... 28

*Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24 (1st Cir. 2000).............................................................................................................................. 3

*Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17 (1st Cir. 2011).............................. 23

*Conto v. Concord Hospital, Inc.*, 265 F.3d 79 (1st Cir. 2001).................................................. 29

*Cornelius-Millan v. Caribbean University, Inc.*, 261 F. Supp. 3d 143 (D.P.R. 2016)............................................................................................................................... 25

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999) ...................................................................................... 9, 12, 15, 16, 30

*Doe v. Brown University*, 896 F.3d 127 (1st Cir. 2018)........................................ 12, 16, 19, 21

*Doe v. Emerson College*, 153 F. Supp. 3d 506 (D. Mass. 2015).............................................. 27

*Doe v. Morehouse College, Inc.*, 622 F. Supp. 3d 1279 (N.D. Ga. 2022)................................. 21

*Doe v. Pawtucket School Department*, 969 F.3d 1 (1st Cir. 2020)............................... 12, 13, 15

*Doe v. Sacks*, 714 F. Supp. 3d 402 (S.D.N.Y. 2024)........................................................... 15-16

*Doe v. Sarah Lawrence College*, 453 F. Supp. 3d 653 (S.D.N.Y. 2020)................................... 10

*Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018) .............................................. 11

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011) ................................................... 17, 21

*Fitzgerald v. Barnstable School Committee*, 504 F.3d 165 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009)..................................................................................... 14-15

*Frith v. Whole Foods Market, Inc.*, 38 F.4th 263 (1st Cir. 2022)............................................. 10

*Gartenberg v. Cooper Union for the Advancement of Science & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025) ................................................................................................ 17, 18

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998)........................... 10, 13

*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ...................................... 29

*Germanowski v. Harris*, 854 F.3d 68 (1st Cir. 2017)............................................................... 25

*Gomez-Perez v. Potter*, 452 F. App'x 3 (1st Cir. 2011) .......................................................... 23

*Goodman v. Bowdoin College*, 380 F.3d 33 (1st Cir. 2004) ..................................................... 11

*Gorski v. New Hampshire Department of Corrections*, 290 F.3d 466 (1st Cir. 2002)...................................................................................................................................... 29

*Green v. Wyman-Gordon Co.*, 422 Mass. 551 (1996) .............................................................. 27

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) ......................................................... 22, 23

*Katica v. Webster Bank, N.A.*, No. 13-cv-30072, 2014 WL 3587383 (D. Mass. July 18, 2014)........................................................................................................................... 23

*Kennedy v. Town of Billerica*, 617 F.3d 520 (1st Cir. 2010).................................................... 27

*Kestenbaum v. President & Fellows of Harvard College*, 743 F. Supp. 3d 297 (D. Mass. 2024)............................................................................................................. 10, 15, 19

*Koumantaros v. City University of New York*, No. 03-cv-10170, 2007 WL 840115 (S.D.N.Y. Mar. 19, 2007)..................................................................................................... 10

*Landau v. Corp. of Haverford College*, 780 F. Supp. 3d 548 (E.D. Pa. 2025)..................... 18, 19

*Lawless v. Town of Groveland*, No. 24-cv-12605, 2025 WL 1951949 (D. Mass. July 16, 2025)............................................................................................................................. 27

*Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34 (1st Cir. 2003)........................... 22

*Lockwood v. Madeiros*, No. 18-cv-40143, 2018 WL 4087938 (D. Mass. Aug. 27, 2018)................................................................................................................................... 28

*Louis D. Brandeis Center for Human Rights Under Law v. President & Fellows of Harvard College*, No. 24-cv-11354, 2024 WL 4681802 (D. Mass. Nov. 5, 2024) ............................................................................................................ 10, 24, 25

*Luu v. Fallon Service, Inc.*, 105 Mass. App. Ct. 236 (2025) ...................................... 27

*Mandel v. Board of Trustees of California State University*, No. 17-cv-03511, 2018 WL 5458739 (N.D. Cal. Oct. 29, 2018) ............................................................. 20

*Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511 (1985), *aff'd*, 397 Mass. 1004 (1986) ..................................................................................................................... 26

*Mills v. Southern Connecticut State University*, No. 08-cv-1270, 2011 WL 3490027 (D. Conn. Aug. 10, 2011), *aff'd*, 519 F. App'x 73 (2d Cir. 2013) ....................... 22

*M.L. ex rel. D.L. v. Concord School District*, 86 F.4th 501 (1st Cir. 2023) .............. 12

*Mouradian v. General Electric Co.*, 23 Mass. App. Ct. 538 (1987) ..................... 26, 28

*Mullane v. Breaking Media, Inc.*, 433 F. Supp. 3d 102 (D. Mass. 2020), *aff'd*, No. 20-1061, 2021 WL 3027150 (1st Cir. Feb. 26, 2021) ......................................... 27

*New Hampshire Motor Transport Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006), *aff'd*, 552 U.S. 364 (2008) ............................................................................................ 30

*Nungesser v. Columbia University*, 244 F. Supp. 3d 345 (S.D.N.Y. 2017) .............. 16

*Papelino v. Albany College of Pharmacy of Union University*, 633 F.3d 81 (2d Cir. 2011) ..................................................................................................................... 20

*Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019) ................................................................................................................ 29, 30

*Pollard v. Georgetown School District*, 132 F. Supp. 3d 208 (D. Mass. 2015) ..... 13, 19

*Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79 (1st Cir. 2006) ......................... 22

*Ponte v. Steelcase Inc.*, 741 F.3d 310 (1st Cir. 2014) ................................... 22, 23, 24

*Porto v. Town of Tewksbury*, 488 F.3d 67 (1st Cir. 2007) ................................. 12, 15

*Rae v. Woburn Public Schools*, 113 F.4th 86 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 1431 (2025) ..................................................................................................... 25

*Reddy v. Foster*, 845 F.3d 493 (1st Cir. 2017) ........................................................... 9

*Rivera v. Puerto Rico Aqueduct & Sewers Authority*, 331 F.3d 183 (1st Cir. 2003) ................. 24

*Roof v. Howard University*, 501 F. Supp. 2d 108 (D.D.C. 2007) ....................... 23, 24

*Soni v. Wespiser*, 239 F. Supp. 3d 373 (D. Mass. 2017)............................................ 27

*StandWithUs Center for Legal Justice v. MIT*, 742 F. Supp. 3d 133 (D. Mass. 2024),
    *appeal docketed*, No. 24-1800 (1st Cir. Sept. 5, 2024).......... 1, 3, 4, 9-10, 11, 12, 13, 15, 29

*Stratton v. Bentley University*, 113 F.4th 25 (1st Cir. 2024)..................................... 11

*T.E. v. Pine Bush Central School District*, 58 F. Supp. 3d 332 (S.D.N.Y. 2014)...................... 18

*Thirkield v. Neary & Hunter OB/GYN, LLC*, 76 F. Supp. 3d 339 (D. Mass. 2015)................... 26

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517
    U.S. 544 (1996)................................................................................... 29

*Walmart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)............................................... 29

*Warth v. Seldin*, 422 U.S. 490 (1975)............................................................. 29

## STATUTES

28 U.S.C. § 1367(c)(3)............................................................................. 26

42 U.S.C. § 2000d................................................................................... 9

Mass. Gen. L. ch. 152 § 24.......................................................................... 26

## OTHER AUTHORITIES

Amended Complaint, *StandWithUs Center for Legal Justice v. MIT*, No. 24-CV-
    10577 (D. Mass. May 30, 2024), ECF No. 40 ................................................ 3, 4, 5

Complaint, *StandWithUs Center for Legal Justice v. MIT*, No. 24-CV-10577 (D.
    Mass. Mar. 7, 2024), ECF No. 1 ................................................................ 3

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (May 7, 2024),
    https://bit.ly/3z1ySeg........................................................................... 18

Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague*
    (July 28, 2003), https://bit.ly/4bY9Zid......................................................... 18

# INTRODUCTION

Massachusetts Institute of Technology ("MIT" or the "Institute") rejects antisemitism and other forms of hate. Based on MIT's active and engaged response to concerns about antisemitic harassment since October 7, 2023, this Court previously dismissed claims by another set of plaintiffs asserting that MIT had violated federal antidiscrimination law, including Title VI of the Civil Rights Act of 1964. *See StandWithUs Center for Legal Justice v. MIT* ("*SWU*"), 742 F. Supp. 3d 133 (D. Mass. 2024), *appeal docketed*, No. 24-1800 (1st Cir. Sept. 5, 2024). Less than a year later, Plaintiffs—now three community members and a new advocacy group—filed this action seeking to relitigate claims about campus activity that this Court already decided in dismissing *SWU*. As before, the allegations in the pleading and the materials incorporated by reference demonstrate MIT's robust and escalating response to concerns about antisemitism, refuting Plaintiffs' central theory that MIT exhibited deliberate indifference.

Beyond relitigating those claims, this case adds allegations about disagreements between an MIT faculty member (Defendant Michel DeGraff) and two MIT community members (Plaintiffs William Sussman and Lior Alon). Sussman and Alon joined the public debate about the conflict in the Middle East and related campus activism through posting on personal social media platforms, appearing on national television, and even voluntarily testifying before Congress. They claim that DeGraff's engagement with them was actionable discriminatory harassment, and that MIT itself responded with deliberate indifference—and even retaliated and discriminated against them—based on their race or ethnicity. But their own allegations and the materials they incorporate render those claims implausible, demonstrating instead that MIT responded promptly and appropriately and that in all events there was no actionable harassment. Sussman and Alon thus

fail to state any claim under antidiscrimination law, much less under the common law claims that repackage the same theories.

With the Amended Complaint ("AC"), this case also adds allegations about a current MIT employee seeking to litigate via pseudonym as "John Doe." According to the allegations—many of which were not disclosed to MIT prior to the filing of the AC, even though Doe did raise other concerns internally—Doe was "eliminated" from a lab because his subordinates did not want to work with him, purportedly because he was Israeli and Jewish. In reality, Doe received MIT's assistance to transition to another (higher paid) position at MIT, and he has repeatedly refused to participate in MIT's multiple efforts to investigate concerns he raised about his first position—efforts that remained ongoing when Doe elected to file suit. MIT vigorously disputes Doe's claims and assertions in the AC—which omits critical details about the significant outreach and support Doe received from MIT faculty and multiple MIT offices—and reserves all rights to answer and litigate those claims at the appropriate stage of these proceedings.

Finally, the AC includes claims by the Louis D. Brandeis Center Coalition to Combat Anti-Semitism ("the Coalition"), which asserts associational standing on behalf of Alon, Sussman, Doe, and an anonymous purported MIT community member. As this Court has already held, associational standing is not available for damages claims. Here, the Coalition cannot pursue injunctive-relief claims either. The antidiscrimination-law claims in this case, including the Title VII theories for employment discrimination, simply cannot be litigated without the individual participation of the Coalition's members—a fact that is undeniable based on the significant variation in the alleged experiences of the members in this case. The Coalition's claims must therefore be dismissed.

# BACKGROUND[1]

## A.    The Prior Litigation Against MIT Before This Court

As this Court is aware, this is not the first lawsuit of its kind. In 2024, two MIT students and an advocacy group sued MIT under Title VI for deliberate indifference and direct discrimination. *See* Compl., *SWU*, No. 24-CV-10577 (D. Mass. Mar. 7, 2024), ECF No. 1. The allegations centered on pro-Palestinian campus protest activity after October 7, including conduct and expression that the plaintiffs found to be deeply offensive. *Id.* ¶¶ 130-194; Am. Compl. ¶¶ 220-245, *SWU*, No. 24-CV-10577 (D. Mass. May 30, 2024), ECF No. 40 ("*SWU* AC").

After a hearing on MIT's motion to dismiss under Rules 12(b)(1) and (b)(6), this Court dismissed that action in its entirety and without leave to amend. *SWU*, 742 F. Supp. 3d at 144. With respect to the Title VI deliberate-indifference claim, the Court disagreed with the plaintiffs' characterization of MIT's response as "one of inaction," reasoning that, "[f]ar from sitting on its hands, MIT took steps to contain the escalating on-campus protests," including "suspending student protestors from non-academic activities" and "suspending one of the most undisciplined of the pro-Palestine student groups," as well as clearing an encampment on Kresge Lawn after "arrest[ing] trespassing students." *Id.* at 142. The Court cautioned against "send[ing] the unhelpful message that anything less than a faultless response in similar circumstances would earn no positive recognition in the eyes of the law." *Id.* at 143. The Court also held that, to the extent the amended complaint "gesture[d] at a direct discrimination theory," it was really "one of vicarious liability," which is not recognized under Title VI. *Id.* at 141 n.8. The Court dismissed a claim under

---

[1] Consistent with the applicable standard of review, this background is based on the AC's allegations and documents they incorporate by reference. Those documents, attached as exhibits to this Motion, are properly considered because they are referred to or cited in the AC and integral to the claims. *See Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000); *SWU*, 742 F. Supp. 3d at 139 n.6.

Section 1986 and declined to exercise supplemental jurisdiction over the state-law claims. *Id.* at 143-44. The plaintiffs' appeal is pending. *SWU*, No. 24-1800 (1st Cir. filed Sept. 6, 2024).

**B.    The Present Complaint**

Plaintiffs in this case are Lior Alon, an MIT instructor in the Math department and former postdoctoral associate; William Sussman, a former MIT PhD student in the Electrical Engineering and Computer Science department; John Doe, an MIT instructor and former postdoctoral associate; and the Coalition, "a national membership organization whose mission is to advance the civil and human rights of the Jewish people and promote justice for all through lawful means, including litigation." AC ¶¶ 18-19, 21, ECF No. 17. The Coalition purports to have members in the MIT community who experienced antisemitism on campus, *id.* ¶ 21, but its claims are based solely on the alleged experiences of Alon, Sussman, Doe, and "Coalition Member #1," who is not a plaintiff.

As relevant to MIT's Motion, the AC's allegations fall into three categories: (1) general allegations about alleged antisemitism at MIT, (2) allegations about interactions between Plaintiffs Alon and Sussman and Defendant DeGraff, and (3) other allegations about the Coalition's claims.

**1.    General Allegations About Alleged Antisemitism On Campus**

Plaintiffs allege they have experienced "consistent, widespread and steadily intensifying anti-Semitic and anti-Israeli harassment and discrimination on campus." AC ¶ 31. Their allegations closely resemble those this Court already considered in *SWU*. For example, Plaintiffs allege that student activists posted pro-Palestinian content on social media, *compare* AC ¶ 33, *with SWU* AC ¶¶ 149, 211; sent campus-wide emails criticizing Israel, *compare* AC ¶ 33, *with SWU* AC ¶¶ 145, 147, 151; hosted walk-outs and "die-ins" in support of Gaza, *compare* AC ¶ 34, *with SWU* AC ¶¶ 159-160; engaged in protest activity with chants the plaintiffs found to be offensive, *compare* AC ¶¶ 35-38, *with SWU* AC ¶¶ 157, 174, 186; defaced property with slogans the plaintiffs

found to be offensive, *compare* AC ¶¶ 32, 57, *with SWU* AC ¶¶ 144, 150; and established a temporary encampment on Kresge Lawn, *compare* AC ¶¶ 40-43, *with SWU* AC ¶¶ 221-246.

Alon, like the *SWU* plaintiffs, alleges that he heard some of the chants, and that he complained to the MIT administration in October 2023. *Compare* AC ¶¶ 80-81, *with SWU* AC ¶¶ 155, 205. Alon acknowledges MIT President Sally Kornbluth promptly replied that the "matter ha[d] [MIT's] full attention." AC ¶ 82; *see* Ex. 1. The next day, President Kornbluth released a campus-wide message condemning "individual targeting, harassment, [and] calls to violence" as "unacceptable," introducing additional safety measures, and urging student activists to recognize that their "right to speech" came with "profound responsibility." Ex. 2; AC ¶ 82. Like one of the *SWU* plaintiffs, Alon alleges that he was denied entry into the Kresge Lawn encampment on one occasion, though he adds no support for the conclusory assertion that he was denied entry because of his Jewish and Israeli identity, *see* AC ¶¶ 85, 88, nor does he allege that other MIT community members were allowed to enter the encampment while he was not. *Compare* AC ¶¶ 84-86, *with SWU* AC ¶ 301. Alon further alleges that he once "entered the encampment by climbing over a fence" and was then temporarily blocked from leaving. AC ¶ 90. Alon reported these incidents to President Kornbluth in another email, while acknowledging that the police assisted him in leaving the encampment area when he was allegedly blocked from doing so. AC ¶ 104; *see* Ex. 3.

The alleged protest activity from this past academic year, as with the Kresge Lawn encampment, focused on MIT's purported "complicity in genocide" and its research ties to Israel. AC ¶ 50. And, as in *SWU*, the AC admits that the MIT administration took prompt action in response to the events alleged. For example, Plaintiffs allege that in April 2025, students handed out flyers on campus that marked buildings with Israeli connections and displayed phrases such as "From the river to the sea, Palestine will be free." *Id.* ¶ 47; *see* Ex. 4. According to Plaintiffs, this

followed an orientation event earlier in the year when students handed out flyers containing a link to the "Mapping Project," a website listing local Jewish organizations that "support the colonization of Palestine." AC ¶ 49. But, as Plaintiffs acknowledge, in an open letter to the MIT community, President Kornbluth immediately condemned the "Mapping Project" flyers as "promot[ing] antisemitism" and reiterated that antisemitism is "totally unacceptable in [our] community" and "antithetical to MIT's values." Ex. 5; AC ¶ 49.

In May 2025, during MIT's commencement ceremony, Plaintiffs allege that the undergraduate class president delivered an *unapproved* speech to the graduates that in part criticized MIT and the Israeli government. AC ¶ 51. As the AC admits, "MIT later banned the student president from the following day's graduation." *Id.* In June 2025, Plaintiffs allege that flyers were distributed on campus depicting a Star of David dripping in blood. *Id.* ¶ 53. Again, the AC acknowledges that President Kornbluth immediately "issued a statement about the desecration of a religious symbol," reminding the community that "targeting, threatening, intimidating and spreading false statements about members of the MIT community is unacceptable and potentially unlawful." *Id.* ¶¶ 53-54; *see* Ex. 6. She further explained that MIT was "investigating the incident" and would hold any perpetrators responsible. Ex. 6. And Plaintiffs allege that in July 2025, an unidentified individual who "was not affiliated with MIT" spray-painted graffiti on the Stata Center at MIT that read "Death to the IOF." AC ¶¶ 57-58. As the AC acknowledges, an outside group called the "Direct Action Movement for Palestinian Liberation" later took credit, specifically naming "a top researcher at MIT for her work on technology allegedly used by the Israeli military." AC ¶ 57. MIT released a campus-wide communication about this incident, *id.* ¶ 58, reiterating that "[w]e reject calls for violence" and noting that MIT Police had increased patrols around the Stata Center and was "working closely with outside law enforcement, including

the FBI, to investigate this incident and enhance campus security," Ex. 7.

### 2.     Allegations About Professor DeGraff And MIT's Response

Much of the AC focuses on alleged interactions—mostly on personal social media—between Plaintiffs Alon and Sussman and Defendant DeGraff, an MIT Professor.

With respect to Alon, the AC alleges that in one instance, DeGraff filmed Alon during a gathering at or near the public encampment, AC ¶ 91, then posted unspecified "videos on social media" with Alon's face and personal information, *id.* ¶ 97. Alon was allegedly "aggressively confronted by people he did not know," including at a grocery store. *Id.* ¶ 98. DeGraff also allegedly "smear[ed]" Alon in an essay published in *Le Monde diplomatique*, which included a link to an interview Alon gave on Fox News, as well as a social media video of Alon. *Id.* ¶ 100; *see* Ex. 8 (essay citing https://www.foxnews.com/video/6339844104112 and https://www.instagram.com/p/C60DLDwNMhY/). The video was linked in another piece DeGraff published in MIT's student newspaper, though Alon's name is not mentioned in that article. AC ¶ 103; *see* Ex. 9. Alon complained to President Kornbluth, asking the MIT administration to either request that DeGraff remove the posts or otherwise discipline DeGraff. AC ¶¶ 104-105; *see* Ex. 3.

With respect to Sussman, the AC depicts a public disagreement on social media between Sussman and DeGraff, which Sussman initiated. AC ¶¶ 115-116, 118, 129, 143-147; *see* Ex. 10.[2] Their personal dispute centered on guest lectures in DeGraff's seminar series (in which Sussman was not enrolled), which sparked a debate about perceived "Zionist propaganda." Ex. 8; *see* AC ¶¶ 113, 115. The tension spilled into an email thread involving various MIT community members. AC ¶¶ 119-136. As this exchange unfolded, Sussman reached out to MIT offices including the

---

[2] Plaintiffs assert that Sussman did not "tag" Professor DeGraff in his initial post, AC ¶ 115, but Sussman's post clearly displays DeGraff's name and social media handle, Ex. 10.

Division of Student Life; MIT Police; the Office of the President; and the Institute Discrimination and Harassment Response Office ("IDHR"). *See* AC ¶¶ 119, 130, 138, 151; Ex. 11; Ex. 12; Ex. 13; Ex. 14. Every office responded to Sussman promptly, often with an offer of support. *See* Ex. 11; Ex. 12; Ex. 13; Ex. 14; *see also* AC ¶¶ 128, 152. For example, the Vice Chancellor for Student Life pointed Sussman to support resources and, following MIT process, forwarded his complaint to Human Resources ("HR") to pursue next steps, AC ¶ 128, and an IDHR staff member offered discussing a no-contact arrangement between Sussman and DeGraff, *id.* ¶ 152. While the AC takes issue with IDHR's determination that Sussman's complaint did not fall under its purview, it acknowledges that IDHR's Manager of Investigations personally responded to Sussman, explaining why, after a thorough assessment, the office determined that MIT's central HR office would investigate instead. *Id.* ¶¶ 154-157; *see* Ex. 15. HR began investigating, but was then told by Sussman that he declined to participate at all. Without his participation, the review was closed. AC ¶ 160; *see* Ex. 16.

### 3.    Additional Allegations Relevant To The Coalition

The Coalition asserts associational standing on the theory that it has members (Alon, Sussman, and Doe) who have been harmed by the alleged events. AC ¶¶ 18-20. In addition, Plaintiffs allege that "Coalition Member #1," a current Jewish graduate student at MIT, was identified as "an Israeli" based on "a curated list of Israelis maintained by graduate students on the MIT campus" that was allegedly shown to someone who shared this fact with Member #1 (but did not show him any such list). *Id.* ¶¶ 273-274. When Coalition Member #1 reported this incident, IDHR responded "with a reference to online resources dealing with doxing and online harassment" and then indicated it was "very concerned about the existence of such a list" and that it wanted to help but could not do so without more information. *Id.* ¶¶ 276-277, 281.

### 4.    Claims For Relief

Against MIT, the AC asserts claims for direct discrimination, hostile environment, and retaliation under Titles VI and VII and Massachusetts General Law Chapter 151B, and claims for breach of contract. AC ¶¶ 319-430. The AC also asserts various tort claims against both MIT and DeGraff, and a claim of defamation against DeGraff only. *Id.* ¶¶ 431-453. Plaintiffs seek declaratory and injunctive relief; compensatory and consequential damages; and punitive damages.

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing plausibility, the court does not credit "mere conclusory statements" or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557). Under Rule 12(b)(1), a court must dismiss any claim over which it lacks subject-matter jurisdiction, including where the plaintiff lacks standing. *Reddy v. Foster*, 845 F.3d 493, 499-500 (1st Cir. 2017).

## ARGUMENT

## I.    The AC Fails To Allege Title VI Direct Discrimination Against Alon Or Sussman.

Alon and Sussman both allege MIT violated Title VI, which prohibits discrimination based on race, color, and national origin in programs receiving federal funding. 42 U.S.C. § 2000d.[3] Title VI's implied private right of action is limited to intentional discrimination by the funding recipient itself. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642-43 (1999). "[V]icarious liability is unavailable for Title VI," even for actions taken by teachers. *SWU*, 742 F.

---

[3] MIT assumes solely for purposes of this Motion that the implied private right of action recognized under Title VI applies to Alon, Sussman, and the Coalition's purported members.

Supp. 3d at 141 n.8 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998)).

Alon's and Sussman's Title VI allegations of direct discrimination—also known as disparate treatment—do not come close to meeting the applicable legal standard. *See* AC ¶¶ 319-341. Disparate treatment occurs when an institution intentionally "treated a particular person less favorably than others *because of* a protected trait." *Frith v. Whole Foods Market, Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (emphasis added) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). "[T]he mere existence of disparate treatment … does not furnish [an] adequate basis for an inference that the discrimination was racially motivated." *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 310 (D. Mass. 2024). Instead, to plausibly allege the requisite intent, a plaintiff must point to a "similarly situated comparator" who was treated differently by the institution. *Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*, No. 24-cv-11354, 2024 WL 4681802, at *4 (D. Mass. Nov. 5, 2024). In addition, a plaintiff must allege that the institution took some material "adverse school-related action" against him as a result of that discriminatory animus, such as suspension, *see Doe v. Sarah Lawrence Coll.*, 453 F. Supp. 3d 653, 668 (S.D.N.Y. 2020), or dismissal, *see Koumantaros v. City Univ. of N.Y.*, No. 03-cv-10170, 2007 WL 840115, at *3 (S.D.N.Y. Mar. 19, 2007).

Alon's and Sussman's direct-discrimination theory hinges on MIT's handling of their complaints about DeGraff. For Sussman, the theory goes that because IDHR determined his complaint was best investigated by HR, and because HR closed the investigation after Sussman left MIT, MIT intentionally discriminated against him. AC ¶¶ 332, 336; *see* Exs. 13, 15, 16. But this is far from the "adverse action" needed to support a disparate-treatment claim, particularly where MIT opened an investigation and only closed it after Sussman indicated he would not meet with HR investigators. AC ¶ 160. For Alon, the AC does not even attempt to articulate a direct-

discrimination theory other than a generalized argument that MIT discriminated by failing to take action to stop DeGraff's alleged harassment. *See* AC ¶¶ 328-337. That theory sounds in deliberate indifference, *not* direct discrimination, and it fails for the reasons discussed below. Indeed, the AC acknowledges that Alon remains at MIT and received an award in April 2025 recognizing "extraordinary members of the MIT community," AC ¶ 69, hardly an adverse action. *See Stratton v. Bentley Univ.*, 113 F.4th 25, 38 n.6 (1st Cir. 2024).

The AC also lacks any allegations supporting direct or circumstantial evidence of animus, a "necessary component" of the claim. *See Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004). MIT's decision to address Sussman's complaint through HR does not show that MIT was treating Sussman worse than others, let alone *because* he is Jewish. The AC fails to identify any similarly situated comparator, much less one treated more favorably. Indeed, MIT's concrete steps to address alleged antisemitism, *see SWU*, 742 F. Supp. 3d at 142; Exs. 2, 5-7, render implausible any claim MIT harbors discriminatory animus against its Jewish or Israeli students. *Cf. Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) ("alleged prejudice … must be based on more than mere speculation and tenuous inferences"). As in *SWU*, the pleading fails to sustain any direct-discrimination theory against MIT for intentional discrimination against Alon and Sussman.

## II.    The Bulk Of Plaintiffs' Title VI And Title VII Hostile-Environment Theories Should Be Dismissed.

Setting aside only Doe's specific claims related to the lab where he worked, which rest on factual inaccuracies and omissions that MIT will address at the appropriate stage of litigation, the AC fails to allege a hostile-environment claim under either Title VI or Title VII. These claims fail because (1) the AC does not allege that MIT was deliberately indifferent under Title VI, (2) Alon and Sussman do not allege actionable harassment under Title VI, and (3) Alon does not allege actionable harassment under Title VII.

11

### A.    Plaintiffs Have Not Alleged Deliberate Indifference Under Title VI By MIT.

To state a hostile-environment claim against a funding recipient under Title VI, a plaintiff must plausibly allege five elements: "(1) '[the plaintiff] was subject to severe, pervasive, and objectively offensive … harassment'; (2) 'the harassment caused the plaintiff to be deprived of educational opportunities or benefits'; (3) the funding recipient was aware of such harassment; (4) the harassment occurred 'in [the funding recipient's] programs or activities'; and (5) the funding recipient's response, or lack thereof, to the harassment was 'clearly unreasonable.'" *Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018). Critically, "a recipient of federal funds may be liable in damages … only for its own misconduct," *Davis*, 526 U.S. at 640-41, not through vicarious liability for the actions of others, *SWU*, 742 F. Supp. 3d at 141 n.8. Here, Plaintiffs fall short of demonstrating the "stringent standard of fault" that applies. *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007) (quotation mark omitted).

The "clearly unreasonable" standard precludes a court from second-guessing a school's response unless it rises to the level of an abject institutional failure. The "inquiry is limited to whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023) (quotation marks omitted). "[F]unding recipients are not required to have perfect foresight or manage all student interactions expertly," *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020), and "a claim that the [institution] could or should have done more is insufficient to establish deliberate indifference," *Porto*, 488 F.3d at 73. This "is not a mere reasonableness standard," and consistent with the Supreme Court's directive that it can be decided "as a matter of law," *Davis*, 526 U.S. at 648-49 (quotation marks omitted), courts in this district have repeatedly rejected deliberate-indifference claims at the pleadings stage, *see, e.g.*, *SWU*, 742

F. Supp. 3d at 141-44; *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 229-31 (D. Mass. 2015); *Bray v. Worcester Polytechnic Inst.*, 596 F. Supp. 3d 142, 156-57 (D. Mass. 2022).

This Court has already held that MIT was not deliberately indifferent to alleged antisemitism on campus through the spring 2024 semester. 742 F. Supp. 3d at 142; *supra* at 3. The same logic applies to the new allegations postdating the pleading in *SWU* relating to the general campus environment. The AC concedes that MIT has continued to take steps to combat antisemitism, *see, e.g.*, AC ¶¶ 49, 53-54, 58, 82, to the extent actual notice reached the appropriate MIT officials, *see Gebser*, 524 U.S. at 290.[4] For example, the AC points to the "Mapping Project" flyers, but also admits President Kornbluth immediately released a campus-wide statement condemning their message. AC ¶ 49; *see* Ex. 5. The AC points to the class president's *unapproved* commencement speech criticizing the Israeli government, but also admits that MIT immediately barred her from the following day's graduation. AC ¶ 51. The AC points to other flyers distributed in June 2025, while also admitting President Kornbluth released a campus-wide message stating that "we absolutely reject antisemitism" and confirming that MIT was investigating the matter. *Id.* ¶¶ 53-54; Ex. 6. The AC cites an incident where an outside group spray-painted "Death to the IOF" on the Stata Center, but acknowledges MIT promptly denounced "calls for violence" and informed the community that MIT Police were increasing their patrols around the Stata Center and collaborating with FBI and other external law enforcement to investigate and strengthen security. AC ¶ 58; Ex. 7. And, while the AC alleges that the unnamed "Coalition Member #1" complained

---

[4] The AC asserts that "[a]ll of the anti-Semitic incidents described herein … were widely publicized on the MIT campus" and "also known to the MIT administration." AC ¶ 59. But "constructive knowledge is plainly insufficient." *Pawtucket*, 969 F.3d at 7. In multiple instances, Plaintiffs fail to allege what the law requires: actual notice to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf," *Gebser*, 524 U.S. at 290; *see, e.g.*, AC ¶¶ 44-48, 50, 52.

to IDHR about a purported list of Israelis, it also concedes IDHR's response that it was "very concerned" and would "like to help" but needed more information to do so. AC ¶¶ 274, 281.

As for the allegations by Alon and Sussman concerning DeGraff, the AC also does not come close to alleging deliberate indifference. It acknowledges that after Sussman emailed MIT administrators, the Vice Chancellor for Student Life replied the very next day, informing Sussman that his report would be passed on to HR; encouraging him to take advantage of "support resources"; and advising him to contact MIT Police with any concerns about physical safety. AC ¶ 128; *see* Ex. 11. When Sussman reported flyers purportedly referring to his social media posts, AC ¶ 139, the Dean of Student Life responded almost immediately, asking if Sussman had specific information about who distributed them, Ex. 11. The Chief of MIT Police also informed Sussman that a detective would be in contact. *Id.* After Sussman submitted a complaint to IDHR, a staff member notified Sussman that his complaint would be transferred to HR because it was "best handled" by that office, and offered additional support, including facilitating a discussion about a no-contact agreement with DeGraff. Ex. 13; AC ¶ 152. When Sussman requested an appeal of that decision, the Manager of Investigations emailed Sussman—despite the fact that the decision was not subject to appeal under MIT's policies—further explaining that HR was the appropriate office to investigate or otherwise resolve his complaint because the allegations did not appear to reflect harassment based on a protected characteristic. AC ¶ 155; *see* Ex. 15. Finally, HR had already begun investigating Sussman's complaint when he voluntarily left MIT, and HR only closed the investigation because Sussman informed investigators that he would not meet with them as part of their process. AC ¶ 160; *see* Ex. 16. Even if Sussman disagrees with how MIT elected to investigate his report, he does not and cannot allege that its response was "clearly unreasonable." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 175 (1st Cir. 2007), *rev'd on other grounds*,

555 U.S. 246 (2009).

For Alon, the AC alleges that after he emailed President Kornbluth about his interactions with DeGraff and experiences on campus, President Kornbluth "never responded," and MIT "took no action." AC ¶ 106. But Title VI does not entitle every community member to a response from the school official of their choice every time they write, and Alon's own email acknowledges that MIT Police took action by assisting him when he believed he needed help in connection with the encampment. *See* Ex. 3; AC ¶ 104. Moreover, as recognized in *SWU*, it is untrue that MIT "took no action" in response to the encampment and other campus protest activity. *SWU*, 742 F. Supp. 3d at 142. To the extent Alon's claim hinges on his interactions with DeGraff, Alon does not allege the type of actionable harassment that triggers an institutional response obligation for purposes of Title VI, as discussed *infra* in Section II.B.

In short, none of the above rises to the level of deliberate indifference needed to assert a viable claim of discrimination. Where courts have allowed deliberate-indifference claims to proceed, it was because, for example, the school did nothing at all, *see Pawtucket*, 969 F.3d at 9, or pursued a "vacillating" and "internally contradictory" response, *Kestenbaum*, 743 F. Supp. 3d at 309. Plaintiffs here do not dispute that MIT has taken steps to address their concerns. AC ¶ 350. They contend those efforts were imperfect, but that is not enough to state a claim. *See Porto*, 488 F.3d at 74 (rejecting argument that school's response was "clearly unreasonable" because it was "ineffective"); *SWU*, 742 F. Supp. 3d at 142 (explaining that whether different measures could have been more effective in hindsight is "not the applicable standard"). Plaintiffs likewise cannot use Title VI "to make particular remedial demands," *Davis*, 526 U.S. at 648, such as disciplining DeGraff, *see* AC ¶ 350. That is particularly so where the response they demand could "impermissibly restrict[ ] … speech-protected values." *Doe v. Sacks*, 714 F. Supp. 3d 402, 413

15

(S.D.N.Y. 2024) (rejecting deliberate-indifference claim alleging university did not discipline the creators of allegedly harassing content online). Plaintiffs thus fail to clear the high bar for alleging a "clearly unreasonable" response—either to their general allegations about the campus or to the alleged conduct by DeGraff.

**B.     Alon And Sussman Do Not Plausibly Allege Actionable Title VI Harassment.**

These Title VI hostile-environment claims also fail because Plaintiffs have not alleged actionable harassment triggering MIT's Title VI response obligation in the first place. Title VI covers only harassment that is "so severe, pervasive, and objectively offensive"—or that "so undermines and detracts from the victims' education experience"—that "it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Brown Univ.*, 896 F.3d at 132 (quoting *Davis*, 526 U.S. at 650-51). This deprivation must occur "on the basis of" the victim's protected characteristic, and the defendant must be able to exercise "substantial control" over the alleged harasser and the context in which it occurs in order to be held responsible for it. *Davis*, 526 U.S. at 645.

The communications featuring most prominently in Alon's and Sussman's hostile-environment claims did not occur in a context over which MIT "exercise[s] substantial control," so MIT cannot be said to have "expose[d]" them to the alleged "harassment or 'cause[d]' them to undergo it 'under' [its] programs." *Id.* Alon and Sussman cite social media posts and an online article that named them and allegedly hurt their reputations. *See, e.g.*, AC ¶¶ 97, 116, 118, 129, 145, 148-149. But MIT does not have the legal obligation under Title VI to monitor or police the personal social media postings or extramural writings of its community members. *See Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 368 (S.D.N.Y. 2017). Title VI addresses "severe and pervasive" harassment in the funding recipient's educational environment, and there is no legal support (much less sound policy) for expanding Title VI obligations to social media posts

exchanged between adult community members on matters of intense public debate.

Additionally, political disagreements cannot sustain a deliberate-indifference claim. Although Alon and Sussman may take offense at statements that criticize the actions of Israel's government, these statements do not amount to actionable harassment against them based on their race or national origin. In the communications underpinning these claims, for example, DeGraff states that he is criticizing what he views as "an explicitly colonial … project" by the government of Israel that deprives Palestinians of "human rights, land rights, justice and dignity as equals." Ex. 8; *see also* Ex. 10. As demonstrated by the allegations and incorporated materials, DeGraff's public disagreements with Alon and Sussman, both of whom have positioned themselves publicly as supporting Israel's actions, *see* Exs. 8, 10, was based on their *politics*—not on their racial identity or national origin.[5]

Holding otherwise would raise significant First Amendment concerns. Much of the alleged harassment consists of publicly expressed political opinions, which—no matter how offensive—are protected by the First Amendment. *See Felber v. Yudof*, 851 F. Supp. 2d 1182, 1187-88 (N.D. Cal. 2011) (finding allegations of anti-Zionist and anti-Israeli expression insufficiently severe and pervasive where substantial portion was protected speech, even if plaintiffs viewed the language as "inflammatory, offensive, or untrue"); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 271 (S.D.N.Y. 2025) (deeming protected "expressions … related to the ongoing Israeli-Palestinian conflict … touch[ing] upon topics like Zionism, colonialism, and

---

[5] Moreover, multiple incidents described in the AC were expressly targeted at MIT as an institution—*not* Plaintiffs. The AC alleges, for example, that in May 2025, a protestor posted a social media video about "MIT's complicity in genocide." AC ¶ 50. Similarly, the flyers distributed on campus in April 2025, *id.* ¶ 47, listed alleged connections between various MIT research centers and the Israeli government, *see* Ex. 4, and the graffiti on the Stata Center targeted an MIT researcher for "her work on technology allegedly used by the Israeli military," AC ¶ 57.

racism" not to be "a proper basis on which to impose civil liability on Cooper Union"). Title VI cannot be interpreted to unconstitutionally burden private speech. *See Gartenberg*, 765 F. Supp. 3d at 260; *see also* Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague* (July 28, 2003), https://bit.ly/4bY9Zid (clarifying that Title VI cannot be applied "in ways that would lead to the suppression of protected speech on public or private campuses"). Here, the fact that so much of the alleged harassment consisted of *speech* in public venues on matters of great public concern makes MIT's institutional response all the more reasonable. *See supra* at 12-16; Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* at 3 (May 7, 2024), https://bit.ly/3z1ySeg (addressing compliance with Title VI through "tools that do not restrict any rights protected by the First Amendment"—including the very steps taken by MIT here).

Relatedly, Alon and Sussman have not adequately alleged that the purported harassment was based on race or national origin. Much of the alleged harassment involved statements that criticized the Israeli government's actions. *See AC* ¶¶ 6, 36-38, 50-51, 57, 112-113, 143-148. Plaintiffs aver that anti-Zionism is *per se* antisemitism because Zionism—the belief in "the Jewish people's ancestral connection to Israel"—is part of Jewish religion and identity. *Id.* ¶ 143; *see also id.* ¶ 30 (characterizing "the love of Zion" as "a central tenet of the Jewish faith"). But Title VI does not cover discrimination based on religious beliefs; it has been interpreted to cover discrimination against Jewish and/or Israeli individuals only insofar as the discrimination is based on actual or perceived shared ancestry, race, ethnic characteristics, or national origin. *See, e.g.*, *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014); *cf. Landau v. Corp. of Haverford Coll.*, 780 F. Supp. 3d 548, 555 (E.D. Pa. 2025) (rejecting that "any anti-Israel speech is intrinsically antisemitic"). Thus, even if this purported harassment were not protected speech, it still would not be actionable. Other alleged harassment involved disagreements over campus

activism related to the Israel-Gaza conflict, which is also not plausibly based on a protected characteristic. For example, it is apparent from the AC and the materials it incorporates that the friction between Alon and DeGraff stemmed from their interactions at the encampment, AC ¶¶ 91, 101—which Alon acknowledges he once entered "by climbing over a fence," *id.* ¶ 101, though he does not explain why—and DeGraff's commentary on Alon's public actions and statements related to protest activity on campus, *see id.* ¶¶ 100-103; Ex. 8; Ex. 9.

In all events, the totality of Alon and Sussman's allegations does not demonstrate harassment "so severe, pervasive, and objectively offensive" that "it can be said to deprive the victims of access to the educational opportunities or benefits provided by" MIT. *Brown Univ.*, 896 F.3d at 132 (quoting *Davis*, 526 U.S. at 650-51). Again, Alon and Sussman's claimed discriminatory harassment consists largely of written statements—most on public platforms—of a political nature. They allege no threats or physical violence. *Contra Kestenbaum*, 743 F. Supp. 3d at 307-09. Courts consistently dismiss deliberate-indifference claims that involve *more* extensive and serious allegations of harassment against *more* vulnerable individuals. In *Pollard*, for example, a minor student alleged that he was "regularly emotionally, physically[,] and verbally bullied and abused," including because he was Jewish. 132 F. Supp. 3d at 218. His peers mocked him "with snide comments about Jews being massacred and stat[ements] that the Holocaust was unsuccessful because [his] family survived." *Id.* Despite these disturbing allegations, the court concluded that the complaint lacked "sufficient, non-conclusory factual allegations that the harassment was severe and pervasive." *Id.* at 230. And unlike in *Pollard*, Plaintiffs here (and the Coalition's members) are adult members of a university community, not schoolchildren, who have chosen to publicly engage on deeply contested political issues. *See, e.g.*, *Landau*, 780 F. Supp. 3d at 555 (dismissing complaint for failure to allege severe and pervasive harassment where allegations centered on

19

"anti-Israel speech," including by college faculty on social media); *Canel v. Art Inst. of Chi.*, No. 23-cv-17064, 2025 WL 564504, at *10 (N.D. Ill. Feb. 20, 2025) (similar); *Mandel v. Bd. of Trs. of Cal. State Univ.*, No. 17-cv-03511, 2018 WL 5458739, at *22 (N.D. Cal. Oct. 29, 2018) (finding it "highly questionable" that "isolated" incidents of anti-Zionist and anti-Israel graffiti, threats of violence against Israeli soldiers, and threatening "stare downs" were severe and pervasive).

Even beyond failing to allege severe and pervasive harassment, Alon and Sussman have not shown that they "have been denied the benefits of educational and other programs at MIT." AC ¶ 352; *see also Canel*, 2025 WL 564504, at *8. Plaintiff Alon—an MIT employee who chose to appear on a national news program—says his "public exposure" "impacted his search for a position as a tenured professor" at other universities; he "no longer felt welcome" in certain spaces; he "no longer engaged in conversation" with some postdocs and PhD students; and it was difficult "to focus" and "collaborate," undermining his "sense of belonging" and "ability to engage fully in scientific work." AC ¶¶ 163-164, 166. Plaintiff Sussman—a former graduate student who regularly and actively seeks out public engagement on issues relating to Israel, including by directly challenging individuals like DeGraff on social media and voluntarily testifying before Congress—says he too found it "difficult to concentrate" and perform "academic tasks"; that he was "distracted" from his master's thesis when handling responsibilities for Hillel during the encampment time period; and that he "felt forced" to leave MIT. *Id.* ¶¶ 95, 170, 173.

To hold MIT liable under Title VI, Plaintiffs must show that their educational environment was "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [their] educational environment." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011). Neither social discomfort nor distraction from academic activities meets that standard—particularly since Alon and Sussman voluntarily

participated in public debates about the contentious political topics at issue. *See Canel*, 2025 WL 564504, at *8 (plaintiff failed to allege professor's "offensive social media post so eroded her experience" at university "that she was denied equal access to its resources or opportunities" where she alleged neither that she was enrolled in professor's classes nor any "'concrete, negative effect' on her education, like a measurable drop in her grades or an increase in her absenteeism"). Nor does it suffice for Alon to speculate that DeGraff's posts potentially affected other institutions' hiring decisions, *see* AC ¶¶ 167, 339, because a victim of harassment must be deprived of access to educational opportunities or benefits "*provided by the school.*" *Brown Univ.*, 896 F.3d at 132 (emphasis added). Finally, Sussman's "voluntary withdrawal from educational opportunities is insufficient" to show denial of access, *see Doe v. Morehouse Coll., Inc.*, 622 F. Supp. 3d 1279, 1290 (N.D. Ga. 2022), particularly since Sussman declined to participate in HR's investigation and left MIT while Institute officials were working with him on supportive measures, AC ¶ 152.

In short, the AC does not plausibly allege how MIT denied Alon or Sussman access to educational benefits, as Title VI liability requires. *See Felber*, 851 F. Supp. 2d at 1188 (holding that plaintiffs had failed to allege Title VI violation where "one person attempting to exercise free speech rights in a public forum was allegedly attacked by another person who likewise was participating in a public protest in a public forum," meaning the conduct "did not occur in the context of [their] educational pursuits"); *see also Canel*, 2025 WL 564504, at *8.

### C.     Alon Does Not Allege Actionable Title VII Harassment.

Alon also brings a claim under Title VII of the Civil Rights Act of 1964 for a hostile work environment, based on the same facts underlying his Title VI claim. For similar reasons, his Title VII claim does not clear the plausibility bar either. Nor does Doe state a Title VII claim to the extent it is based on the same allegations Alon makes about the general campus environment.

"Title VII is neither a civility code nor a general anti-harassment code." *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 37 (1st Cir. 2003). The statute is not meant to police "personality conflicts at work that generate antipathy," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), especially in an "academic environment like [MIT], [which] necessitates debate and disagreement that may become vigorous at times," *Mills v. S. Conn. State Univ.*, No. 08-cv-1270, 2011 WL 3490027, at *13 (D. Conn. Aug. 10, 2011), *aff'd*, 519 F. App'x 73 (2d Cir. 2013). To establish a hostile work environment claim under Title VII, a plaintiff must show that: (1) "he is a member of a protected class"; (2) he "was subjected to unwelcome harassment"; (3) "the harassment was based" on a protected characteristic; (4) "the harassment was sufficiently severe or pervasive so as to alter the conditions of [the] plaintiff's employment and create an abusive work environment"; (5) the harassment was "both objectively and subjectively offensive"; and (6) "some basis for *employer* liability" exists. *Ponte v. Steelcase Inc.*, 741 F.3d 310, 320 (1st Cir. 2014). Alon's claim falls short for at least three reasons.

*First*, Alon fails to plausibly allege that any of these incidents "unreasonably interfere[d] with [his] work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The AC acknowledges that Alon and DeGraff were in two entirely separate departments, *see* AC ¶¶ 67, 112, and there is no allegation that they interact regularly in the course of their professional responsibilities. Indeed, there is no alleged connection between them at all beyond the fact that they are both employees at an institution that employs over 17,000 people. Alon merely alleges that "Professor DeGraff publicly shamed him on social media," which has "impacted his search for a position as a tenured professor," AC ¶¶ 163, 166—but again, these allegations do not explain how DeGraff's conduct has interfered with Alon's performance as an employee *at MIT. See Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 84 (1st Cir. 2006) (rejecting Title VII claim

due to lack of showing that supervisor conduct "negatively affected [the plaintiff's] ability to work as a [Celulares Telefonica] sales consultant"). And there is no allegation that DeGraff, as Alon's co-worker only in the loosest sense of the term, had any impact on Alon's professional standing at MIT. *See* AC ¶ 69 (describing a School of Science award Alon received in April 2025).

*Second*, Alon has not plausibly alleged harassment "sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment." *Ponte*, 741 F.3d at 320. Courts assess factors including "the frequency of the discriminatory conduct"; "its severity"; and "whether it is physically threatening or humiliating, or a mere offensive utterance." *Harris*, 510 U.S. at 23; *see also Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 44 (1st Cir. 2011) ("isolated incidents" are not actionable harassment unless "extremely serious"). Alon points to only a handful of incidents involving DeGraff: an unspecified number of social media videos posted sometime between May and June 2024, and two articles published online, only one of which mentioned Alon by name. AC ¶¶ 97-104. These "isolated incidents"—which Alon does not allege to be "physically threatening," *Colon-Fontanez*, 660 F.3d at 4, and indeed appear to be no more than a disagreement between two individuals on a subject of public concern in a university setting—are not serious enough to be "severe or pervasive" harassment. *See Roof v. Howard Univ.*, 501 F. Supp. 2d 108, 114-15 (D.D.C. 2007) ("[S]even e-mails are the sort of isolated acts that courts have consistently rejected as the basis for Title VII claims."); *see also Gomez-Perez v. Potter*, 452 F. App'x 3, 5, 8-9 (1st Cir. 2011) (rejecting Title VII claim where alleged harassment, including posters defaced with the plaintiff's "name and features," was neither severe nor pervasive); *Katica v. Webster Bank, N.A.*, No. 13-cv-30072, 2014 WL 3587383, at *6 (D. Mass. July 18, 2014) (same where "no individual ever threatened Plaintiff's physical well-being, nor did she suffer from a consistent barrage of insults," even though she was treated "poorly" and "co-

workers were rude to her"). Nor do the allegations about the general campus environment help Alon's claim—for the same reasons that they fall short under Title VI, *see supra* 16-20, they do not constitute "severe or pervasive" harassment under Title VII, *see Ponte*, 741 F.3d at 320.

*Third*, Alon has not plausibly alleged that the purported harassment was based on a protected characteristic. *Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 189-90 (1st Cir. 2003). It is not enough for an environment to be "offensive to" someone with a particular protected characteristic. *Id.* at 190. For all the reasons above, Alon has not plausibly alleged that DeGraff's supposed harassment was motivated by animus toward Jews or Israelis. Instead, the AC reflects that a "constellation of factors led to the friction between" Alon and DeGraff, *id.* at 191, including the encampment, AC ¶¶ 91, 101, and their disagreements about protest activity on campus, *see id.* ¶¶ 100-103; Ex. 8; Ex. 9. The two articles that were purportedly part of the "smear campaign" against Alon, AC ¶ 100, are clearly engaged in commentary about broader activism at MIT, and the article in *The Tech* does not even mention Alon by name. Ex. 8; Ex. 9; *see Roof*, 501 F. Supp. 2d at 114 (dismissing Title VII claim where four of seven allegedly discriminatory emails made "absolutely *no* reference or allusion to plaintiff's race," and "many of the criticisms of plaintiff seem[ed] to be part of a general and rambling critique of the pedagogical 'philosophy' and administration of Howard's graduate school").

## III.    The AC Fails To State A Claim For Retaliation Against Alon Or Sussman Under Either Title VI Or Title VII.

Alon and Sussman do not plausibly allege essential elements of their retaliation claims under Title VI (for both) and Title VII (for Alon). These claims hinge on allegations that DeGraff retaliated against them by escalating his alleged harassment after they complained to MIT's administration. AC ¶¶ 359-360. A *prima facie* case of retaliation has three elements: (1) protected activity; (2) a material adverse action; and (3) a causal connection between the two. *Louis D.*

24

*Brandeis Ctr.*, 2024 WL 4681802, at *6; *see also Cornelius-Millan v. Caribbean Univ., Inc.*, 261 F. Supp. 3d 143, 150 (D.P.R. 2016) (explaining that courts apply Title VII's retaliation standard to Title VI). Alon and Sussman have failed to allege at least the second and third elements.

An adverse action must be *materially* adverse, meaning it "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-69. The "decision to report discriminatory behavior" cannot "immunize" the reporting party from "petty slights or minor annoyances." *Id.* at 68; *see also Rae v. Woburn Pub. Sch.*, 113 F.4th 86, 101 (1st Cir. 2024) (holding that a hostile work environment must be severe or pervasive to qualify as a retaliatory adverse action), *cert. denied*, 145 S. Ct. 1431 (2025). Even if DeGraff "escalated" his alleged harassment, the social media posts and emails are neither severe nor pervasive. *See supra* at 16-24. Nor have Alon and Sussman alleged a causal link between their reports and the purported "escalation," particularly given that—as the AC details at length—the alleged harassment took place in the context of an unfolding "emotionally fraught and longstanding dispute." *Germanowski v. Harris*, 854 F.3d 68, 74-75 (1st Cir. 2017). Alon and Sussman cannot double-count DeGraff's conduct as both the underlying harassment *and* the retaliation for their complaints about that alleged harassment. Alon does not even allege that DeGraff knew about any protected activity. *See* AC ¶¶ 105-109, 359, 362, 398-399.

Sussman's claim must be dismissed for an additional reason: As the AC recognizes, MIT can only be liable under Title VI for alleged retaliation by an individual MIT employee if MIT itself was deliberately indifferent to the retaliation. *See Louis D. Brandeis Ctr.*, 2024 WL 4681802, at *6. MIT responded promptly to Sussman's complaints and opened an investigation, which it closed only after Sussman declined to participate. *See supra* at 14. This does not constitute deliberate indifference to any "escalating" harassment that Sussman claims was retaliatory.

## IV.    Alon's And Sussman's State-Law Claims Should Be Dismissed.

Because Alon and Sussman do not state any federal claim, this Court should decline to exercise supplemental jurisdiction over their state-law claims against MIT, which threaten to "substantially predominate[]" over Doe's federal claims as this litigation moves forward. *See* 28 U.S.C. § 1367(c)(3). But if the Court reaches the state-law claims, they should be dismissed.

*First*, claims that fail under Title VI and Title VII likewise fail under Massachusetts General Law Chapter 151B, to which courts apply the same legal standards. *Thirkield v. Neary & Hunter OB/GYN, LLC*, 76 F. Supp. 3d 339, 344 & n.1 (D. Mass. 2015).

*Second*, Alon's and Sussman's common-law claims against MIT should be rejected as transparent efforts to evade the rigorous standards governing Title VI, Title VII, and 151B. These claims are based on MIT's allegedly "intentionally discriminating against" Alon and Sussman, "deliberately ignoring the harassment they were enduring, and deliberately ignoring the retaliation they were experiencing." AC ¶ 433 (intentional infliction of emotional distress); *id*. ¶ 439 (reckless infliction of emotional distress); *see also id*. ¶ 444 ("MIT negligently breached its duty of care in refusing to follow its own policies and refusing to reasonably respond to Alon's … complaints of discrimination, harassment, stalking, and doxing."). In other words, Alon and Sussman seek, through their common law claims, to hold MIT accountable for violating antidiscrimination law. But Massachusetts law bars such efforts to "dress[]" statutory antidiscrimination claims in "different outfits." *Mouradian v. General Elec. Co.*, 23 Mass. App. Ct. 538, 542-43 (1987); *see also Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 513 (1985), *aff'd*, 397 Mass. 1004 (1986).

*Third*, Alon's common law claims are all barred under the exclusivity provisions of Massachusetts' workers' compensation law. *See* Mass. Gen. L. ch. 152 § 24. Alon has alleged he is an employee of MIT and suffered a personal injury arising from his employment. *See* AC ¶ 443.

Such claims must be funneled through the workers' compensation statute. *Green v. Wyman-Gordon Co.*, 422 Mass. 551, 558 (1996) (exclusivity bar covers intentional infliction of emotional distress claim); *see also Lawless v. Town of Groveland*, No. 24-cv-12605, 2025 WL 1951949, at *2 (D. Mass. July 16, 2025) (same); *Luu v. Fallon Serv., Inc.*, 105 Mass. App. Ct. 236, 245 (2025) (same as to negligent infliction of emotional distress claim).

The AC also fails to allege essential elements of these common law claims. To make out a claim for intentional or reckless infliction of emotional distress, a plaintiff must allege that MIT's "conduct was extreme and dangerous, such that it transgressed all possible bounds of decency and was utterly intolerable in a civilized community." *Mullane v. Breaking Media, Inc.*, 433 F. Supp. 3d 102, 114 (D. Mass. 2020), *aff'd*, No. 20-1061, 2021 WL 3027150 (1st Cir. Feb. 26, 2021). The bar is exceptionally high: "There is no liability even if the defendant acted with an intent which is tortious or even criminal, with malice, or with a degree of aggravation which would entitle the plaintiff to punitive damages for another tort," and "not even an intent to inflict emotional distress is sufficient." *Aaron v. City of Lowell*, 666 F. Supp. 3d 102, 120 (D. Mass. 2023) (alterations omitted). Alon's and Sussman's allegations—which take issue with MIT's responses to their complaints and the particular office at MIT that was designated to conduct an investigation—fall far short. *See, e.g.*, *Doe v. Emerson Coll.*, 153 F. Supp. 3d 506, 518 (D. Mass. 2015).

Nor have Alon and Sussman alleged that this conduct "caused [them] to suffer emotional distress" that was "severe and of a nature that no reasonable person could be expected to endure it." *Mullane*, 433 F. Supp. 3d at 114. It is not enough to plead mere "emotional responses including anger, sadness, anxiety, and distress," *Kennedy v. Town of Billerica*, 617 F.3d 520, 530 (1st Cir. 2010), or "severe emotional distress" "without any facts in support," *Soni v. Wespiser*, 239 F. Supp. 3d 373, 390-91 (D. Mass. 2017). Alon and Sussman have not pleaded distress so extreme

no reasonable person could be expected to endure it—such as the distress caused by sexual abuse by a prison guard in a "cycle of abuse and powerlessness," *Chao v. Ballista*, 806 F. Supp. 2d 358, 380 (D. Mass. 2011), or a state governor's actions to lure noncitizens across the country and abandon them resourceless in another state, rendering them "helpless, defrauded, desperate, anxious, and confused," *Alianza Ams. v. DeSantis*, 727 F. Supp. 3d 9, 66 (D. Mass. 2024).

Finally, Alon's negligent infliction of emotional distress claim—if the Court reaches it—is similarly deficient. This claim requires MIT to have breached a duty it owed Alon. *See Lockwood v. Madeiros*, No. 18-cv-40143, 2018 WL 4087938, at *8 (D. Mass. Aug. 27, 2018). Alon cites "MIT's relationship to Plaintiff[] Alon … as an employee[], its published policies on discrimination, nondiscrimination, harassment, stalking, and doxing, its public statements that anti-Semitism is totally unacceptable in the MIT community and would not be tolerated, and its private interactions with Alon." AC ¶ 443. He thus seeks to impose a general nondiscrimination tort duty on MIT—but again, courts are clear that such efforts to "dress[]" statutory antidiscrimination claims in "different outfits" are impermissible. *Mouradian*, 23 Mass. App. Ct. at 543. Moreover, the AC lacks allegations that Alon suffered "physical harm" "manifested by objective symptomatology" from MIT's alleged negligence. *Lockwood*, 2018 WL 4087938, at *8.

## V.     The Coalition's Claims Should Be Dismissed For Lack Of Standing.

The Coalition advances claims for disparate treatment and hostile environment under federal and state antidiscrimination law. These claims are premised on the alleged experiences of four purported Coalition members—Alon, Sussman, Doe, and Member #1—and thus fail to the same extent those claims are deficient, as outlined above.

The Coalition's claims must be dismissed for an even more fundamental reason: It lacks standing, so the Court lacks jurisdiction over its claims. The Coalition asserts standing solely as a representative of its members. It therefore must establish, among other elements, that "neither the

claim asserted nor the relief requested" requires its members' individual participation. *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551-53 (1996). The Coalition clearly cannot pursue damages, as this Court previously held as to SWU. *See SWU*, 742 F. Supp. 3d at 140 & n.7. But its injunctive-relief claims are also deficient because those claims are based on highly fact-intensive and varied experiences of individual community members that make them impossible to litigate via associational standing rather than personal involvement.

In the Title VII context, the First Circuit has repeatedly observed that "[t]he determination as to whether [an employer has] subjected [a plaintiff] to a hostile work environment necessarily entail[s] a fact-specific assessment of all the attendant circumstances." *Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81 (1st Cir. 2001); *see also, e.g.*, *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002) (similar). That is why employment claims by plaintiffs working in different units and under different supervisors across a large organization are not susceptible to common proof: The "crux" of their claims is "the reason for [each] particular employment decision," which varies from person to person. *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011) (internal quotation marks omitted); *cf. Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 (1982) ("If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action."). So too here. The Coalition seeks to advance a Title VII (and Chapter 151B) claim on behalf of individuals working in different MIT departments and for different supervisors, not subject to any kind of uniform employment policy challenged in this case. Those claims simply cannot be resolved without "individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975).

The same is true for the Coalition's Title VI claims, which "turn on facts specific to each [community member]," *Parent/Pro. Advocacy League v. City of Springfield*, 934 F.3d 13, 35 (1st

Cir. 2019)—including, for instance, whether they have been denied "access to an educational opportunity or benefit," *Davis*, 526 U.S. at 633. *Contra Bos. Parent Coal. for Academic Excellence Corp. v. Sch. Comm. for City of Boston*, 89 F.4th 46, 55 (1st Cir. 2023) (association had standing to pursue Title VI challenge to across-the-board admissions policy because individual students did not "need to do much, if anything, in the lawsuit"), *cert. denied*, 145 S. Ct. 15 (2024); *accord N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006) (associational standing to seek injunctive relief appropriate where underlying law "suggests that, if [there has been a violation] as to one" member, there is a violation as to "all" members), *aff'd*, 552 U.S. 364 (2008).

The AC's allegations underscore why individual participation will be required. Across two lawsuits bringing antisemitism-related claims against MIT—this one and *SWU*—six individuals have alleged different individualized experiences on campus. Coalition Member #1—whose only allegation of individualized harm related to being placed on and identified from a purported list of Israeli students—has an entirely different theory of discrimination than Sussman and Alon, whose claims focus on the (mostly online) public statements Professor DeGraff made about them and his views on Israel. And each of those claims has little overlap with Doe's narrative, which unfolds largely within the lab in which he worked. Plaintiffs cannot seriously suggest that adjudicating the allegations and legal claims of any one of these individuals would resolve the claims of the others. It is plain that "[e]fficient and successful judicial resolution of [the Coalition's] claims would," as a result, "require participation and cooperation by numerous students," rendering associational standing inappropriate. *Parent/Pro. Advocacy League*, 934 F.3d at 35. The Court should therefore dismiss the Coalition's claims in their entirety for lack of subject-matter jurisdiction.

## CONCLUSION

For these reasons, the Motion should be granted without leave for repleading.

Date: October 8, 2025

Respectfully submitted,

MASSACHUSETTS INSTITUTE
OF TECHNOLOGY,

*/s/ Ishan K. Bhabha*

Daniel J. Cloherty (BBO# 565772)
dcloherty@clohertysteinberg.com
617.481.0610
CLOHERTY & STEINBERG LLP
One Financial Center, Suite 1120
Boston, MA 02111

Ishan K. Bhabha (*pro hac vice*)
IBhabha@jenner.com
202.637.6327
Lauren J. Hartz (*pro hac vice*)
LHartz@jenner.com
202.637.6363
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001-4412

## CERTIFICATE OF SERVICE

I certify that a true copy of this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 8, 2025.

/s/ Ishan K. Bhabha
Ishan K. Bhabha