# EXHIBIT 9

OPINION   GUEST COLUMN

# Is MIT's #MindHandHeart for a #BetterWorld compatible with its "vibrant" complicity in Israel's genocide of Palestinians in Gaza?

By Michel DeGraff  |  Jun. 13, 2024

Facebook

X

Reddit

Email

Print

What could make an elderly senior faculty at one of the nation's leading institutions of higher education so upset that he stood up, banged his cane on the floor, and demanded that the discussion of recently suspended MIT students protesting against the genocide in Gaza come to an immediate halt because of the turn it had taken.

On May 15, 2024, at an MIT faculty meeting with record attendance, this professor was reacting to a senior administrator evoking the danger posed by rapists as part of the justification for the temporary suspensions that were levied, without any due process, against students who had been part of the Scientists Against Genocide Encampment (SAGE) on campus. Most of these students, like the senior faculty, are Black and Brown; and, most shockingly, the administrator compared the reason for the suspensions to the urgent need to stop rapists in their tracks in order to ensure the safety of potential victims. The rationale: The suspensions were as urgently needed as in the hypothetical rapist case — in order to preempt irreparable harm to the community. As the images of Emmett Till in his coffin remind us, this comparison echoes racial stereotypes that have long been fatal to minoritized individuals in the US. Yet, what the students were protesting against is MIT's complicity with the *actual* irreparable harm caused by Israel's ongoing genocide of Palestinians in Gaza. Why, then, would they be compared to rapists?



The logo of the MIT MindHandHeart initiative.
ELLIE MONTEMAYOR–THE TECH

That's what things have come to at the Massachusetts Institute of Technology — in spite of our slogans #MITMindHandHeart for #BetterWorld.

Regardless of where you stand on Israel's war on Gaza, you might agree that the students' suspensions and the beyond-the-pale comparison with rapists are part of a larger campaign to suppress free speech at MIT — in this case, the righteous demands of students engaged in peaceful protest but falsely accused of creating unsafe conditions for the MIT community. Some of those students, along with their families, were threatened with housing eviction — including an Air Force veteran with his 5-year-old daughter. Some were unable to graduate because the timeline of lifting the temporary suspensions interfered with their finishing up their last classes. So their futures still hang in the balance. These temporary suspensions could have permanent life- and career-related consequences.

At another faculty meeting, on May 17, 2024, an MIT faculty member compared the SAGE protests to racist attacks against Black people, comparing Zionists on campus to Black people feeling unsafe because of white supremacy. This comparison inverts well-known power relationships. It's as if Zionists as a group were like Blacks living under racial oppression — and as if Zionists were not the ones in control of a nuclear, supremacist ethno-state unconditionally backed by the US and armed with US-built 2,000-pound bombs that behead and burn babies alive.

In reality, the SAGE students, like anti-genocide protesters across the globe, resemble David fighting against a Zionist Goliath. It is easy to find the facts of what transpired at the encampment — facts that illustrate the power and impunity of the Zionist faction at MIT. The online world is full of images and videos of aggression, not from the SAGE students, including MIT Jews for Ceasefire, but from the counter-protesters (many from the MIT Israel Alliance, which includes students, faculty, and staff) — often directly threatening or mocking SAGE students and covering SAGE posters and artwork with Israeli and US flags while MIT police and administrators looked on. I myself have been the target of surveillance by MIT Israel Alliance. The MIT Police itself, which has been reported as harassing SAGE students, is headed by Chief John DiFava who, in a trip sponsored by the Anti-Defamation League (a Zionist organization), received counter-terrorism training in Israel where he stated, in an overt case of racial and ethnic profiling, that one potential source of terrorism at MIT is from foreign students "from countries that aren't necessarily friends of the United States per se." There's also documentation showing deliberate mistranslations of Arabic used to fuel the flames of this "unsafety" claim. This mistranslated video, a version of which was shown at a CSAIL faculty meeting with erroneous credits that included the names of students who were not even filmed in the video, was subsequently mis-used as "evidence" by the MIT Administration to suspend students who were later un-suspended when the "evidence" was shown by the accused students to be false. Juxtapose these false accusations of SAGE students with the impunity of Israeli students and their supporters from off campus dancing, at an MIT-sanctioned event, to the beat of an anti-Palestinian song, "Harbu Darbu," with genocidal lyrics, which they were playing loudly near the encampment to celebrate Israel Day.

But let's go back to the MIT administration. In person and in email on May 17, 2024, to MIT President Sally Kornbluth, I've raised one question about her stunning claim on that day that faculty are "out of bounds" when present at students' protests in front of her home, then another question about her and her administration's oft-repeated statement that academic freedom justifies MIT faculty's collaboration with Israel's Ministry of Defense. I still have not received any answer. So I'll ask again here:

Are MIT professors really "out of bounds" when present at student protests? How about our own freedom of speech? How about faculty who, applying said freedom of speech and their moral principles, joined students in protesting the Vietnam War? How about faculty who joined students in protesting apartheid in South Africa? Were they all "out of bounds" due to their noble ethical imperatives toward a #BetterWorld?

Now when it comes to MIT Administration's Orwellian (that is, doublespeak) appeal to "academic freedom" for licensing complicity with genocide, let's look at yet another case of double standards that apply directly to me as a senior professor at MIT:

For nearly 6 months now, my colleagues at MIT Linguistics have heightened to an unprecedented level their scrutiny of a "Special Topics" seminar that I have proposed for Fall 2024 on "Language and linguistics for decolonization and liberation and for peace and community-building from the river to the sea in Palestine and Israel to the mountaintops of Haiti and beyond." I doubt it's a coincidence that this exceptional level of scrutiny — in effect, censorship — is led by my department head, an Israeli, who had previously yelled profanities at me and accused me of being "out of [my] mind," in a Zoom meeting in the presence of my 6-year-old-daughter during which he criticized my anti-genocide writings on social media? This yelling was triggered by his disagreement with my use of terms like "genocide," "Amalek," "apartheid," "settler-colonial Zionism," "antisemitism," etc. He would have preferred the use of "ethnic cleansing" over "genocide"; he rejected my analysis of Israeli leaders' use of the biblical "Amalek" figure as denoting genocidal intent; he disagreed with my opinion that Zionism is a form of settler-colonialism; he took it as "antisemitic" that my letter to President Liz Magill of UPenn highlighted the role of Zionist Jewish donors in pressuring her to attack freedom of speech in order to silence criticism of Israel…

A few weeks after apologizing for yelling at me, my department head was joined by all the other MIT Linguistics faculty in raising "concerns" that my course might not "fit" our linguistics curriculum, then they claimed that I didn't have the required expertise to include contents about the Middle East — even though, among already confirmed guest speakers, the seminar will rely on eminent specialists on the politics of language, on meaning and power, and on language-related issues in Israel and Palestine. Then I was also told that the reason for this unprecedented review was the unprecedented political climate at MIT. Please note that this climate — an updated version of McCarthyism — was created by, among others, the antagonistic congressional leader Virginia Foxx. This is the climate in which Danny Fox, MIT Linguistics & Philosophy Department Head, and other colleagues would decide what we can or cannot teach at MIT, as determined by fear of political backlash! This saga is all documented in a very long email thread from December 5, 2023 to June 9, 2024.

But in retrospect I should not have been surprised by this Palestine exception in my department under the veil of curricular "fitness" or lack thereof. In addition to its political motivation, this particular Palestine exception seems related to an overly narrow mission statement that separates our linguistics curriculum from the central roles of language in education, human rights and social justice for Indigenous communities. Given linguists' work on these key issues, I've offered an amended mission statement, to no avail — as if liberatory linguistics, the revitalization of Indigenous languages and the role of language for social justice were all outside the scope of linguistics proper! Then, in trying to justify their censorship of my course proposal, my MIT Linguistics colleagues, after appealing to our outdated and narrow mission statement, appealed to a paragraph in MIT's Report on Free Expression regarding freedom of teaching whereby "faculty do not have total discretion over their course content. For example, a class titled 'Beginning Chinese' cannot be taught as an advanced calculus class." In effect, my colleagues are saying that the study of language and linguistics for the sake of decolonization and liberation — a topic that I've worked on for decades — is equivalent to the study of Chinese in a calculus class! Am I the "invisible man" of MIT Linguistics?

On June 7, 2024, in the latest round of this saga about genocide-related language — a saga that started with yelling and profanities from my department head on December 8, 2023 — I am now being told by the same Department Head and by the Directors of Graduate and Undergraduate Studies at MIT Linguistics that my course proposal is still not approved because I have not "engage[d] in *productive conversation* about [my] proposed class" and because their "efforts to initiate any *real communication* with [me] were *repeatedly rejected*" (emphases added). Such statements are yet another round of Orwellian doublespeak when we consider the 39-page email thread about this course, including the 2-page course description that I provided since April 10 — with many more details and much longer in advance than any previous proposals for "Special Topics" linguistics seminars in my 28 years at MIT. I have provided extensive details about my course, in writing, even though I had already realized that I was the target of a Palestine exception. Do the linguists at MIT really consider *written* communications with all sorts of details about my course proposal — themes, readings, guest speakers, learning objectives, etc. — outside the category of "*real* communication"? Should I follow the lead of my department head and yell profanities to express disagreement with my colleagues in order for me to engage in what they call "productive conversation"?

Now, to go back to MIT President Kornbluth, if, despite freedom of speech and academic freedom, she still judges that I am "out of bounds" for joining protests against genocide and against MIT's role in it while I am also being censored by my department apparently due to political disagreements about Palestine and Israel, how can the same Kornbluth appeal to "academic freedom" as a license for MIT faculty's complicity in genocide with an Israeli state whose Prime Minister calls her own students "Nazis" when they protest this complicity?

And, perhaps most importantly, what about MIT's "red lights" principle, adopted from the Suri report written after the university's fiasco with an actual rapist, Jeffrey Epstein? This report led to an "elevated-risk project review process" that prohibits MIT faculty's collaboration in projects whose "research outcomes will be used in ways that would infringe on political, human, or civil rights in a foreign country, or [where] the engagement will indirectly legitimize violations of political, human, or civil rights in that country" or projects with "the risk to the MIT community of providing support for actions that run counter to MIT's core values, or that are not aligned with its academic mission, or that might lead to discrimination between members of our community."

Are MIT's "core values" compatible with MIT faculty aiding and abetting genocide as part of their "academic freedom"? Are MIT's "core values" compatible with attacks on the academic freedom of MIT faculty proposing a seminar to help demystify the weaponizing of language in service of genocide?

Those students in the encampment were demanding nothing more, and will accept nothing less, than MIT applying the red lights in Suri report, which entails a halt to MIT's collaboration with the Zionist project and with the red line that Israel has crossed in Gaza — collaboration that violates MIT's core values, but that MIT president Sally Kornbluth calls "vibrant."

Recall that MIT faculty who collaborated with Epstein were asked by MIT administrators to publicly apologize because of their engagement with a pedophile rapist — not an hypothetical one. Now it's a senior administrator who compares the SAGE students to some hypothetical rapists in terms of the alleged threats they represent to the MIT community. Kornbluth herself appeals to "academic freedom" in order to trump human rights and allow MIT's complicity with genocide to continue. Yet she and no one in her administration are saying or doing anything to preempt actual violations of academic freedom as in the case of my proposed seminar.

This raises four final questions for now: Why is the MIT Administration so disproportionately punishing students who have broken relatively minor rules in their acts of civil disobedience while the same administration is breaking the very rules that were explicitly designed to put "red lights" on MIT's contributions to the worst crimes against humanity? Why this Palestine exception? Why is MIT willing, in order to defend Israel, to sacrifice the very essence of what an institution of higher education means and is supposed to stand for? Why have my colleagues at MIT Linguistics, for the past 6 months, attempted to censor the contents of a seminar whose very objectives — including analyses of language in the service of dehumanization and genocide — are in line with MIT's mottos #MITMindHandHeart for a #BetterWorld?

*Michel DeGraff is professor of linguistics at MIT, co-founder and co-director of the MIT-Haiti Initiative, and a founding member of the Haitian Creole Academy. If you're interested in this seminar and would like to participate in any way, then please fill out the survey at https://forms.gle/wxUi2XR6HfBDE89o7*

Tags | GUEST COLUMN