**UUNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| William Sussman, et al., | |
| Plaintiffs, | |
| v. | Case No. 25-CV-11826-RGS |
| Massachusetts Institute of Technology and Michel DeGraff, | |
| Defendants. | |

**<u>DEFENDANT MICHEL DeGRAFF'S MOTION TO DISMISS</u>**

**<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................3

PRELIMINARY STATEMENT ................................................................................9

ASSERTION OF THE COMPLAINT ....................................................................10

Point One --   THE STANDARD ....................................................................11

Point Two --   ANTI-ZIONISM IS NOT ANTISEMITISM ..............................11

Point Three --   IMPOSITION OF THE IHRA STANDARD BY THE COURT
WOULD  VIOLATE PROFESSOR DEGRAFF'S FIRST
AMENDMENT RIGHTS ........................................................14

Point Four --   PLAINTIFFS ASK THIS COURT TO INFRINGE THE
FIRST AMENDMENT............................................................18

Point Five --   THE DEFAMATION CLAIMS FAIL TO STATE A
CAUSE OF ACTION ..............................................................21

Point Six --   MR. ALON IS A LIMITED PUBLIC FIGURE, YET FAILED
TO PLAUSIBLY ASSERT ACTUAL MALICE.........................22

Point Seven --   THE CLAIMS FOR INFLICTION OF EMOTIONAL DISTRESS
FAIL TO STATE A CAUSE OF ACTION................................24

Point Eight --   PLAINTIFF ALON CANNOT SHOW THAT THERE HAS
BEEN PERVASIVE HARASSMENT OR ABUSE INTERFERING
WITH HIS EMPLOYMENT OR THAT PROFESSOR DeGRAFF'S
CRITICISMS HAD ANY ILLEGAL MOTIVATIONS .............29

Point Nine --   IN THE ALTERNATIVE, THIS COURT SHOULD REJECT
PENDENT JURISDICTION AGAINST PROFESSOR DEGRAFF ON
THE TORT CLAIMS, AND SHOULD SEVER THOSE CLAIMS.........................31

CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

**Page**

*Am. Ass'n of Univ. Professors v. Rubio,*
  (D.Mass. Sep. 30, 2025, No. 25-10685-WGY) 2025 LX 417279, at *142)...................................9,14

*Am. Assn. of Univ. Professors v Rubio,*
  780 F Supp 3d 350 (D Mass 2025) ...................................................................................32

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................................................11

*Bair v. Shippensburg Univ.,*
  280 F. Supp. 2D 357, 369 (M.D. Penn. 2003) ...................................................................19

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ...................................................11

*Birchem v Knights of Columbus,*
  116 F3d 310, 314, n 3 (8th Cir 1997) ...............................................................................33

*Brandeis Center v. U.S. Department of Education,*
  1:24-cv-01982  (D.D.C.  2024)......................................................................................31

*Brandenburg v. Ohio,*
  395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969)......................................................20

*Bursey v United States,*
  466 F2d 1059, 1088 (9th Cir 1972) .................................................................................17

*California Parents for the Equalization of Educ. Materials v Torlakson,*
  973 F3d 1010, 1016 (9th Cir 2020), *cert. den.*  141 S. Ct. 2583 (2021)...............................20

*Canel v Art Inst. of Chicago,*
  2025 US Dist LEXIS 30309, at *26-27 (ND Ill Feb. 20, 2025, No. 23 CV 17064).........................13

*Cantwell v. Connecticut,*
  310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900 (1940).........................................................20

*Caputo v. Bos. Edison Co.,*
  924 F.2d 11, 12, 15 (1st Cir. 1991)................................................................................28

*Chungchi Che v Massachusetts Bay Transp. Auth.,*
  342 F3d 31, 37 (1st Cir 2003).......................................................................................33

*College Republicans v. Reed,*
523 F. Supp. 2D 1005, 1011 (N.D. Ca. 2007) ............................................................19

*College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination,*
400 Mass. 156, 162, 508 N.E.2d 587 (1987)............................................................ 29

*Commack Self-Service Kosher Meats, Inc. v. Weiss,*
294 F.3d 415, 418 (2d Cir. 2002)............................................................................13

*Conley v. Romeri,*
60 Mass. App. Ct. 799, 806 N.E.2d 933, 936-37 (2004)                              26,28

*Conway v. Smerling,*
799, 800. 804-805. 37 Mass. App. Ct. 1, 8, 635 N.E.2d 268, 273 (1994) ...........................28

*DeAngelis v. El Paso Mun. Police Officers Ass'n,*
51 F.3d 591, 596 (5th Cir. 1995) ..........................................................................20

*Doe v City of Holyoke,*
764 F Supp 3d 2, 6-7 (D Mass 2025)......................................................................11

*Doyle v Nevada*
2023 US Dist LEXIS 218504, at *11 (D Nev June 9, 2023,
No. 3:23-cv-00018-MMD-CSD) ...........................................................................15

*Engdahl v. Kenosha,*
317 F.Supp. 1133 (E.D. Wis. 1970)........................................................................16

*Equal Means Equal v Ferriero,*
3 F.4th 24, 30 (1st Cir 2021).............................................................................. 20,32

*Fenner v News Corp.,*
2013 US Dist LEXIS 170187, at *47-48  (SDNY Dec. 2, 2013) .....................................20

*Fiacco v Sigma Alpha Epsilon Fraternity,*
528 F3d 94, 99 (1st Cir 2008).............................................................................24

*Foley v. Polaroid Corp.,*
400 Mass. 82, 95-96, 508 N.E.2d 72, 80 (1987)........................................................28

*Franchini v Inv'rs Bus. Daily, Inc.,*
981 F3d 1, 6, n 4 (1st Cir 2020)...........................................................................23

*Gartenberg v Cooper Union for the Advancement of Science & Art,*
765 F Supp 3d 245, 271 (SDNY 2025)..............................................................18,19,20

*Gurmessa v Genocide Prevention in Ethiopia, Inc.,*
   2024 US Dist LEXIS 197686, at *3-4 (D Del Sep. 11, 2024, No. 21-869-CFC)...............................21

*Gray v St. Martin's Press, Inc.,*
   221 F3d 243, 251 (1st Cir 2000) *cert. den.* 531 U.S. 1075 (2001) .......................................22

*Howell v. Enterprise Publ'g Co.,*
   455 Mass. 641, 670–73. 920 N.E. 2d 1 (2010) ....................................................................25

*Huerth v Anthem Ins. Cos.,*
   257 F Supp 3d 131, 145 (D Mass 2017) ...............................................................................33

*Hustler Mag. v Falwell,*
   485 US 46, 56 (1988)................................................................................................. 24,25

*In re Eaton Vance Corp. Sec. Litig.,*
   220 FRD 162, 169 (D Mass 2004)......................................................................................*32*

*I.U. v. Pioneer Valley Chinese Immersion Charter Sch.,*
   No. 14-cv-12709-MAP,, at *11 (D. Mass. June 10, 2016)...................................................28

*Jiangong Lei v City of Lynden,*
   2014 US Dist LEXIS 162777, at *14-15 (WD Wash Nov. 20, 2014,
   No. C14-0650-JCC) ...........................................................................................................32

*Jones v. City of Philadelphia,* 893 A.2d 837,
   844 (Commonwealth Ct. Pa. 2006), *appeal denied,* 589 Pa. 733 (2006) ............................17

*Koontz v. Watson,*
   283 F. Supp. 3D 1007, 1022 (D. Kansas 2018) ..................................................................20

*LaChance v. Boston Herald*
   (2011) 78 Mass.App.Ct. 910, 911 [942 N.E.2d 185]) ........................................................22

*Landau v. Corp. of Haverford Coll.,*
   No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025)......................13

*Lanier v. President & Fellows of Harvard Coll.,*
   490 Mass. 37, 44, 191 N.E.3d 1063, 1072-73 (2022)                                             27

*Lluberes v Uncommon Prods., LLC,*
   663 F3d 6, 13 (1st Cir 2011)................................................................................................22

*Loughlin v Goord,*
   2022 U.S. App. LEXIS 28662, at *6-7 (2d Cir Oct. 17, 2022, No. 21-2460-cv) ................23

*Mandell v. County of Suffolk & John Gallagher,*
316 F.3d 368, 374 (2nd Cir. 2003) ................................................................17

*McCabe v Rattiner,*
814 F2d 839, 843 (1st Cir 1987) ...................................................................22

*Miceli v. JetBlue Airways Corp.,*
914 F.3d 73, 85 (1st Cir. 2019) .....................................................................31

*Mole v. Univ. of Mass.*
(2004) 442 Mass. 582, 592 [814 N.E.2d 329] ..............................................31

*MPAA v. Spector*,
315 F.Supp. 824 (ED Pa. 1970) ....................................................................16

*New York Times Co. v. Sullivan,*
376 U.S. 254, 265 (1964) .......................................................................*passim*

*New York v United States Dept. of Educ.,*
477 F Supp 3d 279, 297 (SDNY 2020) .........................................................21

*Newman v. Point Park Univ.*,
No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, at *78-79
(W.D. Pa. Mar. 31, 2022) ..............................................................................13

*Payton v. Abbott Labs*,
386 Mass. 540, 557, 437 N.E.2d 171 (1982) ................................................26

*Pendleton v City of Haverhill,*
156 F3d 57, 69 (1st Cir 1998) .......................................................................23

*Perry v. Schwarzenegger,*
591 F.3d 1126, 1139 (9th Cir. 2010) .............................................................18

*Phantom Touring, Inc. v Affiliated Publs.,*
953 F2d 724, 728 (1st Cir 1992) *cert. den.* 504 U.S. 974 (1992) ..................22

*Piccone v Bartels,*
785 F3d 766, 771 (1st Cir 2015) ...................................................................22

*Polay v McMahon,*
468 Mass 379, 385, 10 NE3d 1122, 1128 (2014) ................................... 27,29

*Rosen v. Thornburgh,*
928 F.2d 528, 531 (2nd Cir. 1991) ...............................................................17

*Saxe v State Coll. Area Sch. Dist.,*
   240 F3d 200, 206 (3d Cir 2001).................................................................................20

*Shelley v. Kraemer,*
   334 U.S. 1, 17-18 (1948) ........................................................................................18

*Snyder v Phelps,*
   562 US 443, 448 (2011).......................................................................................21,25

*Speech First, Inc. v Sands,*
   144 S Ct 675, 675, n. 1 (2024)...............................................................................32

*Students for Just. in Palestine v Abbott,*
   756 F Supp 3d 410, 425 (WD Tex 2024)................................................................16

*Swope v. Lubbers,*
   560 F.Supp. 1328 (W.D. Mich. 1983) ....................................................................16

*Tappe v. Alliance Capital Mgmt. L.P.,*
   177 F. Supp. 2D 176, 182  (SDNY 2001)................................................................18

*T.E. v. Pine Bush Cent. Sch. Dist.,*
   58 F. Supp. 3D 332, 341 (SDNY 2014)...................................................................17

*Thomas v Review Bd. of Indiana Empl. Sec. Div.,*
   450 US 707, 715 (1981).........................................................................................15

*Tops Sales & Servs. v City of Forest Park,*
   487 F App'x 489, 490 (11th Cir 2012)....................................................................23

*Turkish Coalition of Am., Inc. v Bruininks,*
   678 F3d 617, 625 (8th Cir 2012 ............................................................................21

*United Mine Workers v Gibbs,*
   383 US 715, 727 (1966).........................................................................................33

*United States v. Schwimmer,*
   279 U.S. 644, 654-655 (1929) ...............................................................................21

*Yakubowicz v. Paramount Pictures Corp.,*
   404 Mass. 624, 629, 536 N.E.2d 1067, 1070 (1989) .......................................26,27

*Yelling v. St. Vincent's Health Sys.,*
   82 F.4th 1329, 1344-1345 (11th Cir. 2023) ..........................................................18

## **STATUTES**

Fed.R. Civ.Proc. 12(b)(6) ...................................................................................9,11,23

28 USC §1367.............................................................................................................9,32

28 USC 1367(c)(2)..........................................................................................................32

28 USC 1367(c)(4).......................................................................................................32,33

Defendant Michel DeGraff, by his counsel Mark Kleiman and Jonathan Wallace, submits this Memorandum of Law in Support of his Motion to Dismiss the Complaint as against him under Fed.R. Civ.Proc. 12(b)(6) and 28 USC §1367.

## PRELIMINARY STATEMENT

Michel DeGraff is a tenured professor at Defendant Massachusetts Institute of Technology ("MIT") who is a world-recognized expert on linguistics, with an interest in how language is exploited to support colonialist projects. Professor DeGraff has also ceaselessly advocated for the well-being and political rights of the Palestinian people, and has criticized Israel for its seizure of their land and violence against them. Plaintiffs Sussman and Alon are, respectively, a former student and an instructor at MIT who support Israel unconditionally and who profoundly disagree with Professor DeGraff's views. They have brought this Strategic Lawsuit Against Public Participation, asking this Court to infringe Professor DeGraff's First Amendment rights by enjoining his protected and pure speech about Palestine and Israel.

This audacity of an effort to punish and chill Professor DeGraff's speech and to compel MIT to do likewise contrasts sharply with the recent decision of Judge Young which has received national and even international attention. After a nine-day evidentiary trial Judge Young abjured **"**a definition of antisemitism that includes protected speech such as comparing Israel's policies to those of the Nazis. (*Am. Ass'n of Univ. Professors v. Rubio* (D.Mass. Sep. 30, 2025, No. 25-10685-WGY) 2025 LX 417279, at *142); criticized the equation of campus protests related to Palestine as per se "pro-Hamas,"and challenges to that policy as "support" for terrorists *Id.*, at *143-144: and reminded us that even <u>actual</u> anti-Semitism, although heinous, remains protected speech unless it has created a clear and present danger of an imminent, immediate violent emergency. *Id.*, at 145, 159.

Against this backdrop we examine the Plaintiffs' complaint.

## ASSERTIONS OF THE COMPLAINT

Plaintiffs do not sue Professor DeGraff in any of the federal question discrimination claims (Counts I to VI), nor could they. They target him in their state-based civil rights and tort claims, Counts VIII, IX, and XII through XV

CountsXII, XIII, and XIV are for intentional, reckless and negligent infliction of emotional distress respectively. These Counts do not specify which assertions about Professor DeGraff in the main body of the Complaint allegedly support these claims, but merely allege that "Professor DeGraff's conduct intentionally harassing, discriminating against, and retaliating against Plaintiffs Alon and Sussman was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community." (¶¶ 432-33, 438-39). Count VI, though stating it is alleged against "all defendants", only mentions MIT.

Because of the wide variety of assertions made against Professor DeGraff in the body of the Complaint, these counts are vague and hard to defend against, without knowing which statements were deemed "harassment".

Count XV is a defamation claim, alleged by Plaintiff Alon against Professor DeGraff alone. Here the specific statements on which the claims are based are spelled out-- and are astonishingly slight.  Mr. Alon alleges that Professor DeGraff  attributed a statement to Mr. Alon that "SAGE's students' pleas to halt the genocide of Palestinians are 'pro-Hamas' and advocate the killing of Jews" and also stated that Alon "participate[d] in well-rehearsed propaganda that erases the anti-Zionist Jewish students and misrepresents them, along with their non-Jewish comrades, as violent and antisemitic."

As the Memorandum shows in Points Five and Six, these statements are First Amendment-protected speech on matters of public importance, and not defamatory because they are statements of opinion. In addition, Plaintiff who complains he was defamed fails to mention his multiple appearances

on Fox News about this very matter, disingenuously concealing his status as at least a limited public figure.

The FAC's final efforts to evade the First Amendment involve a claim that Professor DeGraff, who does not work in the same department or even in the same building, created a hostile work environment even though he had no effect on plaintiff's hiring, promotion, compensation, or other terms of employment. Professor DeGraff is also accused of retaliating against one Plaintiff when no facts are pleaded that would plausibly establish the professor's knowledge that a civil rights complaint had been filed.

Point One

**THE STANDARD**

"As this matter is before the court on Defendants' motions to dismiss pursuant to Rule 12(b)(6), the court applies the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Therefore, the complaint must allege sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Doe v City of Holyoke,* 764 F Supp 3d 2, 6-7 (D Mass 2025).[1]

Point Two

**ANTI-ZIONISM IS NOT ANTISEMITISM**

Plaintiffs' assertion that opposition to Zionism is a form of antisemitism (Complaint paragraph # 7, 21, 22, 27 and passim) is an egregious ontological error. Not all Jewish people are Zionists or are

---

[1]  All cases cited in this Memorandum are "cleaned up" by the removal of quotation marks and internal citations.

offended by opposition to Zionism[2];  not all Zionists are Jews[3]; and, in fact, some Christian Zionists are antisemites[4].

Plaintiffs' claim of a core religious tenet masks a deep divide.  Although "many" Jews are Zionists (FAC ¶ 143), many are not.  Fully twenty percent of American Jews under 40 agreeing that "Israel doesn't have the right to exist".  And 25% of all Jewish American voters, regardless of age agreed that Israel is an apartheid state.[5]  More recently a survey of American Jews conducted by the Jerusalem Center for Security and Foreign Affairs showed that 30% of all American Jews agreed that Israel was committing genocide, with a plurality (34%) viewing the campus demonstrations as anti-war and pro-peace.[6]

By conflating all criticisms of Israel with antisemitism Plaintiffs seek to proscribe an entire area of First Amendment-protected political, legal and ethical discussion as morally off limits as a means of, withdrawing it from free speech guarantees.

> "Plaintiffs also dedicate a full eight pages of their Complaint to their effort to link Judaism to Zionism, while simultaneously insisting that they are not asking the Court to resolve any religious issues. Plaintiffs' equivocation is disingenuous, but likely strategic, seeking to blur the line between Zionism as a political philosophy and Zionism as a

---

[2]    Peter Beinart, "Debunking The Myth That Anti-Zionism Is Anti-Semitic", *The Forward* February 27, 2019 https://forward.com/opinion/419988/debunking-the-myth-that-anti-zionism-is-anti-semitic/ ; Shaul Magid, "'Anti-Zionism = Antisemitism' isn't Just Wrong, It's the Problem", *Religion Dispatches* December 13, 2023 https://religiondispatches.org/anti-zionism-is-antisemitism-isnt-just-wrong-its-the-problem/ .

[3]    William N. Dale,  "The Impact of Christian Zionism on American Policy", *American Diplomacy* Volume IX, Number 2, 2004 https://ciaotest.cc.columbia.edu/olj/ad/ad_v9_2/daw01.html

[4]    Julian Sayarer, "The Antisemitic Face of Israel's Evangelical Allies", *Jacobin Magazine* February 20, 2022 https://jacobin.com/2022/02/israeli-us-evangelical-alliance-zionism-antisemitism

[5]    2021 survey of Jewish American voters by the Jewish Electorate Institute, https://www.jewishelectorateinstitute.org/p6971 last visited April 28, 2025

[6]    "Survey Among American Jews: Over 51% Support for Biden's Decision to Withhold Arms Shipments to Israel",  https://jcpa.org/survey-among-american-jews-over-51-support-for-bidens-decision-to-withhold-arms-shipments-to-israel/.  Last visited September 29, 2025.

component of Jewish identity, and in the process implicitly sweep any and all criticism of Israel into the basket of antisemitism. As a threshold matter,....I reject Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views";

*Landau v. Corp. of Haverford Coll.,* No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4-5 (E.D. Pa. Jan. 6, 2025): *see also Canel v Art Inst. of Chicago,* 2025 US Dist LEXIS 30309, at *26-27 (ND Ill Feb. 20, 2025, No. 23 CV 17064) (Citing *Haverford;* "Plaintiff effectively asked the Court to conflate" "expressions of political viewpoints" with antisemitism);

Despite the sensitive and important the issues these conflicting viewpoints and actions raise, as an overarching matter, such debates... have been recognized to fall within First Amendment protections when efforts have been advanced to limit or impair such advocacy...Against that backdrop, Plaintiff has not shown that Defendant has subjected her to an objectively hostile work environment by its not suppressing, or otherwise protecting Plaintiff from, the personal views and academic interests of some of Defendant's professors and students related to these geopolitical topics. *Newman v. Point Park Univ.*, No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, at *78-79 (W.D. Pa. Mar. 31, 2022

Holding Zionism to be a protected class, would in fact violate the Establishment Clause as well as the Defendant's freedom of speech. The argument that Zionism and a right to the Holy Land are cornerstones of the Jewish religion ignores both that many Jewish people do not believe this, and that two other faiths, Christian and Muslim, also formulated such claims to the same land. A finding by this Court that anti-Zionism is antisemitism would violate the Establishment Clause by enacting one religious claim into law and penalizing competing religious claims,  *Commack Self-Service Kosher Meats, Inc. v. Weiss,* 294 F.3d 415, 418 (2d Cir. 2002) (state law enforcing Orthodox Jewish standards for foods sold as "kosher" violated First Amendment by privileging one Jewish group over others).

The assertion that anti-Zionism constitutes antisemitism is neither a Constitutional nor a logical framework for analysis.

**Point Three**

## IMPOSITION OF THE IHRA STANDARD BY THE COURT WOULD VIOLATE PROFESSOR DEGRAFF'S FIRST AMENDMENT RIGHTS

The Plaintiffs' attempt to persuade this Court to adopt the IHRA standards of antisemitism is similarly flawed[7]. (*Am. Ass'n of Univ. Professors v. Rubio* at *142.)

Contrary to Plaintiffs' request for relief, the IHRA on its web site defines its standards as a "non-legally binding working definition". It also cautions that "criticism of Israel similar to that leveled against any other country cannot be regarded as antisemitic". However, the IHRA then gives examples which clearly, facially, cannot and should not be adjudicated and become the basis for civil or criminal interdiction: "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor... Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation...Drawing comparisons of contemporary Israeli policy to that of the Nazis",

https://holocaustremembrance.com/resources/working-definition-antisemitism

The stunning constitutional overbreadth and invalidity of the IHRA standards, and Plaintiffs' claims based on them, is also patent in their assumption that all Jewish people support Israel-- and the

---

[7] The International Holocaust Remembrance Alliance ("IHRA") , a NGO founded in 1998, describes itself as deploying a "network of trusted experts [who] share their knowledge on early warning signs of present-day genocide and education on the Holocaust. This knowledge supports policymakers and educational multipliers in their efforts to develop effective curricula, and it informs government officials and NGOs active in global initiatives for genocide prevention".
https://www.holocaustremembrance.com/about-us

facile and immediate (and egregious) accusation of anti-Semitism levied against Jewish people who criticize the state of Israel.[8]

Kenneth Stern, one of the drafters of the IHRA Standards, has since said: "It's not the definition that's the problem. It's the abuse of it....There was never any idea that this would be used as a de facto hate speech code on campus....[I]t sets up a system in which administrators have a reason to either condemn or try to suppress pro-Palestinian speech because their job is to keep the university from being sued under Title VI....A lot of this comes to whether anti-Zionism is anti-Semitism or not.... I don't like government putting its thumb on the scales inside of a debate inside the Jewish community....Do I think it's going to chill speech? Yeah, and I think that's the purpose. " Eric Cortelessa, "The scholar who wrote the definition of anti-Semitism says it's been subverted",  January 9, 2020 https://www.timesofisrael.com/the-scholar-who-wrote-the-definition-of-anti-semitism-says-its-been-subverted/

Plaintiffs make no attempt to conceal the extent to which they are asking this Court to decree that the most  vague and overbroad elements of the IHRA Standards are the law of the land under Title VI (with First Amendment completely ignored).

The Complaint could not more clearly and centrally advance the theory, based on the IHRA standards, that First Amendment-protected criticism of Israel is anti-Semitic[9]-- and that this Court

---

[8]  Plaintiffs therefore ask this Court to privilege one set of Jewish religious beliefs, involving a God-granted right to the Holy Land, over the beliefs of other Jews who do not believe in such a right. The Court doing so would of course violate the Establishment Clause, *Doyle v Nevada* 2023 US Dist LEXIS 218504, at *11 (D Nev June 9, 2023, No. 3:23-cv-00018-MMD-CSD) (Prison was alleged to "establish[] Orthodox/Rabbinic Judaism as a religious faith over that of  Messianic Judaism"). "Intrafaith differences... are not uncommon among followers of a  particular creed, and the judicial process is singularly ill equipped to resolve such differences", *Thomas v Review Bd. of Indiana Empl. Sec. Div.,* 450 US 707, 715 (1981).

[9]  For example, the Plaintiffs list the phrase "free Palestine" nine times in the Complaint as evidence of antisemitism, maintaining that this rather generic and certainly First Amendment-protected phrase is a call for violence against Jewish people (for example, paragraph 50).

should, as the essential relief requested in the Complaint, formalize the requested partial repeal of the First Amendment.

By its own admission and its co-author's, the IHRA standards are a proposed private speech code, obviously not written (nor intended to be) with anywhere near the precision required for a statute.

The first court to analyze the use of the IHRA Standards in a university (or, in fact, any) context has indeed held they embodied viewpoint discrimination:

> [T]he [university] speech policies do not leave 'antisemitism' open to constitutional definitions and interpretations, [but] mandate[] a specific definition. That definition, by incorporation of the IHRA's examples, labels 'calling the State of Israel a racist endeavor' and 'drawing comparisons of contemporary Israeli policy to that of the Nazis' as antisemitic...[The] Court finds the revised policies are intertwined with... the IHRA examples, which identify content-specific expression....Through the connection to these examples, the policies make that speech punishable, thereby chilling it.

*Students for Just. in Palestine v Abbott,* 756 F Supp 3d 410, 425 (WD Tex 2024).

This is not the first time in this country that laws have been implemented to enforce private speech codes-- and been held unconstitutional. Various states passed legislation purporting to implement the private, and very subjective and vague, MPAA movie ratings, with predictable results, *MPAA v. Spector*, 315 F.Supp. 824 (ED Pa. 1970) ("[H]owever well-intended, [the law] is so patently vague and lacking in any ascertainable standards and so infringes upon the plaintiffs' rights to freedom of expression"); *Swope v. Lubbers*, 560 F.Supp. 1328 (W.D. Mich. 1983) ("[I]t is well-established that the Motion Picture ratings may not be used as a standard for a determination of constitutional status"); *Engdahl v. Kenosha*, 317 F.Supp. 1133 (E.D. Wis. 1970) ("[I]f the Motion Picture Association utilized any standards whatsoever in reaching its judgments as to what is an 'adult' movie, the defendants are not aware of what these standards are").

The IHRA standards are similarly a mysterious, subjective, confusing and contradictory private speech code, not ready for "prime time", for the role of a constitutional scalpel[10] tracing the line between discrimination and free speech.

A Lexis search of the term anti-Semitism turns up numerous cases considering specific acts, typically in the context of a discrimination claim: "When D.C. was in ninth grade, another student 'would constantly berate [D.C],' telling him that D.C.'s 'ancestors died in the Holocaust,' calling D.C. 'ashes,' and pantomiming the blowing of dust off his hands while telling D.C. that he was 'just ashes.' The same student would slap D.C. in the face as the student got off the bus and smirk at D.C.   Other students joined in this harassment, slapping D.C. in the face and telling him 'shut up, D., or I will burn you in an oven.' …. D.C. also witnessed students in the school cafeteria and classrooms performing 'Hitler salutes,' both to each other and to D.C.  *T.E. v. Pine Bush Cent. Sch. Dist.,* 58 F. Supp. 3D 332, 341 (SDNY 2014). "He has repeatedly been a target of anti-Semitic remarks and taunting, such as being called 'that Jew'  and 'Jewboy' and being told that all Jews stick together, and was subjected to insulting and demeaning conduct by fellow officers.....Plaintiff claims also to have heard virulent anti-Semitic remarks directed at other Jews, such as 'f***ing Jews' and 'f***ing Jew lawyer'". *Mandell v. County of Suffolk & John Gallagher,* 316 F.3d 368, 374 (2nd Cir. 2003). "ALJs allegedly made comments demonstrating overt animosity (e.g., Lee-Sang asking 'What's wrong with these [Jewish] people?' and Waltrous speaking of 'Jewish pig food')", *Jones v. City of Philadelphia,* 893 A.2d 837, 844 (Commonwealth Ct. Pa. 2006), *appeal denied,* 589 Pa. 733 (2006)   "Rosen also asserts that his counselors and instructors condoned the anti-semitic behavior of his DEA classmates. In particular, one trainee called Rosen a 'half-breed jew bastard' and made other religious slurs".  *Rosen v. Thornburgh,* 928 F.2d 528, 531 (2nd Cir. 1991).

---

[10]   "When First Amendment interests are at stake, the Government must use a scalpel, not an ax". *Bursey v United States,* 466 F2d 1059, 1088 (9th Cir 1972).

These cases all demonstrate what is uncontestably bias: de facto, prima facie, however you care to phrase it. Plaintiffs instead assert the vague, over-inclusive IHRA Standards to claim that pure First Amendment-protected political and ethical speech supporting Palestine or criticizing Israel is antisemitic.

As a fundamental matter, "half-breed jew bastard" and "Free Palestine" are not the same-- ontologically, ethically or legally.

### Point Four

### <u>PLAINTIFFS ASK THIS COURT TO INFRINGE THE FIRST AMENDMENT</u>

Although MIT is a private university, Plaintiffs invoke the power of this Court to impose and enforce the full and over-inclusive sweep of the IHRA Standards against it , while wholly disregarding the First Amendment. This it cannot do, *New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964) ("Alabama courts....applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press"); *Shelley v. Kraemer,* 334 U.S. 1, 17-18 (1948) (reviewing circumstances in which court orders in civil disputes are "state action of the sort prohibited by the Amendment's guaranties of freedom of discussion"); *Perry v. Schwarzenegger,* 591 F.3d 1126, 1139 (9th Cir. 2010) (Court enforcement of subpoena would violate First Amendment); *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1344-1345 (11th Cir. 2023) ("A court cannot enforce a law in a dispute between private parties if doing so requires it to impose invalid restrictions on [a person's] constitutional freedoms of speech and press"); *Tappe v. Alliance Capital Mgmt. L.P.,* 177 F. Supp. 2D 176, 182  (SDNY 2001) ("Thus, the Court, in interpreting the statute, becomes the 'government actor'").

The Court in the recent case of *Gartenberg v Cooper Union for the Advancement of Science & Art,* 765 F Supp 3d 245, 271 (SDNY 2025), asserting a hostile antisemitic environment at Cooper Union, analyzed the boundary line between the First Amendment and Title VI:  "Regardless of whether this expression is better characterized as righteous protest in support of a noble cause, as the vulgar

celebration of terrorism and antisemitism, or as something in-between, it is not a proper basis on which to impose civil liability on Cooper Union. The content of the protest slogans, fliers, and other expressions described above related to the ongoing Israeli-Palestinian conflict and touched upon topics like Zionism, colonialism, and racism... [A]part from a conclusory suggestion that this speech included 'threats of violence,'  the Complaint does not plausibly allege that any of this expressive conduct constituted true threats, incitement, fighting words, obscenity, or any other category of traditionally unprotected speech under the Supreme Court's First Amendment jurisprudence. To the contrary, as described in the Complaint, this expression qualifies as pure speech on matters of public concern because it can be fairly considered as relating to [a] matter of political, social, or other concern to the community" and was communicated in a manner reasonably calculated to contribute to an ongoing public debate of considerable political significance." The Court acknowledged its own status as a state actor capable of violating the First Amendment, as spelled out in *New York Times v. Sullivan* and other cases cited supra:  "Although the primary method of enforcement of the harassment prohibition is through civil actions between private parties, imposition of liability by the courts under federal and state statutes easily falls within the definition of 'state action.'" *Gartenberg, supra,* at 260-261.

But  "the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it..... Thus, regulations that prohibit speech on the basis of listener reaction alone are unconstitutional....in the.... university setting", *Bair v. Shippensburg Univ.,* 280 F. Supp. 2D 357, 369 (M.D. Penn. 2003); *College Republicans v. Reed,* 523 F. Supp. 2D 1005, 1011 (N.D. Ca. 2007) ("[T]he goals and policies of a university, e.g., to promote respectful and reasoned discourse on issues of moment, might be in direct conflict with rights protected by the First Amendment, which can entitle people, in some settings, to express themselves in unreasoned, disrespectful and intensely emotional ways")*.

Implementation by this Court of the IHRA standards would legitimate and institutionalize viewpoint discrimination against students and faculty who support Palestine or criticize Israel, *Koontz v. Watson,* 283 F. Supp. 3D 1007, 1022 (D. Kansas 2018) (A "goal... to undermine the message of those participating in a boycott of Israel ... is either viewpoint discrimination against the opinion that Israel mistreats Palestinians or subject matter discrimination on the topic of Israel. Both are impermissible goals under the First Amendment"). Plaintiff make assertions about Dr. DeGraff's pedagogy ("an anti-Israel seminar", paragraph 108), yet "Constitutional challenges to the content of curricula... must be adjudicated under... the First Amendment, not Equal Protection", *California Parents for the Equalization of Educ. Materials v Torlakson,* 973 F3d 1010, 1016 (9th Cir 2020), *cert. den.* 141 S. Ct. 2583 (2021).

Plaintiffs are also profoundly wrong when they assert (in effect) that once you say the word "discrimination", you have definitively established that the targeted speech is outside the First Amendment. This case however, as *Gartenberg, supra,* also illustrates, is far from the first one in which federal courts have had to trace the boundaries (and contradictions) between discrimination law and the First Amendment.

> But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs. See, e.g., Brandenburg v. Ohio, 395 U.S. 444, 23 L. Ed. 2d 430, 89 S. Ct. 1827 (1969); Cantwell v. Connecticut, 310 U.S. 296, 84 L. Ed. 1213, 60 S. Ct. 900 (1940). When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications. Where pure expression is involved, anti-discrimination law "steers into the territory of the First Amendment." DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 596 (5th Cir. 1995)."

*Saxe v State Coll. Area Sch. Dist.,* 240 F3d 200, 206 (3d Cir 2001)  *Also  Fenner v News Corp.,* 2013 US Dist LEXIS 170187, at *47-48  (SDNY Dec. 2, 2013) ("The Court recognizes the tension between the First Amendment protection of editorial decisions and Title VII's protection against a hostile work

environment"); *New York v United States Dept. of Educ.,* 477 F Supp 3d 279, 297 (SDNY 2020)

(Department of Education's responsibility is to enforce Title IX "consistent with the First Amendment").

### Point Five

### <u>THE DEFAMATION CLAIMS FAIL TO STATE A CAUSE OF ACTION</u>

While Professor DeGraff's statements about Israel and genocide were in no way antisemitic, it

would not matter for First Amendment purposes if they were, *Snyder v Phelps*, 562 US 443, 448 (2011)

(First Amendment right to carry signs outside soldier's funeral which said, "God Hates the USA/Thank

God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Thank God

for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "God Hates Fags," "You're Going to Hell,"

and "God Hates You"). "[I]f there is any principle of the Constitution that more imperatively calls for

attachment than any other, it is the principle of free thought -- not free thought for those who agree with

us, but freedom for the thought that we hate",  *United States v. Schwimmer,* 279 U.S. 644, 654-655

(1929) (Justice Holmes, dissenting)

 Professor DeGraff's statements set forth in the Complaint are also nonactionable because they

are expressions of opinion, not verifiable or  falsifiable facts. In *Gurmessa v Genocide Prevention in

Ethiopia, Inc.,* 2024 US Dist LEXIS 197686, at *3-4 (D Del Sep. 11, 2024, No. 21-869-CFC)

(Defendant stated that Plaintiff "openly supports genocide, glorifying torture, lynching, massacre, and

ethnic cleansing of Amhara ethnic groups in [the] Oromia Region of Ethiopia."  The Court held that

these were statements of opinion "about matters of public concern and are...not provably false"); *Turkish

Coalition of Am., Inc. v Bruninks,* 678 F3d 617, 625 (8th Cir 2012)  (Statement that website discussing

Armenian genocide was not credible was "essentially an opinion, not capable of being proven true or

false").

First Circuit courts are in accord. "Because defamation requires a false statement at its core,

opinions typically do not give rise to liability since they are not susceptible of being proved true or

false... Thus, a statement cannot be defamatory if 'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Piccone v Bartels,* 785 F3d 766, 771 (1st Cir 2015); *Phantom Touring, Inc. v Affiliated Publs.,* 953 F2d 724, 728 (1st Cir 1992) *cert. den.* 504 U.S. 974 (1992) ("Many of the statements cited in the complaint and appellate brief either constitute obviously protected hyperbole or are not susceptible of being proved true or false. Such, for example, is the language...quoting a critic who described the Hill production as 'a rip-off, a fraud, a scandal, a snake-oil job.' Not only is this commentary figurative and hyperbolic, but we also can imagine no objective evidence to disprove it"); *McCabe v Rattiner,* 814 F2d 839, 843 (1st Cir 1987) ("Readers may have disagreed with the conclusion that it was a scam, but they could not have said that the conclusion was false, because there is no core meaning of scam to which Rattiner's facts and allegation can be compared").

The First Amendment demands dismissal of the Complaint as against Professor DeGraff.

**Point Six**

**<u>MR. ALON IS A LIMITED PUBLIC FIGURE, YET FAILED</u>**

**<u>TO PLAUSIBLY ASSERT ACTUAL MALICE</u>**

Plaintiff Alon achieved two separate appearances on Fox News.  One, during the MIT encampment, was a three minute and twenty-four second "opinion piece", where Alon simply held forth, without being asked a single question.  https://www.foxnews.com/video/6352193687112)  The other was a nearly six-minute long segment in which Alon declaimed that any students supporting Palestine were "anti-Semitic by their nature".  https://www.foxnews.com/video/6339844104112 .

Plaintiff's status as a public figure is a question of law.  (*LaChance v. Boston Herald* (2011) 78 Mass.App.Ct. 910, 911 [942 N.E.2d 185]). Alon has voluntarily injected himself into a particular public controversy" becoming "limited-purpose public figure[s]", *Lluberes v Uncommon Prods., LLC,* 663 F3d 6, 13 (1st Cir 2011); *Gray v St. Martin's Press, Inc.,* 221 F3d 243, 251 (1st Cir 2000) *cert. den.* 531 U.S.

1075 (2001)  ("The record also shows that Gray was a central figure in this controversy... the subject of comment and criticism in mainstream publications like Time, Newsweek, the Washington Post and the New Republic"); *Pendleton v City of Haverhill,* 156 F3d 57, 69 (1st Cir 1998) ("[B]y granting an interview to Perkins and lobbying for a permanent teaching post at a time when the racial composition of the public school faculty had become a matter of intense interest in the community, Pendleton invited public scrutiny of the qualities that equipped him to teach in the Haverhill school system").

As a limited public figure Alon is required by *New York Times Co. v. Sullivan,* 376 US 254 (1964), to plausibly allege actual malice in his defamation complaint, and not simply rely on conclusory generalizations, *Franchini v Inv'rs Bus. Daily, Inc.,* 981 F3d 1, 6, n 4 (1st Cir 2020) ("As to the 12(b)(6) motion...Franchini failed to plead actual malice");  *Loughlin v Goord,* 2022 U.S. App. LEXIS 28662, at *6-7 (2d Cir Oct. 17, 2022, No. 21-2460-cv) ("Plaintiffs have failed to plead... actual malice.... [a]part from conclusory allegations that the statement in the Form 10-Q was 'made with actual malice' and 'with malicious intent'");  *Tops Sales & Servs. v City of Forest Park,* 487 F App'x 489, 490 (11th Cir 2012) "Although the complaint includes conclusory allegations of intentional and willful conduct, Plaintiffs' pleadings provide insufficient support to state a plausible claim that the individual defendants acted with actual malice").

The Complaint's sole reference to "actual malice" is precisely the type of conclusory, empty statement which should not survive a 12(B)(6) motion. "Professor DeGraff's statements about Alon were false, published with actual malice, and designed to hold Alon up to contempt, hatred, scorn or ridicule. Professor DeGraff's statements were made solely for the purpose of causing Alon harm and impairing his standing at MIT and in the larger academic community" (para. 452).

The Plaintiffs' failure to set forth any facts supporting actual malice, as opposed to conclusory statements, requires dismissal of Count XV.

**Point Seven**

## <u>THE CLAIMS FOR INFLICTION OF EMOTIONAL DISTRESS FAIL</u>
## <u>TO STATE A CAUSE OF ACTION</u>

As a matter of Massachusetts law and the First Amendment, all three emotional-distress counts fail on the pleadings.[11] This memorandum addresses: (1) the fact that Alon cannot smuggle his claims past the First Amendment's protections by relabeling them as claims for emotional distress; (2) the absence of any tort duty running from the Professor to plaintiff; (3) the failure of all three claims to allege the required objective, harm which must be corroborated by objective evidence. As to the IIED/RIED counts, their (4) failure to plead "extreme and outrageous" conduct; (5) failure to plead distress "so severe that no reasonable person could be expected to endure it"; (6) failure to plead facts showing why Professor DeGraff should have known of the apparently wildly disproportionate distress this would cause; and (7) duplication of "reckless infliction" with IIED.

As a threshold matter, none of Professor DeGraff's political speech may be stripped of its First Amendment protections relabeling Plaintiff as suffering from an "emotional distress" claim,[12] based on the exact same speech as their defamation claim, *Hustler Mag. v Falwell,* 485 US 46, 56 (1988) ("[P]ublic figures...may not recover for the tort of intentional infliction of emotional distress... without showing in addition that the publication contains a false statement of fact which was made with actual malice"); *Fiacco v Sigma Alpha Epsilon Fraternity,* 528 F3d 94, 99 (1st Cir 2008) (citing *Hustler*).

The elements of an IIED claim also pose another unique threat to First Amendment protections, since an IIED claim requires Plaintiff to plead and later prove that he is the victim of "outrageous"

---

[11] Negligent infliction of emotional distress (NIED); reckless infliction of emotional distress (RIED; and intentional infliction of emotional distress (RIED)

[12] Plaintiffs advance three emotional distress claims, for intentional, reckless and negligent infliction (counts XII, XIII, and XIV). It is unnecessary to analyze these separately, as First Amendment principles barring an intentional infliction claim would not tolerate a reckless or negligent one.

conduct.  In *Hustler* a unanimous Supreme Court warned that when applied to political speech "outrageousness" is so subjective that it invites a jury to impose liability out of dislike for any particular speech.  *Hustler* at 55.

Plaintiffs by contrast are trying to repeal significant First Amendment protections, by inviting this Court to hold that pure speech on political and ethical matters, with which they greatly disagree, and thus find distressing, is tortious. The First Amendment forbids this.[13]

*Snyder v. Phelps* was an intentional infliction of emotional distress case; plaintiff "testified that he is unable to separate the thought of his dead son from his thoughts of Westboro's picketing, and that he often becomes tearful, angry, and physically ill when he thinks about it. Expert witnesses testified that Snyder's emotional anguish had resulted in severe depression and had exacerbated pre-existing health conditions", *Snyder v Phelps*, 562 US 443, 450 (2011). The Court held (at 458): "Given that Westboro's speech was at a public place on a matter of public concern, that speech is entitled to special protection under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt".

Massachusetts likewise does not allow plaintiffs invoke emotional distress claims to smuggle a barred claim past the First Amendment.  *Howell v. Enterprise Publ'g Co*., 455 Mass. 641, 670–73. 920 N.E. 2d 1 (2010) is especially instructive, as it involved press accounts of a public issue that mixed factual reporting with highly critical opinions. Although the articles arguably mischaracterized the public employee plaintiff as having had "porn" on his city-owned computer, and conflated his conduct with that of another employee in an entirely different city, the Massachusetts Supreme Court rejected the

---

[13] Both plaintiffs have sued Professor DeGraff alleging intentional and reckless infliction of emotional distress.  The negligence allegations belong to Mr. Alon alone.  It is therefore worth noting that Sussman has testified before the House Education and Workforce Committee in July, 2024, Sussman has also been interviewed and quoted about his claims of antisemitism  in the Washington Times, Ed Workforce, MIT's The Tech (multiple times), Jewish Insider, aad Campus Reform, His own articles on the subject have been published in the New York Post, and Tablet Magazine.

idea that this was defamatory, holding that the reporting concerned public hearings and were therefore a matter of public importance, that the hearings were accurately reported, and that although the opinions were interwoven with the reporting, their hyperbole and rhetorical flourish made it clear they were opinions. The court then turned to the charge of infliction of emotional distress would not change the fact that the statement itself was privileged.  (*Id.*, at 673.)

This should be more than enough to permanently foreclose Alon's emotional distress claims under all thee theories and Sussman's under IIED and RIED.  However, out of an abundance of caution, we analyze the FAC's other failings, beginning with NIED:

> To recover for the tort of negligent infliction of emotional distress, a plaintiff must prove: (1) negligence; (2) causation; (3) emotional distress corroborated by actual, objective symptoms; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton v. Abbott Labs*, 386 Mass. 540, 557, 437 N.E.2d 171 (1982).

The most fundamental point is where the analysis beings:  Negligence requires that there be a duty of care (*Yakubowicz v. Paramount Pictures Corp.,* 404 Mass. 624, 629, 536 N.E.2d 1067, 1070 (1989) )) and this is a question of law. *Conley v. Romeri, 60 Mass. App. Ct. 799, 801* 806 N.E.2d 933, 936-37 (2004)

As to Alon, the FAC alleges only public commentary by a faculty member about a campus controversy over opposition to a recognized genocide that involves an unrelated postdoctoral researcher who publicly advocates the opposing view. The parties are in different departments at a private university with 17,000 employees. The FAC never claims that they work together or rarely encounter each other apart from on-campus political demonstrations. Alon voluntarily appeared on national television twice to advocate his position on the controversy. Professor DeGraff's challenged statements are political commentary and an accurate reference to Alon's Israeli military service.

Professor DeGraff never even discussed Sussman until Sussman began attacking him in social media .

These allegations fail to establish a duty of care, and in 453 paragraphs the FAC is silent on one might be owed. That is because any explicit effort to assert one collides directly with the First Amendment. The communication of ideas is protected by the First Amendment. "[F]or First Amendment purposes whether speech is suppressed under the criminal law or by "penalties" imposed by tort law. See *New York Times Co.* v. *Sullivan* 37 U.S. 254, 277 (1964). *Yakubowicz* at 630. Speech does not lose its First Amendment protection merely because it has "a tendency to lead to violence." *Hess v. Indiana*, 414 U.S. 105, 109 (1973). The "incitement exception" to the First Amendment applies only where speech is both <u>directed</u> to producing imminent lawless action and is <u>likely</u> to produce it. *Brandenburrg v. Ohio*, 395 U.S. 444, 447 (1969). Since Professor DeGraff owed no duty of care to Alon, there can be no negligence.

And even if there were negligence the claim fails for its failure to offer more than vague claims of finding the conduct "offensive" (¶¶ 344, 384) and causing him embarrassment and substantial emotional distress. (¶¶ 101, 312). These are precisely the threadbare allegations rejected in *Lanier v. President & Fellows of Harvard Coll.*, 490 Mass. 37, 44, 191 N.E.3d 1063, 1072-73 (2022) (to qualify as objective evidence of emotional distress, a symptom must "go beyond "mere upset, dismay, humiliation, grief and anger.") Conclusory recitals that distress was "severe and of such a nature that no reasonable person could be expected to endure it" are insufficient, as these are mere labels, not facts. At most, Plaintiff alleges ordinary upset from a public debate he voluntarily entered into. *Polay*, 468 Mass. at 387–88

The Plaintiffs' failure to plead that Professor DeGraff owed them any sort of a duty of care, and failure to plead any recognizable signs or symptoms beyond indignation and general offense are fatal and Count XIV for negligence must be dismissed as to Alon..

Plaintiffs have also inexplicably pleaded the same tort twice, with two only slightly different labels. The elements and legal analyses of reckless infliction of emotional distress and intentional

infliction of emotional distress are exactly the same, and are therefore duplicative. *I.U. v. Pioneer Valley Chinese Immersion Charter Sch.*, No. 14-cv-12709-MAP,, at *11 (D. Mass. June 10, 2016), so Count XIII for reckless infliction of emotional distress should also be dismissed.

The FAC also falls far short of pleading a claim for IIED.

> To prevail on a claim of intentional infliction of emotional distress, a plaintiff "must establish '(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, . . . (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community, (3) [that] the actions of the defendant were the cause of the plaintiff's distress, and (4) [that] the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.'

*Conley v. Romeri*, 60 Mass. App. Ct. 799, 806 N.E.2d 933, 936-37 (2004). These standards must be applied with the warning in mind that "the door to recovery [for IIED] should be opened but narrowly and with due caution." Excluding "insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Foley*, id., at 99.

This is why facts alleging intolerable conduct must show a "high order of reckless ruthlessness or deliberate malevolence" that is "profoundly shocking" (Not outrageous conduct for a male to mislead a women in her 40s who said she wanted children into a six-month sexual relationship by concealing his vasectomy . *Conway v. Smerling*, 799, 800. 804-805.  37 Mass. App. Ct. 1, 8, 635 N.E.2d 268, 273 (1994); (Not outrageous conduct to subject an employee to hours' long interrogation by private security manager who yelled, threatened plaintiff with a balled up fist, and refused to allow plaintiff to use the restroom when he was ill. *Foley v. Polaroid Corp.,* 400 Mass. 82, 95-96, 508 N.E.2d 72, 80 (1987)); *Caputo v. Bos. Edison Co.,* 924 F.2d 11, 12, 15 (1st Cir. 1991) (repeatedly exposing a worker to potentially lethal amounts of radiation and concealing it from him as part of an effort to conceal a radioactive spill from the Nuclear Regulatory Commission not outrageous enough to support IIED.)

The offending conduct must literally be "atrocious" and if it does not rise to this level dismissal is appropriate. *Polay v. McMahon*, 468 Mass. 379, 385-86, 10 N.E.3d 1122, 1128 (2014)  If falsely imprisoning employees and threatening to beat them in a workplace investigation is not enough, and lying one's way into a months-long sexual relationship is not enough, it is hard to accept plaintiffs' premise that newspaper articles or social media posts in the midst of a red-hot political dispute, somehow clear this bar.

Count XII, like the other two emotional distress counts, must be dismissed.

### Point Eight

### <u>PLAINTIFF ALON CANNOT SHOW THAT THERE HAS BEEN PERVASIVE HARASSMENT OR ABUSE INTERFERING WITH HIS EMPLOYMENT, OR THAT PROFESSOR DEGRAFF'S CRITICISMS HAD ANY ILLEGAL MOTIVATION</u>

Alon's "hostile work environment" and retaliation claims against Professor DeGraff fail at the threshold. Any "hostile work environment" claim must plead facts showing that the work environment was "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace." *College-Town, Div. of Interco, Inc*. v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 162, 508 N.E.2d 587 (1987). Alon must also plead facts showing that the harassment was "because of" his religion or national origin.

Alon has done neither.  Although he mouths the words "severe" and "pervasive," the FAC is actually silent about anything that has happened to him in his workplace, the Department of Mathematics  (FAC, ¶¶ 386-387).  Being aggressively confronted by a stranger in a grocery store cannot be said to obstruct Alon's participation at work.  This failure alone is fatal to his "hostile environment" claim.

But it is not the only one. MGL Ch. 151B requires Alon to plead facts making plausible his threadbare assertion that Professor DeGraff's sharp criticisms of Alon's public performances were driven by animus because Alon is Jewish or Israeli.  None of Professor DeGraff's remarks about Alon have suggested this.  In fact, Alon himself gives away the game when he told national Fox News viewers that pro-Palestine students were "anti-Semitic by their nature."  *Id.*, https://www.foxnews.com/video/6339844104112.  No one would ask this Court to accept the premise that opposing the Saudi dictatorship or the Iranian regime meant they were Islamophobic.  Israel's advocates cannot claim an exception.

The numerous logical, sociological flaws, and constitutional pitfalls of this position have been articulated at Points Two, Three, and Four, and need not be repeated.

And pointing out that Alon served the Israeli military while it enforced apartheid and carried out genocidal policies shows opposition to government actions, but does not show animus toward individual Israelis. Israelis faced with conscription still have the choice of being civilly disobedient and refusing military service, as did Americans when there was a draft, and as do Russians now. Criticizing someone's morality is entirely different from national origin bias.

The FAC fails to plead any pervasive interference with Alon's conditions of employment and fails to plead facts showing any anti-Semitic beliefs, statements, or acts by Professor DeGraff.  Count VIII should be dismissed as a matter of law.

Alon's retaliation claim is even shakier. To plead retaliation under either §4(4) or §4(4A) of Ch. 151B, Alon must allege facts showing protected activity, an adverse action by Prof. DeGraff, and a causal connection between them. The protected activity must be a complaint, testimony, or assistance with a MCAD proceeding (§4(4)) or "having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter" (§4(4A).)  Generalized policy advocacy such as Alon's media campaign on Fox Network is not a protected activity.

A causal connection requires that the defendant knew of the protected activity (*Mole v. Univ. of Mass.* (2004) 442 Mass. 582, 592 [814 N.E.2d 329]. "[T]he mere fact that one event followed another is not sufficient to make out a causal link.") "Timing and sequence, without more, are not enough to ground an inference of causation." (*Miceli v. JetBlue Airways Corp.,* 914 F.3d 73, 85 (1st Cir. 2019).)

The FAC never alleges facts showing that Professor DeGraff knew about Alon's EEOC complaint, and without knowledge Count IX fails as a matter of law.

**Point Nine**

**IN THE ALTERNATIVE, THIS COURT SHOULD REJECT**

**PENDENT JURISDICTION AGAINST PROFESSOR DEGRAFF**

**ON THE TORT CLAIMS,  AND SHOULD SEVER THOSE CLAIMS**

The Complaint asserts only state law claims against Professor DeGraff, and one of the three plaintiffs, The Louis D Brandeis Center Coalition to Combat Anti-Semitism (the "Coalition"), is not included in any of the state law claims.

As a threshold matter, this Court might inquire into whether the Coalition has standing to participate in this action, or even exists as an entity which can bring litigation. A Google search discloses only the website of the Louis D. Brandeis Center itself,  an entity with a Washington D.C. Address, and a phone number, which has described itself in litigation as "a nonprofit, non-partisan corporation established in 2011 to advance the civil and human rights of the Jewish people and to promote justice for all" (*Brandeis Center v. U.S. Department of Education,*  1:24-cv-01982  (D.D.C. 2024),  para. 18). By contrast, the Coalition is described only as "a national membership organization whose mission is to advance the civil and human rights of the Jewish people and promote justice for all through lawful means, including litigation" (Complaint, para. 18). In a page listing affiliated membership organizations on its own web site, the Brandeis Center does not mention the Coalition, https://brandeiscenter.com/membership/.  The Google search disclosed no information about legal

status, location, contact information, or how to join the Coalition. It is impermissible to bootstrap the

existence of an organization and gain standing through mere assertions in a Complaint, *cf. In re Eaton

Vance Corp. Sec. Litig.,* 220 FRD 162, 169 (D Mass 2004) "The principles at the heart of Article III

standing are simply too important to permit such bootstrapping"). Would the Coalition be able to

produce any proof as to what the individual plaintiffs did to join the Coalition (Did they pay a

membership fee? Fill out any paperwork? Have they volunteered any services to the Coalition, other

than acting as plaintiffs in this case?) To prove standing, the Coalition must either show that it itself

suffered harm through MIT's actions, "more than simply a setback to the organization's abstract social

interests"; "an organization that has not suffered a concrete injury caused by a defendant's action cannot

spend its way into standing simply by expending money to gather information and advocate against the

defendant's action", *Am. Assn. of Univ. Professors v Rubio,* 780 F Supp 3d 350 (D Mass 2025). It is not

permissible to "create a[n organization] for the purpose of conferring standing, or [to] adopt [a mission]

so that the [organization] expressed an interest in the subject matter of the case, and then spen[t] its way

into having standing", *Equal Means Equal v Ferriero,* 3 F.4th 24, 30 (1st Cir 2021). Of course, a more

traditional and concrete way for an organization to establish standing is to do so through its individual

members, *Speech First, Inc. v Sands,* 144 S Ct 675, 675, n. 1 (2024) ("To establish organizational

standing under our precedent, Speech First must first show that one of its student-members has suffered

an injury"). How could the Coalition do so if it can't establish it has members?

Notwithstanding, in the event this Court does not dismiss the Complaint as against Professor

DeGraff in its entirety, he respectfully requests that in the alternative, this Court deny pendent

jurisdiction under 2 USC 1367(c)(2) and (4):[14] "(c)The district courts may decline to exercise

---

[14]   Some federal courts have found a "lack of common factual ground" between defamation and federal questions,  *Jiangong Lei v City of Lynden,* 2014 US Dist LEXIS 162777, at \*14-15 (WD Wash Nov. 20, 2014, No. C14-0650-JCC)  ("Plaintiff's disparate claims do not truly form a single Article III case or controversy. Accordingly, this Court cannot exercise Section 1367 supplemental jurisdiction over

supplemental jurisdiction over a claim under subsection (a) if—(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction" or "(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction".

Given that there is no federal claim asserted against Professor DeGraff, the four state claims certainly "predominate", *Huerth v Anthem Ins. Cos.,* 257 F Supp 3d 131, 145 (D Mass 2017) ("Huerth's six claims against MHC, which raise various questions of state law, would predominate over his single ERISA claim against the Plan Defendants").

"[G]iving consideration to such issues as "comity, judicial economy, convenience, fairness and the like", *Chungchi Che v Massachusetts Bay Transp. Auth.,* 342 F3d 31, 37 (1st Cir 2003), the Court should separately exercise discretion to deny supplemental jurisdiction under (c)(4), on the grounds that it would be severely prejudicial to Professor DeGraff to try the tort claims together with the hostile environment claim against MIT. Proof of the hostile environment will include allegations regarding numerous incidents unrelated to Professor DeGraff, while the defamation and infliction claims against Professor DeGraff are based on a small number of specific statements that he himself made. A jury might well become confused and seek to hold Professor DeGraff responsible for speech or actions unrelated to him. The prejudice to Professor DeGraff of being tried together with MIT and the hostile environment claim are the "exceptional circumstances "and "compelling reasons" for this Court to decline jurisdiction under 1367(c)(4), *United Mine Workers v Gibbs,* 383 US 715, 727 (1966) ("[T]he likelihood of jury confusion in treating divergent legal theories of relief... would justify separating state and federal claims for trial"); *Birchem v Knights of Columbus,* 116 F3d 310, 314, n 3 (8th Cir 1997) (likelihood of jury confusion due to conflicting standards).

---

Plaintiff's defamation claim against the Lynden Tribune and Tim Newcomb.   As they are not mentioned in any of Plaintiff's remaining claims, Tim Newcomb and the Lynden Tribune are dismissed from this suit").

If the Complaint is not dismissed in its entirety against Professor DeGraff, this Court should in the alternative decline supplemental jurisdiction over the state law claims.

## **CONCLUSION**

Because the Constitutional infirmities cannot possibly be saved through amendments, the Complaint as against Professor DeGraff should be dismissed with prejudice.  In the alternative, supplemental jurisdiction over the state claims should be rejected by this Court.

Dated: October 8, 2025

Respectfully  submitted,

*/s/ Jonathan Wallace*
Jonathan Wallace (NY SBN 1733537)
P.O. Box 728
Amagansett, NY 11930
(917) 359-6234
Jonathan.wallace80@gmail.com

Mark Allen Kleiman  (CAL SBN 115919)
(*pro hac vice*)
mark@krlaw.us
KLEIMAN RAJARAM
12121 Wilshire Boulevard  Suite 810
Los Angeles, California 90025
(310) 392-5455

Mahsa KhanbabaI, (BBO #639803)
mahsa@mk-immigration.com
KHANBABAI IMMIGRATION LAW
115 Main street, Suite 1B
North Easton, MA 02356
508-297-2065

*Attorneys For Defendant*
*Michel DeGraff*

## CERTIFICATE OF SERVICE

I, Mark Kleiman, hereby certify that a true copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 8, 2025.


*/s/ Mark Kleiman*
Mark Kleiman