**UUNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

William Sussman, et al.,

      Plaintiffs,

v.

Massachusetts Institute of Technology and
Michel DeGraff,

      Defendants.

Case No. 25-CV-11826-RGS

**DEFENDANT MICHEL DeGRAFF'S REQUEST FOR JUDICIAL NOTICE IN**

**SUPPORT OF HIS MOTION TO DISMISS PLAINTIFFS' COMPLAINT;**

**DECLARATION OF MARK KLEIMAN**

Defendant Michel DeGraff asks the Court to take judicial notice of the following documents attached as Exhibit A and B.

| Exhibit | Description |
|---------|-------------|
| **A** | 3:24 video clip of Plaintiff Lior Alon's "opinion" about the encampment, filmed while Alon was in the encampment, May 2, 2024 https://www.foxnews.com/video/6352193687112. Site last visited October 6, 2025. |
| **B** | 5:57 video clip of Plaintiff Lion Alor's interview on Fox News discussing pro-Palestine protests at MIT, filmed October 25, 2023. https://www.foxnews.com/video/6339844104112. Site last visited October 6, 2025. |

| C | Transcript of July 9, 2024 hearing before United States House of Representatives' Committee on Education and the Workforce including the testimony of Plaintiff William Sussman and list of extensive exhibits he included with his testimony, pp. 1-20 of transcript only. https://www.congress.gov/event/118th-congress/house-event/LC73372/text  Site last visited October 8, 2020. |
| D | Plaintiff Sussman's article in Tablet Magazine, June 27, 2025 https://www.tabletmag.com/sections/news/articles/mit-mind-infection-will-sussman Site last visited October 8, 2025. |
| E | Plaintiff Sussman's article in the New York Post, July 1, 2025 https://nypost.com/2025/07/01/opinion/i-was-chased-out-of-mit-and-it-was-all-because-im-jewish/  Site last visited October 8, 2025. |

## **BASES FOR REQUESTING JUDICIAL NOTICE**

On a motion to dismiss a complaint, a court may take judicial notice of matters of public record in accordance with Federal Rule of Evidence 201 without converting the motion to dismiss to a motion for summary judgment. When considering a motion to dismiss, although  district courts generally do not consider matters extraneous to the pleadings, the Court may consider a "document integral to or explicitly relied upon in the complaint" may be considered without converting the motion [to dismiss] into one for summary judgment.[and] may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus*., 998 F.2d 1192, 1196 (3d Cir. 1993) other internal citations cleaned up). (*In re Burlington Coat Factory Sec. Litig.* (3d Cir. 1997) 114 F.3d 1410, 1426.)

In this case, Alon bases his claims for hostile work environment, retaliation, defamation, and intentional, reckless, and negligent infliction of emotional distress on allegations that Professor DeGraff has improperly juxtaposed multiple videos, including the Fox News clips. (FAC, ¶¶ 97-103).

Courts may take judicial notice of documents outside of the pleadings that are capable of accurate and ready determination by resort to sources not reasonably subject to dispute whose accuracy cannot reasonably be questioned. *Victaulic Co. v. Tieman* (3d Cir. 2007) 499 F.3d 227, 236-237. Federal Rule of Evidence 201(d). Defendant is not requesting judicial notice of the Fox Network videos for the truth of the statements contained therein, but merely to establish their existence, and plaintiff's status as at least a limited public figure who seeks publicity for himself and his views.

Notice may also be taken of authentic government records of hearings, at least insofar as evidence that the hearings took place and that witnesses (in this case Alon) testified. *In re Plum Baby Food Litig.*, 637 F.Supp.3d 210, 220 (D. N.J. 2022).

<u>Exhibits A and B</u>  Demonstrate that Plaintiff Lior Alon voluntarily sought and obtained national news coverage to express his opinions that anyone supporting Palestine was "by their nature anti-Semitic", and to make his objections to this position and to students supporting it nationally known, rendering him, <u>at the least</u> a limited public figure with respect to this controversy

<u>Exhibit C</u> Demonstrates that Plaintiff William Sussman voluntarily sought and obtained publicity as a witness before a House of Representatives Congressional Committee  to express his views about support for Palestine among the college workforce.

<u>Exhibits D and E</u> Demonstrate Plaintiff Sussman's seeking publicity for himself about his opposition to student and faculty positions at M.I.T.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 8, 2025

Respectfully submitted,

*/s/ Mark Kleiman*
Mark Kleiman

Mark Allen Kleiman
(*pro hac vice*)
mark@krlaw.us
KLEIMAN RAJARAM
12121 Wilshire Boulevard Suite 810
Los Angeles, California 90025
(310) 392-5455

Mahsa KhanbabaI, (BBO #639803)
mahsa@mk-immigration.com
KHANBABAI IMMIGRATION LAW
115 Main street, Suite 1B
North Easton, MA 02356
508-297-2065

*Attorneys For Defendant*
*Michel DeGraff*

## <u>DECLARATION OF MARK KLEIMAN</u>

I, Mark Kleiman, hereby declare as follows:

1.  I am an attorney duly licensed to practice law before all courts in the State of California and am admitted to practice before this Court as well.  I am cocounsel for Omar Abdulaziz.  If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge.

2.  Attached hereto as Exhibit A is a true and correct copy of what is displayed when I clicked on the purported link to the Guardian article in defendant's Motion to Dismiss, Dkt. 119. This page was last visited May 29, 2021.

3.  Attached hereto as B is a true and correct copy of what is displayed when I clicked on the purported link to the New York Daily News article in defendant's Motion to Dismiss, Dkt. 119.  This page was last visited May 29, 2021.

4.  Attached hereto as C is a true and correct copy of what is displayed when I clicked on the purported link to the Yahoo News article in defendant's Motion to Dismiss, Dkt. 119.   This page was last visited May 29, 2021.

5.  Attached hereto as D is a true and correct copy of the BBC News article refenced in defendant's Motion to Dismiss, Dkt. 119.   This page was last visited May 29, 2021.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information,  knowledge, and belief.

Executed this 8th day of  October 2025 at Los Angeles, California.

_/s/ Mark Allen Kleiman_
Mark Allen Kleiman

5

# EXHIBIT A

# **EXHIBIT B**

# EXHIBIT C

# CONFRONTING UNION ANTISEMITISM: PROTECTING WORKERS FROM BIG LABOR ABUSES

## HEARING

BEFORE THE

### SUBCOMMITTEE ON HEALTH, EMPLOYMENT, LABOR, AND PENSIONS

OF THE

### COMMITTEE ON EDUCATION AND THE WORKFORCE
### U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED EIGHTEENTH CONGRESS

SECOND SESSION

———————

HEARING HELD IN WASHINGTON, DC, JULY 9, 2024

———————

### Serial No. 118–58

———————

Printed for the use of the Committee on Education and the Workforce



Available via: *edworkforce.house.gov* or *www.govinfo.gov*

———————

U.S. GOVERNMENT PUBLISHING OFFICE

57–223 PDF                WASHINGTON : 2024

## COMMITTEE ON EDUCATION AND THE WORKFORCE

VIRGINIA FOXX, North Carolina, *Chairwoman*

JOE WILSON, South Carolina
GLENN THOMPSON, Pennsylvania
TIM WALBERG, Michigan
GLENN GROTHMAN, Wisconsin
ELISE M. STEFANIK, New York
RICK W. ALLEN, Georgia
JIM BANKS, Indiana
JAMES COMER, Kentucky
LLOYD SMUCKER, Pennsylvania
BURGESS OWENS, Utah
BOB GOOD, Virginia
LISA McCLAIN, Michigan
MARY MILLER, Illinois
MICHELLE STEEL, California
RON ESTES, Kansas
JULIA LETLOW, Louisiana
KEVIN KILEY, California
AARON BEAN, Florida
ERIC BURLISON, Missouri
NATHANIEL MORAN, Texas
LORI CHAVEZ-DeREMER, Oregon
BRANDON WILLIAMS, New York
ERIN HOUCHIN, Indiana
VACANCY

ROBERT C. "BOBBY" SCOTT, Virginia,
    *Ranking Member*
RAUL M. GRIJALVA, Arizona
JOE COURTNEY, Connecticut
GREGORIO KILILI CAMACHO SABLAN,
    Northern Mariana Islands
FREDERICA S. WILSON, Florida
SUZANNE BONAMICI, Oregon
MARK TAKANO, California
ALMA S. ADAMS, North Carolina
MARK DeSAULNIER, California
DONALD NORCROSS, New Jersey
PRAMILA JAYAPAL, Washington
SUSAN WILD, Pennsylvania
LUCY McBATH, Georgia
JAHANA HAYES, Connecticut
ILHAN OMAR, Minnesota
HALEY M. STEVENS, Michigan
TERESA LEGER FERNANDEZ, New Mexico
KATHY MANNING, North Carolina
FRANK J. MRVAN, Indiana
JAMAAL BOWMAN, New York

Cyrus Artz, *Staff Director*
Véronique Pluviose, *Minority Staff Director*

————

## SUBCOMMITTEE ON HEALTH, EMPLOYMENT, LABOR, AND PENSIONS

BOB GOOD, Virginia, *Chairman*

JOE WILSON, South Carolina
TIM WALBERG, Michigan
RICK ALLEN, Georgia
JIM BANKS, Indiana
JAMES COMER, Kentucky
LLOYD SMUCKER, Pennsylvania
MICHELLE STEEL, California
AARON BEAN, Florida
ERIC BURLISON, Missouri
LORI CHAVEZ-DeREMER, Oregon
ERIN HOUCHIN, Indiana

MARK DeSAULNIER, California
    *Ranking Member*
JOE COURTNEY, Connecticut
DONALD NORCROSS, New Jersey
SUSAN WILD, Pennsylvania
FRANK J. MRVAN, Indiana
PRAMILA, JAYAPAL, Washington
LUCY McBATH, Georgia
JAHANA HAYES, Connecticut
ILHAN OMAR, Minnesota
KATHY MANNING, North Carolina

(II)

# C O N T E N T S

———

Page

Hearing held on July 9, 2024 ............................................................. 1

## OPENING STATEMENTS

Good, Hon. Bob, Chairman, Subcommittee on Health, Employment, Labor, and Pensions ................................................................... 1

Prepared statement of ................................................................ 3

DeSaulnier, Hon. Mark, Ranking Member, Subcommittee on Health, Employment, Labor, and Pensions ........................................... 3

Prepared statement of ................................................................ 5

## WITNESSES

Kopmar, Ilana, Staff Attorney, Nassau County Legal Aid Society .............. 7

Prepared statement of ................................................................ 9

Sussman, William, Graduate Student, Massachusetts Institute of Technology ..................................................................................... 12

Prepared statement of ................................................................ 14

Lofaso, Dr. Anne Marie, Professor of Law, West Virginia University College of Law ................................................................................ 51

Prepared statement of ................................................................ 53

Taubman, Glenn, Staff Attorney, National Right To Work Legal Defense Foundation ..................................................................... 67

Prepared statement of ................................................................ 68

## ADDITIONAL SUBMISSIONS

Foxx, Hon. Virginia, a Representative in Congress from the State of North Carolina:

Testimony dated July 22, 2024, from Glenn M. Taubman .................... 91

Letter from Adina Bechhofer .................................................... 98

# CONFRONTING UNION ANTISEMITISM: PROTECTING WORKERS FROM BIG LABOR ABUSES

————

**Tuesday, July 09, 2024**

House of Representatives,
Subcommittee on Health, Employment, Labor, and Pensions,
Committee on Education and the Workforce,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 10:15 a.m., in Room 2175, Rayburn House Office Building, Hon. Bob Good [Chairman of the Subcommittee] presiding.

Present: Representatives Good, Wilson, Walberg, Allen, Bean, Burlison, Houchin, Foxx, DeSaulnier, Courtney, Norcross, Jayapal, Manning, and Scott.

Staff present: Mindy Barry, General Counsel; Jackson Berryman, Speechwriter; Isabel Foster, Press Assistant; Daniel Fuenzalida, Staff Assistant; AnnMarie Graham Barnes, Deputy Communications Director; Ben Gruber, Intern; Sheila Havenner, Director of Information Technology; Alex Knorr, Legislative Assistant; Trey Kovacs, Professional Staff Member; Georgie Littlefair, Clerk; Hannah Matesic, Deputy Staff Director; Carson Middleton, Staff Director; Mike Patterson, Oversight Investigative Counsel; Rebecca Powell, Staff Assistant; Kiah Stith, Intern; Seth Waugh, Director of Workforce Policy; Maura Williams, Director of Operations; Ellie Berenson, Minority Press Assistant; Ilana Brunner, Minority General Counsel; Arana Blake, Minority CBCF Intern; Stephanie Lalle, Minority Communications Director; Dhrtvan Sherman, Minority Research Assistant; Raiyana Malone, Minority Press Secretary; Kevin McDermott, Minority Director of Labor Policy; Meghan O'Neil, Minority Intern; Eleazer Padilla, Minority Staff Assistant; Mason Pesek, Minority Policy Counsel; Veronique Pluviose, Minority Staff Director; Banyon Vassar, Minority IT Administrator.

Chairman GOOD. The Hearing on the Subcommittee on Health, Employment, Labor and Pensions will come to order. I note that a quorum is present. Without objection, the Chair is authorized to call a recess at any time. Today's hearing will examine the ways in which unions put politics over people through the lens of rampant union antisemitism.

Unfortunately, the politicization of unions is not new. The National Institute for Labor Relations Research estimates that unions spent about 25 billion dollars in political donations during the 2022

2

election cycle, or far more than the roughly 2 billion they report as political activities.

In the 2020 Presidential campaign, President Biden received 27.5 million in direct donations from labor organizations, while President Trump received less than 360,000. While the working class seems to be moving in favor of the GOP in the upcoming election cycle, it is clear that union bosses sold out to the left long ago.

Additionally, the response by union leaders to the October 7 Hamas terrorist attacks on Israel have exposed yet another way that unions are beholden to the radical left, instead of to the workers they claim to represent. Rather than focus on their stated purpose of negotiating better workplace conditions for workers, unions choose to spend time and money advancing their divisive and anti-American political agenda.

Take for example the Association of Legal Aid Attorneys, or ALAA, the ALAA represents more than 2,700 public interest lawyers in the New York metro area. On December 19, 2023, it passed a highly controversial resolution calling for a cease-fire in Gaza.

The resolution's inflammatory rhetoric, such as calling Israel an apartheid State alienated many members and caused nearly 35 percent of the membership to vote against it. The New York Post has further exposed more details of offensive and harmful anti-semitism that is rampant throughout ALAA communications.

Some of the union members sued the union, but shockingly the union members that filed the lawsuit were charged with, "Conduct unbecoming of a union member." They were charged under the UAW Constitution, and they are now facing trial with a penalty of expulsion from the union.

In other words, the union members shelling out roughly $120.00 a month to be part of the union, will now be put on trial by the same organization intended to protect and represent them, simply for standing up for what they believe.

One of the Plaintiffs argued, "I should not have to financially support an organization that adopts antisemitic resolutions, sides with terrorist organizations, and advocates for the destruction of Israel in order to be a public defender in New York."

I could not agree more. Union members have rights under the Labor Management Reporting and Disclosure Act, and the Supreme Court's Beck decision to speak out against their unions, and to cease paying union dues for political activities they disagree with. Unfortunately, unions have an incentive to keep their members ignorant of their rights.

They often make little effort to inform them of these rights, and as Jewish workers have recently experienced current Federal labor law, and Supreme Court precedent failed to adequately protect individual employees' right to refrain from union activity.

The ALAA, along with other organizations like the MIT graduate student union, demonstrates how unions neglect their members to pursue left wing activism at all costs.

Today we are providing a platform for those who are not truly represented by the unions they pay dues to. We will discuss how the law protects their political and religious convictions, and how further protections could be provided.

3

Perhaps not everyone here and on the panel agrees on the appropriate role of the unions in society, but I hope we can all agree that if anything, they should pursue, they should advocate on behalf of the workplace interest of workers, rather than pursuing a radical, political agenda that alienates their members. With that, I yield to the member for his opening statement.

[The Statement of Chairman Good follows:]

STATEMENT OF HON. BOB GOOD, CHAIRMAN, SUBCOMMITTEE ON HEALTH, EMPLOYMENT, LABOR, AND PENSIONS

Today's hearing will examine the ways in which unions put politics over people through the lens of rampant union antisemitism.

Unfortunately, the politicization of unions is not new. The National Institute for Labor Relations Research estimates that unions spent about $25 billion in political donations during the 2022 election cycle, or far more than the roughly $2 billion they report as political activities.

In the 2020 presidential campaign, President Biden received $27.5 million in direct donations from labor organizations, while President Trump received less than $360,000. While the working class seem to be moving in favor of the GOP in the upcoming election cycle, it is clear that union bosses sold out to the Left long ago.

Additionally, the response by union leaders to the October 7 Hamas terrorist attacks on Israel have exposed yet another way unions are beholden to the radical Left instead of the workers they claim to represent. Rather than focus on their stated purpose of negotiating better workplace conditions for workers, unions choose to spend time and money advancing their divisive and anti-American political agenda.

Take, for example, the Association of Legal Aid Attorneys (ALAA). The ALAA represents more than 2,700 public interest lawyers in the New York Metro Area, and on December 19, 2023, it passed a highly controversial resolution calling for a ceasefire in Gaza.

The resolution's inflammatory rhetoric—such as calling Israel an apartheid state—alienated many members and caused nearly 35 percent of the membership to vote against it. The New York Post has further exposed more details of offensive and harmful antisemitism that is rampant throughout ALAA communications.

Some of the union members have sued the union, but shockingly, the union members who filed the lawsuit were charged with "Conduct Unbecoming of a Union Member" under the UAW Constitution and are now facing trial with a penalty of expulsion from the union.

In other words, these union members shelling out roughly $120 a month to be part of the union will now be put on trial by the same organization intended to protect and represent them, simply for standing up for what they believe.

One of the plaintiffs argued, "I should not have to financially support an organization that adopts antisemitic resolutions, sides with terrorist organizations, and advocates for the destruction of Israel in order to be a public defender in New York."

I could not agree more. Union members have rights under the Labor-Management Reporting and Disclosure Act and the Supreme Court's Beck decision to speak out against their unions and to cease paying dues for political activities they disagree with.

Unfortunately, unions have an incentive to keep their members ignorant of their rights and often make little effort to inform them of these rights. As Jewish workers have recently experienced, current federal labor law and Supreme Court precedent fail to adequately protect individual employees' right to refrain from union activity.

The ALAA, along with other organizations like the MIT Graduate Student Union, demonstrates how unions neglect their members to pursue Left-wing activism at all costs.

Today we are providing a platform for those who are not truly represented by the unions they pay dues to. We will discuss how law protects their political and religious convictions, and how further protections could be provided.

Perhaps not everyone here and on the panel agrees on the appropriate role of unions in society, but I hope we can all agree that—if anything—they should advocate on behalf of the workplace interests of workers rather than pursuing a radical political agenda that alienates their members.

———

Mr. DESAULNIER. Thank you, Mr. Chairman. I want to start by making clear that I condemn antisemitism, and all forms of hate,

4

whether it be in the classroom, in the workplace, or anywhere else. As Members of Congress, and citizens, we have a responsibility to stand up against all forms of hate, regardless of the source of the political party, or the political party.

I agree with the Chairman that we should do more to combat antisemitism. No one should be threatened, harassed, or attacked because of who they are, who they worship or what they stand for.

I look forward to the witnesses' testimoneys, but we should avoid the broad brush, stereotypical attacks on workers' ability to organize and collectively bargain that have characterized the Subcommittee's six prior anti-labor hearings.

Based on the title of today's hearing, I fear we will do it again. Just for the record, corporate interests and the wealthiest in America, and income and equality is at its most intense in the history of this country, eclipsing the Gilded Age, is now the advantage of corporations in the top 10 percent, 16 to 1.

We talk about labor contributing to campaigns, they are being buried by corporate interests, particularly after the Supreme Court's Citizens United decision. Immigrants, including Jewish immigrants, left their home countries often under duress, and sought to build a better life and future for themselves and their families in the United States.

Many immigrants opted to organize and join the labor movement because they understood what is still very true today, unions give workers a voice, and have the power to transform their lives through collective action. That means elections—union elections.

Throughout history unions have been pivotal in advancing the conditions and rights of workers, from establishing the 5-day work week, to championing minimum wage laws, banning child labor, which is now under attack again, and protecting workers from being maimed and killed at work.

Their advocacy, the union advocacy, has been instrumental in building and sustaining America's middle class, which is now under attack. At a time of extreme wealth inequality, workers are increasingly organized because as they seek the collective and democratic power unions provide them in order to secure higher wages, better benefits, and safer workplaces, union workers enjoy approximately 20 percent higher wages, and are more likely to have access to essential benefits, such as health insurance, paid leave, and defined benefits pension plans.

These gains not only benefit individual workers and their families, but they also contribute to a more robust economy, where prosperity is more broadly shared. Unions also create workplace democracy. Unions are inherently "small d" democratic institutions. For example, workers need at least majority support in the workplace to form and join a union.

Union workers need majority support to authorize a strike. They need majority support to ratify a contract. Workers are their unions, and unions are accountable to their members, by a vote While the fundamental principle of unions is rooted in majority rule, just like any democracy, our Nation's laws also protect the rights of individual workers.

We are fortunate to have Dr. Anne Marie Lofaso as one of our witnesses today. The Doctor's testimony notes that workers have

5

multiple levels to choose from, to related to how they want to affiliate with their unions.

Union-represented workers have a right to resign from union membership. The right to object to dues beyond representational activities known as the Beck right, and the right to request a religious accommodation for non-payment of union dues.

Those are all rights. Unions are legally required to inform workers of their Beck right, and their equal rights, and protection under Title 1 of the Labor Management Reporting and Disclosure Act.

While employers are required to inform workers of their right to religious accommodations beyond a basic flyer posted in the workplace, employers have no obligation to directly inform workers of their rights to organize a union or come together with their coworkers to engage in concerted activity regarding the terms and conditions of employment.

As we discuss these issues today, let us not forget that the true threat to workers' freedom and rights is not unions, but employer, bad employer, low road employers, intimidation and retaliation, as well as deficiencies in our labor laws to hold unscrupulous businesses.

As I have said many times, it is not responsible businesses, it is a few businesses that bring the whole culture down to us versus them, more money for us, and less for them. Not all businesses, just the ones that do not play by the rules, accountable for violations of the law. These include employers holding mandatory coercive, captive audience meetings, inadequate penalties for violating workers' rights and prolonged delays in justice for workers facing retaliation.

We must reaffirm our commitment to strengthening workers protections, and advancing legislation such as the PRO Act, Protecting the Right to Organize e Act. This landmark legislation would modernize our labor laws for the first time in decades, empowering workers to organize freely, and ensuring that employers are held accountable for their actions.

Last, we have a responsibility to fund the very agencies that enforce workers' rights. We should make sure we are appropriately funding key agencies like the National Labor Relations Board, and the EEOC, so they can fulfill their vital mission to protect workers. Thank you, Mr. Chairman, and I yield back.

[The Statement of Ranking Member DeSaulnier follows:]

STATEMENT OF HON. MARK DESAULNIER, RANKING MEMBER, SUBCOMMITTEE ON HEALTH, EMPLOYMENT, LABOR, AND PENSIONS

Thank you, Mr. Chairman.

I want to start by making clear that I condemn antisemitism and all forms of hate—whether it be in the classroom, in the workplace, or anywhere else. As Members of Congress and citizens, we have a responsibility to stand up against all forms of hate, regardless of the source or the political party.

I agree that we should do more to combat antisemitism. No one should be threatened, harassed, or attacked because of who they are, who they worship, or what they stand for. I look forward to the witnesses' testimonies—but we should avoid the broad-brush stereotypical attacks on workers' ability to organize and collectively bargain that have characterized the subcommittee's six prior anti-labor hearings, and—based on the title of today's hearing—I fear we will hear again.

Just for the record, corporate interest is the wealthiest in America, and income inequality is the most intense in this country. Eclipsing the glided age is now the advantage of cooperation in the top 10 percent, 16 to 1. When we talk about labor

6

contributing to campaigns, they are being buried by corporate interest, particularly after the Supreme Court's *Citizens United* decision.

Immigrants, including Jewish immigrants, left their home countries—often under duress—and sought to build a better life and future for themselves and their families in the United States. Many immigrants opted to organize and join the labor movement because they understood what is still very true today—unions give workers a voice and have the power to transform their lives through collective action. That means elections. Union elections.

Throughout history, unions have been pivotal in advancing the conditions and rights of workers, from establishing the five-day work week to championing minimum wage laws, banning child labor, which is now under attack again, and protecting workers from being maimed and killed at work. Their advocacy, the union advocacy, has been instrumental in building and sustaining America's middle class. Which is now under attack.

At a time of extreme wealth inequality, workers are increasingly organizing because they recognize the collective and democratic power unions provide them in order to secure higher wages, better benefits, and safer workplaces. Union workers enjoy approximately 20 percent higher wages and are more likely to have access to essential benefits such as health insurance, paid leave, and defined-benefit pension plans. These gains not only benefit individual workers and their families but also contribute to a more robust economy where prosperity is more broadly shared.

Unions also create workplace democracy.

Unions are inherently small "d" democratic institutions. For example, workers need at least a majority of support in their workplace to form or join a union. Union workers need majority support to authorize a strike. They need majority support to ratify a contract. Workers are their unions, and unions are accountable to their members by a vote.

While the foundational principle of unions is rooted in majority rule, just like any democracy, our nation's laws also protect the rights of individual workers. We are fortunate to have Dr. Anne Marie Lofaso as one of our witnesses today. Dr. Lofaso's testimony notes that workers have multiple avenues to choose the level with which they wish to affiliate their unions. Union-represented workers have the right to resign from union membership, the right to object to dues beyond representational activities, known as the "Beck" right, and even the right to request a religious accommodation for nonpayment of union dues.

Unions are legally required to inform workers of their "Beck" rights and their equal rights and protections under Title I of the *Labor Management Reporting and Disclosure Act*. While employers are required to inform workers of their right to religious accommodations, beyond a basic flyer posted in the workplace, employers have no obligation to directly inform their workers of their rights to organize a union or come together with their coworkers to engage in concerted activity regarding the terms and conditions of their employment.

As we discuss these issues today, let us not forget that the true threat to workers' freedom and rights is not their unions, but employers, bad employers, low road employers. Intimidation and retaliation, as well as deficiencies in our labor laws to hold unscrupulous businesses—as I have said many times, it is not a responsible business, but a few businesses that bring the whole culture down to us versus them. Not all businesses, just the ones that do not play by the rules—accountable for violations of the law. These include employers holding mandatory and coercive captive audience meetings, inadequate penalties for violating workers' rights, and prolonged delays in justice for workers facing retaliation.

We must reaffirm our commitment to strengthening worker protections and advancing legislation such as the bipartisan *Protecting the Right to Organize (PRO) Act*. This landmark legislation will modernize our labor laws for the first time in decades, empowering workers to organize freely and ensuring that employers are held accountable for their actions.

Lastly, we have a responsibility to fund the very agencies that enforce workers' rights. We should make sure we are appropriately funding key agencies like the National Labor Relations Board and the EEOC so they can fulfill their vital mission to protect workers.

Thank you, Mr. Chairman, and I yield back.

———

Chairman GOOD. Thank you. Pursuant to Committee Rule 8–C, all members who wish to insert written statements into the record may do so by submitting them to the Committee Clerk electroni-

7

cally in Microsoft Word format by 5 o'clock p.m., 14 days after the date of this hearing, which is July 23, 2024.

Without objection, the hearing record will remain open for 14 days to allow such statements, and other extraneous materials referenced in the hearing, to be submitted to the official hearing record.

I will now turn to the introduction of our distinguished witnesses. Our first witness is Ms. Ilana Kopmar, who is a Staff Attorney employed by the Nassau County Legal Aid Society in Hempstead, New York. Welcome.

Our next witness is Mr. William Sussman, who is a Graduate Student, at the Massachusetts Institute of Technical, or MIT, in Cambridge, Massachusetts. Welcome, Mr. Sussman.

Our third witness is Dr. Anne Marie Lofaso, who is a Professor of Law at West Virginia University College of Law in Morgantown, West Virginia. Welcome, Dr. Lofaso.

Our final witness is Mr. Glenn Taubman, who is a Staff Attorney with the National Right to Work Legal Defense Foundation, which is located in Springfield, Virginia. Welcome, Mr. Taubman.

We thank the witnesses for being here today and look forward to your testimony. Pursuant to the Committee Rules, I would ask that you limit your oral presentation to a 5-minute summary of your written statement, and I would like to remind the witnesses to be aware of their responsibility to provide accurate information to this Subcommittee.

I now recognize Ms. Kopmar for 5 minutes.

**STATEMENT OF MS. ILANA KOPMAR, STAFF ATTORNEY, NASSAU COUNTY LEGAL AID SOCIETY, HEMPSTEAD, NEW YORK**

Ms. KOPMAR. Thank you, Chairman Good, and Ranking Member DeSaulnier. I am a criminal defense attorney at Nassau County Legal Aid, and I am also a member of the UAW Local 2325, the Association of Legal Aid Attorneys, the ALAA.

I am also Jewish, and Zionism, the belief in the right of the Jewish people to self-determination in our ancestral homeland is as integral to my religious practice as is keeping kosher and observing the sabbath. Most American Jews share this belief, that Zionism is integral to their Jewish faith.

After Hamas' bloody attack against Israel on October 7th, the ALAA and its leadership created an antisemitic, hostile work environment for its Jewish members, for whom the existence of Israel is integral to their Jewish identity, and for their non-Jewish allies.

On November 14th, the ALAA just gave 3 days' notice of a membership vote on a resolution entitled, Resolution Calling for the Ceasefire in Gaza, an End to the Israeli Occupation of Palestine. Despite its title, the Resolution was not a call for a cease-fire, but for Israel's defeat. The Resolution does not mention Hamas even once.

It dehumanizes the victims of October 7th by not mentioning that Hamas massacred, raped, and mutilated Jews, Israelis and Americans, and violently abducted men, women and children. Instead, it is a one-sided vitriolic attack against the Jewish State using antisemitic tropes, and language widely understood to be a call for the destruction of Israel.

8

Three of my colleagues and I from my office, believe that this antisemitic resolution would interfere with our ethical responsibility to zealously represent our Jewish and Israel clients free from discrimination. It also added to an already hostile, antisemitic environment in the union.

We sought, and were granted in State Court, a temporary restraining order halting the vote. After the case was removed to Federal Court, the TRO was dissolved, the resolution passed with just over half of members voting at all, and one-third of those voted no.

Immediately after filing the TRO, the union retaliated and filed internal charges to expel us. They accused us of conduct unbecoming to a union member, even though we have a legal right to oppose the union's antisemitism. We appealed to the UAW International Executive Board.

It denied our appeal without even considering our legal arguments. If we had not filed an immediate appeal of that decision to the UAW's Public Review Board, the union was going to start jury selection, and our expulsion trial tonight. We have now filed our own charges against the union with the EEOC and brought a lawsuit in Federal Court for violating our labor rights, and unlawful discriminatory retaliation.

After the TRO, the union's antisemitism against us intensified, and in Gaggle, an email listserv for members, and in member-wide Zoom meetings, we were called "fascist," genocider," "fascist colonizers," "Zionist ghouls." We were told to go kill ourselves. Members advocating kicking Zionists out of the union, and outrightly called for the elimination of Israel.

One member stated that the union has a duty to stand up and called for an end to Israel, and signed their email with the Nazi reference, "Goosestepping outside." When Jewish and Zionist members introduced a resolution to free the hostages, the immediate response on Gaggle was "LMAO," laughing my ass off. Another responded that this resolution confirmed that Zionist union members were not comrades, but fascist colonizers.

At the Joint Council meeting the resolution's presenters were called "disgusting" and "F'd up," and there were calls to mute them. Members wanted to kick out a Jewish member from the meeting for expressing typical Zionist lies. The union overwhelmingly voted down the resolution, calling to free the hostages.

ALAA President Lisa Ohta, and leadership were at that meeting, and they did nothing to stop the attacks, or tamp down the bullying and vitriol. The next day, a paid ALAA staffer emailed the membership characterizing the hostage release resolution as a small Zionist minority, attempting to disrupt the ALAA. He also blamed the Zionists for collaborating with this congressional Committee and attempting to weaken the union.

I am not here to weaken the union, but to strengthen it. The union is tearing itself apart. Union leadership has a duty to protect its members from bias and discrimination, not foster attacks against its Jewish and non-Jewish Zionist members. This is not how a union should act, and we should not be forced to support the discriminatory actions. Thank you so much for inviting me, it has been an honor and a privilege.

9

[The Statement of Ms. Kopmar follows:]

STATEMENT OF ILANA KOPMAR, STAFF ATTORNEY, NASSAU COUNTY LEGAL AID
SOCIETY, HEMPSTEAD, NEW YORK

My name is Ilana Kopmar. I have spent my entire legal career of 32 years as a
criminal defense attorney for the Legal Aid Society of Nassau County. I also served
as President of our office's prior Union for five years before we joined our present
Union.

My job is very rewarding, primarily because of the relationships that I develop
with my clients. Every day, my colleagues and I appear in court to zealously defend
our clients and protect their rights. Pursuant to the Sixth Amendment right to coun-
sel, we are assigned to clients of every race, national origin, and religion, including
Jewish clients.

Our clients do not choose their attorneys, and we have an ethical obligation to
represent every client free from even the perception of bias and discrimination.
When we walk into a courtroom, it is crucial that our clients trust us to protect and
defend them.

Just as our job is to protect and defend our clients, our Union has a job to protect
and defend its members. Our job can be very difficult. We are paid low salary wages
and have high caseloads and low retention rates. As prior President of our office
Union, I know that we need a strong Union to protect and advance our interests.
Over 10 years ago, our office joined UAW Local 2325, the Association of Legal Aid
Attorneys, also known as the ALAA. We believed that through the camaraderie and
the support of more than 3000 members of the ALAA, spread over 30 non-profit
agencies, we would have the Union's support to help us bargain for higher wages,
increased state and county funding, improved benefits, and a better work environ-
ment. We thought a supportive
Union would make us a stronger, more effective Union.

Recently, instead of focusing on collective bargaining and fostering a united mem-
bership, the ALAA and its leadership created an antisemitic, hostile work environ-
ment for its Jewish members for whom Zionism is an integral part of their Jewish
identity, as it is for the vast majority of American Jews, and their non-Jewish allies.
After the attack by the terrorist organization Hamas on October 7—the worst attack
against the Jewish people since the Holocaust—the ALAA communication channel,
Gaggle (an email listserv for Union members and Joint Council meetings) became
a hotbed of antisemitism and blatant discrimination directed against us.

Shortly after October 7, my office colleagues and I learned that ALAA colleagues
of ours working at the NYC Legal Aid Society were subject to inter-office emails
from their fellow ALAA members denying the atrocities that happened on October
7. One email questioned whether Jewish Legal Aid lawyers who have "an allegiance
to Israel" can zealously represent clients who are Palestinian or Muslim and ques-
tioned whether such lawyers were colluding with prosecutors. In late October, the
Bronx Defender Chapter of the ALAA adopted a blatantly antisemitic resolution
which questioned the veracity of reports of Hamas' brutality, killing, mutilation and
rape of Israeli victims, and falsely accused Israel of genocide. Most shockingly, the
resolution proclaimed the ALAA Chapter's support of Hamas' "resistance under oc-
cupation," which is a call for continued violence by Hamas against the Israeli and
Jewish people. Shortly thereafter, the CAMBA Chapter of the ALAA, located in
Brooklyn, New York, put out a similar antisemitic resolution. These resolutions
caused a public outcry and calls to defund the organizations employing ALAA mem-
bers.

I and others recognize these resolutions as supporting violence and discrimination
against us, our families, friends and other Jewish Zionist and allied Union mem-
bers. Unions should not engage in discriminatory speech against its own members
or show bias against our clients. My Union has the right to criticize Israel and its
government, just as it may any other government. However, denying Jews the right
to self-determination in their ancestral homeland and condoning violence and dis-
crimination against Jews crosses a clear line into antisemitism. Pursuant to the
International Holocaust Remembrance Alliance ("IHRA") definition of antisemitism,
such denial of the Jewish people's right to self-determination, and the demonization
of Jews who support Israel, constitutes antisemitism. This esteemed body recognized
this by passing H.R. 6090, the "Antisemitism Awareness Act of 2023," and H.R. 894,
affirming unequivocally that anti-Zionism is antisemitism.

To me, an integral part of my faith and identity as a practicing Jew is the recogni-
tion of Jewish people's right to self-determination in their indigenous homeland in
Israel. My connection to and support of Israel is as important to me as is my com-

10

mitment to keep kosher and observe the Sabbath. In other words, it is an integral part of my sincerely held religious belief system.

On November 14, 2024, the ALAA gave just three days' notice of a resolution to be voted on by its entire membership, entitled "Resolution Calling for a Ceasefire in Gaza, and End to the Israeli occupation of Palestine." This resolution is an antisemitic screed against the Jewish state and its supporters including myself and other Union members. Despite its title, the resolution was not a call for a ceasefire, but for Israel's defeat. Nowhere in the 1,147-word screed is the terrorist organization Hamas even mentioned, let alone called upon to stand down. Nowhere does the resolution acknowledge that Hamas massacred, mutilated, raped, maimed, burned, killed over 1,000 Jews and Israelis, including many American citizens. Nowhere does the resolution mention that Hamas violently abducted men, women, children and babies and are holding them hostage. There was no demand that Hamas release its hostages. Instead, the resolution was a one-sided vitriolic attack against Israel. It uses antisemitic tropes and language widely understood as a call for the destruction of Israel.

The ALAA resolution was so shocking in its antisemitism that the Legal Aid Society of New York City, The Bronx Defenders Organization and the President of the New York Legal Assistance Group issued statements rejecting the ALAA resolution as antisemitic. The Board and management of the Legal Aid Society of Nassau County, my employer, led by our Chief Attorney,N. Scott Banks, issued a statement rejecting the resolution for its "antisemitic language and thinly veiled call for the destruction of the State of Israel." The statement concluded that "this resolution does not represent the values or mission of our office and is divisive and hurtful to so many members of our staff and clients."

My colleagues and I were immediately concerned about the negative effect this resolution would have on our office and our clients. We reasonably believe that the resolution constituted a discriminatory statement and created a hostile work environment. People questioned why our Union was getting involved in a conflict thousands of miles away that has nothing to do with defending our clients' constitutional rights. More importantly, we were concerned that the antisemitic resolution showed bias against our Jewish, Israeli and non-Jewish Zionist clients and fellow Union members, making them lose trust in us. Four of us obtained a temporary restraining order under New York law from a Nassau County Supreme Court Judge, in Clarke, et al. v. The Association of Legal Aid Attorneys, et al., Index No. 618764/2023 (Sup. Ct., Nassau Cnty.), to halt the membership vote from concluding on November 17. The following week, after listening to extensive oral arguments, the Judge extended the TRO. Eventually the case was transferred to federal court in the Eastern District of New York, where the TRO was dissolved. The vote proceeded, and the resolution was passed by a vote of 1067 to 570—almost half of ALAA members did not vote at all, and a third who did voted "no."

After the resolution was presented, the Union turned on anyone who expressed their support for Israel as a means of retaliating against us to dissuade us from engaging in protected activities such as testifying before this body or making or supporting a charge of discrimination. We were subjected to a barrage of vitriolic hate speech through Gaggle and during Joint Council meetings. We were called fascists, genociders, genocide deniers, snitches and Zionist ghouls. We were told to go kill ourselves. The slogan "from the river to the sea" was routinely used. More than that, Union members were very vocal in outrightly calling for the elimination of Israel. One member wrote "we have a duty to stand up and call for a Free Palestine, which means an end to Isreal [sic]. . ." and signed off with "goosestepping [sic] outside."

Contrary to the very nature of a Union requiring unity and camaraderie with fellow members, one member wrote that they "will never have camaraderie with zionists." Another email stated "y'all are assuming and conflating that somehow our vote was unconstitutional or antisemitic simply because y'all are Zionists and will defend israel's [sic] settler colonial project until you cannot any longer. until [sic] the liberation of palestine [sic]—from the river to the sea." One member wrote that "If the majority decides that LAS should not have Zionists in its ranks, then it will be the majority."

The emails were a continuous barrage of antisemitic and anti-Israel rhetoric. There was no thoughtful discussion and respectful dialogue. Instead, Gaggle was replete with insults, denigration, divisiveness and antisemitism that would not be tolerated in any other workplace space. For what was intended to be a safe space for people to express themselves, Gaggle was not a safe space for Jews and Zionists, and, most alarmingly, the Union leadership did nothing to tamp-down this behavior.

Immediately after the TRO was filed, four members from the ALAA filed discriminatory retaliatory charges, pursuant to Article 31 of the UAW Constitution, to expel

11

me and the other three members who exercised our legal right to oppose the Union's antisemitism by securing the TRO. They accused us of "conduct unbecoming of a union member" for engaging in protected activities in filing the TRO to stop the Union from voting on the resolution and for calling out antisemitism espoused by Union members in Gaggle. On January 2, 2024, the ALAA Amalgamated Council ratified the discriminatory Article 31 charges and sent the retaliatory complaint to the Joint Council to hold a trial and render a verdict. A guilty verdict results in our expulsion from the Union.

With the assistance of the Louis D. Brandeis Center for Human Rights Under Law, we appealed the ALAA's ratification of the expulsion charges proceeding to the UAW International Executive Board. We argued that the proceeding violates the Labor-Management Reporting and Disclosure Act, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. After waiting months for a decision without hearing anything, we filed charges against the ALAA with the Equal Employment Opportunity Commission. Within days of the ALAA being notified of the EEOC charges, we received a decision from the UAW International Executive Board denying our appeal without even considering our arguments that the expulsion violates Federal and New York laws. Shortly thereafter, we received notice that the Union intended to commence the expulsion trial on July 9, 2024. We immediately appealed to the UAW Public Review Board, staying the expulsion proceedings.

This vitriol continued even after the Union began expulsion proceedings against us, in both Joint Council meetings and Gaggle. Jewish Zionist members and their allies were demonized as "scabs, snitches and genocide-deniers." One recent meeting was particularly difficult. At that meeting, three Israel-related resolutions were proposed to be voted on by Union delegates. The first resolution demanded that in support of the student pro-Palestinian protesters, all public defense agencies should issue public statements opposing Israeli genocide. The second resolution condemned UAW President Shawn Fain and other IEB members for voting against divesting from Israel Bonds and continuing the "UAW's complicity in genocide." Two of my colleagues (Jewish ALAA members) offered a third resolution as an alternative. This resolution condemned Hamas for abducting hostages and called for the release of hostages. When the resolution supporting the release of the hostages was first introduced on Gaggle, the immediate response was "lmao." Another member wrote that the resolution confirms that "in act and thought, y'all not like us. Y'all aren't comrades, but fascist colonizers—mere prosecutors in defender's clothes."

The meeting proceeded along similar hostile lines. In the Zoom chat when one Jewish Zionist member expressed her opposition to the divestiture resolution, one member responded that she was expressing "typical Zionist lies," and another responded, "sorry but no settler colony like Isra*l [sic] has the right to exist." Another commented that she should "please get out of here with this despicable shit," and someone else on the chat requested that she be removed from the chat because she is a Zionist. During the presentation by two Union members in support of the Release the Hostages Resolution, people called for an end to the presenter's "rant" and to mute her. Others commented that their presentation was "disgusting" and "fucked up." The chat was then flooded with "Free Palestine" and "all eyes on Rafah" statements.

These attacks were done in the presence of ALAA President Lisa Ohta and the ALAA Sergeant at Arms. Not once did they or anyone else from Union leadership tell the membership to stop their antisemitic vitriol, to act with decency and respect, and to stop their attacks. They did nothing to stop the antisemitic bullying. The resolution condemning Hamas for the taking of Hostages was a simple one, meant to call upon the Union to show compassion towards innocent Jews, including five American citizens, and non-Jews who were violently abducted and are still being held hostage by Hamas. That night, the Union revealed its animus and discrimination against Jewish Zionist members. The Union delegates overwhelmingly rejected the resolution calling for the release of hostages by a vote of 18 in favor and 124 against. The other two resolutions were overwhelmingly affirmed.

The next day, a paid ALAA staff member sent an email to the entire membership stating that "a small Zionist minority has repeatedly, but unsuccessfully, attempted to distract from and disrupt UAW 2325 ALAA members' support of Palestinian Liberation." The staff member then blamed the Zionists within the ALAA for collaborating with this Congressional Committee, allegedly attempting to weaken the Union. To be clear, the Union's paid staff member associated being a Zionist with weakening the Union.

I am not here to weaken the Union, but to strengthen it. This Union is tearing itself apart. Union leadership has a duty to protect all members from bias and discriminatory attacks. Instead, they are allowing and fostering attacks against its

12

Jewish and non-Jewish Zionist members who fight against antisemitism and discrimination. This is not how a Union should act, and its members should not be forced to support such discriminatory actions.

———

Chairman GOOD. Thank you. Mr. Sussman, you are recognized for 5 minutes.

## STATEMENT OF MR. WILLIAM SUSSMAN, GRADUATE STUDENT, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, CAMBRIDGE, MASSACHUSETTS

Mr. SUSSMAN. There we go. Chairman Good, Ranking Member DeSaulnier, and members of the Subcommittee. My name is William A. Sussman. I am a doctoral student in computer science at the Massachusetts Institute of Technology. This past year I served as President of MIT Graduate Hillel.

Last December, this Committee heard MIT's President testify that calling for the genocide of Jews, "can be antisemitic, depending on the context." Allow me to share some of that context.

According to the Anti-Defamation League, the Boycott, Divestment and Sanctions movement, or BDS, is an international campaign aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and increasingly, Jews who support Israel's right to exist.

The MIT Graduate Student Union, known as the GSU, has engaged in BDS since its inception. It is one of the reasons they chose to affiliate with the United Electrical Workers, or UE, which endorses the BDS movement, and urges the union at all levels to become engaged in BDS.

In 2022, a plurality of MIT graduate students voted to install this union as our exclusive bargaining agent, and in September 2023, MIT capitulated to its demand for a contract with mandatory dues. Then came October 7th. According to the American Jewish Committee, Hamas terrorists waged the deadliest attack on Jews since the Holocaust, slaughtering babies, raping women, burning whole families alive, and taking hundreds of innocents, hostage.

The blood had not yet dried when my colleagues at MIT declared, "Victory is Ours." The full-time GSU staff organizer told NBC 10 Boston, "Those who rebel against oppression cannot be blamed for rebelling against that repression." In November, my union representative joined anti-Israel protestors, who were occupying a building, and when threatened with suspensions, the GSU backed the protestors.

Meanwhile, the GSU illegally threatened to terminate anyone who refused to pay for their so-called activism. I filed a charge against the union with the National Labor Relations Board, which agreed that the GSU had violated our Beck rights. However, the NLRB refused to require training of union agents, who continue to break the law.

In January, when MIT brought disciplinary charges against two graduate student protestors, the GSU blamed external pressure from billionaire donors and right-wing politicians, and organized another protest, this time in front of the Discrimination and Har-

13

assment Office. One picket sign read, "Anti-Zionism does not equal Antisemitism."

In April, the GSU pushed through a cease-fire resolution that does not mention "peace," "hostages," or "Hamas." In May, the GSU Vice President was arrested at yet another protest. She was banned from campus, but remains on paid union leave. As I wrote in the Wall Street Journal, "Jewish graduate students are a minority at MIT."

We cannot remove the GSU or disabuse it of its antisemitism. We also cannot support an organization that actively works for the eradication of the Jewish homeland, where I have family living now. That is why many of us asked for a religious accommodation that would divert our compulsory dues from the UE to a charity.

The union denied my request, telling me in a letter that no principles, teachings or tenets of Judaism prohibit membership in, or the payment of dues or fees to a labor union, that one of UE's founders was Jewish, and that opposition to BDS is not a position I hold for religious reasons. In other words, UE thinks it understands my faith better than I do.

With the help of the National Right to Work Legal Defense Foundation, I joined four other Jewish graduate students in filing discrimination charges against the union, with the Equal Employment Opportunity Commission. In response, the GSU chanted "shame" against us, calling our lawyers "well-financed." They forgot to mention our horns.

Facing potential charges of its own, MIT began approving religious accommodations, and the union followed suit. UE represents graduate students at a dozen other universities, and it should not take five discrimination charges to exercise our freedom of religion and association.

This Congress should pass the National Right to Work Act, so that unions have to earn their dues, and think twice before discriminating against minorities. As a lifelong democrat, I would like to conclude with a warning for my fellow party members. A major union president who voted for FDR four times would later in life say, "I didn't leave the democratic party, the democratic party left me."

That union president was Ronald Reagan. If the democratic party leaves the Jews, we will have no choice but to leave the party. Ironically, this incentive structure is precisely what is missing from unions. Thank you for the invitation to testify today, and I look forward to answering your questions.

[The Statement of Mr. Sussman follows:]

14

Confronting Union Antisemitism:
Protecting Workers from Big Labor Abuses

William A. Sussman
Massachusetts Institute of Technology

United States House of Representatives
Committee on Education and the Workforce
Subcommittee on Health, Employment, Labor, and Pensions

July 9, 2024

Chairman Good, Ranking Member DeSaulnier, and Members of the Subcommittee:

My name is William A. Sussman. I am a doctoral student in computer science at the Massachusetts Institute of Technology, and this past year I served as president of MIT Graduate Hillel.

Last December, this Committee heard MIT's president testify that calling for the genocide of Jews "can be antisemitic, depending on the context." Allow me to share some of that context.

According to the Anti-Defamation League, the Boycott, Divestment and Sanctions movement (BDS) is "an international campaign aimed at delegitimizing and pressuring Israel, through the diplomatic, financial, professional, academic and cultural isolation of Israel, Israeli individuals, Israeli institutions, and, increasingly, Jews who support Israel's right to exist."

The MIT Graduate Student Union, known as the GSU, has engaged in BDS since its inception. It's one of the reasons they chose to affiliate with the United Electrical Workers (UE), which "endorses the BDS movement and urges the union at all levels to become engaged in BDS."

In 2022, a plurality of MIT graduate students (46.7%) voted to install this union as our exclusive bargaining agent, and in September 2023, MIT capitulated to its demand for a contract with mandatory dues.

Then came October 7. According to the American Jewish Committee, "Hamas terrorists waged the deadliest attack on Jews since the Holocaust — slaughtering babies, raping women, burning whole families alive, and taking hundreds of innocent civilians hostage."

The blood had not yet dried when my colleagues at MIT declared, "Victory is Ours." The full-time GSU staff organizer told NBC10 Boston, "Those who rebel against oppression cannot be blamed for rebelling against that repression."

In November, my union representative joined anti-Israel protesters who were occupying a building, and when threatened with suspensions, the GSU backed the protesters.

Meanwhile, the GSU illegally threatened to terminate anyone who refused to pay for their so-called activism. I filed a charge against the union with the National Labor Relations Board (NLRB), which agreed that the GSU had violated our Beck rights. However, the NLRB refused to require training of union agents, who continue to break the law.

15

In January, when MIT brought disciplinary charges against two graduate student protesters, the GSU blamed "external pressure from billionaire donors and right-wing politicians" and organized another protest, this time in front of the discrimination and harassment office. One picket sign read, "Anti-Zionism ≠ Anti-Semitism."

In April, the GSU pushed through a ceasefire resolution that does not mention "peace," "hostages," or "Hamas," and in May, the GSU vice president was arrested at yet another protest. She was banned from campus but remains on paid "union leave."

As I wrote in the Wall Street Journal: Jewish graduate students are a minority at MIT. We can't remove the GSU or disabuse it of its antisemitism. But we also can't support an organization that actively works toward the eradication of the Jewish homeland, where I have family living now.

That is why many of us asked for a religious accommodation that would divert our compulsory dues from the UE to a charity. The union denied my request, telling me in a letter that "no principles, teachings or tenets of Judaism prohibit membership in or the payment of dues or fees to a labor union," that one of UE's founders was Jewish, and that opposition to BDS isn't a position I hold for religious reasons. In other words, UE thinks it understands my faith better than I do.

With the help of the National Right to Work Legal Defense Foundation, I joined four other Jewish graduate students in filing discrimination charges against the union with the Equal Employment Opportunity Commission. In response, the GSU chanted "shame" against us, calling our lawyers "well-financed." They forgot to mention our horns.

Facing potential charges of its own, MIT began approving religious accommodations, and the union followed suit. But UE represents graduate students at a dozen other universities, and it should not take five discrimination charges to exercise our freedom of religion and association. This Congress should pass the National Right to Work Act, so that unions have to earn their dues and think twice before discriminating against minorities.

As a lifelong Democrat, I would like to conclude with a warning for my fellow party members. A major union president who voted for FDR four times would later in life say, "I didn't leave the Democratic Party, the Democratic Party left me." That union president was Ronald Reagan. If the Democratic Party leaves the Jews, we will have no choice but to leave the party. Ironically, this incentive structure is precisely what's missing from unions.

Thank you for the invitation to testify today, and I look forward to answering your questions.

16

# Contents

| | |
|---|---|
| The Boycott, Divestment and Sanctions movement (BDS) | 6 |
| UE endorses BDS | 11 |
| Meeting minutes from the GSU organizing committee | 17 |
| "Victory is Ours" | 20 |
| GSU staff organizer defends Hamas | 22 |
| GSU vice president violates Beck | 27 |
| Letter to UE requesting religious accommodation | 29 |
| Joint union statement backing anti-Israel protesters | 31 |
| "Anti-Zionism $\neq$ Anti-Semitism" | 34 |
| Letter from UE denying religious accommodation | 36 |
| Charge of discrimination | 38 |
| GSU ceasefire resolution | 40 |
| Beck settlement notice | 42 |
| GSU vice president is arrested | 44 |
| Open letter regarding GSU priorities | 49 |

# **EXHIBIT D**

NEWS & POLITICS

# A Tenured MIT Professor Accused Me of Having a 'Zionist Mind Infection'

I left a PhD program in computer science because of the antisemitism I experienced on campus. Now I'm suing the university.

BY WILL SUSSMAN

JUNE 27, 2025

---

Before Oct. 7, 2023, I was the literal poster boy for a PhD student at MIT. I was featured in a July 2023 profile in MIT News, which relayed my background and aspirations. "Although he has just two years of graduate school under his belt," it said, "Sussman is considering a career in academia."

That career is no longer available to me. In January, I left MIT because of the antisemitism I experienced on campus. Now I'm suing the university.

The antisemitism didn't start on Oct. 7. I joined the board of MIT Grad Hillel during my first year on campus because, as I told MIT News, "I think it's important to demonstrate Jewish culture at a time when antisemitism is on the rise." Three months after the profile was published, Hamas terrorists waged the deadliest attack on Jews since the Holocaust—and my fellow students at MIT celebrated, posting "Victory is ours."

A Jewish MIT Professor Wouldn't Wait for Having Her Mind Infected | Tablet Magazine

As president of Grad Hillel, I had to cope not only with my own grief but also with that of my community members who sought support in the face of antisemitism that they encountered on campus. We witnessed our peers chant for violence against Jews, take over buildings, interrupt classes with antisemitic rants, and harass, intimidate, and bully Jews for being Jewish.

This hostile environment was exposed to the world in December 2023 when MIT's president, Sally Kornbluth, was called to Congress alongside the presidents of Harvard and Penn to answer for the antisemitism on her campus. She testified, now infamously, that calls for the elimination of the Jewish people can be antisemitic "depending on the context." After that day, calls for the genocide of Jews continued, and the climate of terror on campus intensified.

---

# "Students, staff, and nonaffiliates piled on, amplifying the professor's vitriol against me. One staff member sent a mass email painting me as a racist."

Share ↗

---

It became increasingly difficult to focus on my computer science research. Students were arrested for unruly protest both inside and outside of my office building. A man urinated on the window of the MIT Hillel Center. When demonstrators erected an encampment in the middle of campus, MIT Hillel was forced to move and postpone its long-planned annual celebration of Israel's Independence Day.

A Tenured MIT Professor Accused Me of Having a 'Zionist Mind Infection' — Tablet Magazine

With MIT doing nothing to curb the escalating antisemitism on campus, the situation spiraled out of control. In November 2024, a tenured MIT professor posted online that a "Zionist 'mind infection'" is being funded by "Jewish student life organizations" such as Hillel and Chabad. When I pointed out that his message was extremely dangerous rhetoric, the professor began targeting me personally in X posts to his 10,000 followers. He did so over and over again. In his sixth post, for example, he referred to me as "an excellent case study."

I sent the professor an email with a simple request: "Please leave me alone." He then emailed the entire Department of Linguistics and Philosophy, including students and faculty, promising to use me in his upcoming seminar as a "real-life case study" of the Jewish "mind infection." He continued targeting me in a relentless series of mass emails, copying high-level administrators, including President Kornbluth. In one of these mass emails, he stated that I have "powerful connections" to the media and to "influential friends in Congress like Rep. Elise Stefanik"—which is false.

Suddenly, I became the target of widespread harassment. Students, staff, and nonaffiliates piled on, amplifying the professor's vitriol against me. One staff member sent a mass email painting me as a racist. My mother worried I would be killed.

The most disturbing aspect of this whole episode was that President Kornbluth—who was copied on the exchange where the harassment was on display in real time—stayed silent, as did the other high-level administrators. Not one of them intervened.

On the morning of the seminar, flyers were slipped under the doors in the graduate dormitory where I used to live, containing an article advocating for violent "resistance" against Jews. The flyer specifically targeted me. It contained a graphic styled after Hamas headbands that read, "This article and the author were banned from MIT after Zionists tweeted about it." I was one of the Jews who had tweeted

about the article, which says, "We will burn the ground beneath your feet" next to the logo of a U.S.-designated foreign terrorist organization.

Then the professor followed through on his awful promise, beginning his seminar—titled "Language and linguistics for decolonization and liberation and for peace and community building from the river to the sea in Palestine and Israel to the mountaintops in Haiti and beyond"—by discussing me. "There was one student ... I won't mention his name, but you probably know who he is," the professor said. "Let us not forget that as we engage in this academic exercise that there is a genocide going on."

I filed a formal complaint with MIT's Institute Discrimination and Harassment Response Office, but the staff decided "not to pursue a discrimination investigation" and stated that their decision "is not subject to appeal." Incredibly, they claimed that the professor's conduct was not antisemitic because his use of the term *mind infection* refers to "settler-colonial Zionist propaganda" that he believes "is funded by the Israeli government." I was left with the distinct impression that MIT's own antidiscrimination office had used common antisemitic tropes to reject my antisemitism complaint, and I felt there was nowhere left to turn.

It was the privilege of a lifetime to study computer science at MIT. But when it became clear that the university would not protect me from the ongoing harassment and threats, I had no choice but to leave my PhD program and abandon my dream. All because I am Jewish.

*An MIT spokesperson has responded to the complaint by stating that MIT "rejects antisemitism" and "will defend itself in court regarding the allegations raised in the lawsuit."*

Will Sussman is the lead plaintiff in a new lawsuit against MIT. He served as president

of MIT GradHillel from 2023–2024. Follow him @realWillSussman

#MIT     #CAMPUS ANTI-SEMITISM     #PRO-PALESTINIANS

# EXHIBIT E



**SHOP NOW**

**We track deals for a living— these 50 items just hit lowest price ever for fall Prime Day**

*OPINION*

# I was chased out of MIT — and it was all because I'm Jewish

By Will Sussman

Published July 1, 2025, 10:08 p.m. ET

732





LOG IN



People chant and hold signs at a rally to support Palestinians at the Massachusetts Institute of Technology in Cambridge, Massachusetts.

AFP via Getty Images

Before Oct. 7, 2023, I was the literal poster boy for a PhD student at MIT. I was featured in a July 2023 profile in MIT News, which relayed my background and aspirations.

"Although he has just two years of graduate school under his belt," it said, "Sussman is considering a career in academia."

That career is no longer available to me. In January, I left MIT because of the antisemitism I experienced on campus. Now I'm suing the university.

The antisemitism didn't start on Oct. 7. I joined the board of MIT Grad Hillel during my first year on campus because, as I told MIT News, "I think it's important to demonstrate Jewish culture at a time when antisemitism is on the rise."

Three months after the profile was published, Hamas terrorists waged the deadliest attack on Jews since the Holocaust — and my fellow students at MIT celebrated, posting, "Victory is ours."

## Chanting for violence

As president of Grad Hillel, I had to cope not only with my own grief but also with that of my community members who sought support in the face of antisemitism that they encountered on campus. We witnessed our peers chant for violence against Jews, take over buildings, interrupt classes with antisemitic rants, and harass, intimidate and bully Jews for being Jewish.

This hostile environment was exposed to the world in December 2023 when MIT's president, Sally Kornbluth, was called to Congress alongside the presidents of Harvard and Penn, to answer for the antisemitism on her campus.

She testified, now infamously, that calls for the elimination of the Jewish people can be antisemitic "depending on the context." After that day, calls for the genocide of Jews continued, and the climate of terror on campus intensified.

It became increasingly difficult to focus on my computer science research. Students were arrested for unruly protest both inside and outside my office building. A man urinated on the window of the MIT Hillel Center. When demonstrators erected an encampment in the middle of campus, MIT Hillel was forced to move and postpone its long-planned annual celebration of Israel's Independence Day.

With MIT doing nothing to curb the escalating antisemitism on campus, the situation spiraled out of control.

In November 2024, a tenured MIT professor posted online that a "Zionist 'mind infection' " is being funded by "Jewish student life organizations" such as Hillel and Chabad.

When I pointed out that his message was extremely dangerous rhetoric, the professor began targeting me personally in X posts to his 10,000 followers. He did so over and over again. In his sixth post, for example, he referred to me as "an excellent case study."

I sent the professor an email with a simple request: "Please leave me alone." He then emailed the entire Department of Linguistics and Philosophy, including students and faculty, promising to use me in his upcoming seminar as a "real-life case study" of the Jewish "mind infection."

He continued targeting me in a relentless series of mass emails, copying high-level administrators, including Kornbluth. In one of these emails, he stated that I have "powerful connections" to the media and to "influential friends in Congress like Rep. Elise Stefanik" — which is false.

## Staying silent

Suddenly, I became the target of widespread harassment. Students, staff and non-affiliates piled on, amplifying the professor's vitriol against me. One staff member sent a mass email painting me as a racist. My mother worried I would be killed.

The most disturbing aspect of this whole episode was that Kornbluth — who was copied on the exchange where the harassment was on display in real time — stayed silent, as did the other high-level administrators. Not one of them intervened.

On the morning of the seminar, flyers were slipped under the doors in the graduate dormitory where I used to live, containing an article advocating for violent "resistance" against Jews. The flyer specifically targeted me. It contained a graphic styled after Hamas headbands that read, "This article and the author were banned from MIT after Zionists tweeted about it."

I was one of the Jews who had tweeted about the article, which says, "We will burn the ground beneath your feet" next to the logo of a US-designated foreign terrorist organization.

Then the professor followed through on his awful promise, beginning his seminar — titled "Language and linguistics for decolonization and liberation and for peace and community building from the river to the sea in Palestine and Israel to the mountaintops in Haiti and beyond" — by discussing me.

 "There was one student … I won't mention his name, but you probably know who he is," the professor said. "Let us not forget that as we engage in this academic exercise that there is a genocide going on."

I filed a formal complaint with MIT's Institute Discrimination and Harassment Response Office, but the staff decided "not to pursue a discrimination investigation" and stated that their decision "is not subject to appeal."



## Get opinions and commentary from our columnists

Subscribe to our daily Post Opinion newsletter!

| Enter your email address | SIGN UP |

By clicking above you agree to the **Terms of Use** and **Privacy Policy**.

Incredibly, they claimed that the professor's conduct was not antisemitic because his use of the term "mind infection" refers to "settler-colonial Zionist propaganda" that he believes "is funded by the Israeli government."



Score discounts on Apple, Dyson and more before they sell out!



**Crest 3D Whitestrips Professional**
CHECK PRICE ❯



**Apple Air Pods**
CHECK PRICE ❯

**COSRX Snail Mucin**

CHECK PRICE ›

I was left with the distinct impression that MIT's own antidiscrimination office had used common antisemitic tropes to reject my antisemitism complaint, and I felt there was nowhere left to turn.

## No other choice

It was the privilege of a lifetime to study computer science at MIT. But when it became clear that the university would not protect me from the ongoing harassment and threats, I had no choice but to leave my PhD program and abandon my dream.

732    **What do you think? Post a comment.**

All because I am Jewish.

*From Tablet magazine. Will Sussman is the lead plaintiff in a new lawsuit against MIT. He served as president of MIT GradHillel from 2023 to 2024. Follow him @realWillSussman.*

FILED UNDER    ANTISEMITISM,    COLLEGES AND UNIVERSITIES,    ISRAEL,    JUDAISM,    MIT,    PALESTINE,
7/1/25

READ NEXT    **The Democratic Party as we know it is dead — and they ar...**

## MORE STORIES

**PAGE SIX**



**Mandy Moore baffles fans with bold new look: 'Is it even the same person?'**

## NYPOST



**Deadly Palisades Fire set 'maliciously' by Florida firebug who created AI-image of dystopian burned city: feds**

NEW YORK POST

© 2025 NYP Holdings, Inc. All Rights Reserved  |  Terms of Use  |  Subscription Terms  |  Privacy Notice  |  Sitemap

**Your California Privacy Rights**

VIP | **Powered by WordPress VIP**

## <u>CERTIFICATE OF SERVICE</u>

I, Mark Kleiman, hereby certify that a true copy of this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 8, 2025.

*/s/ Mark Kleiman*
Mark Kleiman
