# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM SUSSMAN, LIOR ALON, AND THE LOUIS D BRANDEIS CENTER COALITION TO COMBAT ANTI-SEMITISM,<br><br>Plaintiffs,<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY AND MICHEL DEGRAFF.<br><br>Defendants. | Case No. 1:25-cv-11826 |

## <u>BRIEF OF AMICUS CURIAE PALESTINE LEGAL IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

**Table of Contents**

INTERESTS OF AMICUS CURIAE ........................................................................... 1

SUMMARY OF ARGUMENT .................................................................................. 1

ARGUMENT ............................................................................................................. 4

    **I.**   **Plaintiffs Fail to State a Claim Under Title VI** ............................................ 4

        A.   The Alleged Conduct Did Not Target Plaintiffs or Any Students on the Basis of a
Protected Characteristic ................................................................................. 5

        B.   Protected Political Speech Cannot Form the Basis of a Hostile Environment Claim .... 7

    **II.**  **Title VI and Title VII Do Not and Cannot Require Universities to Censor, Punish,
or Condemn Speech Activity Supporting Palestinian Rights** ........................................... 20

CONCLUSION ....................................................................................................... 22

C<small>ASES</small>

*B.W. v. Austin Indep. Sch. Dist.*, 121 F.4th 1066 (5th Cir. 2024)----------------------------------7, 23

*Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13(1st Cir. 1989) ------------------------------ 6, 7

*Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160 (N.D. Cal. 2024)---------------- 2

*Dube v. State of Univ. N.Y.*, 900 F. 2d 587 (2d. Cir 1990) ---------------------------------------------- 9

*Felber v. Yudof*, 851 F. Supp. 2d 1182, 1183 (N.D. Cal. 2011)------------------------------11, 12, 13

*Franklin v. Gwinnett Cnty. Public Schs.*, 503 U.S. 60 (1992)------------------------------------------13

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art,* 2025 U.S. Dist. LEXIS 33977 (S.D.N.Y. Feb. 25, 2025).--------------------------------------------------------------------------------------12

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025)--------------------------------------------------------------------------------------------------------- passim

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ------------------------------------------- 6

*Hayut v. State Univ. of N.Y.*, 352 F.3d 733 (2d Cir. 2003) --------------------------------------------- 6

*Landau v. Corp. of Haverford Coll.,* No. 24-2044, 2025 U.S. Dist. LEXIS 1402 (E.D. Pa. Jan. 6, 2025)----------------------------------------------------------------------------------------------------6, 8, 10

*Louis D. Brandeis Ctr., Inc. v. Regents of the Univ. of Cal.*, 2025 U.S. Dist. LEXIS 62680 (N.D. Cal. Mar. 31, 2025) ------------------------------------------------------------------------------------------- 8

*Newman v. Point Park Univ.*, No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722 (W.D. Pa. Mar. 31, 2022) ------------------------------------------------------------------------------------------- 8, 10, 13

*Porto v. Town of Tewksbury*, 488 F.3d 67 (1st Cir. 2007)--------------------------------------------- 5

*President & Fellows of Harv. Coll. v. United States HHS*, Civil Action No. 25-cv-11048-ADB, 2025 U.S. Dist. LEXIS 171326 (D. Mass. Sep. 3, 2025).-----------------------------------------------19

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703 (9th Cir. 2009)-----------------------13

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ----------------------------25

*Shaheed v. Wu*, Civil Action No. 23-cv-10870-ADB, 2025 U.S. Dist. LEXIS 156479 (D. Mass. Aug. 13, 2025)------------------------------------------------------------------------------------------------- 7

*Siyu Yang v. Ardizzone*, 540 F. Supp. 3d 372 (W.D.N.Y. 2021)------------------------------------23

*Spengler v. Coop. Educ. Serv. Agency 7*, No. 22-C-1199, 2025 U.S. Dist. LEXIS 149109 (E.D. Wis. Aug. 4, 2025)--------------------------------------------------------------------------------------------23

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ------------------------------------------------------------------------------------------------------------------22

*Texas v. Johnson*, 491 U.S. 397 (1989)-----------------------------------------------------------------------20

*Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist LEXIS 178359 (D. Md. Oct. 1, 2024) ----------------------------1, 18

*Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001) ----------------------------------------------------------------20

*W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624 (1943) ---------------------------------------------24

*Woodard v. TWC Media Solutions, Inc.*, No. 09-cv-3000 (BSJ)(AJP), 2011 U.S. Dist. LEXIS 1536 (S.D.N.Y. Jan. 4, 2011)----------------------------------------------------------------------------------26

*Yakoby v. Trs. of the Univ. of Pa.*, No. 23-4789, 2025 U.S. Dist. LEXIS 103709 (E.D. Pa. June 2, 2025)------------------------------------------------------------------------------------------------------------ 7

O<small>THER</small> A<small>UTHORITIES</small>

Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (S. Afr. v. Isr.), Provisional Measures, 2024 I.C.J. Rep. 3 (Jan. 26, 2024) ----------------- 1

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025) -------------------------------------- 7, 14, 15, 18

Deborah Hellman, *Defining Disparate Treatment: A Research Agenda for Our Times*, 99 IND. L.J. 205 (2023) --------------------------------------------------------------------------------- 19

Itamar Mann & Lihi Yona, *Defending Jews From the Definition of Antisemitism*, 71 UCLA L. Rev. 1150 (2024) ----------------------------------------------------------------------------- 18

Timothy Cuffman, *The State Power to Boycott a Boycott: The Thorny Constitutionality of State Ant-BDS Laws*, 57 Colum. J. Transnat'l L. 115 (2018) ---------------------------------------- 8

# INTERESTS OF AMICUS CURIAE

Palestine Legal (a project of Tides Center) is a non-profit legal and advocacy organization dedicated to protecting the civil and constitutional rights of people in the U.S. who speak out for Palestinian freedom. Palestine Legal tracks incidents of censorship and efforts to suppress expression supporting Palestinian rights, including through the misuse of Title VI of the Civil Rights Act of 1964. Palestine Legal has represented hundreds of students at universities across the country engaging in the speech activity at issue in this litigation and has successfully defended the First Amendment rights of students protesting Israel's treatment of Palestinians. *See, e.g.*, *Univ. of Md. Students for Just. in Palestine v. Bd. of Regents of the Univ. Sys. of Md.*, No. 24-2683 PJM, 2024 U.S. Dist. LEXIS 178359 (D. Md. Oct. 1, 2024). Palestine Legal submits this brief to argue, in part, that there is no violation of Title VI of the Civil Rights Act of 1964 where allegations pertain to protected political speech on a matter of public concern.

# SUMMARY OF ARGUMENT

Over the past two years, tens of thousands of students from universities across the United States[1] have engaged in protests, sit-ins, marches, and encampments on the conviction that Israel is committing, and the United States is supporting, a genocide in Gaza.[2] At the Massachusetts

---

[1] Jay Ulfelder, *Crowd Counting Consortium: An Empirical Overview of Pro-Palestine Protests at U.S. Schools*, HARVARD KENNEDY SCHOOL, ASH CENTER FOR DEMOCRATIC GOVERNANCE AND INNOVATION (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.

[2] Nick Cummings-Bruce, *Israel is Committing Genocide in Gaza, U.N. Inquiry Says*, N.Y. TIMES (Sep. 16, 2025), https://www.nytimes.com/2025/09/16/world/middleeast/un-israel-gaza-genocide.html; Aaron Boxerman, *In a First, Leading Israeli Rights Groups Accuse Israel of Gaza Genocide*, N.Y. TIMES (July 28, 2025), https://www.nytimes.com/2025/07/28/world/middleeast/israel-genocide-gaza-rights-groups.html. In January 2024, the ICJ found that Israel's assault on the Palestinian people in Gaza plausibly constitutes genocide. Application of Convention on Prevention and Punishment of Crime of Genocide in the Gaza Strip (S. Afr. v. Isr.), Provisional Measures, 2024 I.C.J. Rep. 3, ¶ 54 (Jan. 26, 2024), https://www.icj-cij.org/sites/default/files/case-related/192/192-20240126-ord-01-00-en.pdf. A U.S. district court echoed that finding in a case brought to enjoin the then-U.S. president, secretary of state,

1

Institute of Technology (MIT), students have been advocating for Palestinians' right to exist free from apartheid, genocide, and other violations of international law and are doing so in a manner that echoes past movements for social justice throughout history, from the Civil Rights Movement to opposition to the Vietnam War to the struggle against South African apartheid. During the Civil Rights Movement, Black Americans and their allies of other races engaged in similar protests demanding equal rights.[3] Today's movement for Palestinian rights is likewise supported by non-Palestinians, including a significant number of Jewish students, Jewish faculty, and Jewish organizations.[4]

Plaintiffs allege that MIT failed to protect them from purported antisemitic harassment and other alleged violations of Title VI of the Civil Rights Act of 1964, and include in their complaint a litany of slogans, flyers, speeches, street theatre, symbols, cultural attire, and ideological and classroom debates with which they disagree, claiming that MIT acted with deliberate indifference because it did not censor, condemn, or punish such expression.

Such advocacy for Palestinian rights, including language that zealously criticizes Israel, is protected political speech on a geopolitical issue that does not target members of a protected group, and thus cannot ground a hostile environment claim merely because some students disagree with, are offended by, or feel isolated by the messages being expressed. In short, Title VI does not and

---

and defense secretary from aiding and abetting Israel's genocide, stating that evidence indicated "that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide," "implor[ing] Defendants to examine the results of their unflagging support of the military siege against the Palestinians in Gaza," and stating that "[i]t is every individual's obligation to confront the current siege in Gaza." *Def. for Children Int'l-Palestine v. Biden*, 714 F. Supp. 3d. 1160, 1163, 1167 (N.D. Cal. 2024), *aff'd,* 107 F.4th 926 (9th Cir. 2024) (dismissed on jurisdictional grounds).

[3] *See The White Southerners Who Fought US Segregation*, BBC (Mar. 12, 2019), https://www.bbc.com/news/world-us-canada-47477354.

[4] *See* Peter Beinart, *Trump Doesn't Want to Protect All Jewish Students — Just Those on His Team*, N.Y. TIMES (Apr. 28, 2025), https://www.nytimes.com/2025/04/28/opinion/jewish-student-protesters-gaza.html.

cannot require universities to suppress criticism of a state merely because some members of a protected group feel that such criticism is hateful. Doing so would run afoul of the First Amendment and "cast significant doubt on the statute's constitutionality." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 264, 271 (S.D.N.Y. 2025) (citing *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

The Gaza encampment, street theatre, chants and slogans, red paint on an Israeli flag, and other similar examples in paragraphs 33 to 58 of the complaint constitute political speech on a matter of public concern directed to the college community—and many Jewish students at MIT engaged in this political expression, which they, and other students supporting Palestinian human rights, viewed as commentary on Israel's genocide and Palestinians' struggle for freedom.[5] These actions were not based on the Jewish identity of any student or member of the MIT community.

The Court should grant Defendants' Motion to Dismiss because, among other reasons, the allegations in paragraphs 33 to 58  do not meet the threshold requirement of a Title VI claim that the challenged conduct target a protected group – because the alleged speech and expression in

---

[5] For example, the student group MIT Jews for a Collective Liberation, formerly MIT Jews for a Ceasefire, posted to Instagram or collaborated with other pro-Palestinian MIT groups and Defendant DeGraff on a number of Instagram posts showing Jewish MIT students actively organizing events at the Gaza encampment, depicting kuffiyehs, criticizing Zionism, and using the slogans at issue in this case. *See, e.g.*, MIT Jews for Collective Liberation (@mit_jcl), Instagram (Apr. 22, 2024), https://www.instagram.com/p/C6ERuyau76a/ (inviting MIT community to Passover Seder at the Gaza encampment); Michel DeGraff (@micheldegraff), Instagram (May 8, 2024), https://www.instagram.com/p/C6tmTmeLblA/ (video depicting "MIT Scientists Against Genocide" protest outside MIT using slogans such as "from the river to the sea, Palestine will be free," and "long live the student intifada, globalize the intifada"); MIT Jews for Collective Liberation (@mit_jcl), Instagram (Oct. 31, 2024), https://www.instagram.com/p/DBywpTGOLwn/?img_index=4 (describing the group's sukkah erected during the twelfth month of "Israel's horrific genocide," stating "we will not stop standing with our friends and allies who call for Palestinian liberation from the river to the sea" and showing an image of the sukkah with the slogans "Free Palestine" and "Jews for Palestine"); MIT Coalition for Palestine (@m1t_caa), Instagram (Sep. 19, 2024), https://www.instagram.com/p/DAHuw0tsyd2/ (calling on students to "wear your keffiyehs"); MIT Jews for Collective Liberation (@mit_jcl), Instagram (Aug. 13, 2024), https://www.instagram.com/p/C-nhf-NpbdY/ (hosting documentary and discussion of a film on anti-Zionist Jews in Israel).

these paragraphs is political speech on a matter of public concern, directed at the college community.

## ARGUMENT

### I. Plaintiffs Fail to State a Claim Under Title VI

Plaintiffs dedicate eight pages of their complaint to allegations of pro-Palestinian speech activity and expression they allege create a hostile environment in violation of Title VI. This includes slogans such as "Free, Free Palestine," "From the River to The Sea, Palestine Will be Free," and "Globalize the Intifada," statements on social media opining that "the resistance is 100% predictable and justified," professors allowing students to say they are witnessing an ongoing genocide in Gaza, anti-Israel protest signs, anti-Israel students starting an encampment, chants critical of Zionism, street theatre, red handprints on Israeli flags, an MIT scientist posting a picture of themselves draped in a kuffiyeh (Palestinian scarf), a student accusing Israel of genocide in a commencement speech, flyers stating "You can't deport the intifada," an email stating "[W]e hold the Israeli regime responsible for all unfolding violence," chants of "resistance is justified when people are occupied" and "death to Zionism," an MIT student group posting a picture of a protest on social media featuring an individual waving a Palestinian flag with a Palestinian Front for the Liberation of Palestine (PFLP) logo on it, students handing out maps that highlight campus locations and organizations that "support the colonization of Palestine," anti-Israel graffiti spray painted onto an MIT building, and students handing out flyers with a link to a project that targets organizations "that support the colonization of Palestine," flyers with a Jewish star dripping with blood and more. First Am. Compl., ("FAC") ¶¶ 33-58, ECF No. 40.

This is an incorrect and unconstitutional interpretation of Title VI, which requires, as a threshold matter, that the complaint allege discrimination on the basis of a protected characteristic

(with specificity)—and does not apply to pure speech on matters of public concern. *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650-51 (1999));[6] *see also Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 22 (1st Cir. 1989) (overruled on other grounds) ("To state a claim under Title VI, as under 42 U.S.C. § 1981, a complaint must adequately allege discrimination based on a protected category [race, color, or national origin] and must do so with the same degree of factual specificity as required in civil rights cases generally."); *Gartenberg*, 765 F. Supp. 3d at 271 (citing *Snyder v. Phelps,* 562 U.S. 443, 453 (2011)); *Landau v. Corp. of Haverford Coll.*, No. 24-2044, 2025 U.S. Dist. LEXIS 1402, at *4 (E.D. Pa. Jan. 6, 2025) (describing student expression supporting Palestinians as a "classic example of" First Amendment-protected activity).

Plaintiffs have not met this burden for the allegations in paragraphs 33 through 58 because the alleged speech activities do not target Plaintiffs on the basis of any protected identity, but rather, are protected political speech on issues of public concern—Israel's genocide and Palestinians' struggle for freedom.

### A. The Alleged Conduct Did Not Target Plaintiffs or Any Students on the Basis of a Protected Characteristic

To establish a hostile environment claim under Title VI, the acts at issue must target a protected class. 42 U.S.C. § 2000d; *Dartmouth Review*, 889 F.2d at 22; *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 748 (2d Cir. 2003) (harassment must be motivated at least in part, by a protected characteristic); *Shaheed v. Wu*, No. 23-cv-10870-ADB, 2025 U.S. Dist. LEXIS 156479, at *10 (D. Mass. Aug. 13, 2025) (finding "Plaintiff failed to plead that she is a member of a protected class or was intentionally discriminated against on that basis, as required to have a claim

---

[6] Title IX "was modeled after Title VI" and thus "[t]he two statutes operate in the same manner." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

under Title VI of the Civil Rights Act of 1964."). If the conduct alleged does not discriminate on the basis of a protected class, there can be no violation of Title VI—even where plaintiffs may have pled the other parts of the test. *See, e.g.*, *B.W. v. Austin Indep. Sch. Dist.*, 121 F.4th 1066, 1066-67 (5th Cir. 2024) (Richman, P., concurring) (affirming dismissal of Title VI claim where "the primary impetus of the bullying was, according to B.W., his political beliefs."). The allegations that a protected class was targeted must also be pled "with the same degree of factual specificity as required in civil rights cases generally." *Dartmouth Review*, 889 F.2d at 22 (overruled on other grounds).

Thus, in hostile environment claims involving pro-Palestinian advocacy, several courts have, as a threshold matter, examined whether the alleged conduct was motivated, at least in part, by a protected characteristic. *See, e.g.*, *Yakoby v. Trs. of the Univ. of Pa.*, No. 23-4789, 2025 U.S. Dist. LEXIS 103709, at *10, *18-19 (E.D. Pa. June 2, 2025) (finding plaintiffs failed to plead any facts showing intentional discrimination and that "[a]t worst, Plaintiffs accuse Penn of tolerating and permitting the expression of viewpoints which differ from their own."); *Newman v. Point Park Univ.*, No. 2:20-cv-00204, 2022 U.S. Dist. LEXIS 60722, *76, *89 (W.D. Pa. Mar. 31, 2022) (finding plaintiff failed to allege she suffered "severe or pervasive discrimination *on the basis of* her race/national origin or religion" (emphasis included) and that there were no allegations that pro-Palestinian students or professors "held their viewpoints on these contentious issues to cause hostility directed toward Plaintiff or had and advocated discriminatory views to harm Plaintiff specifically."); *Landau*, 2025 U.S. Dist. LEXIS 1402, at *10 n.11 (delving into a showing of severity or pervasiveness of harassment "assumes that the Plaintiff has already made a showing that they are a member of a protected class under Title VI and that they were qualified for the relevant educational opportunities."); *Louis D. Brandeis Ctr., Inc. v. Regents of the Univ. of Cal.*,

No. 3:23-cv-06133, 2025 U.S. Dist. LEXIS 62680, *6 (N.D. Cal. Mar. 31, 2025) (finding that complaint plausibly alleged "that Jewish students and professors were disparately treated because they are Jewish").

Plaintiffs do not allege that any of the speech activity was prompted by their membership in a protected class—or only make conclusory allegations that the dozens of examples of pro-Palestinian speech activity and expression detailed in paragraphs 33 to 58 were "widely publicized" or "known to" them. FAC ¶ 59. This is fatal to their claim.

### B. Protected Political Speech Cannot Form the Basis of a Hostile Environment Claim

Title VI does not and cannot require universities to punish and censor protected political speech. *See Gartenberg*, 765 F. Supp. 3d at 260 ("A statute that burdens protected speech must comport with the First Amendment regardless of whether it does so directly, such as prohibiting certain speech outright, or indirectly, such as by requiring a court adjudicating a 'civil lawsuit between private parties' to apply a rule of law that has the effect of 'impos[ing] invalid restrictions on [the defendant's] constitutional freedom[] of speech.'") (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964)); *Dube v. State of Univ. N.Y.*, 900 F. 2d 587, 598 (2d. Cir 1990) ("[F]or decades it has been clearly established that the First Amendment tolerates neither laws nor other means of coercion, persuasion or intimidation 'that cast a pall of orthodoxy' over the free exchange of ideas in the classroom") (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)).

As harassment claims based on pure political speech are rare, few courts have discussed the limitations the First Amendment places on federal anti-discrimination laws; but as Title VI and Title VII have been increasingly used as a First Amendment work-around to target pro-Palestinian

activism on college campuses,[7] several courts have first looked into whether the alleged speech or conduct was intended to contribute to the debate on the Palestinian cause before delving into questions of deliberate indifference and severity/pervasiveness. *See, e.g.*, *Gartenberg,* 765 F. Supp. 3d at 270; *Landau*, 2025 U.S. Dist. LEXIS 1402, at *4 (describing pro-Palestinian student expression as a "classic example" of activity protected by the First Amendment); *Newman*, 2022 U.S. Dist. LEXIS 60722 at *78-79, *80 n.16 ("Despite the sensitive and important the [*sic*] issues these conflicting viewpoints and actions raise, as an overarching matter, such debates…have been recognized to fall within First Amendment protections when efforts have been advanced to limit or impair such advocacy." )[8]. Thus, the court found, as a threshold matter in a Title VI complaint alleging a hostile environment at the University of California Berkeley over pro-Palestinian activity, that "a very substantial portion of the conduct" alleged, which included signs and publications alleged to be critical of Israel and supportive of Hamas, "represents pure political speech and expressive conduct, in a public setting, regarding matters of public concern, which is entitled to special protection under the First Amendment." *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1183, 1187-88 (N.D. Cal. 2011). The court also noted "'[s]uch speech cannot be restricted simply because it is upsetting or arouses contempt. . . .'" *Id.* at 1188 (quoting *Snyder v. Phelps*, 562 U.S. 443, 458 (2011)).

---

[7] *See* Darryl Li, *The Rising Threat of Antisemitism Investigations,* LAW AND POLITICAL ECONOMY PROJECT (Sep. 30, 2025), https://lpeproject.org/blog/the-rising-threat-of-antisemitism-investigations/; Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 HARV. L. REV. F. 1 (2025); Evelyn Douek & Genevieve Lakier, *Title VI as a Jawbone*, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY (Sep. 26, 2024), https://knightcolumbia.org/blog/title-vi-as-a-jawbone; Alex Kane, *The Civil Rights Law Shutting Down Pro-Palestine Speech*, JEWISH CURRENTS (Nov. 15, 2024), https://jewishcurrents.org/civil-rights-law-pro-palestine-speech-israel-trump; Alex Gourevitch, *The Right to Be Hostile*, BOSTON REVIEW (July 22, 2025), https://www.bostonreview.net/forum/the-right-to-be-hostile/.
[8] Citing Timothy Cuffman, *The State Power to Boycott a Boycott: The Thorny Constitutionality of State Anti-BDS Laws*, 57 COLUM. J. TRANSNAT'L L. 115, 138 (2018).

The analysis in *Gartenberg v. Cooper Union for the Advancement of Science and Art* is instructive. While the court ultimately allowed the plaintiffs to proceed on a narrow set of claims,[9] it dismissed allegations pertaining to "pure speech on matters of obvious public concern directed at the campus community as a whole." *Gartenberg*, 765 F. Supp. 3d at 275. This included alleged flyers "'[c]elebrat[ing] the 36th anniversary of the First Intifada'," a vigil to "'grieve and honor all those killed by decades of Israeli occupation and imperial violence,'" articles "criticizing 'the conflation of Zionism and Judaism'," and an "'art display' that included the words 'RESIST COLONIALISM FROM THE BRONX TO PALESTINE 'BY ANY MEANS NECESSARY,'" finding that plaintiffs "offer[ed] no factual support" that they were intended to target Jewish students "as opposed to efforts to communicate a political message to the Cooper Union community at large." *Id*. at 270-71. The court noted that Plaintiffs' claims that pro-Palestinian slogans were "threats of violence" was a "conclusory suggestion" and that "the Complaint does not plausibly allege that any of this expressive conduct constituted true threats, incitement, fighting words, obscenity, or any other category of traditionally unprotected speech under the Supreme Court's First Amendment jurisprudence." *Id*. at 271.

On a motion for reconsideration, the court again found that Title VI "does not reach instances of pure speech by pro-Palestinian members of Cooper Union's community that, as pleaded, were reasonably designed or intended to contribute to the ongoing debate regarding the Israeli-Palestinian conflict." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art* (*Gartenberg II*), 2025 U.S. Dist. LEXIS 33977, at *8-9 (S.D.N.Y. Feb. 25, 2025).

---

[9] These were of a different nature than those alleged in paragraphs 33 to 58 here, including allegations "that did not involve Cooper Union's refusal to suppress political speech," such as allegations that a group of Jewish students wearing traditional Jewish attire hid in the library while protesters banged on the library doors, demanding to be let in. *Gartenberg*, 765 F. Supp. 3d at 272. The plaintiffs in that case claimed that the situation was so severe that the Jewish students called the police for help and the president of the college locked her own office door. *Id*.

Thus, courts have found that pro-Palestinian speech and conduct similar to what Plaintiffs allege here—even where it offends—does not constitute actionable harassment under federal civil rights laws, but is pure speech protected by the First Amendment.[10] For example, in *Landau v. Corporation of Haverford College*, the court refuted the allegation that kuffiyehs, which it described as "attire that signified [] support for Palestinians," created a hostile antisemitic environment, and instead described kuffiyehs as a "classic example of First Amendment expression." 2025 U.S. Dist. LEXIS 1402, at *4. In *Felber v. Yudof*, the court found that "a very substantial portion of the conduct" alleged, which included street theatre depicting Palestinians navigating Israeli checkpoints and student signs alleged to criticize Israel and support Hamas, "represents pure political speech and expressive conduct" that is "entitled to special protection under the First Amendment." 851 F. Supp. 2d at 1184-85, 1188. And in *Newman v. Point Park University*, the court concluded that finding pro-Palestinian advocacy, including professors allegedly "advoca[ting] militant, hateful, and anti-Semitic/anti-Israel views inside and outside the classroom," supporting boycotts of Israel, criticizing Israel's settlements in the West Bank, and criticizing "the actions of the Israeli government by other faculty members or students," as a basis for a hostile environment claim would "invalidate … an entire academic and public debate" and "would effectively compel, under the pain of Title VII liability, that any speech and viewpoints

---

[10] The DOE Office for Civil Rights (OCR), which enforces Title VI, has long recognized that "to be prohibited by the statutes within OCR's jurisdiction, [harassment] must include something beyond the mere expression of views, words, symbols that some person finds offensive." Gerald A. Reynolds, Asst. Sec'y, U.S. Dep't of Educ. Off. for C.R., *First Amendment: Dear Colleague [OCR-00028]* (July 28, 2003), https://www.ed.gov/about/offices/list/ocr/firstamend.html. Title VI protects students from "prohibited discrimination" and does not "restrict the exercise of expressive activities or speech that are protected under the First Amendment," which is "particularly relevant in the university environment, where academic freedom fosters the robust exchange of ideas." Letter from Zachary Pelchat, Team Leader, U.S. Dep't of Educ., to Robert J. Birgeneau, Off. of Chancellor, Univ. of Cal. Berkeley (Aug. 19, 2013), https://news.berkeley.edu/wp-content/uploads/2013/08/DOE.OCR_.pdf.

held and espoused by others as part of that debate … be reformulated." 2022 U.S. Dist. LEXIS at *76-77, 80, 77-78, 80, n. 16.

The Ninth Circuit's decision in *Rodriguez v. Maricopa County Community College* also supports dismissal.[11] In *Rodriguez*, the court found that allegations of "racially-charged emails" by a professor over a college listserv and on a college district-hosted website was "pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot." 605 F.3d 703, 710 (9th Cir. 2009). The court staunchly defended provocative and offensive speech on campuses, holding: "[t]he Constitution embraces such a heated exchange of views, even (perhaps especially) when they concern sensitive topics like race, where the risk of conflict and insult is high…. Without the right to stand against society's most strongly-held convictions, the marketplace of ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched." *Id.* at 708 (internal citations removed).

This case is governed by the same principle. As the courts found in *Gartenberg* and *Rodriguez*, speech "'on a matter of public concern, directed to the college community,' will generally fail to 'constitute unlawful harassment.'" *Gartenberg*, 765 F. Supp. 3d at 265 (citing *Rodriguez*, 605 F.3d at 710). The speech alleged in paragraphs 33 to 58 is pure political speech or expression on a matter of public concern. Criticism of Israel and speech supporting Palestinian

---

[11] Courts and the Department of Education's Office for Civil Rights "rely on the legal principles articulated in cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Title VII), which prohibits employment discrimination based on race, color, religion, sex, and national origin, and under Title IX, which prohibits discrimination on the basis of sex in education programs or activities receiving federal financial assistance." (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-98 (1979) (stating that Title IX was modeled on Title VI); *Franklin v. Gwinnett Cnty. Public Schs.*, 503 U.S. 60, 75 (1992) (applying Title VII principles to Title IX case).

liberation, however discomforting it may be to those with opposing views, cannot be construed as actionable discriminatory harassment without running afoul of the First Amendment.

As the court explained in *Gartenberg II*:

> …[T]he First Amendment cannot be evaded through the motte-and-bailey routine of professing to concede that "Title VI does not compel a school to restrict speech" while attempting to redefine virtually all forms of contentious political expression—from a sidewalk protest and leafletting to a disagreeable speech by a college professor—as "harassment" that colleges must address on pain of civil liability. It is therefore no answer to say that the First Amendment concern in avoiding government censorship of campus speech dissipates merely by virtue of broadly characterizing offensive speech on sensitive issues as "harassment" or "discrimination." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.).… (some internal citations removed).

2025 U.S. Dist. LEXIS 33977 at *11-12.

### 1.  Slogans Referencing "Intifada" Are Protected Political Speech

Plaintiffs claim that the slogans "One Solution: Intifada Revolution" and "Globalize the Intifada" and the word "Intifada," which they allege were chanted at rallies and posted on social media and on stickers, create a hostile environment on campus in violation of Title VI. These slogans are also pure political speech on a matter of public concern that do not target a protected group— and are frequently used by Jewish students who support Palestinian freedom, including at MIT.[12]

---

[12] See note 5, *supra;* Asaf Elia-Shalev, *Spurning Jewish Voice for Peace as Insufficiently Radical, New Student Group Joins 'Student Intifada'*, JTA (Sep. 9, 2025), https://www.jta.org/2025/09/09/politics/spurning-jewish-voice-for-peace-as-insufficiently-radical-new-jewish-student-group-joins-student-intifada (Anti-Zionist Jewish Student Front uses "L'chaim Intifada" in Yiddish, in its logo); Talia Jane (@taliaotg), X (Oct. 22, 2024 11:06 AM), https://x.com/taliaotg/status/1848742746430787601 (Press release from NYU Jewish students announcing erection of a "Gaza Solidarity Sukkah" with the language 'L'Chaim Intifada!'); Jewish Voice for Peace NY (@jvpny), INSTAGRAM (July 30, 2021), https://www.instagram.com/p/CR9nnSnlRtU/ (#GlobalizeTheIntifada with image); The Story, THE RABBIS' INTIFADA, https://www.therabbisintifada.com/story (Documentary by Jewish filmmaker on Orthodox rabbis who support Palestinian liberation).

Etymologically, "intifada" refers to a literal shaking off.[13] The term is widely used in Arabic to refer to popular uprisings around the world and carries a specific connotation of asymmetry in power rather than a battle between two equally-resourced parties.[14] For example, the term *intifada* has been used to refer to uprisings in other parts of the world outside of Palestine, including Western Sahara[15] and Iraq[16] as well as the Arab Spring Uprisings against authoritarianism and for democracy. Palestinians use this word to refer to periods of collective uprising in their decades-long struggle against colonization, and it has more recently been used as a call for global opposition to injustice.[17]

Slogans referencing an "uprising" or "uprisings" in the Arabic language, while potentially offensive to many who support Israel's actions, contribute to political discourse by expressing the viewpoint that Palestinians, like other occupied or otherwise disenfranchised people before them, should rise up against injustice ("One Solution: Intifada Revolution")—and deserve solidarity from those who support their cause for freedom ("Globalize the Intifada"). These slogans have contributed to the public discourse on what Palestinians are or are not allowed to say and do in response to the status quo in the region. For example, Democratic candidate for New York City Mayor Zohran Mamdani's refusal to condemn the slogan "Globalize the Intifada" sparked

---

[13] Mikaela Bell and Alice Zanini, *The Origins and Meaning of Intifada*, NATAKALLAM, https://natakallam.com/blog/meaning-of-intifada/ (last visited Oct. 1, 2025).

[14] Corey Robin, *What Do We Talk About When We Talk About "Globalize The Intifada?"* COREY ROBIN (June 30, 2025), https://coreyrobin.com/2025/06/30/what-do-we-talk-about-when-we-talk-about-globalize-the-intifada/.

[15] Elliana Bisgaard-Church, *Sahrawis Campaign for Human Rights and Independence in the First Intifada, Western Sahara, 1999-2004*, GLOBAL NONVIOLENT ACTION DATABASE (Nov. 20, 2011), https://nvdatabase.swarthmore.edu/content/sahrawis-campaign-human-rights-and-independence-first-intifada-western-sahara-1999-2004.

[16] Abdulwahab Al-Qassab, *Iraq's Southern Intifada: Mere Demands or a Popular Revolution?*, ARAB CENTER WASHINGTON DC (July 25, 2018), https://arabcenterdc.org/resource/iraqs-southern-intifada-mere-demands-or-a-popular-revolution/.

[17] Yousef Munayyer, *Zohran Mamdani Shows Democrats How Not to Take the Bait*, THE INTERCEPT (July 10, 2025), https://theintercept.com/2025/07/10/mamdani-globalize-intifada-democrats/.

conversation across the mainstream and independent media on the meaning of these words, including to Palestinians.[18]

While for many, depending on age and background, the word evokes images of Palestinians throwing stones at Israeli tanks during the First Intifada or violent attacks on Israeli civilians during the Second Intifada, "the fact that some will hear a call for 'intifada' as urging the murder of Israeli Jews," as a recent law review article notes, "[does not] entail that protestors who hew to the 'intifada' chant are making that choice to provoke, insult or threaten their Jewish (or even Israeli) peers." Eidelson & Hellman, *supra*, at 16-18 (noting that "I stand with the IDF" is correspondingly highly offensive to Palestinian students, who may reasonably hear that as a call for atrocities against them). Throughout history, political slogans have been interpreted as being a call for justice, or alternatively an attack on the majority racial group, including, "Immediate Emancipation!," "End Segregation Now," "Jim Crow Must Go," "By Any Means Necessary," "Black Lives Matter," "No Justice, No Peace" "End Apartheid Now," and "No Human Is Illegal." That some students view political slogans challenging government policies as threatening does not make such slogans actionable harassment under Title VI. See *Gartenberg*, 765 F. Supp. 3d at 271. Were that to be the case, students would not be able to speak out against slavery, segregation, or apartheid.

### 2. "From the River to the Sea" is Protected Political Speech

The slogan "From the River to the Sea, Palestine Will Be Free," which Plaintiffs also claim creates a hostile environment, is a quintessential example of political speech. From the perspective of Palestinians and their allies, the phrase is an expression of the aspiration for freedom, equality,

---

[18] As one Palestinian commenter stated: "What is at issue here is not simply what the word means, but who gets to define its meaning and who gets to have their intentions and the validity of their concerns defined by others." *Id*.

and human rights across the entirety of historic Palestine—the land between the Jordan River and the Mediterranean Sea. Supporters of Israel, including Prime Minister Benjamin Netanyahu's Likud Party, have also used "From the River to the Sea," as a slogan calling for Israeli sovereignty between the Jordan and the Mediterranean.[19] Jewish students at MIT and elsewhere have likewise used the slogan to express support for Palestinian freedom.[20]

Courts have made clear that political slogans of this nature are protected even when controversial, provocative, or unsettling to some. *See, e.g., Univ. of Md. Students for Just. in Palestine* 2024 U.S. Dist. LEXIS 178359, at *22 (D. Md. Oct. 1, 2024) (holding that "From the river to the sea" is protected by the First Amendment). Because the slogan addresses "matters of public concern," namely, one of the most contested issues in modern international politics— whether the land between the Jordan and the Mediterranean should be a state equally for all its people, a state with full rights for Jews and limited rights for Palestinians, or something completely different—the phrase "'occupies the highest rung of the hierarchy of First Amendment values.'" *Snyder*, 562 U.S. at 451-52 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

---

[19] Jonathan Ofir, *If You're Surprised by Netanyahu's 'River to the Sea' Comment, You Haven't Been Paying Attention,* MONDOWEISS (Jan. 19, 2024), https://mondoweiss.net/2024/01/if-youre-surprised-by-netanyahus-river-to-the-sea-comment-you-havent-been-paying-attention/; Jewish Virtual Library, *Likud Party: Original Party Platform*, THE JEWISH VIRTUAL LIBRARY (last visited Sep. 30, 2025), https://www.jewishvirtuallibrary.org/original-party-platform-of-the-likud-party.
[20] See note 5 for MIT Jews for Collective liberation Instagram posts from May 8, Aug 13, and Oct 31, 2024.

The group MIT Jews for Collective Liberation has also put out a number of statements calling Israel's actions a genocide and/or criticizing Zionism and the conflation of Judaism with support for Israel. *See, e.g., Jewish Activism, Safety, and Recent Events at MIT*, MIT JEWS FOR COLLECTIVE LIBERATION *(*Apr. 11, 2024), https://jcl.mit.edu/posts/statement-jewish-activism/ (explaining the reasoning behind MIT Jewish student group's participation in peaceful sit-in urging MIT to divest from Israeli occupation); *Statement on Protests*, MIT JEWS FOR COLLECTIVE LIBERATION (May 6, 2024), https://jcl.mit.edu/posts/protests/ (calling Israel's actions a genocide and encouraging protests calling on MIT to divest from Israel*). See also* Eidelson & Hellman, *supra*.

### 3. 'Free, free Palestine' and Accusations that Israel Is Committing a Genocide Are Pure Political Speech on a Matter of Public Concern

Plaintiffs allege that the chant "Free, free Palestine" and statements accusing Israel of genocide in a classroom and in a graduate's speech create a hostile environment for Jewish students. FAC ¶¶ 36-37; 51.

This is an intellectually dishonest interpretation of an expression that Palestinians deserve life, not to be killed, and to live in freedom. "Free, free Palestine" is an expression that many Jewish students themselves use—that does not target any student on the basis of a protected group, any more than the slogan of "Free Tibet" targets Chinese students, "Free Kashmir" targets Indian students, or "End the Genocide in Rwanda" targets Hutu students.

Speaking out against Israel's genocide is certainly a matter of public concern and as the court noted in *Landau*, "reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views." 2025 U.S. Dist. LEXIS 1402 at *5. Indeed, many Israelis and Jews are highly critical of Israel's genocide in Gaza.[21] As a number of Jewish scholars argued in an amicus brief in another case in this Court, attempts to define Judaism or stereotype Jews as being loyal to Israel or being against the rights of Palestinians separately raises its own Title VI concerns. Amici Curiae Brief of 27 Jewish Scholars of Jewish Studies in Support of Plaintiff's Motion for Summary Judgement, *President & Fellows of Harv. Coll. v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-11048-ADB, 2025 U.S. Dist. LEXIS 171326 (D. Mass. Sep. 3, 2025).

---

[21] *See, e.g.*, Aaron Boxerman, *In a First, Leading Israeli Rights Groups Accuse Israel of Gaza Genocide*, N.Y. TIMES (July 28, 2025), https://www.nytimes.com/2025/07/28/world/middleeast/israel-genocide-gaza-rights-groups.html; Omer Bartov, *I'm a Genocide Scholar. I Know it When I See It.*, N.Y. TIMES (July 15, 2025), https://www.nytimes.com/2025/07/15/opinion/israel-gaza-holocaust-genocide-palestinians.html.

### 4. Flag Desecration Is Protected by the First Amendment

Plaintiffs also claim that protesters displaying Israeli flags with red handprints created a hostile environment in violation of Title VI. FAC ¶ 43. The desecration of national flags as a form of protest has long been held to be core-protected First Amendment speech. *Texas v. Johnson*, 491 U.S. 397 (1989). There is no carve-out for Israeli flags or national flags with religious symbols, which would lead to the absurd conclusion that the First Amendment allows for the burning of the U.S. flag as expression, but not red paint on the Israeli flag—or the dozen-plus national flags with crosses, crescents, and other religious symbols—to express the opinion that a country is committing war crimes.[22]

### 5. Criticizing the Political Ideology of Zionism Is Protected by the First Amendment

Courts have likewise found that criticizing the political ideology of Zionism is protected by the First Amendment. *See, e.g.*, *Vega v. Miller*, 273 F.3d 460, 467 (2d Cir. 2001) (affirming that teachers are permitted to criticize Zionism in classrooms, under the First Amendment "despite the offensiveness of the teacher's viewpoint to some students and some members of the community") (discussing *Dube*, 900 F.2d 587). In another Title VI lawsuit alleging that "Zionism is a central tenet of the Jewish faith"—as plaintiffs do here (FAC ¶ 30)—the court noted that such a claim raised concerns under the Establishment Clause, which "forbids the federal courts from saying what the tenets of a religion are." *Louis D. Brandeis Ctr.*, 2025 U.S. Dist. LEXIS 62680 at *5; *see also* Brief of Amicus Curiae on Behalf of A Jewish Voice for Peace, *President & Fellows of Harv. Coll.*, 2025 U.S. Dist. LEXIS 171326.

---

[22] This includes, for example, Algeria, Greece, Saudi Arabia, Sri Lanka, Switzerland, Turkey, and the United Kingdom.

Plaintiffs argue that "Zionism reflects this enduring connection between the Jewish people and the land and recognizes the right of Jewish self-determination in the land of Israel" (FAC ¶ 24) and that a "vast majority of Jews around the world identify as Zionists or feel a connection or kinship with Israel". FAC ¶ 29. Even if this were true[23], "Title VI recognizes Jewishness only as a racial or ancestral category" which means that allegations of speech or expression targeting Zionists or Zionism—or even excluding Zionists on the basis of ideology—cannot give rise to a Title VI claim. Eidelson & Hellman, *supra, at* 9, 10-11 (noting that when courts have addressed the question of race-associated cultural practices, such as wearing locks or cornrows, absent a claim of pretext, courts have consistently held that antidiscrimination laws "afford no protection") (citing *Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1021, 1025 (11th Cir. 2016)); Deborah Hellman, *Defining Disparate Treatment: A Research Agenda for Our Times*, 99 IND. L.J. 205, 220-21 (2023). For example, slogans criticizing white supremacy, segregation, or apartheid would not be actionable under Title VI, even where a complaint alleged that a majority of white people believed criticizing segregation or white supremacy or apartheid to be anti-white.

As the Supreme Court recently explained, university decisions based on "'stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to criterion barred to the Government and the Constitution'" are proscribed. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 221

---

[23] Israeli law professors Itamar Mann and Lihi Yona recently analyzed this issue and explained why this assumption should not be made, arguing that while "antisemitism is often weaponized against Palestinians and their liberation struggle," stereotyping Jews as Zionists imposes "an additional layer of harm … upon American Jews." Itamar Mann & Lihi Yona, *Defending Jews From the Definition of Antisemitism*, 71 UCLA L. REV. 1150, 1161 (2024). ("Precisely because Judaism may be understood or expressed through multiple ways, attacking a particular amalgamation of nationality and religion (e.g. Zionism) cannot be considered antisemitic per se because it is part of a legitimate debate about the nature of Judaism."). *See also* Brief of 27 Jewish Scholars of Jewish Studies, supra, at 3-7.

(2023) (quoting *Miller v. Johnson*, 515 U.S. 900, 912 (1995)). Although *Students for Fair Admission, Inc*. was largely about the Equal Protection Clause, the Court noted that the same principle applied to Title VI. *Students for Fair Admission,* 600 U.S. at 198 n.2.

### 6. The Gaza Encampment is Pure Political Speech on a Matter of Public Concern

Lastly, Plaintiffs allege in ¶ 40 of their amended complaint that "[o]n April 21, 2024, anti-Israel students at MIT erected an encampment in the center of campus on Kresge Lawn, which remained for two weeks. During this time Jewish and Israeli students were blocked from entering this area of campus." FAC ¶ 40. The complaint does not allege that Jewish and Israeli students were blocked because they were Jewish or Israeli or because of any other protected identity—or only does so in a conclusory manner. As such, the Court must also dismiss this claim. As pled, the complaint leaves open the possibility that students were blocked due to their political beliefs. Many Jewish students, including the student group MIT Jews for a Collective Liberation, participated in the Gaza encampment in order to express criticism of Israel's genocide in Gaza.[24] If, hypothetically, pro-Palestinian Jewish students blocked pro-Israeli Jewish students from entering the encampment on the basis of their political viewpoint (e.g., support for Israeli Prime Minister Netanyahu, views supporting different laws or segregation of Palestinians, or genocide denial), this would not meet the requirements of a Title VI claim. *See*, *e.g.*, *B.W.*, 121 F.4th at 1068 (affirming dismissal of Title VI claims where "the impetus for the harassment and bullying was his political beliefs, actions, and expressions and those of his classmates."); *Spengler v. Coop. Educ. Serv. Agency 7*, No. 22-C-1199, 2025 U.S. Dist. LEXIS 149109, at *42-43 (E.D. Wis. Aug. 4, 2025) ("Titles VI and VII of the Civil Rights Act of 1964 prohibit discrimination on the basis

---

[24] MIT Jews for Collective Liberation (@mit_jcl), INSTAGRAM (Apr. 22, 2024), https://www.instagram.com/p/C6ERuyau76a/ (inviting MIT community to Passover Seder at the Gaza encampment).

of race, not ideology. Plaintiff's racial discrimination claims... fail because Plaintiff has not presented a prima facie case that she was discriminated against... on account of her race....[I]t was her opposition to [her employer's] agenda, not her skin color, that led to her demotion."); *Siyu Yang v. Ardizzone*, 540 F. Supp. 3d 372, 381 (W.D.N.Y. 2021) (quoting *D.S. v. Rochester City Sch. Dist.*, No. 6:19-CV-6528 EAW, 2020 U.S. Dist. LEXIS 223647, at *10 (W.D.N.Y. Nov. 30, 2020)) ("'[b]eing treated differently as a result of one's political beliefs is not the equivalent of discrimination that arises from an individual's particular race, as is required to establish a violation of Title VI."). While Plaintiff Alon alleges that he was excluded from the encampment because he is Israeli and Jewish (FAC ¶ 88) and that he was not let out of the encampment because he is Israeli and Jewish (FAC ¶ 90), he does not provide any supporting facts on how it was known he is Israeli and Jewish or how this was the basis for his exclusion.

## II. Title VI and Title VII Do Not and Cannot Require Universities to Censor, Punish, or Condemn Speech Activity Supporting Palestinian Rights

Plaintiffs claim or imply that MIT should have done a number of things in response to the above-described pro-Palestinian expression on campus in paragraphs 33 through 58 in their complaint. Plaintiffs wanted MIT President Kornbluth to condemn the class president who said Israel was committing genocide during her commencement speech as using "hateful rhetoric," in real time with detailed specifics (FAC ¶ 51), respond to intifada stickers (FAC ¶ 56) and, when condemning antisemitism, to also address "larger issues". FAC ¶ 53. When President Kornbluth did make a statement condemning a flyer, Plaintiffs labeled it a "performative gesture" (FAC ¶ 55) suggesting that by not taking more action, MIT "created a hostile environment and a sense that Jewish and Israeli members of the community were not welcome on campus." FAC ¶ 59.

Plaintiffs are not entitled to have the Court craft for them the response they wish to see from MIT. The Supreme Court has stated that "[t]here is no basis whatsoever, either under Title

VI, nor within the confines of the First Amendment, for a court to hold a college administrator liable for failing to convey a specific message," *W. Va. State Bd. Of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "A court cannot compel administrators' speech, nor insist that administrators should have conveyed a different message." *Landau*, 2025 U.S. Dist. LEXIS 123300, at *20.

As noted above, Plaintiffs' claims target protected political speech and expression supporting Palestinian freedom. Compelling MIT to criticize or condemn speech that is not directed at anyone based on a protected class but rather on the actions of a foreign political entity would violate the First Amendment. *See Gartenberg*, 765 F. Supp. 3d  at 260 ("A statute that burdens protected speech must comport with the First Amendment regardless of whether it does so directly, such as prohibiting certain speech outright, or indirectly, such as by requiring a court adjudicating a 'civil lawsuit between private parties' to apply a rule of law that has the effect of 'impos[ing] invalid restrictions on [the defendant's] constitutional freedom[] of speech.")') (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). The Supreme Court has thus cautioned against the dangers of censoring First Amendment-protected speech in the name of nondiscrimination, holding that "to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 836 (1995). "[R]equiring schools to censor or punish political speech to avoid liability for a hostile environment would burden not only their students' freedom of expression, but the academic freedom of the institution itself to create an educational environment centered around the free exchange of ideas." *Gartenberg*, 765 F.Supp.3d at 261. While a student may be offended by certain speech, "offense does not provide a lawful basis on which to stifle expression."

*Landau*, 2025 U.S. Dist. LEXIS at *14 (citing *Bachellar v. Maryland*, 397 U.S. 564, 567 (1970) and *Matal v. Tam*, 582 U.S. 218, 244 (2017)).

Neither Title VI nor Title VII requires universities to condemn or punish speech criticizing the actions of a nation state under a theory that doing so discriminates against the dominant ethnic (or shared ancestry) group of that state. If that were the case, schools would be forced to adopt censorship policies in order to avoid a finding of "deliberate indifference." For example, universities would be compelled to investigate and possibly punish slogans stating opposition to an independent state for Sikhs as discriminating against Sikh students or even a graduation speech critical of the Trump administration's treatment of immigrants as potentially creating an environment hostile for white students.

A university likewise cannot be required to take steps to curtail student speech critical of a nation state in order to create a campus environment that is more agreeable to a faculty member. *See Woodard v. TWC Media Solutions, Inc.*, No. 09-cv-3000 (BSJ)(AJP), 2011 U.S. Dist. LEXIS 1536, at *34-35 (S.D.N.Y. Jan. 4, 2011) ("[W]here Plaintiff was not the direct recipient of harassing or threatening comments, they are far less persuasive in establishing a claim of hostile work environment."). In their many examples of the kind of student speech they found offensive, Plaintiffs dangerously conflate antisemitism with "pure speech on matters of obvious public concern directed at the campus community as a whole." *Gartenberg*, 765 F. Supp. 3d at 275. Title VI and Title VII impose no obligation on the university to protect Plaintiffs against speech and expressive conduct that expresses viewpoints with which they disagree or feel offended by.

## CONCLUSION

Palestine Legal respectfully requests the Court grant Defendants' motion to dismiss, and that it does not do so in a way that suggests that universities may avoid a finding of deliberate

indifference under Title VI by censoring, punishing, or condemning political speech critical of Israel or supporting Palestinian liberation.

Dated: October 9, 2025

Respectfully submitted,

/s/ *Radhika Sainath*
Radhika Sainath*
PALESTINE LEGAL
55 Exchange Pl
New York, NY 10005
(312) 964-2667
radhika@palestinelegal.org

Sabiya Shelly Ahamed*
PALESTINE LEGAL
55 Exchange Pl
Suite No. 402
New York, NY 10005
(312) 964-2667
sahamed@palestinelegal.org

*Admitted Pro Hac Vice*

*Attorneys for Amicus Curiae*