## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| William Sussman, Lior Alon, John Doe and The Louis D Brandeis Center Coalition to Combat Antisemitism, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action Case No. 1:25-cv-11826-RGS |
| Massachusetts Institute of Technology and Michel DeGraff, | ) ) ) | |
| Defendants. | ) ) ) | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

Jews at the Massachusetts Institute of Technology ("MIT") were threatened, tormented, and publicly humiliated by students, faculty, and staff in the wake of Hamas's brutal attacks on October 7, 2023.  Jewish students, faculty, and staff were forced to retreat from campus life, hide their Jewish identities, suffer mental health issues, and change career paths, because of the severe and pervasive harassment at MIT.  MIT knew that Jews and Israelis were suffering on campus and did little more than pay lip service while sweeping problems under the rug.  Promised investigations never came to pass; bad actors were not punished; misconduct continued and escalated.  MIT's Institute Discrimination and Harassment Response Office ("IDHR") not only refused to investigate discrimination claims, but it also offered purported *justifications* for offensive and illegal conduct.

The same indifference MIT displayed toward anti-Semitism on its campus is echoed in its motion to dismiss.  MIT tries to win its motion by minimizing both its inaction and the well-pled descriptions of pain and life-altering consequences suffered by its Jewish and Israeli students and employees.  Public and grotesque anti-Semitic bullying by a tenured faculty member is shrugged

off as "petty slights and mere annoyances" that were "neither severe nor pervasive."  Plaintiffs living in fear and being forced to give up their planned careers is recast as mere "social discomfort" and "distraction."  ECF No. 47 at 26–27, 31.  MIT even argues that its Jewish students and employees who spoke up about anti-Semitism provoked their own suffering by engaging in "political" debate.  *Id.* at 23, 25, 26–27.

But a defendant cannot prevail on a motion to dismiss by recharacterizing the allegations of a complaint.  All inferences must be drawn in Plaintiffs' favor, and it is an argument for a jury whether an environment is so hostile that a Jewish student feels compelled to leave the university is merely "social discomfort."  Indeed, MIT is forced to concede that some of the allegations— those pertaining to Plaintiff John Doe—are so egregious that they cannot even muster a motion to dismiss.  And because John Doe is a member of the Plaintiff The Louis D Brandeis Center Coalition to Combat Anti-Semitism ("Coalition"), MIT barely even tries to dismiss the case brought by the Coalition, instead focusing its fire on a discredited standing argument that this Court previously rejected.  As the case is moving to discovery anyway, MIT's partial motion to dismiss is best understood as an improper effort to limit the inevitable discovery.

Defendant Michel DeGraff, who is alleged to have led an online mob against Jewish and Israeli students, staff, and faculty, tries to hide behind the First Amendment.  But, as discussed below, the Amended Complaint focuses on harassment Plaintiffs experienced because they were Jewish and/or Israeli—harassment for which the First Amendment provides no protection.  At most, DeGraff's defense insisting he was only intending to criticize Israel as a political matter is also a question of fact.  He cannot stop this case in its tracks without discovery and allowing Plaintiffs the opportunity to develop their case.

The Court should deny the motions to dismiss.

2

## FACTS

### I.    BACKDROP: MIT IS A HOSTILE ENVIRONMENT FOR JEWS AND ISRAELIS

On October 7, 2023, Hamas "launched a grotesque attack on Israel, intentionally killing hundreds of unarmed civilians and taking many others hostage." *Stand With Us Ctr. for Legal Justice v. MIT*, 158 F.4th 1, 5 (1st Cir. 2025). These horrifying events set ablaze simmering anti-Semitism on MIT's campus. *See* ECF No. 17 ("AC" or "Complaint") ¶¶ 32–61. Indeed, the First Circuit recently recognized that the "cacophony of protests" and "ensuing debates over the course of seven months" that followed October 7 "plausibly spun off" other "incidents" that "any thoughtful person would regard as antisemitic." *Stand With Us*, 158 F.4th at 20 (describing how plaintiffs were blocked from entering campus areas and harassed because of their Jewish identity).

Rather than condemn the brutal murders and kidnappings of innocent civilians, MIT community members reveled in Hamas's acts and took up the group's violent mantle. *E.g.*, AC ¶¶ 2, 33. MIT community members called for violence against Jews, occupied campus spaces, and interrupted classes with anti-Semitic chants. On multiple occasions, students handed out "terror map" flyers that identified locations of Jewish and Israeli-related spaces and encouraged violence against them, *id.* ¶¶ 47–49, and created and circulated a list of people who were thought to be Israeli, *id.* ¶¶ 274–75. Flyers displaying a Jewish star dripping in blood were posted around campus in June 2025, *id.* ¶ 53, and Jewish community spaces were vandalized, *id.* ¶¶ 39, 57.

Faculty and staff also harassed Jewish and Israeli members of the MIT community. *Id.* ¶¶ 91, 113, 124–25, 136–37. In fall 2024, one of MIT's tenured professors, Defendant Michael DeGraff, publicly accused "Jewish student life organizations" like Hillel and Chabad of funding a "mind infection." *Id.* ¶ 6. He conducted an anti-Semitic and anti-Israel seminar that invited guest speakers to teach about this "mind infection." *Id.* ¶¶ 112–113, 125. In the leadup to this seminar, DeGraff targeted and publicly harassed the head of his department, who is Israeli, blaming the

head's Israeli identity for DeGraff's seminar not getting approved. *Id.* ¶ 110.

MIT was aware of the anti-Semitic and anti-Israeli conduct. *See, e.g., id.* ¶¶ 59, 283–88. MIT President Sally Kornbluth, other high-ranking administrators, faculty, IDHR, and the MIT Police Department were all directly put on notice about—or were firsthand witnesses to—the severe and pervasive harassment. *See, e.g., id.* ¶¶ 49, 51–53, 55, 111, 124–26, 277–88.

The profound hate on campus has caused Jewish and Israeli MIT community members—some of whom are descendants of Holocaust survivors, lived through the First and Second Intifadas, and lost loved ones on October 7, 2023—to live in fear and to be deprived of academic and professional pursuits. *E.g., id.* ¶ 60. Some have resorted to hiding their Jewish identity, not attending events and classes, avoiding parts of MIT's campus, or leaving the university. *E.g., id.*

Yet MIT failed to take reasonable steps to stop the harassment. *See id.* ¶¶ 281–88. At best, MIT paid lip service to its support of Jewish and Israeli students with statements not backed by action. *See id.* ¶ 54–55, 82. Rather than swiftly addressing discrimination and harassment, MIT was deliberately indifferent to the horrific events faced by Jewish and Israeli students and employees—further exacerbating the isolation and rejection they experienced. *See id.* ¶ 61.

## II.   THE INDIVIDUAL PLAINTIFFS AND COALITION MEMBERS WERE, AND ARE, SUBJECT TO SEVERE AND PERVASIVE HARASSMENT

It is against this appalling backdrop that the claims of Doe, Alon, and Sussman (the "Individual Plaintiffs"), and the Coalition, should be evaluated. Each plaintiff has directly—or in the case of the Coalition, through its members, including the Individual Plaintiffs—been harmed by the anti-Semitism and discrimination on campus. And their experiences collectively establish an environment of anti-Semitic and anti-Israeli harassment and discrimination at and by MIT.

### A. John Doe faced harassment, discrimination, and retaliation because he is Jewish and Israeli, and was forced out of the postdoctoral program in which he excelled.

John Doe is a member of the Coalition. *Id.* ¶ 20. He is a Jewish Israeli grandson of

Holocaust survivors who lived through the Second Intifada. *Id.* ¶¶ 176–179. On October 7, 2023, Hamas kidnapped and brutally murdered several of Doe's friends. *Id.* ¶ 180. Doe holds a PhD from a prestigious Israeli university, has received numerous accolades, and has held respected positions. *Id.* ¶ 182. Professor Richard Roe recruited Doe to join his lab as a postdoctoral associate in an MIT science department. *Id.* ¶¶ 187–92. In his first year, Doe earned high praise, and Roe began discussing tenure-track positions. *Id.* ¶¶ 193–97.

Things changed in fall 2024 when two graduate students began to target and harass Doe based on his Jewish and Israeli identity. *Id*. ¶ 198. They expressed disappointment when they learned Doe and certain faculty members were Jewish, *id*. ¶¶ 199–200; collected data on Jews and Israelis on campus, *id*. ¶ 201; said that Doe's partner's "nose looks Jewish so she is probably Jewish," *id*. ¶ 205; discussed plans to break up Doe's relationship to "prevent more Jewish babies," *id*. ¶ 206; and claimed Doe acted cruelly during his Israeli military service despite Doe never actually serving in the Israeli military, *id*. ¶ 207. Doe reported the anti-Semitic harassment to Roe, who did nothing, and instead contributed discriminatory commentary. *Id*. ¶¶ 211–13. In November 2024, Roe began to push Doe out of the lab. *Id*. ¶¶ 226–29.

Anti-Semitism and anti-Israeli animus also surrounded Doe on campus. *See id*. ¶¶ 215–25. He saw threats of violence written on blackboards, *id*. ¶ 220, and heard protestors chanting "[b]ring the intifada to MIT," *id*. ¶¶ 176, 216. In May 2024, protestors wearing Hamas headbands, chanting "Death to Israel" and "Death to Zionists," blocked Doe on his way to his car, pushed him against a wall, and interrogated him about his identity. *Id*. ¶ 221. Doe wrote to President Kornbluth that he no longer felt safe on campus. *Id*. ¶ 222. She never responded. *Id*. ¶ 223.

In December 2024, Doe met with a human resources officer and the associate head of the department and detailed the harassment he had received and Roe's efforts to terminate Doe's role

in the lab, despite his strong evaluations. *Id.* ¶¶ 231–39. Doe explained that this harassment occurred because he was Jewish (not just Israeli). *Id.* ¶ 233. The MIT officials stated that they would file a complaint with MIT's anti-discrimination office, but they never did. *Id.*

In February 2025, Roe told Doe that two students could not stand the presence of "his kind" in the lab. *Id.* ¶ 240. When Doe asked if it was because he was Jewish, Roe nodded. *Id.* Roe instructed Doe to cease his work on projects involving the group. *Id.* ¶ 241.

In March 2025, Doe again met with the department's human resources officer and the associate head, who admitted there was anti-Semitism caused by Roe and the graduate students. *Id.* ¶ 251. Rather than act to address the bad actors, the associate head relied on an offer Doe had received for a position in another department to propose an early transition. *Id.* She then offered to file a formal complaint with MIT's anti-discrimination office (IDHR), admitting that she had not done so in December. *Id.* ¶ 252. The associate head stated she would speak to Roe. *Id.* ¶ 253. Later that day, Roe emailed many people that he "decided that [Doe] will stop working" in his group immediately. *Id.* ¶ 254. The next day, he banned Doe from entering the offices or labs he had been working in and demanded return of keys and a laptop, depriving Doe of his own research. *Id.* ¶ 256. Roe then tried to smear Doe's reputation to numerous colleagues and prospective employers, causing harm that persists to this day. *Id.* ¶¶ 257–58, 263–66, 272.

Doe later endured other acts of anti-Semitism, including cyberattacks traceable to a student from Roe's lab, which left Doe unable to access his email account and important research files. *Id.* ¶¶ 260, 262. MIT has still not taken any action on Doe's complaints. *Id.* ¶ 267.

As a result of these events, Doe's mental health has deteriorated and he suffers from depression, anxiety, and fatigue. *Id.* ¶ 268. Doe has been forced to hide his Jewish and Israeli identities on campus. *Id.* ¶¶ 269–70. His three-year contract ended prematurely, and he can no

longer perform the work he came to MIT to perform. *Id*. ¶ 271. His reputation and career have been diminished because of Roe's conduct and MIT's inaction. *Id*. ¶ 272.

### B. Coalition Member #1 experienced anti-Semitism that went unchecked by MIT.

Coalition Member #1 is a member of the Coalition and a current Jewish and Israeli student at MIT. *Id*. ¶¶ 273, 274. In May 2025, Coalition Member #1 was the subject of a doxing attack when his identity was included on the "curated list of Israelis maintained by graduate students on the MIT campus." *Id*. ¶ 274. Seriously concerned about his safety, Coalition Member #1 reported the incident to IDHR, seeking help on multiple occasions. *Id*. ¶¶ 276–280. Rather than assist, MIT claimed it needed additional information. *Id*. ¶ 281. But, as the Complaint alleges, IDHR had been made aware months earlier of the identity of the student believed to be involved in making and keeping this list. *Id*. ¶¶ 281–82. MIT thus had sufficient information to identify and punish the student responsible. But MIT did nothing, despite multiple requests for action. *See id*. ¶ 282.

### C. Alon faced harassment, discrimination, and retaliation because he is Jewish and Israeli and has suffered personally and professionally.

Plaintiff Dr. Lior Alon is currently an instructor at MIT who served as a postdoctoral associate in MIT's Mathematics Department from fall 2022 through August 2024. *Id*. ¶¶ 18, 66. Alon is Jewish and Israeli, as well as a Coalition member. *Id*. ¶¶ 18, 63. Alon comes from a family of Holocaust victims and survivors. *Id*. ¶ 62. Alon grew up in Israel and lived through the First and Second Intifadas. *Id*. ¶ 63. On October 7, 2023, Hamas murdered multiple friends. *Id*. ¶ 78.

To his dismay, days after Hamas's massacre, Alon witnessed on-campus demonstrators calling for violence against Jews. *Id*. ¶ 79. On October 19, he heard protestors near his children's daycare chanting "one solution, intifada," which terrified him because, having experienced two intifadas, he recognized this as a call for a violent uprising against Israelis and Jews. *Id*. ¶ 80.

Afraid for his life and the lives of his family, he wrote to President Kornbluth to alert her

about these events and their meaning, *id.*, and later forwarded the email to the head of his department, who affirmed that this was "quite scary" and expressed "hope" that President Kornbluth would take actions to "keep our campus safe," *id.* ¶ 81. President Kornbluth responded to Alon with two sentences: "I appreciate your outreach and share your concern. This matter has our full attention." *Id.* ¶ 82. Days later, she issued a video statement referencing "ugly words and actions," without directly addressing calls for violence on campus. *Id.* But no action was taken.

In April 2024, an anti-Israel encampment was erected in the center of campus. *See id.* ¶ 83. The encampment was located on Alon's daily route—between his child's daycare and the math department. *Id.* ¶ 84. On April 23, 2024, Alon tried to walk through the encampment area, but an MIT administrator and a police officer, knowing Alon was Jewish and Israeli, told him to leave. *Id.* ¶¶ 84, 85, 88.

On that same day, while Israelis gathered and sang the Israeli national anthem to honor their murdered and kidnapped loved ones, DeGraff aggressively filmed them, shoving his phone in Alon's face. *Id.* ¶ 91. Soon after, DeGraff started posting videos online of Alon's face, name, and personal information, including details of his Israeli military service. *Id.* ¶ 97. DeGraff edited the videos to vilify Alon and tagged Al Jazeera, among others. *Id.* This put Alon at serious risk of harm, caused him distress and fear, and harmed his reputation. *Id.* ¶¶ 97, 99. Alon was aggressively confronted by strangers at the grocery store and his child's daycare because of these posts. *Id.* ¶ 98. DeGraff then amplified these posts and further maligned Alon in two widely disseminated articles that harmed his standing in the MIT and broader academic communities. In May 2024, DeGraff published a defamatory essay in *Le Monde diplomatique*, a periodical circulated to millions worldwide, falsely attributing to Alon comments he had not made: widely accusing a group of MIT student protestors of all "advocat[ing] the killing of Jews." *Id.* ¶¶ 100–

03.  In a June 2024 piece on TheTech.com, MIT's weekly student newspaper, DeGraff linked to multiple of his own harassing posts and videos of Alon, falsely citing him as an example of people "directly threatening or mocking" student protestors.  *Id.* ¶ 103.

On June 17, 2024, Alon recounted these events and his fear for his and his family's safety in an email to President Kornbluth.  *Id.* ¶ 104.[1]  Alon asked that MIT request DeGraff take down his posts, and if he refused, to take disciplinary action against him.  *Id.* ¶ 105.  Kornbluth did not respond, and MIT did nothing.  *Id.* ¶¶ 106–08.    Due to MIT's inaction, DeGraff continued harassing Jewish and Israeli professors and students as described below.  *See*, *e.g.*, *id.* ¶¶ 109–50.

On a Zoom call with MIT administrators on November 15, 2024—requested by Alon to discuss the "escalating concern" of anti-Semitism on campus—Alon, Sussman, and others reported direct threats of violence like "[w]e're going to shred you" and "[w]e will burn the ground beneath your feet."  *Id.* ¶ 142.  Nothing came from this call or other pleas from Alon.  *Id.* ¶¶ 114, 163.  Alon continues to frequently see demonstrations calling for violence against Jews and Israelis— including inside his work building, directly beneath his office.  *Id.* ¶ 162.

This hateful climate has affected Alon emotionally, socially, academically, and professionally.  *See id.* ¶ 162.  He has experienced depression and anxiety, began seeing a therapist, and had to seek additional medical support.  *Id.* ¶¶ 162, 165.  He no longer feels welcome to exchange ideas with MIT community members, and it has become extremely difficult for him to focus, collaborate, and benefit from his position the way he had envisioned.  *Id.* ¶¶ 163, 164.  He also had to move his child out of the MIT daycare to a public childcare facility that he can no longer walk to from his office.  *Id.* ¶ 168.  And despite his extraordinary credentials and experience,

---

[1] DeGraff's May 2024 essay was not referenced in this email because Alon was unaware of it then. *See id.* ¶ 104.

public exposure has impaired his ability to obtain a tenure-track position. *Id.* ¶¶ 166–67.

### D. William Sussman suffered harassment, discrimination, and retaliation because he is Jewish, and was forced to leave MIT.

Plaintiff William Sussman, a Coalition member, is a Jewish American former PhD student in computer science at MIT. *Id.* ¶¶ 19, 71–77. Sussman was aware of anti-Semitism on campus based on his own experiences and those of others through his role as President of MIT Grad Hillel. *Id.* ¶¶ 92–95. After October 7, 2023, Sussman witnessed chants for violence against Jews, campus takeovers, and aggressive confrontations, some of which led to arrests both inside and outside his office building, the Ray and Maria Stata Building. *Id.* ¶¶ 93–94.

Sussman was also one of DeGraff's direct targets. *Id.* ¶ 96. After DeGraff promulgated in his seminar the disturbing theory that there was a Jewish "mind infection" through Israeli education, *id.* ¶¶ 112–13, DeGraff posted on Instagram that "Jewish student life organizations" like Hillel and Chabad help fund the "mind infection," *id.* On November 9, 2024, Sussman posted on X, tagging MIT, stating that "[a]n @MIT professor posted extremely dangerous rhetoric about MIT Hillel . . . and other Jewish student life organizations. These groups represent the majority of Jews on campus, and he accuses them of funding a 'mind infection.'" *Id.* ¶ 115. DeGraff then posted messages targeting Sussman and tagging his account. *Id.* ¶ 116.

The next day, Sussman emailed DeGraff, copying high-level administrators and professors at MIT including the Chancellor, Vice President of Equity and Inclusion, and Vice Chancellor of Student Life, stating "Professor DeGraff: Please leave me alone. Will Sussman." *Id.* ¶ 117. That same day, DeGraff posted three more messages on X—each minutes apart—targeting Sussman and tagging his account. *Id.* ¶ 118. Between DeGraff's posts, Sussman emailed administrators reiterating that he had asked DeGraff to stop and pleading for them to intervene. *Id.* ¶¶ 119–120. Less than an hour later, DeGraff replied to Sussman's email, copying more administrators

including President Kornbluth, asking Sussman to "cease and desist," even though Sussman had not contacted DeGraff after asking to be left alone.  *Id.* ¶ 120.  Fifty minutes later, DeGraff forwarded Sussman's email and his response to the entire Linguistics and Philosophy Department (including students and professors), everyone in DeGraff's anti-Israel seminar (including students and staff), MIT's Vice President and Vice Provost, among others, claiming to use Sussman to illustrate "live" the "mind infection."  *Id.* ¶ 121.  Then, a staff member at MIT's Sloan School of Management replied to all, characterizing Sussman as being aligned with a racist cause.  *Id.* ¶ 122.  DeGraff thanked the staff member and expressed his intent to explore Sussman as a "real-life case study" in his next class.  *Id.* ¶ 123.  That day, Sussman filed a complaint with IDHR alleging harassment and retaliation based on a protected class, and stalking.  *Id.* ¶ 151.

On November 11, an Israeli professor expressed his concern about DeGraff's conduct given the "significant power imbalance at play."  *Id.* ¶ 124.  That email was received by high-ranking administrators like MIT's President, Chancellor, Vice Chancellor, and Vice President, among others.  *Id.*  In response, the guest speaker from DeGraff's seminar who taught about the "mind infection" wrote that the Israeli professor was the "best proof for the infection of the Israeli Jewish best minds."  *Id.* ¶ 125.  MIT's Vice Chancellor told Sussman privately that she was "sorry to see this exchange," which she would share with Human Resources, and referred to "support resources at MIT."  *Id.* ¶ 128.  Neither she nor others did anything to condemn or stop the harassment.  *Id.* ¶¶ 127–28.

That same day, DeGraff continued to harass Sussman.  For the sixth time, DeGraff posted on X, tagged Sussman, and said he was as an "excellent case study."  *Id.* ¶ 129.  This prompted Sussman to contact the MIT Police Department to request a restraining order, stating that DeGraff was putting him "(a Jewish student) in danger by directing an anti-[S]emitic mob toward" him.  *Id.*

¶ 130.  DeGraff sent two more mass emails, one of which falsely accused Sussman of having "powerful connections" in Congress and in media—classic anti-Semitic tropes.  AC ¶¶ 131–32. More than 12 hours later, the Israeli professor again asked DeGraff to honor Sussman's request to be left alone.  *Id*. ¶ 133.  *No one* from the long list of senior administrators copied on the chain said anything.  *Id*. ¶ 134.  DeGraff *again* targeted Sussman with another mass email.  *Id*. ¶ 135. Every single administrator again stayed silent.  *Id*.  On November 12, fearing for his safety, Sussman emailed the MIT Police Department *again*, copying MIT's Chancellor and Vice Chancellor, and President Kornbluth, copying a dean, mentioning the anti-Semitic seminar in which DeGraff said Sussman would be referenced and requesting help.  *Id*. ¶ 138.

On November 13, flyers advocating for violent resistance against Israel and Jews—and containing an implicit reference to specific "Zionists" that were understood to be Sussman and another Jewish student—were slipped under the doors of the graduate dormitory where Sussman used to live.  *Id*. ¶ 139.  Sussman reported this to MIT Police too.  *Id*.

Without intervention by MIT, DeGraff's seminar proceeded, in which he referenced Sussman, espoused anti-Semitic tropes, promoted the erasure of Jewish history and identity, and taught that Israeli Jews weaponize Holocaust trauma.  *Id*. ¶¶ 140–41.  The next day, November 14, Sussman heard back from IDHR, which said his complaint would be referred to Human Resources because IDHR failed to find any anti-Semitic discrimination or harassment.  *Id*. ¶ 152.

On the November 15 Zoom call described above in which Sussman, Alon, and others raised concerns about threats of violence on campus, Sussman expressed that he was considering leaving MIT due to anti-Semitism.  *Id*. ¶ 153.  Even so, MIT did not commit to any concrete plans and ultimately, nothing came of the call.  *Id*. ¶¶ 142, 153.

On December 10, Sussman emailed IDHR to appeal its determination, explaining that he

was being treated differently because he is Jewish.  *Id*. ¶ 154.  IDHR's Manager of Investigations informed Sussman that there was no appeal option and that DeGraff's communications "do[ ] not suggest that Prof. DeGraff is treating you differently because you are Jewish."  *Id*. ¶ 155.  She then went on to justify DeGraff's anti-Semitic conduct.  *Id*. ¶¶ 156–58.  On January 16, 2025, Sussman left MIT because of the hostile anti-Semitic climate, relentless harassment, and MIT's failure to recognize this harassment and protect him.  *Id*. ¶ 159.  Days later, contrary to MIT's policies, Human Resources notified Sussman that it was closing its investigation even though Sussman had already provided all of the documentary evidence that they would need from him.  *Id*. ¶¶ 160–61.

DeGraff still continued his anti-Semitic targeting of Sussman.  *Id*. ¶¶ 143–45.  In September 2025, DeGraff posted on Facebook that a recording of his anti-Semitic fall 2024 seminar discussing Sussman would be published on MIT's course repository online, which would allow it to "reach millions of students."  *Id*. ¶ 149.  DeGraff continues to disparage Sussman.  *Id*. ¶ 150.

## **ARGUMENT**

### I.   **THE COMPLAINT PLAUSIBLY ALLEGES THAT MIT WAS DELIBERATELY INDIFFERENT TO ITS HOSTILE ENVIRONMENT AND THE DISCRIMINATION FACED BY PLAINTIFFS**

A plaintiff must allege five elements to state a deliberate indifference claim under Title VI: "(1) plaintiffs were subject to severe, pervasive, and objectively offensive harassment; (2) the harassment caused the plaintiff to be deprived of educational opportunities or benefits; (3) the school knew of the harassment; (4) the harassment occurred in its programs and activities; and (5) the school was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances."  *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 308 (D. Mass. 2024) (cleaned up).[2]  The Amended Complaint

---

[2] The Complaint alleges in Counts I and II that MIT acted deliberately indifferent to the harassment and discrimination Plaintiffs endured.  Plaintiffs are proceeding under a deliberate-indifference

alleges sufficient facts to support each of these elements.

**A. The Complaint sufficiently alleges that Plaintiffs were subject to severe, pervasive, and objectively offensive harassment at MIT.**

In evaluating the first element, this Court "look[s] to a constellation of non-dispositive factors: the severity of the conduct, its frequency, whether it was physically threatening or not, and whether it interfered with the student experience." *Id.* at 308 (cleaned up). "The determination of whether a hostile educational environment exists is made on a case-by-case basis, taking into account the totality of the circumstances." *Youshaei v. MGH Inst. of Health Professions*, 2025 WL 847936, at *5 (D. Mass. Mar. 17, 2025) (echoing *Kestenbaum*); *see also Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 86 (D. Mass. 2023) ("Whether gender-oriented conduct rises to the level of actionable 'harassment' 'depends on a constellation of surrounding circumstances, expectations, and relationships.'" (quoting *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999)). "[T]here is no absolute numerical standard by which to determine whether harassment has created a hostile environment." *Doe v. City of Northampton*, 738 F. Supp. 3d 93, 103 (D. Mass. 2024). "Importantly, conduct that may be deemed non-actionable when perpetuated by a student can become actionable if committed by someone in a position of relative power, such as a professor." *Id*.

1. The Complaint properly alleges that Plaintiffs were subjected to harassment on campus and by MIT faculty and staff.

The Complaint alleges how Plaintiffs were subjected to severe, frequent, and physically threatening harassment that interfered with their on-campus experience. Since October 7, 2023, MIT campus life has included exposure to distributed "terror maps" promoting violence against

---

theory, not a "disparate treatment" theory, as MIT describes. *Id*. To avoid confusion, Plaintiffs proceed with Count II as their "deliberate indifference" claim. MIT does not contest that Plaintiffs Doe and the Coalition allege a "direct discrimination claim" under Count I, so that claim, to the extent it is different from Count II, proceeds as to them. ECF No. 47 at 15–16.

Jewish- and Israeli-related spaces, AC ¶¶ 47–49; calls for the violent elimination of Jews, *id.* ¶¶ 35, 42, 79; anti-Semitic flyers posted around campus, *id.* ¶¶ 52–53; exclusion from campus spaces, *id.* ¶¶ 38, 40, 84–88; and hateful vandalism, *id*. ¶¶ 39, 57.   MIT faculty have harassed Jewish and Israeli MIT community members through anti-Semitic and anti-Israeli teachings and public attacks, as well as over MIT email.  *Id.* ¶¶ 91, 96–143, 148.

The Individual Plaintiffs, all of whom are members of the Coalition, and Coalition Member #1, were each subjected to anti-Semitic and/or anti-Israeli conduct at MIT.  MIT does not contest that the Complaint sufficiently alleges that Roe and the graduate students in his lab subjected Doe to repeated and consistent anti-Semitism over the course of months, which ultimately led to Doe's transition to another department.  ECF No. 47 at 17.  The Complaint also refers to the anti-Semitic and anti-Israeli attacks Doe endured outside the lab, including being physically attacked by protestors who were chanting violent messages while wearing Hamas headbands.  AC ¶ 221.

The Complaint likewise details the severe and pervasive harassment Alon and Sussman faced on campus more broadly and at the hands of MIT faculty and staff.  Alon endured repeated harassment because of his Jewish and Israeli identity.  In May 2024, Alon was filmed by an MIT tenured professor, DeGraff, while gathered with other Israelis.  *Id.* ¶¶ 90–91.  DeGraff then posted edited videos online of Alon's face, name, and personal information, including details of his Israeli military service, which put him at serious risk, and caused him to be aggressively confronted by strangers on and off campus.  *Id.* ¶¶ 97–98.  DeGraff smeared Alon in publications with false accusations.  *Id*. ¶¶ 100–03.  Due to safety concerns arising from these incidents, Alon removed his child from MIT daycare.  *Id.* ¶ 168.  The public exposure impacted Alon's search for a tenure-track position.  *Id*. ¶¶ 166–67.  Alon suffered from depression, began seeing a therapist, and had to seek additional medical support as a result of being at MIT under these conditions.  *Id*. ¶ 165.

Sussman too faced direct attacks from DeGraff, who publicly and repeatedly harassed him in front of senior MIT administrators, professors, students, staff, and more than 10,000 online followers. *Id.* ¶¶ 118, 121, 123, 129, 131–32, 135. Sussman was called out as an example of "mind infection," and referenced in one of DeGraff's seminars, *e.g.*, *id*. ¶¶ 121, 140, which DeGraff informed his followers was taped and would be available on MIT's open-source class database for millions to access, *id*. ¶ 149. MIT staff supported DeGraff on the mass email chains, *id*. ¶¶ 122–23, and MIT's anti-discrimination office rejected Sussman's complaint and justified DeGraff's behavior, *id*. ¶¶ 151–52, 160–61. Without MIT's support, Sussman was forced to leave behind MIT, his PhD program, and his career path. *Id.* ¶ 153.

Members of the Coalition, including Individual Plaintiffs Alon and Doe, were also aware of and distressed by DeGraff's attacks on Sussman and MIT's failure to act, *e.g.*, *id.* ¶ 137, which further contributed to their experience of a hostile environment at MIT. *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998) (holding that "racist attacks need not be directed at the complainant in order to create a hostile educational environment").

Viewed in their totality, the facts in the Complaint are more than sufficient to support this element. *Kestenbaum*, 743 F. Supp. 3d at 308–09 (holding plaintiffs "plausibly pled" this element because the complaint "vividly" depicted "repeated, fear-inducing conduct that amounted to more than 'off-color banter'"); *Youshaei*, 2025 WL 847936, at *6 (holding this element met where Jewish-Israeli graduate student alleged he was questioned by professors about his ability to treat patients with identities different from his own and faced restricted access to resources); *Doe v. City of Northampton*, 738 F. Supp. 3d 93, 103 (D. Mass. 2024) (denying motion to dismiss Title VI claim based on two examples that were "plausibly construed as racial in nature").

### 2. MIT concedes that Doe's Title VI claims must proceed.

MIT admits it does not seek to challenge allegations supporting Doe's Title VI claims. *See*

ECF 47 at 17.  Doe's claims—and therefore this case—will "move[] forward."  *Id.* at 32.

        3.   <u>MIT provides this Court with no basis to dismiss the Coalition's claims.</u>

The Coalition's claim also must proceed to discovery.  The Coalition has brought independent claims against MIT, seeking injunctive relief to remedy the harm suffered by its members.  *E.g.*, AC ¶¶ 21.  MIT's entire argument is relegated to one sentence of its brief: that the Coalition's "claims are premised on the alleged experiences of four purported Coalition members—Alon, Sussman, Doe, and Member #1—and thus fail to the same extent those claims are deficient."  ECF 47 at 34.  Setting aside that the Coalition's claims are not "premised on" (but rather are supplemented by) the experiences of four Coalition members, MIT ignores that because it *does not* challenge that the experiences of Doe are sufficient to state a claim for violations of Title VI, ECF 47 at 17, the Coalition's claims also must proceed.  *See Kestenbaum*, 743 F. Supp. 3d at 307–308 (evaluating Title VI claim brought by individual and organization together and denying motion to dismiss as to both plaintiffs); *see also, e.g.*, *LaCroix v. Bos. Police Dep't*, 454 F. Supp. 3d 97, 105 (D. Mass. 2020) (similar).  In any event, the Individual Plaintiffs' allegations support the Coalition's claim proceeding.

        4.   <u>MIT's arguments that Alon and Sussman do not plausibly allege harassment fail because MIT ignores Plaintiffs' allegations and applicable standards.</u>

MIT does not contest that the Complaint alleges that Doe, Coalition Member #1, and other Coalition members were subjected to severe, pervasive, and objectively offensive harassment because of their Jewish and/or Israeli identities.  *See* ECF No. 47 at 22–25 (referencing only Alon and Sussman in discussion about harassment element).  MIT argues only that Alon and Sussman do not allege "actionable harassment."  *Id*. at 22.  At every turn, MIT's arguments fail.

*First*, MIT argues that it did not exercise substantial control over the context in which the harassment occurred.  ECF No. 47 at 22.  It states that it did not have the legal obligation "to

monitor or police personal social media postings or extramural writings of its community members." *Id.* Even assuming that is correct, MIT does not contest that it had control over the harassment Sussman and Alon, among others, endured on its campus. For example, MIT does not contest that the Complaint alleges Sussman endured harassment over MIT email exchanges involving senior administrators, professors, students, and staff, *id.* ¶¶ 117, 120–28, 131–33, 135–36, and via a seminar delivered on campus, which was to be broadcasted later on MIT's database, *id.* ¶¶ 112, 113, 140, 149. Nor does it contest that anti-Semitic and anti-Israeli conduct against Alon occurred on campus. *See*, *e.g.*, *id.* ¶¶ 84, 89–91.

The case from the Southern District of New York that MIT cites on this point is inapplicable. *See Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 368 (S.D.N.Y. 2017). In that case, the plaintiff had not alleged any facts suggesting that social media posts were posted by members of the Columbia community. *Id.* at 368. Here, there is no dispute that DeGraff is a member of MIT's faculty. And his off-campus harassment can support a hostile educational environment claim. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 687 (4th Cir. 2018) (concluding that University of Madison-Wisconsin had substantial control over harassment because messages originated on or within the campus' immediate vicinity, posts were made using the University's wireless networks, the harassers created the messages on campus, and the harassment concerned campus events and students); *Garrett v. CUNY*, 2025 WL 3096550, at *14 (S.D.N.Y. Oct. 10, 2025) (concluding that an email to a Jewish professor comparing Jews to "Satan worshipers" was actionable harassment).

MIT tries to distance itself from the anti-Semitic harassment Sussman and Alon faced by arguing that "statements that criticize the actions of Israel's government . . . do not amount to actionable harassment." ECF No. 47 at 23. But MIT cites no allegations from the Complaint that

fit this category. Rather, MIT argues that "DeGraff's public disagreements with Alon and Sussman . . . w[ere] based on their *politics*," relying on two exhibits. *Id.*[3] First, MIT relies on the article by DeGraff that contains false accusations against Alon and is *the basis for his defamation claim. See* D.E. 47-9 at 2. But DeGraff *assumed* Alon's political positions because he is a Jewish Israeli. *See* AC ¶¶ 91, 97, 148. Second, Sussman's post characterizing as "extremely dangerous" DeGraff's accusation that "Jewish student life organizations" on campus were funding a "mind infection" was not a statement of support for any Israeli political position. *See id.* ¶ 115. Indeed, Sussman is not Israeli and was not educated in Israel (the purported source of DeGraff's "mind infection" theory). *Id.* ¶ 19. Yet Sussman's objection led DeGraff to harass and rely on anti-Semitic tropes against Sussman. *Id.* ¶¶ 116, 118, 129; *see also Stand With Us*, 158 F.4th at 17 (recognizing that anti-Zionism can be "wielded as a tool of the antisemite"). MIT's assertion that Alon and Sussman were involved in "public disagreements" with DeGraff "based on their *politics*," and that their discrimination claims boil down to "tak[ing] offense at statements that criticize the actions of Israel's government," is thus false and wholly unsupported by the assumed-true facts in the Complaint. ECF No. 47 at 23. And any factual dispute MIT may have about that fact is irrelevant at this time.

MIT also does not account for the numerous allegations in the Complaint that describe anti-Semitic harassment having nothing to do with criticisms of Israel. For example, the Complaint describes the dissemination of "terror maps" promoting violence against buildings with

---

[3] MIT references and attaches to its motion several exhibits that it claims are referenced in the Complaint or integral to Plaintiffs' claims. ECF No. 47 at 3. The Court should only consider these exhibits to the extent that they are incorporated by reference in the Complaint. To be sure, these exhibits support Plaintiffs' position that this case should proceed to discovery. As for the exhibits submitted by DeGraff, the Court should deny his request for judicial notice of Exhibits C, D, and E. None of these documents are referenced in the Complaint.

connections to Jewish and Israeli communities, AC ¶ 47; posters displaying a Jewish star dripping in blood, *id* ¶ 53; DeGraff's widely disseminated anti-Semitic emails about Sussman, who is not Israeli, *e.g.*, *id.* ¶ 132; DeGraff's anti-Semitic teachings during his seminar, including references to Sussman, *id*. ¶¶ 140, 141; DeGraff's guest lecturer's confirmation that her "mind infection" theory—which DeGraff promoted—was directed at Jewish people, *id*. ¶ 125; and anti-Semitic harassment and vandalism that had no connection to Israel, *id.* ¶¶ 39, 205–06, 240.[4]  Because the Complaint alleges harassment and a hostile environment that went beyond pure political speech, this claim should proceed to discovery.  *See Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 271–74 (S.D.N.Y. 2025) (finding claims went beyond "pure political speech" where allegations included that protestors forced their way into a campus building and Jewish students were physically threatened and humiliated, and anti-Semitic vandalism).

As a fallback position, MIT argues that "the totality of Alon and Sussman's allegations do not demonstrate" the requisite harassment.  But the cases that MIT relies on are inapposite.  ECF No. 47 at 25–26 (citing *Landau v. Corp. of Haverford Coll.*, 780 F. Supp. 3d 548, 559 (E.D. Pa. 2025) (dismissing claim because the complaint lacked facts showing that defendants were aware of on-campus incidents and that the school knew about harassment and acted with deliberate indifference); *Canel v. Art Inst. of Chicago*, 2025 WL 564504, at *9 (N.D. Ill. Feb. 20, 2025) (dismissing Title VI on elements other than the severe, pervasive harassment element); *Mandel v. Bd. of Tr. of Cal. State Univ.*, 2018 WL 5458739, at *23–26 (N.D. Cal. Oct. 29, 2018) (assuming hostile environment was alleged, but dismissing claim based on other elements)).  Indeed, in one case MIT cites, the district court recognized that plaintiffs plausibly alleged Title VI claims based

---

[4]  MIT adds that the attacks were also on MIT, not Plaintiffs.  ECF No. 47 at 23, n.5.  But the basis of Plaintiffs' claim arises from attacks on them, not on MIT.

on on-campus conduct targeting Israeli or Jewish students, like the ones Plaintiffs allege here. *Canel*, 2025 WL 564504, at *9 (distinguishing allegations in *Canel* from *Gartenberg* and *Kestenbaum*). MIT relies on *Pollard v. Georgetown Sch. District*, 132 F. Supp. 3d 208 (D. Mass 2015), to argue that courts dismiss cases that involve more extensive harassment against school-aged children. ECF No. 47 at 25. But in that case, the district court dismissed the Title VI claim because there was only *one* allegation related to ethnic or national origin harassment. 132 F. Supp. 3d at 230. In contrast, the Complaint is replete with supporting facts.

This case is more analogous to two cases against Harvard in which this Court allowed Title VI claims to proceed. *See Kestenbaum*, 743 F. Supp. 3d at 308–09; *Louis D. Brandeis Ctr. for Human Rights under Law v. President & Fellows of Harvard Coll.*, 2024 WL 4681802, at *1–*2, *5 (D. Mass. Nov. 5, 2024). In *Kestenbaum*, this Court found that plaintiffs had alleged a hostile educational environment claim where plaintiffs asserted similar facts to those alleged here, including that after the October 7, 2023 attacks, student groups had chanted "provocative slogans" like "globalize the intifada"; students were subjected to anti-Semitic episodes on campus; and an exclusionary encampment was erected on campus. 743 F. Supp. 3d at 303–04. And in *Brandeis*, Harvard did not contest that this element was met where plaintiffs alleged that members of the Coalition had been subjected to anti-Semitic attacks post-October 7. 2024 WL 4681802, at *1–2.

In any event, as one of MIT's own cited cases recognizes, "determining whether conduct is severe or pervasive enough to create a hostile environment involves a question of fact and is generally inappropriate to determine at the pleading stage of a litigation." *Gartenberg*, 765 F. Supp. at 270. The Complaint should proceed.

### B. The Complaint sufficiently alleges that Plaintiffs were denied educational opportunities and benefits due to harassment.

The second element requires that "the harassment caused the plaintiff to be deprived of

educational opportunities or benefits." *Brandeis*, 2024 WL 4681802, at *5; *Davis*, 526 U.S. at 650–51 (recognizing harassment satisfies this element if it "effectively denied equal access to an institution's resources and opportunities").  Plaintiffs allege facts to support this element too.

      1.  <u>The Complaint alleges that the harassment Plaintiffs endured caused them to be deprived of educational opportunities and benefits.</u>

The Complaint describes how "Jews and Israelis on campus were prevented from fully engaging in their studies, their research, and the full spectrum of campus life.  They have been forced out of their programs, out of campus spaces, off campus, and even out of the university entirely.  Some left because the climate was intolerable . . . , losing positions, degrees, courses of study and career paths."  AC ¶ 11.  On-campus incidents have caused Jewish and Israeli MIT community members "to live in fear for their personal safety" and to "experience extreme anxiety." *Id*. ¶ 60.

      2.  <u>MIT does not contest that Doe, and therefore the Coalition too, have presented sufficient allegations to satisfy this element.</u>

MIT does not contest that Doe's experience at MIT has been turned upside down because of the anti-Semitism he suffered.  After being subjected to constant anti-Semitic commentary by graduate students and Roe in the lab, Doe was ostracized.  *Id.* ¶¶ 198–214, 235, 243.  Doe was removed from the lab, his projects were terminated, and he was transitioned to another department. *Id.* ¶¶ 241, 243, 251, 254, 256.  Outside the lab, he was confronted with anti-Semitic conduct on campus that affected his participation in activities, his ability to move freely around campus, and his mental health.  *Id.* ¶¶ 220, 221, 224, 268.  Doe has been forced to downplay his Jewish and Israeli identity, and the harassment has caused him to speak English rather than Hebrew on campus.  *Id.* ¶¶ 269–70.  With Doe satisfying this element, the Coalition does too.

      3.  <u>Alon and Sussman also provide sufficient allegations to show they were deprived of educational opportunities and benefits.</u>

The Complaint alleges the harassment against Sussman was so severe that he gave up his PhD program and abandoned his academic aspirations. *E.g.*, AC ¶¶ 159, 340. He lost the ability to study in an environment free from intimidation and feared for his safety. *Id.* ¶¶ 130, 138, 169, 340. The hostile environment made it hard for Sussman to focus, which affected his research and master's thesis. *Id.* ¶ 95. For the first time in his life, Sussman had to seek mental health services. *Id.* ¶ 171.

Alon similarly no longer feels welcome to engage with other MIT community members, has experienced depression and anxiety, began seeing a therapist, and had to seek medical support. *Id.* ¶¶ 162–65. He had to remove his child from MIT daycare, *id.* ¶ 168, and despite extraordinary credentials, has been unable to obtain a U.S. tenure-track position, *id.* ¶¶ 166–67.

In sum, Alon and Sussman have alleged sufficient facts to support the second element of this claim.

      4.  <u>MIT ignores Plaintiffs' allegations and offers inapposite law to unsuccessfully argue that Sussman and Alon were not deprived of opportunities and benefits.</u>

MIT argues that Sussman and Alon have not "shown" they were denied educational benefits, downplaying the Complaint's allegations and inserting unalleged (and misleading) facts about Sussman and Alon to justify the painful and life-altering impact that anti-Semitism at MIT has had on them. ECF No. 47 at 26–27. But the Complaint includes allegations of fact that support Sussman and Alon were deprived of educational opportunities and benefits.

*First*, MIT minimizes Sussman's and Alon's experiences by referring to them as "social discomfort" and a "distraction from academic activities." *Id.* at 26. But, as discussed above, the Complaint alleges the *life changing* impact this harassment has had on them: Sussman had to leave his PhD program, and Alon cannot find a tenure-track position in the U.S. despite his prior

achievements.  Moreover, Alon was barred from parts of campus.  *Cf. Frankel v. Regents of the Univ. of Cal.*, 744 F. Supp. 3d 1015, 1026 (C.D. Cal. 2024) (finding that plaintiffs were likely to succeed on merits of their Free Exercise claim where they were excluded from campus areas). Sussman and Alon's inability to operate in an educational environment hindered by discrimination and being unable to pursue academic and professional opportunities *is* a deprivation of educational opportunities and benefits.  *E.g.*, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 667 (2d Cir. 2012) (recognizing that deprivation of a "supportive, scholastic environment free of discrimination and harassment" supports a hostile educational environment claim); *Canaan v. Carnegie Mellon Univ.*, 760 F. Supp. 3d 306, 331 (W.D. Pa. 2024) (holding that plaintiff alleged deprivation because she missed course time, was denied meetings with a professor, and avoided community events to avoid the professor who made anti-Semitic comments against her).

MIT claims that Sussman's and Alon's claims fail "particularly" because they "voluntarily participated in public debates about the contentious political topics at issue."  ECF No. 47 at 26– 27.  MIT cites no allegation in the Complaint in support of its assertion.  To the extent MIT is referencing Sussman's post and Alon's media statements, in none of them did Sussman or Alon participate in, or invite, public debate about Israel's politics, let alone advocate the Israeli government's positions.  *See* AC ¶ 115 (referencing Sussman's post that DeGraff's statement about Jewish organizations was "extremely dangerous"), ¶¶ 449–50 (referencing Alon's statements about his fear based on on-campus anti-Semitism and calls for violence).  In fact, as alleged in the Complaint, Sussman and Alon have commented on *anti-Semitism*—an issue MIT continues to demonstrate it is unable to distinguish from legitimate political criticism of Israel.  MIT's efforts to undermine Sussman's and Alon's credibility are better suited for the jury to evaluate.

MIT also argues that Alon's allegation that he has not obtained a tenure-track position in

the U.S. cannot support his claim because he was not deprived of an opportunity or benefit "provided by the school." ECF No. 47 at 27. But an anticipated benefit of serving as a postdoctoral associate at MIT is obtaining a tenure-track position after completion. This *is* an opportunity or benefit provided by MIT. Indeed, the case that MIT cites supports that Title VI covers exclusion from access to, or denial of, benefits. *See Doe v. Brown Univ.*, 896 F.3d 127, 131 (1st Cir. 2018). In that case, the First Circuit concluded that Title IX did not cover a Providence College student's claim against Brown University because she had not alleged that she had or would participate in Brown's programs. *Id.* at 132–33. Here, Alon is an MIT community member who seeks to hold his university accountable for allowing anti-Semitism and anti-Israeli conduct to cause him to be excluded from, or have inferior access to, social, educational, and career opportunities.

MIT also argues that Sussman's voluntary withdrawal is insufficient to show a denial of access to educational opportunities. ECF No. 47 at 27. The Complaint alleges that, in addition to being denied a supportive, discrimination-free academic environment while at MIT, Sussman was deprived of completing his PhD program and access to MIT's faculty, students, campus, and activities because of the discrimination and harassment he suffered on campus. On the face of the Complaint, these are educational opportunities and benefits that Sussman lost. MIT's effort to minimize the life-altering impact on Sussman is unsupported by the case it cites in this regard. *Doe v. Morehouse Coll., Inc.*, 622 F. Supp. 3d 1279, 1290 (N.D. Ga. 2022) (recognizing that a "student's voluntary withdrawal from educational opportunities is insufficient, *on its own*, to show a denial of access" (emphasis added)). At this stage, the Complaint's allegations are sufficient. *See Toni v. Washoe Cnty. Sch. Dist.*, 2024 WL 643044, at *7 (D. Nev. Feb. 15, 2024) (stating that "particularly" at the motion-to-dismiss stage, "being forced to withdraw from school plausibly suggests that [the plaintiff] was deprived of her educational opportunities and benefits"). Any

25

argument MIT wants to make about this point are only appropriate for trial.

The other cases MIT cites also do not support its cause. Two of those cases state that a "concrete, negative effect" must be alleged, which, even if applicable in this Circuit, Alon and Sussman do allege. *Compare Morehouse*, 622 F. Supp. 3d at 1290 (concluding that plaintiff had adequately alleged denial of educational opportunities by "making her vulnerable to further harassment" where plaintiff had changed her major, given up her pre-medical track, avoided school resources and services, and was forced to move into temporary housing), *with Canel*, 2025 WL 564504, at *8 (holding that plaintiff had not alleged that a professor's social media post had any "concrete, negative effect" on her education and her complaint failed to describe how others' acts denied her access to school resources and opportunities). Two other cases are inapplicable. *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 90–91 (2d Cir. 2011) (reversing dismissal of hostile educational environment claim on statute-of-limitation grounds); *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (holding that plaintiffs had not alleged a denial of access to education services beyond being able to use a university plaza as a thoroughfare).

## C. The Complaint alleges that MIT was aware of, and deliberately indifferent to, the harassment Plaintiffs endured.

"An institution is deliberately indifferent to harassment if its response to the mistreatment is 'clearly unreasonable in light of the known circumstances.'" *Brandeis*, 2024 WL 4681802, at *5. "Deliberate indifference means affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires." *Id.* (cleaned up). Here, the Complaint alleges how MIT failed to act in the face of known anti-Semitism and harassment against Jews and Israelis. Again, MIT does not seek to justify its actions as to Doe or dismiss his claims. That is sufficient too for the Coalition to state a claim. And for the remaining Individual Plaintiffs, as shown below, MIT's response to known harassment was "so lax, so misdirected, or so poorly executed as to be clearly

26

unreasonable under the known circumstances." *Stand With Us*, 158 F.4th at 22.

        1.  <u>MIT knew about the escalating and persistent harassment on campus and against the Individual Plaintiffs but did nothing or enabled the harassment.</u>

MIT was aware that anti-Semitism and anti-Israeli conduct was a major problem on campus,[5] but did nothing or responded unreasonably. *See, e.g.*, AC ¶ 59. After President Kornbluth recognized that the Mapping Project is anti-Semitic, the university did nothing a year later to address new, similar "terror maps" that specifically targeted MIT spaces. *Id.* ¶¶ 47–49. President Kornbluth acknowledged that "several faculty, staff and students" had been targeted around campus and paid lip service to the notion that MIT would not accept the "targeting, threatening, intimidating and spreading [of] false statements," but when Plaintiffs notified MIT of egregious instances of these behaviors, MIT failed to hold the perpetrators responsible. *E.g., id.* ¶¶ 54–55.

President Kornbluth did not respond to Alon's June 2024 email detailing anti-Semitic events on campus, being denied access to part of campus because of his Jewish and Israeli identity, DeGraff's harassment, and the fear he had for his safety. *Id*. ¶¶ 104–06. Following Alon's request for MIT to intervene, nothing happened. DeGraff's posts were never taken down, nor was he disciplined. *Id*. ¶¶ 107–08. Instead, DeGraff's harassment persisted. *Id.* ¶¶ 109–50. That summer, MIT learned that DeGraff had targeted an Israeli MIT department head in public writings and mass emails—spamming uninvolved MIT community members—in which DeGraff attributed the denial of his course proposal to the department head's Israeli nationality. *Id.* ¶¶ 110–11.

Emboldened by MIT's failure to take meaningful action, DeGraff went on to harass

---

[5] In a footnote, MIT references a handful of events to argue that the complaint fails to allege "actual notice" to an official with authority to address the alleged discrimination and to institute corrective measures. ECF No. 47 at 19 n.4. But the complaint alleges that MIT administrators were aware of these events, AC ¶ 59, and is replete with examples of MIT's highest-ranking officials and IDHR being on notice. *See, e.g., id.* ¶¶ 49, 51, 53, 55, 80–83, 104, 105, 111, 114, 117, 120, 128, 136, 138, 222–23, 233, 236–239, 244, 245, 248, 283–88, 333–35.

Sussman that fall.  Despite evidence on display over a mass email chain, and pleas from Sussman to have DeGraff stop, MIT did not speak out against DeGraff's anti-Semitic attacks or try to stop him.  *Id*. ¶¶ 127, 128, 138.  Only an Israeli professor spoke up, who was then himself attacked with anti-Semitic rhetoric.  *Id*. ¶ 125.  When Sussman formally complained to IDHR, it transferred the complaint to Human Resources and justified DeGraff's anti-Semitic conduct.  *Id*. ¶¶ 151, 152, 155. Worse, MIT did not continue its investigation after Sussman was forced to leave.  *Id*. ¶¶ 160–61.

Plaintiffs thus sufficiently allege that MIT was deliberately indifferent to the harassment Plaintiffs faced.  *See Kestenbaum*, 743 F. Supp. 3d at 308–09; *Brandeis*, 2024 WL 4681802, at *5.

> 2. <u>MIT's deliberate indifference arguments fail where MIT concedes it did nothing as to Alon, tries to blame its inaction on Sussman, and attempts to reframe the allegations in its favor.</u>

MIT does not contest that the Complaint sufficiently alleges that MIT acted with deliberate indifference as to the severe and consistent harassment Doe endured.  ECF No. 47 at 18–22.  This is sufficient to satisfy Doe's and the Coalition's burdens.  As to Sussman and Alon, MIT misconstrues the Complaint's allegations and callously argues that empty promises and unanswered calls for help were sufficient.  MIT's arguments fail.

As to Alon, MIT concedes that the Complaint alleges that despite Alon's plea for help in June 2024, it did *nothing*.  ECF No. 47 at 21.  Instead, MIT argues that Alon was not entitled to a response.  *Id.*  This argument itself reflects the university's deliberate indifference.  MIT offers no support for this disturbing argument.  Having been on notice about the anti-Semitism and anti-Israeli activity in the preceding months and the harassment DeGraff was inflicting on Alon, MIT was required to intervene.  MIT "affirmatively cho[se] to do . . . nothing, despite knowing what the law requires."  *Kestenbaum*, 743 F. Supp. 3d at 308; *Brandeis*, 2024 WL 4681802, at *5 (same).

MIT also misconstrues Alon's correspondence to President Kornbluth to claim MIT did *something* through its police.  ECF No. 47 at 21.  Alon's email outlines in detail the "distressing

situation" Alon, and other Jewish and Israeli community members, were facing on campus. ECF No. 47-4. One of several events the email cites refers to Alon being trapped in the encampment and not being able to leave without police assistance. *Id.* The fact that MIT Police did their job in that one instance does not prove that MIT addressed the systemic harassment Alon faced. Indeed, that same email states that on another occasion, Alon was blocked from entering the encampment *by an MIT police officer and an MIT administrator* due to his Jewish and Israeli identity. *Id.*

MIT reiterates that it did not have to act in response to DeGraff's harassment because Alon "does not allege the type of actionable harassment that triggers an institutional response." ECF No. 47 at 21. But, as discussed above, Alon does. MIT had the ability to at least request that DeGraff stop harassing Alon. MIT chose not to do so. *See, e.g., Feminist*, 911 F.3d at 688.

As to Sussman, MIT attempts to reframe the allegations to insinuate that MIT acted reasonably under the circumstances. ECF No. 47 at 20. But MIT's inaction in the face of blatant harassment is detailed in the Complaint. AC ¶¶ 127, 128, 138, 151, 152, 155–58. Indeed, MIT went so far as to *justify* the harassment. *Id.* ¶¶ 156–57. At this stage, the Court must take the Complaint's well-pled allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Youshaei*, 2025 WL 847936, at *4. The allegations in the Complaint support the inference that MIT was deliberately indifferent. *See Canaan*, 760 F. Supp. 3d at 330–31 (allegations supported "inference that CMU paid lip service to [the plaintiff's] prompt complaints of discriminatory harassment" where plaintiff complained that she was subject to anti-Semitic comments from her professors but university leaders did little to nothing); *Brandeis*, 2024 WL 4681802, at *5 ("To conclude that the mere act of launching an investigation without any further follow-though necessarily defeats a deliberate indifference claim, would prioritize form over function.").

Even assuming MIT did something, its response was clearly unreasonable. For example,

Sussman was referred to Human Resources after IDHR failed to find anti-Semitic discrimination or harassment, but that investigation went nowhere before Sussman was forced to leave MIT, and then MIT dropped the investigation, contrary to its policies. AC ¶¶ 128, 152, 160, 161. This Court has recognized that similar inaction is enough to survive dismissal. *Kestenbaum*, 743 F. Supp. 3d at 309 (finding that Harvard's "indecisive, vacillating, and at times internally contradictory" response was plausibly insufficient); *Brandeis*, 2024 WL 4681802, at *5. MIT's attempt to use Sussman's departure to support closing its investigation, which contradicted its own policies, is further evidence of its lack of commitment to addressing on-campus anti-Semitism. *See* ECF No. 47 at 20. That MIT may have taken some steps with regards to the encampment or made public statements does not render it liability-proof in the face of its overwhelmingly inadequate response to the repeated, severe, pervasive, and objectively offensive conduct alleged. *See Kestenbaum*, 743 F. Supp. 3d at 310 ("To conclude that the SAC has not plausibly alleged deliberate indifference would reward Harvard for virtuous public declarations that for the most part . . . proved hollow when it came to taking disciplinary measures against offending students and faculty.").

### D. *Stand With Us* establishes that the Complaint alleges a Title VI claim.

After MIT moved to dismiss this action, the First Circuit issued an opinion affirming this Court's ruling in *Stand With Us*. As shown below, the First Circuit's opinion supports the conclusion that the Complaint alleges a Title VI claim.

The First Circuit affirmed what this Court had recognized: "a school can be held liable if it was deliberately indifferent to severe, pervasive and objectively offensive harassment that caused the plaintiff to be deprived of educational opportunities or benefits." 158 F.4th at 11 (cleaned up). The First Circuit concluded that the harassment alleged there was not plausibly anti-Semitic, was protected speech, or was too isolated, and in any event, MIT was alleged to have responded to the encampment that the plaintiffs focused on. *See generally id.* at 12–24. As this

response shows, Plaintiffs have alleged the facts that the First Circuit found were missing in the *Stand With Us* complaint.[6]  Moreover, even if the facts described in the *Stand With Us* complaint were not sufficient to state a claim, they, at a minimum, put MIT on notice that it had a serious problem, which the university subsequently has continued to fail to address.

MIT attempts to analogize the events alleged in the *Stand With US* complaint and the Complaint.  ECF No. 47 at 10–11.  But a review of both cases' allegations reveals that *Stand With Us* is simply a different case.  As discussed in this response, the Complaint is replete with particularized allegations of anti-Semitism and anti-Israeli conduct that have no counterpart in *Stand With Us*. *See, e.g.*, AC ¶¶ 6, 113, 141 (anti-Israel seminar teaching about a "mind infection" and statements by professor that "Jewish student life organizations" fund this "mind infection"); 114–140 (targeted harassment by faculty and staff against a PhD student); 198–214 (constant and targeted harassment, including comment that a plaintiff's partner's "nose looks Jewish" and efforts to prevent more Jewish babies); 240 (acknowledgment by professor that students could not stand presence of Jewish "kind"); 221 (describing physical attack by mob wearing Hamas headbands); 39, 50 (acts of vandalism, including someone urinating on Hillel's window); 165, 445 (describing effects on plaintiffs, including insomnia and panic attacks).

*First*, none of the harassment, discrimination, and retaliation experienced by Doe, Alon, Sussman, or Coalition Member #1, relating to DeGraff or Roe, or MIT's failure to respond to those events, is covered in the *Stand With Us* complaint.  The targeted anti-Semitic harassment they experienced is different in both severity and pervasiveness and, most importantly, leaves no doubt

---

[6] For the same reason, the Court's recent order in *Segev v. President & Fellows of Harvard Coll.*, No. 1:25-cv-12020 (D. Mass. Dec. 4, 2025), ECF No. 35, is also not on point.  The Complaint alleges more facts, more events, more harassment (including by faculty), more notice to the university, more inaction by the university, and a clear basis to infer a discriminatory animus.

as to the discriminatory nature of the harassment.  The First Circuit also recognized that faculty-led harassment is more likely to satisfy Title VI.  158 F.4th at 21 ("[p]eer harassment, in particular, is less likely to satisfy [Title VI] requirements than is teacher-student harassment").

*Second*, the Complaint covers numerous other events beyond those in the *Stand With Us* case, including more recent events, which MIT concedes.  ECF No. 47 at 19.  For example, the dissemination of "terror maps" in April 2025 and the vandalism on the Stata Center in July 2025, are not covered in the *Stand With Us* complaint.  These additional events, along with the anti-Semitism alleged on campus before April 2025, show MIT's anti-Semitic environment.  Indeed, the First Circuit recognized that anti-Semitic events occurred at MIT.  *E.g.*, 158 F.4th at 20.

MIT incorrectly asserts that Plaintiffs have conceded that "MIT has continued to take steps to combat antisemitism."  ECF No. 47 at 19.  MIT again misconstrues the Complaint.  Plaintiffs have conceded nothing, as shown by the allegations MIT cites.  AC ¶ 49 (describing "terror maps" that encouraged violence against Jewish locations that purportedly supported "the colonization of Palestine" that were unaddressed despite President Kornbluth acknowledging the previous year that the "Mapping Project" is anti-Semitic); *id.* ¶ 51 (stating that President Kornbluth failed to speak at a "critical moment" following the undergraduate class president's "hateful rhetoric"); *id.* ¶¶ 53–54 (stating that President Kornbluth's response to anti-Semitic flyers was insufficient and that statements about holding individuals accountable were false as proven by the university's inaction in the face of pleas for help); *id*. ¶ 58 (stating that MIT's response to vandalism and threats of violence implied that conduct would have been justified had the professor supported Israel); *id*. ¶¶ 273–82 (describing MIT's inaction in response to Coalition Member #1's multiple communications about concerns about his physical safety).

Indeed, an allegation MIT cites (at 21) states: "MIT's response to the reports of harassment

and discrimination were either inadequate or more often, nonexistent." *Id*. ¶ 350. These facts are further bolstered by the First Circuit's acknowledgment of MIT's weak response in the weeks following October 7, 2023. 158 F.4th at 6–7. Unlike in *Stand With Us*, the Complaint alleges that MIT did not help Plaintiffs in response to their pleas for intervention in the face of severe and pervasive harassment. *Cf. id.* at 22–23 (stating that plaintiffs in that case were not alleging that MIT had done nothing, which could have supported the case proceeding). Thus, MIT's inaction to Plaintiffs' pleas for help was "clearly unreasonable."

While Plaintiffs acknowledge the First Circuit's skepticism that anti-Israel slogans and activity at encampments are necessarily anti-Semitic, the First Circuit also recognized that context matters. *See* 158 F.4th at 17 (recognizing that anti-Zionism can be "wielded as a tool of the antisemite"). In the context of the Complaint, violent slogans, like "Death to Zionists," "[w]e're going to shred you," calls for "intifada," and statements like "[w]e will burn the ground beneath your feet," are plausibly anti-Semitic. Moreover, other courts have found that slogans like "[l]ong live the intifada," "[r]esistance is justified," and "[f]rom the river to the sea, Palestine will be free," also plausibly demonstrate anti-Semitic animus. *Gartenberg*, 765 F. Supp. 3d at 269. Particularly notable is Judge Cronan's observation that "from the river to the sea . . ." was described as anti-Semitic in a House resolution "precisely because it suggests the eradication of the State of Israel and the Jewish people." *Id.* 269 (quotations omitted). *See also Garrett*, 2025 WL 3096550, at *20. Any alternative explanations should be made to the jury.

At this stage, the Complaint has alleged a plausible hostile educational environment claim. *Gartenberg*, 765 F. Supp. 3d at 253. "[T]he question for now is not about who should win this case, but only about whether [the plaintiff] should have the opportunity to seek proof of her claims through the discovery process." *Id.* This claim should proceed to discovery.

## II.    THE FIRST AMENDMENT ARGUMENTS RAISED BY DEGRAFF AND MIT ARE WITHOUT MERIT

While DeGraff makes the First Amendment the centerpiece of his Motion, MIT argues only that "much" of the alleged harassment consists of "publicly expressed political opinions." ECF No. 47 at 23.    Defendants' invocation of the First Amendment is based on a mischaracterization of Plaintiffs' allegations, claims, and requested relief, as well as a fundamental misstatement of the relevant legal framework.    The fact that DeGraff has espoused views on matters of public concern does not immunize him from the consequences of harassing individual members of the MIT community; nor does it immunize him from liability for false, defamatory statements.    It also does not immunize MIT from its obligation to take steps to alleviate a hostile environment.

*First*, as alleged, MIT has several content- and viewpoint-neutral rules against harassment. MIT's rules prohibit harassment, stalking, cyber stalking, cyberbullying, and doxing.  AC ¶¶ 306–315.  Under MIT's own rules, examples include "continuing to contact a person after receiving requests not to" and "non-consensual communication [including] emails . . . or any other communications that are repeated and undesired."    *Id.* ¶ 312.    MIT similarly prohibits cyberbullying, defined as "willful, repeated harm inflicted using computers, cell phones, and other electronic devices."    *Id.*    MIT defines stalking "as engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others, or to suffer substantial emotional distress."    *Id.*    MIT defines doxing as "a form of intimidation involving the publication of someone's personal information (e.g., private email, personal phone number, home address, family address) on various platforms in an attempt to frighten the individual and encourage additional harassment by others."    *Id.* ¶ 314.    MIT has made clear that all of its policies apply to both students and faculty and apply regardless of viewpoint.    *Id.* ¶ 314.

Neither MIT nor DeGraff argues that enforcement of MIT's harassment rules would violate the First Amendment. The United States Supreme Court has expressly recognized the right of educational institutions to prohibit "actions which materially and substantially disrupt the work and discipline of the school . . . [or] infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Healy v. James*, 408 U.S. 169, 189 (1972) (citation omitted). The fact that harassment involving speech may be circumscribed has been recognized in many contexts. For example, in *Ameristar*, the court gave the example of someone aggressively handing out leaflets by following someone down a street, blocking his way, and demanding that he take the leaflet. *Ameristar Casino E. Chicago, LLC v. UNITE HERE Loc. 1*, 2018 WL 4052150 (N.D. Ill. Aug. 24, 2018). The court held that "[t]hough leafleting is a classic instrument of protected speech, the leafleter's method of conveying his speech, interfering with your ability to mind your business and walk down the street, is a different question." *Id.* at *5.[7] The same principles apply on college campuses. *See Gartenberg*, 765 F. Supp. 3d at 265 (distinguishing between speech "directed to the community at large through generally accepted methods of communication" and speech that constitutes "targeted, personal harassment aimed at a particular" individual); *Garrett*, 2025 WL 3096550, at *7 (same).

*Second*, MIT also has a Non-Discrimination Policy, which prohibits discrimination against

---

[7] *See also Doe v. Hopkinton Pub. Sch.*, 19 F. 4th 493, 509 (1st Cir. 2021) ("Speech or conduct that actively and pervasively encourages bullying by others or fosters an environment in which bullying is acceptable and actually occurs—as in this case—is not protected under the First Amendment."); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) ("Courts have made a distinction between communication and harassment. The difference is one between free speech and conduct that may be proscribed.") (citations omitted); *Sanchez v. Jenkins Twp.*, 2025 WL 1184110, at *4 (M.D. Pa. Apr. 23, 2025) ("Courts have also recognized that repeated communications that are intended to be insulting may fall outside the ambit of First Amendment protection if intended to harass and shame a victim.'"). *Snyder v. Phelps*, 562 U.S. 443 (2011), is inapposite because it involved nothing but speech on public property on a public issue. The defendant was not alleged to have violated any laws, ordinances, or rules. *Id.* at 454–56.

individuals based on numerous characteristics including race, religion, and "national or ethnic origin," and a non-retaliation policy. AC ¶ 307. Again, neither MIT nor DeGraff argues that enforcement of MIT's Non-Discrimination Policy would somehow violate the First Amendment. Plaintiffs have plausibly alleged that DeGraff's harassment (and MIT's failure to do anything about it) were motivated by a discriminatory animus against Jews and/or Israelis in violation of MIT's own policy, which is all that is required at the pleading stage. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 (1982); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082–83 (3d Cir. 1996) ("a reasonable jury could conclude that the intent to discriminate is implicit [in use of code words]"); *Gartenberg*, 765 F. Supp. 3d at 270 ("But at this stage of the case, '[t]he test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation.'" (citation omitted)); *Garrett*, 2025 WL 3096550, at *22 ("The Complaint clearly, repeatedly, and plausibly alleges that the challenged conduct was hostile and discriminatory to [plaintiff] (and other Jews) because of her religion, and 'reflected … attack[s] on [plaintiff] as a [Jew].'" (citation omitted)).

*Third*, as to whether Plaintiffs ultimately can prove that the harassment was motivated by a discriminatory animus, DeGraff's statements, including his vile rhetoric—as well as similar rhetoric proliferating around campus—are relevant and admissible because the First Amendment "does not prohibit the evidentiary use of speech to . . . prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (rejecting First Amendment challenge to provisions of hate-crime legislation where defendant selected his victim because of the victim's race).

Significantly, this principle has also been recognized explicitly in the Title VI context in connection with anti-Semitic harassment on college campuses. *See Gartenberg*, 765 F. Supp. 3d at 267 ("[C]ourts have long recognized that there is no constitutional problem with using offensive

36

speech as evidence of motive or intent." (cleaned up)).  In *Gartenberg*, as here, a key question before the court was whether the plaintiffs sufficiently pled that campus demonstrators were motivated by discriminatory intent against Jews.  Judge Cronan observed that the motion to dismiss "c[ould] be resolved without opining on whether conduct or speech hostile to Zionism . . . is necessarily antisemitic." *Id.* at 268.  Furthermore, Judge Cronan observed that because "the federal anti-discrimination laws can hear [bigotry] sung in the whistle register, . . . even facially neutral words and phrases can be highly probative of discriminatory intent depending on the circumstances and social context in which they are communicated." *Id*. at 269 (cleaned up).

*Fourth*, the First Circuit's discussion of the First Amendment in its recent decision is inapplicable to the facts pled here, which involve targeted harassment for being Jewish and/or Israeli.  In sharp contrast, the First Circuit articulated the issue before it as "whether Title VI required MIT to try to put an end to the protestors' speech . . . merely because those students opposed Israel and favored the Palestinian cause." *Stand With Us*, 158 F.4th at 13.  It thus viewed the matter as involving viewpoint discrimination and implicating precedent addressing prior restraints.  In sum, the First Amendment offers Defendants no protection.

## III.    DOE, ALON, AND THE COALITION ALLEGE HOSTILE WORK ENVIRONMENT CLAIMS UNDER TITLE VII

A Title VII claim for a hostile work environment requires that "(1) the plaintiff is a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on the protected status, (4) the harassment was so severe or pervasive as to create an abusive work environment, and (5) the harassment was objectively and subjectively offensive." *Santay v. Ice House LLC*, 2024 WL 4804967, at *4 (D. Mass. Nov. 15, 2024) (cleaned up).

### A. MIT concedes Doe—and therefore the Coalition—alleges a hostile work environment claim against MIT.

MIT concedes that each element of a hostile work environment claim is alleged on behalf

of Doe where his claim is based on the harassment he suffered while working with Roe and others at MIT.  *See* ECF No. 47 at 27.  The Coalition's claims thus also proceed.

MIT states, without any substantive argument, that Doe fails to allege a Title VII claim based on the general campus environment.  *Id*.  To be sure, Doe also alleges that the hostile work environment existed outside the lab.  *See*, *e.g.*, AC ¶¶ 215–25.  These facts further Doe's claim against MIT.  Thus, the Court should allow Doe's claim to proceed on these allegations too.  *See Harris v. Forklift Sys., Inc*., 510 U.S. 17, 23 (1993) (explaining that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances").

### B.  Alon alleges a hostile work environment claim against MIT.

MIT does not dispute that Alon alleges elements (1), (2), or (5) of a hostile work environment claim, challenging only Alon's allegations as inadequate with respect to elements (3) and (4).  ECF No. 47 at 28–29.  Both arguments are belied by the Complaint.

MIT cherry-picks examples of DeGraff's harassing behavior to minimize the severe and pervasive harassment Alon endured and continues to endure.  But as the Supreme Court case MIT cites explains, "whether an environment is 'hostile' or 'abusive' can be determined only by looking *at all the circumstances*," and "[t]he effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (emphasis added).  Contrary to MIT's claim that Alon fails to plausibly allege that the constant harassment "unreasonably interfered with his work performance," ECF No. 47 at 28 (cleaned up), Alon has alleged that the hostile anti-Semitic climate has made it "extremely difficult to focus, collaborate, and benefit from" his position at MIT, and has undermined his ability to fully engage in his scientific work and obtain tenure-track positions.  AC ¶¶ 162, 339.  These allegations are sufficient at this stage.  *See Landa v. Univ. of Maryland, Coll. Park*, 2022 WL 2905094, at *7 (D. Md. July 22, 2022) (hostile work environment

was alleged where plaintiff alleged that treatment by coworkers and supervisors unreasonably interfered with her work performance). MIT ignores these allegations and focuses on the fact that DeGraff and Alon are in different departments, ECF No. 47 at 28, which is not dispositive.

MIT seeks to excuse DeGraff's harassment by suggesting that they were "isolated incidents" that "appear to be no more than a disagreement between two individuals on a subject of public concern." *Id*. at 29. No "disagreement" of "public concern" is alleged in the Complaint. And Alon offers many examples and incidents that, together, constitute an abusive work environment. *See*, *e.g.*, AC ¶¶ 97–104, 143, 148, 150. In similar cases, motions to dismiss have been denied. *See*, *e.g.*, *Fiss v. California Coll. of the Arts*, 2025 WL 91181, at *6 (N.D. Cal. Jan. 14, 2025) (denying motion to dismiss hostile work environment claim where school posted on Instagram that "Decolonization is not a dinner party," faculty member called out "F*ck the Zionists" without pushback at a faculty meeting, and two faculty members complained about Jewish students reporting anti-Semitic content in course evaluations).

MIT also argues that the harassment was based merely on "friction" between Alon and DeGraff. ECF No. 47 at 30. This ignores that DeGraff's attacks on Alon were based on his Israeli identity and complaints of anti-Semitism at MIT—not any knowledge of Alon's political views about Israel's government. *See* AC ¶¶ 97, 100, 388. MIT ignores the allegations that DeGraff's articles purporting to characterize Alon's comments were based on falsities, and that the Complaint alleges facts to support that Alon was attacked based on his Jewish and Israeli identity. AC ¶¶ 84, 88–89, 91, 95–98, 100–103, 104, 384, 386, 388.

## IV.    THE COMPLAINT ALLEGES RETALIATION CLAIMS

A retaliation claim has three elements: "(1) that the plaintiff engaged in protected activity; (2) that the defendant took a material adverse action against plaintiff; and (3) that a causal connection existed between the protected activity and the adverse action." *Brandeis*, 2024 WL

4681802, at *6 (cleaned up) (Title VI retaliation); *Cabi v. Bos. Child.'s Hosp.,* 161 F. Supp. 3d 136, 155 (D. Mass. 2016) (Title VII retaliation).

### A. MIT concedes that Doe and the Coalition allege retaliation.

MIT offers no arguments against Doe's retaliation claim. MIT's only argument for the dismissal of the Coalition's retaliation claim is based on the facts alleged in support of the Individual Plaintiffs' claims. ECF No. 47 at 34. The Coalition's claim survives with Doe's.

### B. Sussman alleges a Title VI retaliation claim.

*First*, MIT does not dispute Sussman's complaints were protected activity. *Id.* at 31. *Second*, DeGraff's repeated attacks on Sussman on social media and over MIT's email system after he spoke out about DeGraff's anti-Semitic targeting of "Jewish student life organizations," and which continued after he reported DeGraff's harassment to MIT and sought intervention, constitute a materially adverse action. AC ¶¶ 116, 118, 121, 129, 132, 136, 140. These actions were more than "petty slights or minor annoyances" as MIT suggests. ECF No. 47 at 31. DeGraff's harassment was broadcast to his 10,000 followers, made Sussman's report public to MIT administrators, professors, staff, and students, and lasted nearly two months, culminating in Sussman leaving and MIT dropping its investigation. AC ¶¶ 116, 118, 120–21, 129, 145. Thus, DeGraff's attacks "dissuaded" Sussman "from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). *Second*, DeGraff's harassment is causally linked to Sussman's report of his anti-Semitic comments. In fact, much of DeGraff's harassment came on the email chain in which Sussman initially reported DeGraff, and many of DeGraff's emails and social media posts about Sussman came within days of that initial report and Sussman's subsequent formal reports to IDHR and MIT Police. AC ¶¶ 117–18, 120–21, 140.

Despite MIT's claim that DeGraff's harassment "took place in the context of an unfolding 'emotionally fraught and longstanding dispute,'" ECF No. 47 at 31, there was in fact no such

"longstanding dispute," or any preexisting dispute, between DeGraff and Sussman.[8]  And MIT

offers no legal support for its argument that Sussman is "double-counting" DeGraff's conduct as

both harassment and retaliation.  *Id.* at 25.  DeGraff's retaliation against Sussman, in response to

Sussman's report, took the form of continued harassment, and thus furnishes the basis for both

legal claims.  Finally, MIT's arguments that MIT was not deliberately indifferent to the retaliation,

*id.*, fail for the same reasons described above in Section I.C.

### C.  Alon alleges retaliation under Title VI and Title VII.

*First*, MIT does not contest that Alon engaged in protected activity.  *Id.  Second*, following

Alon's report to President Kornbluth, DeGraff targeted Alon on social media, attacking both him

and a program of which Alon is a member.  AC ¶ 148.  Alon received continued harassment from

DeGraff in both public and private channels.  *Id.* ¶¶ 149–50.  Circumstances escalated such that

Alon reported concerns about his safety several times.  *Id.* ¶ 114, 142, 153.  DeGraff's continuation

and escalation of harassment contributing to a hostile environment following Alon's report, and

the refusal of MIT to intercede, constitutes an adverse action.  *See supra* §§ II.A, III.B.1; *Posada*

*v. ACP Facility Servs., Inc.*, 389 F. Supp. 3d 149, 160 (D. Mass. 2019); *Setterlund v. Potter*, 2009

WL 3298095, at *12 (D. Mass. Aug. 7, 2009).  The "cumulative effect" of DeGraff's attacks and

the continued anti-Israeli and anti-Semitic conduct on MIT's campus left Alon "intimidated" and

concerned for his safety.  *Compare Posada*, 389 F. Supp. 3d at 159, *with* AC ¶¶ 110–114.[9]

*Third*, the close temporal proximity between Alon's report and DeGraff's escalating

---

[8] MIT does not define the "emotionally fraught and longstanding dispute."  If not a dispute between DeGraff and Sussman, perhaps MIT is referring to the Israeli/Palestinian conflict.  If so, it is absurd—and contrary to the First Circuit's recent decision—to argue that *anti-Semitic* conduct is permitted because it occurs in the "context" of a foreign war.

[9] Alon may also develop further facts supporting the hostile environment through discovery. *Posada*, 389 F. Supp. 3d at 159.

conduct gives rise to the inference of a causal connection.  *Cabi*, 161 F. Supp. 3d at 156.  As with Sussman, MIT ignores the facts alleged, refers to a nonexistent longstanding dispute, and claims without justification that Alon is improperly "double count[ing]."  ECF No. 47 at 31.  But Alon and DeGraff had no dispute preexisting DeGraff's harassment, and the Complaint alleges that DeGraff's harassment worsened following Alon's report to President Kornbluth.  *See* AC ¶¶ 362, 398–99; *Colon-Diaz v. Dep't of Educ.*, 2010 WL 11679378, at *6 (D.P.R. June 8, 2010) (allegations that reprisals against a plaintiff "immediately became more constant and intense" after the plaintiff filed a discrimination charge demonstrated the supervisor's knowledge of the complaints).

## V.    THE COALITION HAS STANDING

As described above, the Complaint contains sufficient allegations to sustain the Coalition's claims here.  The only substantive argument MIT makes as to the Coalition is that it "lacks standing, so the Court lacks jurisdiction over its claims."  ECF 47 at 34.  But MIT's argument has been rejected by this Court in a different case under similar facts.  *See Brandeis*, 2024 WL 4681802, at *4 (finding that the Coalition had standing to bring claims against Harvard based on similar facts).  The Court should reach the same result here.

To establish Article III standing, a plaintiff must allege three requirements: "(i) that [they] ha[ve] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."  *Id.* at *3 (alterations in original).  An association like the Coalition "has standing to sue on its members' behalf when (1) at least one of its members would have standing to sue individually, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) the claims and types of relief requested do not require individual participation of the members."  *Id.* (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1997)).  "Actions for declaratory or injunctive relief have generally been held to be well-suited to representation by an

association assuming that the participation of individual members is not necessary." *Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.*, 397 F. Supp. 3d 97, 104 (D. Mass. 2019).

Here, the Coalition's members suffered, and continue to suffer, from heinous acts of discrimination and hate that MIT has failed to stop.  As discussed above, MIT's general campus environment was filled with anti-Semitism and anti-Jewish hate that affected all the Coalition's MIT members.  *See also* AC § B.  These acts are in addition to the discrimination and hostile environment that Alon, Sussman, Doe, and Coalition Member #1 (each of whom is a Coalition member) individually suffered, each of which *independently* provides the Coalition with standing. *See, e.g.*, *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Human Servs.*, 2025 WL 2528380, at *15 (D. Mass. Sept. 3, 2025) ("Only one member of an organization need have individual standing for that organization to satisfy the first *Hunt* factor.").  Moreover, the violent anti-Semitic and anti-Israeli rhetoric continues to this day.  These acts and others have deprived the Coalition's members of educational and professional opportunities and the ability to participate in campus life, AC ¶ 11, forced them to stop their ongoing research, *id.* ¶ 341, and even to drop out of MIT altogether, *id.* ¶ 340.  These harms to the Coalition's members justify injunctive relief and provide the Coalition with standing.  *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306–07 (1st Cir. 2005) (finding that associational standing existed where injunctive relief "if granted, will 'inure to the benefit of those members of the association actually injured.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 515(1975))).

MIT does not contest the first two "constitutional" prongs of the *Hunt* inquiry, instead focusing on the third, "prudential" prong.  *See Harvard Coll.*, 2025 WL 2528380, at *15.  MIT argues that the Coalition's "injunctive-relief claims" should be dismissed because they "are based on highly fact-intensive and varied experiences of individual community members."  ECF No. 47

at 28–29.  But this Court already rejected this argument, holding that "individualized consideration of [] members' experiences . . . is no bar to associational standing because the *requested injunctive relief will inure to the benefit of all injured class members*."  *Brandeis*, 2024 WL 4681802, at *4 (emphasis added); *see also Kestenbaum*, 743 F. Supp. 3d 297, 306–07 (D. Mass. 2024).

The MIT-based Coalition members will benefit from the injunctive relief requested here. MIT's cited cases do not hold otherwise.  Nearly all the cases cited by MIT, *see* ECF No. 47 at 35–36, fail to even address associational standing, let alone establish that the Coalition has failed to satisfy the third *Hunt* factor.  And in *Parent/Professional Advoc. League v. City of Springfield*, the court found there was no alleged "common practice" underlying the organization's claims.  934 F.3d 13, 32 (1st Cir. 2019).  Here, the Coalition has plausibly alleged that MIT's campus was overall filled with a common practice of anti-Jewish hate, establishing standing, and is seeking injunctive relief to force the MIT administration to take corrective, meaningful action to stop that hate.  There is no basis to dismiss the Coalition's claims on standing grounds.

## VI.    THE COMPLAINT ALLEGES CLAIMS UNDER STATE LAW

The parties agree that the Court should "apply the same legal standards" to the Massachusetts Chapter 151B claims that apply under federal law.  ECF No. 47 at 32.  For the reasons above, therefore, Plaintiffs have sufficiently alleged these claims under Massachusetts law.

## VII.    THE COMPLAINT ALLEGES EMOTIONAL DISTRESS CLAIMS

### A.  Defendants' attempts to evade the merits of Alon's and Sussman's claims should be rejected.

MIT incorrectly asserts that Alon's and Sussman's emotional distress claims are preempted by Massachusetts's antidiscrimination statutes.  *Id.* at 32.  MIT's citations only show that Massachusetts Chapter 151B did not create a new, separate claim.  Rather, these cases expressly hold that common-law claims are still available against an employer.  *Mouradian v. General Elec.*

*Co.*, 23 Mass App. Ct. 538, 542 (1987) ("*Melley*, of course, recognizes that, despite G.L. c. 151B, a plaintiff . . . may have a claim against his employer on some other recognized common law ground"); *see also Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 513 (1985).  Thus, Alon's and Sussman's emotional distress claims may proceed.[10]

MIT also argues that Alon's emotional distress claims are preempted by Massachusetts's workers' compensation laws.  ECF No. 47 at 32–33.  But this preemption applies only when "the injury is shown to have arisen out of and in the course of employment," i.e., the conduct must have furthered the interests of the employer.  *See*, *e.g.*, *Sheldon v. F.W. Webb Co.*, 2025 WL 2778018, at *4 (D. Mass. Sept. 26, 2025); *Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1049 (D. Mass. 1995).  Courts routinely conclude that discrimination underlying an emotional distress claim is not within the scope of an employee's duties.  *See, e.g.*, *Sheldon*, 2025 WL 2778018, at *4–*5 (rejecting notion emotional distress claim is preempted because "Massachusetts courts do not consider unlawful acts of discrimination and retaliation to be within the scope of employment").  Here, MIT does not argue (because it cannot) that DeGraff's harassment of Alon was in the course of employment.  *See* ECF No. 47 at 31–32.  DeGraff was not Alon's supervisor; they did not work in the same department; and while his harassment created a hostile environment for Alon, it had nothing to do with their job duties.  Thus, there is no basis for preemption.

DeGraff seeks to evade Alon's and Sussman's claims by arguing that speech on matters of public concern cannot provide the basis for an emotional distress claim.  As demonstrated above, Plaintiffs' claims are based on actionable harassment, not protected speech.  *Supra* § II; ; *see also Gersh v. Anglin*, 353 F. Supp. 3d 958 (D. Mont. 2018) (denying motion to dismiss IIED claim where defendant used speech on a public matter to "mask an attack" and "exploit[] the prejudice

---

[10] MIT has not moved to dismiss Doe's emotional distress claims.  Thus, these claims proceed.

widely held among his readers to specifically target an individual").

**B. Alon and Sussman have alleged intentional and reckless infliction of emotional distress claims.**

An intentional or reckless infliction of emotional distress claim is comprised of four elements. *See Sindi v. El-Moslimany*, 896 F.3d 1, 21 (1st Cir. 2018); *Agis v. Howard Johnson Co.*, 371 Mass. 140, 142 n.3 (Mass. 1976). MIT and DeGraff contest only two: (1) whether "the conduct was extreme and outrageous," and (2) whether "the emotional distress sustained by Plaintiffs was sufficiently severe." ECF No. 47 at 33; ECF No. 48 at 24–25.

1. <u>Defendants' behavior was extreme and outrageous.</u>

A defendant's "extreme and outrageous conduct may be found in the totality of the circumstances, and does not have to be alleged in a single incident." *Gouin v. Gouin*, 249 F. Supp. 2d 62, 73 (D. Mass. 2003). A professor's harassment of a student can satisfy the extreme and outrageous standard. *Shyr v. Trs. of Bos. Univ.*, 2017 WL 1014999, at *6 (D. Mass. Mar. 13, 2017); *Russell v. Salve Regina Coll.*, 649 F. Supp. 391, 402 (D.R.I. 1986). Moreover, emotional distress claims can proceed to discover where reasonable people could differ on the outrageousness of the alleged conduct. *See, e.g.*, *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (Mass. 1976).

Here, the same conduct underlying Alon's and Sussman's federal claims also satisfies the extreme and outrageous element. DeGraff posted personal details about Alon, falsely vilified him, and even tagged Al Jazeera to draw the Qatari network's attention to him. *See, e.g.*, AC ¶¶ 97, 100. DeGraff harassed Sussman repeatedly through social media, mass emails, and in his seminar. DeGraff encouraged others to harass Alon and Sussman, leading to more harassment. *See, e.g.*, *id.* ¶¶ 98, 122, 125. Both Alon and Sussman informed MIT of their safety concerns resulting therefrom and repeatedly pleaded for MIT's help. *Id.* ¶¶ 104–105, 114, 117, 119, 128, 130, 138, 139, 142, 153. Another professor even pointed out, twice, the "significant power imbalance at

play" between DeGraff and Sussman and that Sussman was "still a student, likely under considerable stress." *Id.* ¶¶ 124, 133. MIT knew that the harassment was so severe that Sussman considered, and ultimately chose to, leave MIT after he was denied support. *Id.* ¶ 153. These allegations are more than enough to state a claim. *See Shyr*, 2017 WL 1014999, at *7.

2.  <u>Defendants' behavior caused severe emotional distress.</u>

Defendants' behavior impacted Alon's mental and emotional health: he has experienced depression, insomnia, fatigue, and panic attacks. AC ¶¶ 165, 445. Sussman's distress prevented him from performing his academic tasks, compelled him to seek mental health counseling, and led him to leave MIT and abandon his PhD program. *Id.* ¶¶ 169–73. This is sufficient to state a claim. *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 67 (D. Mass 2024) (allegations that "could be fairly described as a perpetual fear and anxiety" satisfied emotional-distress element).

**C.  Alon has alleged a negligent inflition of emotional distress claim.**

Negligent inflition of emotional distress has five elements. But, again, MIT and DeGraff only contest two: whether a duty to Alon existed and whether Alon suffered physical harm. ECF No. 47 at 33–34; ECF No. 48 at 26–27. As to duty, both MIT and DeGraff mischaracterize Alon's claim. Alon does not assert that MIT or DeGraff had a duty to take any particular action. Rather, they owed a general duty of care to all people not to engage in negligent behavior that would harm them. *See, e.g.*, *Taylor v. Swartwout*, 445 F. Supp. 2d 98, 105 (D. Mass. 2006); *Wofse v. Horn*, 523 F. Supp. 3d 122, 137 (D. Mass. 2021) (denying summary judgment on NIED claim because defendants who spread misinformation about plaintiff owed a "general duty" to refrain from conduct that creates a risk of harm). MIT also owed a duty to enforce its policies against harassment, which are detailed in the Complaint, and ignored by MIT in its motion. Alon has met the standard to allege emotional distress. *Compare* AC ¶ 445 (stating that Alon suffered "insomnia, fatigue and panic attacks"), *with Madison v. Cruz*, 390 F. Supp. 3d 191, 200 (D. Mass.

47

2019) (allegations of "lack of concentration, migraines, insomnia, and anxiety" satisfied element).

## VIII.    THE COMPLAINT SUFFICIENTLY ALLEGES DEFAMATION

To state a claim of defamation, a plaintiff must allege facts showing that "(1) the defendant published a false statement regarding the plaintiff"; (2) "the statement could damage the plaintiff's reputation"; and (3) "the statement caused economic loss or is otherwise actionable." *Flagg v. AliMed, Inc.*, 466 Mass. 23, 37 (2013). Libel (printed defamation) or statements that "may prejudice the plaintiff's profession or business" are actionable without proof of economic loss. *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003). DeGraff published written statements which falsely attributed comments to Alon in a widely circulated publication to smear Alon's reputation at MIT and in the broader professional community. AC ¶¶ 447–53. These defamatory statements are falsifiable and are, in fact, false. DeGraff's efforts tarnished Alon's reputation while he was applying for academic positions and made it difficult to secure employment; he was denied from all tenure-track positions in the U.S. despite his sterling credentials. *Id.* In response, DeGraff makes three arguments. Each fails.

*First,* DeGraff argues that the statements at issue merely express his opinion that Alon holds unsavory views. D.E. 48 at 21–22. But this argument fails because, in his article, DeGraff put specific words into Alon's mouth. DeGraff stated that Alon "claim[s] that the SAGE's students' pleas to halt the genocide of Palestinians are 'pro-Hamas' and advocate the killing of Jews," citing an interview Alon gave on October 25, 2023. AC ¶ 449. But SAGE, or Scientists Against Genocide Encampment, was not formed until April 2024. *Id.* ¶ 100. Thus, Alon could not have been referring to SAGE or its members in this interview because the group *did not exist*. Further, none of Alon's comments characterized *all* protests purporting to be against genocide as encouraging violence or being pro-Hamas. Rather, Alon's comments focused on protestors' calls for "Intifada" or the "destruction of Israel" as being anti-Semitic or encouraging violence. DeGraff

also falsely stated in the same article that Alon "erases the anti-Zionist Jewish students." *Id.* ¶ 450. But Alon made no statement that "erases" anti-Zionist Jews; in fact, Alon expressly acknowledged that "not every Jewish person is a Zionist." *Id.*

These facts differ from all of DeGraff's cited cases, in which the defendants had offered general impressions of the plaintiffs and their beliefs. *See, e.g.*, *Gurmessa v. Genocide Prevention in Ethiopia, Inc.*, 2024 WL 4604400, at \*1 (D. Del. Sep. 11, 2024) (defendant said plaintiff "supports genocide"); *Piccone v. Bartels*, 785 F. 3d 766, 771 (1st Cir. 2015) ("unprofessional"); *Phantom Touring, Inc. v. Affiliated Publs.*, 953 F.2d 724, 728 (1st Cir. 1992) ("rip-off, fraud, scandal"). DeGraff did not interpret Alon's comments; he misrepresented them and attributed statements to Alon that he did not make. Merely "couching a statement as an opinion" cannot shield DeGraff because his statements "impl[y] the existence of underlying defamatory facts." *Piccone*, 785 F3d at 771. Finally, if there is ambiguity as to whether DeGraff's statements are opinion or fact, "the issue must be left to the jury's determination." *See Hi-Tech Pharms., Inc. v. Cohen*, 277 F. Supp. 3d 236, 244 (D. Mass. 2016), *as amended* (Oct. 28, 2016).

*Second*, DeGraff asserts that Alon is a limited-purpose public figure. The Complaint alleges otherwise. Alon gave two interviews to a news program about anti-Semitic chants he heard on MIT's campus. One was just over three minutes; the other just under six. This minuscule engagement with the press does not establish that Alon "inject[ed] himself into a . . . public controversy" such that he became a public figure. *Alharbi v. TheBlaze, Inc.*, 199 F. Supp. 3d 334, 355–57 (D. Mass. 2016) ("five press interviews over a relatively brief period of time" describing an experience did not constitute a public figure). As in *Alharbi*, Alon was an eyewitness who gave two brief interviews to a single news outlet. In contrast, in each case DeGraff cites for this, the plaintiff asserting defamation was the *subject* of the news item—a relevant player in the

controversy itself, not merely a witness giving a brief interview. *See Lluberes v. Uncommon Prods., LLC*, 663 F3d 6, 13 (1st Cir. 2011); *Gray v St. Martin's Press, Inc.*, 221 F.3d 243, 251 (1st Cir. 2000) (plaintiff was a "central figure in th[e] controversy"); *Pendleton v. City of Haverhill*, 156 F3d 57, 69 (1st Cir. 1998) (plaintiff was the teacher whose own teaching skills were at issue).

*Third*, even if Alon did become a limited-purpose public figure, the Complaint alleges facts showing DeGraff acted "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Here, both negligence and actual malice are easily established by the fact that: DeGraff's false recounting of Alon's comments is contradicted by the content of the videos *DeGraff himself* cites in his article, which depict Alon's *actual* comments; and that DeGraff's efforts to tarnish Alon's reputation were repeated and published in multiple forums. *See* AC ¶¶ 97–103, 449–450, 452.

## CONCLUSION

For the reasons stated, the Court should deny the motions to dismiss. Should the Court find that Plaintiffs have not sufficiently alleged a claim, Plaintiffs request leave to amend.

## REQUEST FOR ORAL ARGUMENT

Given the gravity of the claims alleged, Plaintiffs respectfully request oral argument.

Dated:  December 8, 2025

Respectfully submitted,

**THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW**

By: */s/ Philip Y. Brown*

**THE LOUIS D. BRANDEIS CENTER FOR HUMAN RIGHTS UNDER LAW**
Richard A. Rosen (*pro hac vice*)
Paul M. Eckles (*pro hac vice*)
Rebecca L. Harris (*pro hac vice*)
1675 Broadway, 13th floor
New York, NY 10019
Telephone:  (202) 559-9296
rrosen@brandeiscenter.com
peckles@brandeiscenter.com
rharris@brandeiscenter.com

**BROWN COUNSEL, LLC**
Philip Y. Brown (BBO #552366)
Amelia R. Gray (BBO #675632)
One Marina Park Drive, 1410
Boston, MA 02210
Telephone:  (617) 683-1500
pbrown@browncounsel.com
agray@browncounsel.com

*Attorneys for Plaintiffs*
*William Sussman, Lior Alon, John Doe & The Louis D Brandeis Center Coalition to Combat Anti-Semitism*

**WHITE & CASE LLP**
Jonathan D. Polkes (*pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020-1095
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
jonathan.polkes@whitecase.com

Rachel Rodman (*pro hac vice*)
Mark Davies (*pro hac vice*)
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone: (202) 626-3600
Facsimile:  (202) 639-9355
rachel.rodman@whitecase.com
mark.davies@whitecase.com

Veronica Gordon (*pro hac vice*)
200 S. Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
veronica.gordon@whitecase.com

*Attorneys for Plaintiff*
*The Louis D Brandeis Center Coalition to Combat*
*Anti-Semitism*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that, on December 8, 2025, this document filed through the ECF system will be served electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be served by email and by first class mail postage prepaid, to those indicated as non-registered participants (to the extent there are any) on December 8, 2025.

*/s/ Philip Y. Brown*
Philip Y. Brown